# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| Siemens Gamesa Renewable Energy, ) | |
| ) | |
| Plaintiff, ) | **Court No. 21-00449** |
| ) | |
| v. ) | |
| ) | |
| United States, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| Wind Tower Trade Coalition, ) | |
| ) | |
| Defendant-Intervenor. ) | |

## BRIEF OF PLAINTIFF SIEMENS GAMESA RENEWABLE ENERGY IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

Daniel Cannistra
Simeon Yerokun
Michael Bowen

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
(202) 624-2500

Counsel for Siemens Gamesa Renewable Energy

January 14, 2021

# TABLE OF CONTENTS

**Page**

I. STATEMENT PURSUANT TO RULE 56.2 .................................................................. 2

II. ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE ADMINISTRATIVE DETERMINATION ................................................................... 2

III. STATEMENT OF FACTS .......................................................................................... 3

IV. SUMMARY OF ARGUMENT ................................................................................... 8

V. STANDARD OF REVIEW ....................................................................................... 10

ARGUMENT ......................................................................................................................... 12

I. THE DEPARTMENT'S FAILURE TO CONDUCT AN INDIVIDUAL EXAMINATION OF SGRE IS NOT IN ACCORDANCE WITH LAW ...................... 12

    A. Commerce Is Required by Statute to Individually Examine At Least One Company ............................................................................................................. 13

    B. Commerce Had Both the Time and Resources to Examine SGRE ..................... 18

    C. Commerce's Reasons for Denying to Individually Examine SGRE are Unreasonable ...................................................................................................... 20

    D. The Department's Determination is Contrary to Public Policy ........................... 21

II. THE DEPARTMENT'S REFUSAL TO CONDUCT AN INDIVIDUAL EXAMINATION OF SGRE IS ARBITRARY AND CAPRICIOUS ............................ 23

III. THE DEPARTMENT'S REFUSAL TO EXTEND THE DEADLINES FOR THE PRELIMINARY AND FINAL DETERMINATIONS DESPITE CLAIMED TIME CONSTRAINTS IS ARBITRARY AND CAPRICIOUS ............................................. 26

IV. THE DEPARTMENT'S ASSIGNMENT OF AN ANTIDUMPING DUTY RATE TO ALL PARTIES BASED ENTIRELY ON AFA IS NOT REPRESENTATIVE OF ALL OTHER EXPORTERS AND IS NOT IN ACCORDANCE WITH LAW ...................... 28

V. CONCLUSION ......................................................................................................... 31

CERTIFICATE OF COMPLIANCE ..................................................................................... 1

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*SKF USA Inc. v. United States*,
263 F.3d 1369 (Fed. Cir. 2001)..........................................................................................11

*Albemarle Corp. v. United States*,
821 F.3d 1345 (CAFC 2016) ........................................................................................30, 31

*Am. All. for Hardwood Plywood v. United States*,
392 F. Supp. 3d. 1298 (CIT 2019)........................................................................ 10, 15, 23

*Animal By-Products Imp. & Exp. Corp. v. United States*,
33 CIT {1125 ....................................................................................................................16

*Caribbean Ispat Ltd. v. United States*,
450 F.3d 1336 (Fed. Cir. 2006)..........................................................................................10

*Carpenter Tech. Corp. v. United States*,
33 CIT 1721 (2009)....................................................................................................14, 16

*Cast Iron Soil Pipe Fittings from the People's Republic of China: Initiation of Less-Than-Fair Value Investigations*,
82 FR 37053 (August 8, 2017)......................................................................................23, 24

*Chevron U.S.A., Inc. v. Natural Res. Defense Council*,
467 U.S. 837 (1984) ............................................................................................ 10, 12, 13

*Grobest & I-Mei Indus. (Vietnam) Co. v. United States*,
815 F.Supp 2d. 1342 (CIT 2012) .......................................................................................28

*Husteel Co. v. United States*,
98 F. Supp. 3d 1315 (2015) ...............................................................................................14

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
83 FR 8058 (February 23, 2018)........................................................................................24

*NTN Bearing Corp. v. United States*,
74 F.3d 1204 (Fed. Cir. 1995)...........................................................................................11

*Rhone Poulenc, Inc. v. United States*,
899 F. 2d 1185 (Fed. Cir. 1990).........................................................................................11

*Schaeffler Italia S.r.l. v. United States*,
781 F. Supp. 2d 1358 (Ct. Int'l Trade 2011)........................................................................16

*SNR Roulements v. United States*,
402 F.3d 1358 (Fed. Cir. 2005)..........................................................................................11

*WelCom Prods., Inc. v. United States,*
36 C.I.T. 1336, 865 F. Supp. 2d 1340 (2012) ......................................................... 11

*Wheatland Tube Co. v. United States,*
161 F.3d 1365 (Fed. Cir. 1998) ............................................................................... 11

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States,*
716 F.3d 1370 (Fed. Cir. 2013) ............................................................................... 11

*Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States,*
637 F.Supp. 2d. 1260 (CIT 2009) ....................................................................... 16, 21

**Federal Statutes**

5 U.S.C. § 706(2)(A) ............................................................................................. 23, 26

19 U.S.C. 1673b(c)(1)(B)(ii) ...................................................................................... 26

19 U.S.C. 1673d(a)(2) ................................................................................................ 27

19 U.S.C. 1677f-1(c)(1)-(2) .......................................................................................... 9

19 U.S.C. 1677f-1(c)(2) .............................................................................................. 28

19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and 1516a(a)(2)(B)(iii) ......................................... 1

19 U.S.C. § 1516a(b)(1)(B)(i) .................................................................................... 10

19 U.S.C. § 1673(1)-(2) .............................................................................................. 12

19 U.S.C. § 1673d ........................................................................................................ 2

19 U.S.C. § 1673d(5) .................................................................................................. 13

19 U.S.C. § 1673d(c) .................................................................................................. 30

19 U.S.C. § 1673d(c)(5) ......................................................................................... 28, 29

19 U.S.C. § 1677(d)(1)(A) .......................................................................................... 12

19 U.S.C. § 1677f–1(c) ............................................................................................... 14

19 U.S.C. § 1677f–1(c)(2) .......................................................................................... 15

19 U.S.C. § 1677f–1(c)(2)(B) ..................................................................................... 15

19 U.S.C. § 1677f-1(c) ........................................................................................... 12, 14

19 U.S.C. § 1677f-1(c)(2) .................................................................................. 12, 13, 16

{19 U.S.C. § 1673d(c)(5)(A)} ..................................................................................... 29

Tariff Act of 1930 §§ 516A(a)(2)(A)(i)(I) and 516A(a)(2)(B)(iii) ............................... 1

Tariff Act of 1930 § 777A(c)(1) ............................................................4

Tariff Act § 777A(c)(2) .............................................................4, 5, 16

Tariff Act § 777A(c) ¶ (2) ...............................................................16

**Rules**

Rule 56.2 ....................................................................................1, 2, 31

**Regulations**

19 CFR 351.204(c)(2) .......................................................................4

19 CFR 351.205(b)(2) ......................................................................6, 9

19 CFR 351.210(e)(1)-(2) .................................................................9

86 Fed. Reg. 7619-7633 (Feb. 1, 2021)..............................................22

*Antidumping Duty Order*, 86 Fed. Reg. 45,707 (August 16, 2021)..................2

*Antidumping Duty Order*, 86 Fed. Reg. 45707 (August 16, 2021)..................8

*Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Final Results and Final Determination of No Shipments of Antidumping Duty Administrative Review; 2018–2019*, 84 Fed. Reg. 64,457 (Nov. 22, 2019) .............................25

*Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Preliminary Results, Partial Rescission, and Preliminary Determination of No Shipments, of Antidumping Duty Administrative Review; 2018–2019*, 84 Fed. Reg. 48,109 (Sept. 12, 2019) .......................................25

*Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 Fed. Reg. 11,690 (Mar. 16, 2018) .............................................................25

*Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Rescission, in Part; 2015–2016*, 82 Fed. Reg. 42,281 (Sept. 7, 2017)...........................25

Commerce's Letter, "Utility Scale Wind Towers from Spain: Request to Select Replacement Mandatory Respondent," ................................6, 7

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 Fed. Reg. 36,886 (Jul. 30, 2019) ............................................25

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016– 2017*, 83 Fed. Reg. 67,222 (Dec. 28, 2018) ..........................................................................25

Executive Order 14008.................................................................................................................22

*Initiation Extension*, 85 Fed. Reg. at 65,028.............................................................................27

*Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping and Countervailing Duty Petitions: Utility Scale Wind Towers from India, Malaysia, and Spain*, 85 Fed. Reg. 65,028 (Oct. 14, 2020)..............................................3

Petitioner's Letter, "Utility Scale Wind Towers from India, Malaysia and Spain: Petitions for the Imposition of Antidumping and Countervailing Duties,"...............................3

SGRE's Letter, "Antidumping Duty Investigation of Utility Scale Wind Towers from Spain: SGRE's Case Brief," ............................................................................................7

SGRE's Letter, "Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from Spain: Request for Mandatory Respondent Selection,"..........................................6

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Final Results and Partial Rescission of Review; 2017-2018*, 85 Fed. Reg. 9,459 (Feb. 19, 2020).....................................................................25

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Preliminary Results and Intent To Rescind the Review in Part; 2017–2018*, 84 Fed. Reg. 41,701 (Aug. 15, 2019).....................................25

*Utility Scale Wind Towers from India and Malaysia: Postponement of Preliminary Determinations in the Less-Than-Fair-Value Investigations*, 86 Fed. Reg. 14,071 (March 12, 2021).......................................................................................................................27

*Utility Scale Wind Towers from India, Malaysia, and Spain*, 85 Fed. Reg. 79,217 (Dec. 9, 2020) ...............................................................................................................................4

*Utility Scale Wind Towers from India, Malaysia, and Spain: Initiation of Less Than-Fair-Value Investigations*, 85 Fed. Reg. 73,023 (Nov. 16, 2020)..............................3

*Utility Scale Wind Towers from India: Postponement of Final Determination of Sales at Less Than Fair Value Investigation*, 86 Fed. Reg. 38,274 (July 20, 2021), *et al*.......................................................................................................................................27

*Utility Scale Wind Towers From Spain; Determination*, 86 Fed. Reg. 44,748 (August 13, 2021)..........................................................................................................................7

*Utility Scale Wind Towers from Spain: Final Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 33,656 (June 25, 2021)..............................................................2, 7

*Utility Scale Wind Towers from Spain: Preliminary Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 17,355 (April 2, 2021) ........................................7

Vestas' Letter, "Utility Scale Wind Towers from Spain: Response to Petitioner's
    January 26, 2021 Letter Regarding Industry Support," ........................................22

## Other Authorities

*CISPF Respondent Selection* at 2................................................................................24

Department's *Final Determination* ...............................................................................2

Memorandum, "2016 – 2017 Administrative Review of Multilayered Wood
    Flooring from the People's Republic of China: Selection of Respondents,"............24

Memorandum, "Administrative Review of Multilayered Wood Flooring from the
    People's Republic of China: Selection of Additional Mandatory Respondent," ......24

Memorandum, "Antidumping Duty Investigation of Cast Iron Soil Pipe Fittings
    from the People's Republic of China: Selection of Additional Mandatory
    Respondent,"...........................................................................................................24

Memorandum, "Less-Than-Fair-Value Investigation of Utility Scale Wind Towers
    from Spain: Respondent Selection,"..........................................................................4

Memorandum, "Multilayered Wood Flooring from the People's Republic of China:
    Extension of Deadline for Preliminary Results of Antidumping Administrative
    Review; 2016-2017,".................................................................................................24

Memorandum, "Tolling of Deadlines for Antidumping and Countervailing Duty
    Administrative Reviews,".........................................................................................27

Uruguay Round Agreements Act, H.R. Doc. No. 103–316 (1994), reprinted in 1994
    U.S.C.C.A.N. 4040..................................................................................................29

White House, FACT SHEET: *President Biden Sets 2030 Greenhouse Gas Pollution
    Reduction Target Aimed at Creating Good-Paying Union Jobs and Securing
    U.S. Leadership on Clean Energy Technologies* (April 22, 2021) .........................23

*YC Rubber Co. (North America) LLC, et al., v. United States*,
    Case No. 21-1489 (CAFC 2021)...............................................................9, 16, 17, 18

## Suspects

Section 732(c)(1)(B) ......................................................................................................3

"Respondent Selection" section......................................................................................3

*Id*. at 6.........................................................................................................................4

section 735(a)(2)(A)..................................................................................................9, 26

602 F.3d at 1323 ..........................................................................................................11

33 CIT...........................................................................................................................16

1727-32}, 662 F. Supp. 2d 1337, 1342- 46 (2009) ...................................................16

*Id.* ........................................................................................................................25

Section 733(c)(1) ...................................................................................................26

Section 1673b(d) ...................................................................................................28

Section 1677e .................................................................................................28, 29

Article 9.4 .............................................................................................................29

Section 219(b) .......................................................................................................29

Section 735(c)(5)(A) .............................................................................................29

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

|  |  |  |
|---|---|---|
| Siemens Gamesa Renewable Energy, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Court No.  21-00449 |
| v. | ) | |
| | ) | |
| United States, | ) | |
| | ) | |
| Defendant, | ) | |
| and | ) | |
| | ) | |
| Wind Tower Trade Coalition, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

## BRIEF OF PLAINTIFF SIEMENS GAMESA RENEWABLE ENERGY IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

Plaintiff Siemens Gamesa Renewable Energy ("SGRE") files this brief in support of its Rule 56.2 Motion for Judgment on the Agency Record in accordance with the Rules of this Court, and pursuant to this Court's Scheduling Order of December 14, 2021.  As discussed below, Plaintiff SGRE has moved for judgment on the agency record, challenging the U.S. Department of Commerce's ("Department" or "Commerce") *Final Determination* as an abuse of discretion and otherwise not in accordance with law.

Pursuant to sections 516A(a)(2)(A)(i)(I) and 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended (the "Act"), 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and 1516a(a)(2)(B)(iii), Plaintiff brings this action to contest, as unreasonable and not in accordance with law, the

Department's *Final Determination*. Particularly, SGRE challenges the Department's: (i) refusal to conduct an individual examination of SGRE; (ii) refusal to conduct an individual examination of a single exporter; (iii) refusal to extend the deadlines for the preliminary and final determinations despite claimed time constraints, and; (iv) imposition of an AD order and assignment of a rate to all exporters based on adverse facts available ("AFA") in the absence of an individual examination of a single exporter.

Because the Department's *Final Determination* is unreasonable and is not otherwise in accordance with the law, Plaintiff respectfully requests that this Court remand the underlying administrative determination and instruct the Department to reconsider its findings on the issues challenged by Plaintiff.

## I.     **STATEMENT PURSUANT TO RULE 56.2**

The administrative determination under review is Commerce's final affirmative determination under 19 U.S.C. § 1673d as implemented in the antidumping duty order on utility scale wind towers from Spain ("wind towers") (case nos. A-469-823/731-TA-1545). *See Utility Scale Wind Towers from Spain: Antidumping Duty Order*, 86 Fed. Reg. 45,707 (August 16, 2021) (the *Order*); *see also Utility Scale Wind Towers from Spain: Final Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 33,656 (June 25, 2021), and accompanying Issues and Decision Memorandum ("*Final Determination*") (June 14, 2021).

## II.     **ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE ADMINISTRATIVE DETERMINATION**

1.     Whether the Department's failure to conduct an individual examination of SGRE precluded the Department from fulfilling its statutory obligation and is not in accordance with law?

2.     Whether the Department's refusal to conduct an individual examination of

SGRE is arbitrary and capricious?

3.      Whether the Department's refusal to extend the deadlines for the preliminary and final determinations despite the Department's claimed time constraints is arbitrary and capricious?

4.      Whether the Department's imposition of an AD order and assignment of a rate to all exporters based entirely on AFA, in the absence of an individual examination of a single exporter, is not in accordance with law?

## III.   **STATEMENT OF FACTS**

On September 30, 2020, Defendant-Intervenor Wind Tower Trade Coalition filed a petition with Commerce for the imposition of antidumping duties on imports of wind towers from Spain.[1] On October 7, 2020, Commerce extended the initiation deadline by 20 days to poll the domestic industry, in accordance with section 732(c)(1)(B) of the Act, because the Petition, as filed, failed to establish that the domestic producers or workers accounting for more than 50 percent of total production supported the Petition.[2]  Thereafter, on November 9, 2020, the Department initiated the investigation.[3]

In the "Respondent Selection" section of the *Initiation Notice*, Commerce stated its intent to select respondents based on U.S. Customs and Border Protection ("CBP") data for entries of wind towers from Spain over the period of investigation ("POI").  In light of subsequent comments received, specifically, that the CBP data was flawed due to mixed units of measure, on November 25, 2020, Commerce determined to issue quantity and value ("Q&V")

---

[1] *See* Petitioner's Letter, "Utility Scale Wind Towers from India, Malaysia and Spain: Petitions for the Imposition of Antidumping and Countervailing Duties," dated September 30, 2020 (Petition).
[2] *See Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping and Countervailing Duty Petitions: Utility Scale Wind Towers from India, Malaysia, and Spain*, 85 Fed. Reg. 65,028 (Oct. 14, 2020) (*Initiation Extension*).
[3] *See Utility Scale Wind Towers from India, Malaysia, and Spain: Initiation of Less Than-Fair-Value Investigations*, 85 Fed. Reg. 73,023 (Nov. 16, 2020) (*Initiation Notice*).

questionnaires to prospective respondents. This event resulted in a *de facto* extension of the time necessary to select mandatory respondents in this investigation.

On December 4, 2020, the U.S. International Trade Commission ("ITC") preliminarily determined that there was a reasonable indication that an industry in the United States is materially injured by reason of imports of wind towers from Spain.[4]

On December 23, 2020, Commerce identified the Q&V of exports of wind towers from Spain reported by all responsive companies. This demonstrated that SGRE was the second largest exporter of subject merchandise for the period of investigation ("POI").[5] However, in the accompanying *Respondent Selection* memorandum, Commerce stated: "after consideration of the complexity of the issues involved in this investigation, we find that we have the resources to examine individually one mandatory respondent."[6]

Commerce selected Vestas Eolica, S.A.U. (Vestas) as the single mandatory respondent based on its purported status as the largest exporter of subject merchandise during the POI. This selection was made 45 calendar days after initiation of the investigation.[7]

Commerce indicated that, Section 777A(c)(1) of the Tariff Act of 1930, as amended (the "Act"), Commerce is directed to determine an individual weighted-average dumping margin for *each known exporter and producer of the subject merchandise.* However, Commerce stated that it may limit its examination to a *reasonable number* of exporters or producers under section 777A(c)(2) of the Act and 19 CFR 351.204(c)(2), *if it determines that it is not practicable to*

---

[4] *See Utility Scale Wind Towers from India, Malaysia, and Spain*, 85 Fed. Reg. 79,217 (Dec. 9, 2020).
[5] *See* Memorandum, "Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from Spain: Respondent Selection," dated December 23, 2020 (*Respondent Selection* Memorandum).
[6] *Id*. at 6.
[7] We note that although Vestas Eolica, S.A.U. and Vestas Manufacturing submitted combined Q&V information, in light of the Department's practice to not conduct collapsing analyses at the respondent selection stage, Commerce treated these two companies as separate entities for purposes of respondent selection. *See Respondent Selection* Memorandum at 1.

*determine individual weighted-average dumping margins because of the large number of exporters or producers involved in the investigation.*[8]

The *Respondent Selection* memorandum further stated: "Ideally, in an investigation, Commerce would examine all known exporters and producers. However, in instances where Commerce must limit its examination due to the large number of potential respondents relative to its resource constraints, Commerce will examine *as many exporters and producers as is practicable*, consistent with its statutory obligation."[9] The memorandum concluded by stating that while section 777A(c)(2) of the Act does not define a "large number of exporters or producers," Commerce found that the number of exporters and producers included in the Petition and CBP data constituted a large number.

Based on a subjective assessment of its resources, Commerce concluded that it would not be practicable in this investigation to examine and determine an individual weighted average dumping margin for each exporter and producer. By way of explanation, Commerce stated that "AD/Countervailing Duty (CVD) Operations Office V," the office to which this investigation was assigned, was conducting numerous other AD and CVD proceedings. Commerce claimed that this particular investigation would be complex, and when combined with overlapping statutory deadlines of other AD and CVD proceedings, as well as Office V's additional workload, it would place burdens on the number of analysts that could be assigned to this case. Thus, Commerce could reasonably examine only a limited number of respondents.[10] Commerce then selected Vestas as the sole mandatory respondent in this investigation.

Roughly two months prior to the un-extended preliminary determination, Vestas notified

---

[8] *See Respondent Selection* Memorandum.
[9] *Id*.
[10] *Id*.

the Department on January 28, 2021, of its intent to withdraw from the investigation, without having filed a single questionnaire response. Vestas submitted the letter to Commerce with notice of its intent to no longer participate as a mandatory respondent in this investigation on behalf of Vestas and its affiliates (including Vestas Manufacturing).[11]

SGRE, which was initially identified by Commerce as the second largest exporter, thus became the largest and only remaining fully participating exporter of subject merchandise in this investigation. However, despite this fact, Commerce at no time prior to the preliminary determination notified SGRE that it would be selected as either 1) a mandatory respondent or 2) as a replacement mandatory respondent once Vestas advised Commerce of its intent to no longer participate.

Instead, on February 17, 2021, SGRE was forced to submit its own request to Commerce specifically requesting that Commerce select SGRE as a mandatory respondent as the next largest and only other known exporter, in accordance with the statute and established practice, in light of Vestas' withdrawal.[12] SGRE pointed out that if Commerce was burdened by Vestas' withdrawal and did not view the remaining months sufficient to complete the investigation, it could also exercise its statutory power to extend its preliminary determination deadline by 50 days, as provided in 19 CFR 351.205(b)(2).[13]

On March 5, 2021, Commerce informed SGRE that it had decided not to select SGRE as a replacement mandatory respondent, and that it would neither conduct an individual examination of SGRE, nor extend the deadline for the preliminary determination.[14] Instead,

---

[11] *See* Vestas' Letter, "Utility Scale Wind Towers from Spain: Notice of Decision to Not Participate in the Investigation," dated January 28, 2021 (Vestas' Withdrawal Letter).
[12] *See* SGRE's Letter, "Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from Spain: Request for Mandatory Respondent Selection," dated February 17, 2020 (SGRE's Request Letter).
[13] *Id*.
[14] *See* Commerce's Letter, "Utility Scale Wind Towers from Spain: Request to Select Replacement Mandatory Respondent," dated March 5, 2021 (Commerce's Denial Letter).

Commerce would proceed with no individual examination of any exporter.[15]

On March 29, 2021, Commerce made an affirmative preliminary determination of sales at less than fair value based entirely on adverse facts available ("AFA"), having not conducted an individual examination of a single exporter in the investigation.[16]

On May 3, 2021, SGRE submitted an administrative case brief for the *Final Determination*, requesting the Department to reconsider its refusal to individually examine SGRE, and extend the deadlines for the preliminary and final determinations.[17]

On June 25, 2021, Commerce issued a final affirmative antidumping duty determination with respect to wind towers from Spain, once again based entirely on AFA.[18] Commerce assigned an AD margin of 73.00% to all producers based on facts available with adverse inferences.[19] Commerce derived this rate directly from the Petition, and did not corroborate this rate with any source data, stating: "Due to the nature of wind tower sales and the industry, actual prices and quotes were unavailable to determine calculations."[20]

On August 9, 2021, the Commission made determinations that an industry in the United States is materially injured by reason of imports of wind towers from Spain to be sold in the United States at less than fair value.[21]

Commerce issued the antidumping duty order on wind towers from Spain on August 16,

---

[15] *Id.*

[16] *See Utility Scale Wind Towers from Spain: Preliminary Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 17,355 (April 2, 2021) and accompanying Issues and Decision Memorandum ("IDM") (March 29, 2021).

[17] See SGRE's Letter, "Antidumping Duty Investigation of Utility Scale Wind Towers from Spain: SGRE's Case Brief," dated May 3, 2021 (SGRE's Case Brief).

[18] *See Utility Scale Wind Towers from Spain: Final Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 33,656 (June 25, 2021), and accompanying IDM (June 14, 2021). *See also Preliminary Determination* and accompanying IDM.

[19] *Id.*

[20] *See Preliminary Determination* and accompanying IDM at 8.

[21] *See Utility Scale Wind Towers From Spain; Determination*, 86 Fed. Reg. 44,748 (August 13, 2021).

2021.[22]

IV.    **SUMMARY OF ARGUMENT**

The Department erred by imposing an AD order (and rate of 73.00 percent) on wind towers from Spain after having failed to conduct a single individual examination, despite the fact that SGRE – a fully participating exporter – timely requested such an individual examination, with ample time remaining and resources available, as soon as it became clear Commerce would not act in accordance with the statute and its established practice.  This egregious outcome was the culmination of a series of unlawful, arbitrary and capricious actions by the Department, including: 1) selecting only one respondent for individual examination, and not selecting SGRE as a replacement once that respondent withdrew from the investigation; 2) refusing to extend the deadlines for the preliminary and final determinations despite claimed time constraints; and 3) imposing an AD order with a rate based entirely on AFA despite having failed to conduct an individual examination of a single exporter.

Commerce's failure to select a replacement mandatory respondent after Vestas stated its intent to no longer participate, resulting in the imposition of an AD order based entirely on AFA, is not in accordance with the law.  Once the Department's intent to not select a replacement respondent became clear, SGRE timely requested individual examination, in light of the imminent and extreme prejudicial impact of the assignment of an AD rate based entirely on AFA, despite SGRE itself having fully participated and complied with Commerce's requests for information.  Nonetheless, the Department declined SGRE's request, proffering two excuses to justify that outcome: time and resources.  However, as explained in its February 17, 2020 letter and more fully below, the facts of this case very clearly do not support the Department's

---

[22] *See Utility Scale Wind Towers from Spain: Antidumping Duty Order*, 86 Fed. Reg. 45707 (August 16, 2021) (the *Order*).

manifest arbitrary and capricious administration of the investigation in this respect. Simply put, Commerce had ample time and available resources to conduct an individual examination of SGRE.

Moreover, Commerce had both the authority and obligation to extend one or both of the determination deadlines. With respect to the preliminary determination, Commerce is within its discretion to extend this deadline by up to 50 days when 1) the petitioner requests; or 2) the Secretary determines the investigation is extraordinarily complicated.[23] Here the latter consideration was established by Commerce's own appraisal regarding the investigation's complexity which, incongruously, Commerce attempted to use to justify its decision *not* to extend the deadline.[24] Additionally, at the request of an exporter, Commerce *must* extend final determinations that follow affirmative preliminary determinations, up to 60 days, unless the Department "finds compelling reasons to deny the request."[25] Here, Commerce failed to articulate **any** reason for its decision to deny SGRE's request to extend the *Final Determination*.

Further, Commerce is charged under the statute with determining individual dumping margins for each known exporter. Only when it is not practicable to determine individual margins for each exporter, the statute provides that Commerce may limit its examination to a "reasonable number of exporters."[26] This privilege is not without limits, and the statute does not differentiate between investigations and reviews when setting the parameters of this authority.[27] This Court has already contended with the question of whether a "reasonable number" as described may be defined as two or more, and this question is currently on appeal.[28]

---

[23] *See* 19 CFR 351.205(b)(2).
[24] *See* Commerce's Denial Leter.
[25] *See* 19 CFR 351.210(e)(1)-(2). *See also* section 735(a)(2)(A) of the Act.
[26] *See* 19 U.S.C. 1677f-1(c)(1)-(2).
[27] *Id.*
[28] *See YC Rubber Co. (North America) LLC, et al., v. United States*, Case No. 21-1489 (CAFC 2021), appeal from U.S. CIT Case No. 19-00068.

Nevertheless, it is indisputable that a "reasonable" number of exporters must at least be one. Here, despite the ample time and resources available, Commerce failed to meet that statutory duty.

Finally, obvious public policy concerns counsel against issuing an AD order without a legitimate examination of a single exporter, in addition to pressing claims in equity. Despite SGRE's request, in addition to its ongoing readiness, willingness, and ability to respond, and the ample time and resources at Commerce's disposal, the Department has nonetheless concluded that it would be preferable to irreversibly issue an AD order and base the rate for all exporters of wind towers from Spain on a gratuitous Petition rate instead.

## V. <u>STANDARD OF REVIEW</u>

In appeals of final determinations, the Court shall hold unlawful and remand any administrative determination by Commerce that is "unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i). In order to review whether Commerce's interpretation of a statute is in accordance with the law, the Court follows the two-step test of *Chevron U.S.A., Inc. v. Natural Res. Defense Council*, 467 U.S. 837, 842-45 (1984). First, the Court determines "whether Congress has directly spoken to the precise question at issue." *Id*. at 842. If Congress's intent is clear, the Court must give effect to that unambiguously expressed intent. *Id*. at 842-43. Second, if the statute is silent or ambiguous with respect to the precise question, the Court must determine whether the agency's interpretation of the statute is a permissible construction. *Id*. at 843. The Court may defer to the agency's interpretation only if it is reasonable, procedurally sufficient, and consistent with agency policy. *Caribbean Ispat Ltd. v. United States*, 450 F.3d 1336, 1340 (Fed. Cir. 2006).

Further, agency action is arbitrary and capricious if the agency offers insufficient reasons for treating similar situations differently. *Am. All. for Hardwood Plywood v. United*

10

*States*, 392 F. Supp. 3d. 1298, 1371 (CIT 2019). Specifically, "Courts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998). "{A}n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently*," SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001), and "{a}n abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represent an unreasonable judgment in weighing relevant factors." *WelCom Prods., Inc. v. United States*, 36 C.I.T. 1336, 1341, 865 F. Supp. 2d 1340, 1344 (2012).

Lastly, when the Court reviews the imposition of an antidumping duty, the dumping margin must be examined for its accuracy and fairness even where Commerce acted in conformity with its statutory and regulatory obligations. *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995). Commerce's rate calculations must be designed to accurately reflect the respondent's true dumping margin. *See, e.g., Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible"); *Gallant Ocean*, 602 F.3d at 1323 (a rate must be a "reasonably accurate estimate of the respondent's actual rate") (internal quotation marks and citations omitted); *SNR Roulements v. United States*, 402 F.3d 1358, 1363 (Fed. Cir. 2005) ("Antidumping laws intend to calculate antidumping duties on a fair and equitable basis"); *Rhone Poulenc, Inc. v. United States*, 899 F. 2d 1185, 1191 (Fed. Cir. 1990) (the "basic purpose of the statute" is to "determin{e} current margins as accurately as possible").

**ARGUMENT**

I. <u>**THE DEPARTMENT'S FAILURE TO CONDUCT AN INDIVIDUAL**</u>
<u>**EXAMINATION OF SGRE IS NOT IN ACCORDANCE WITH LAW**</u>

Commerce's decision to deny an individual examination of SGRE once Vestas withdrew from the investigation is not in accordance with law. Specifically, under *Chevron*, Congress's intent with respect to the AD statute is clear – Commerce must conduct an individual examination of at least one exporter prior to the imposition of an AD order. Here, Commerce failed to conduct an individual examination, and instead relied entirely on a single margin alleged in the Petition under AFA as the basis for the imposition of the AD order on wind towers from Spain.

With respect to the imposition of AD orders, 19 U.S.C. § 1673(1)-(2) instructs Commerce to investigate the extent an individual foreign exporter's U.S. selling prices are lower than "normal value" which in turn reflects the estimated dumping "margin" and, ultimately, the rates at which entered merchandise will be assessed duties. *See also* 19 U.S.C. § 1677(d)(1)(A). Reflecting the need for accuracy, 19 U.S.C. § 1677f-1(c) explicitly instructs that "the administering authority {Commerce} shall determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise." The statute, however, also contains a narrow, practical consideration exception. 19 U.S.C. § 1677f-1(c)(2) effectively recognizes that Commerce might not have the resources to undertake an investigation and calculate an AD margin for each known exporter in every case. The statute therefore further provides that, when there are a "large number of exporters or producers involved in the investigation or review," Commerce may limit its examination to a "reasonable number of exporters" when it is not practicable to determine individual margins for each known exporter. *See* 19 U.S.C. § 1677f-1(c)(2). If that precondition is met, reflecting the need for representativeness, the Department may select companies "accounting for the largest volume" of subject merchandise from the exporting country

12

that can reasonably be examined. *Id*. These calculated rates are then imputed to all other exporters of the subject merchandise. *See* 19 U.S.C. § 1673d(5). In any event, when there are exporters involved or participating in an investigation or review, an individual examination of at least one of those exporters must be conducted.

As discussed, when reviewing whether Commerce's interpretation of a statute is in accordance with the law, the Court follows the principles of *Chevron*. Under this test, the Court must determine "whether Congress has directly spoken to the precise question at issue," and if so, the Court "must give effect to the unambiguously expressed intent of Congress." *See Chevron*, 467 U.S. at 843. In this case, the agency action under review is Commerce's decision to impose an AD order, and assign a rate based entirely on AFA, without having conducted an individual examination of a single exporter. However, Congress's expressed intent is unambiguous: Commerce must conduct an individual examination prior to imposing an AD order when there are known, involved exporters ready and willing to participate in such an examination. Indeed, an individual examination of a "reasonable number of exporters," as expressed in the statute, cannot be zero – it must at least be one.

### A. Commerce Is Required by Statute to Individually Examine At Least One Company

The statute requires that Commerce individually examine at least one company prior to the imposition of an AD order when there are known exporters or producers involved in the investigation. As a general matter, the statute entitles each known exporter and producer participating in an investigation to be individually examined and assigned a company-specific margin of dumping:

**(c) Determination of dumping margin**

**(1) General rule**

> In determining weighted average dumping margins under section 1673b(d), 1673d(c), or 1675(a) of this title, the administering authority shall determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise.

19 U.S.C. § 1677f-1(c) (emphasis added).  The statute provides a limited exception to this general rule in cases where there is a "large number" of exporters or producers under investigation.  In that case, Commerce may limit its examination "to a reasonable number of exporters or producers":

> **(2) Exception**
>
> If it is not practicable to make individual weighted average dumping margin determinations under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to—
>
> **(A)** a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority at the time of selection, or
>
> **(B)** exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.

19 U.S.C. § 1677f–1(c) (emphasis added).  This Court has observed that "limiting the number of individually examined respondents is intended to be the exceptional circumstance, not the norm." *Carpenter Tech. Corp. v. United States*, 33 CIT 1721, 1731 (2009) (citing *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731-32 (1995)).  It has also emphasized that "the statute expresses a general preference that each exporter or producer receive its own margin." *Husteel Co. v. United States*, 98 F. Supp. 3d 1315, 1329 (2015) (emphasis added).  In light of this language, the governing law establishes a strong presumption that Commerce will examine all companies subject to the investigation, and provides only narrow exceptions in which Commerce can invoke limiting its examinations.

Moreover, Commerce's authority to limit examinations in the first instance is only triggered when the number of participating exporters or producers is "large." 19 U.S.C. § 1677f–1(c)(2). Here, the record demonstrates, effectively, only two participating exporters, Vestas Eolica S.A.U. with its affiliate Vestas Manufacturing, and SGRE. *See Respondent Selection* memorandum at Attachment. However, Commerce nevertheless chose initially to limit its individual examination to just one exporter, presumably because Commerce determined that this exporter constituted a large "volume of subject merchandise from the exporting country." 19 U.S.C. § 1677f–1(c)(2)(B). Nevertheless, the statute requires that this consideration does not, and should not, enter Commerce's calculus at the respondent selection phase until the first question, *i.e.*, whether or not the number of participating exporters is in fact a "large number," may be answered in the affirmative. In this case, to put it plainly, Commerce put the cart before the horse in determining to initially select only one exporter for individual examination, without having first reasonably and accurately concluded that the number of participating exporters was in fact "large." In so doing, Commerce effectively created the predicament in which it claimed to find itself.[29]

Moreover, just as "two" exporters or producers cannot be reasonably interpreted as a "large" number under the statute, **_zero_** companies cannot be reasonably interpreted from statutory language requiring individual examinations of a plural number of "exporters and producers." To allow such an interpretation would expand Commerce's authority under the specific limiting exception to envelop the general requirement of conducting an individual examination of **_all_** known participating exporters and producers. In any case, SGRE does not contest Commerce's ability to invoke the exception permitting the agency to limit its individual examination to a "reasonable number of exporters or producers" when there is in fact a "large number" of known

---

[29] Nevertheless, as will be explained more fully below, ample time and resources remained to resolve this purported predicament prior to the preliminary and final determinations.

exporters participating in an investigation.  What SGRE contests is Commerce's failure to conduct an individual examination entirely once the single exporter Commerce initially selected for individual examination withdrew from the investigation.

In *Schaeffler Italia S.r.l. v. United States*, 781 F. Supp. 2d 1358, 1362-63 (Ct. Int'l Trade 2011), this Court determined that:

> In using the terms "reasonable number of exporters or producers" and "large number of exporters or producers" in section 777A(c)(2) of the Tariff Act, Congress has directly spoken to the precise question at issue. The plural term "reasonable number of exporters or producers," read according to its plain meaning, does not encompass a quantity of one. 19 U.S.C. § 1677f-1(c)(2) (emphasis added). Nor may the term "large number of exporters or producers," *id*. (emphasis added), plausibly be construed to mean any number of exporters   or producers greater than two. *See Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States*, 33 CIT {1125, 1129-30}, 637 F. Supp. 2d 1260, 1264-65 (2009); *Carpenter Tech. Corp. v. United States*, 33 CIT {1721, 1727-32}, 662 F. Supp. 2d 1337, 1342- 46 (2009). Not only does the Department's implied construction violate plain meaning, it so elevates the "{e}xception" of paragraph (2) of section 777A(c) of the Tariff Act as to render meaningless the "{g}eneral rule" of paragraph (1) of the provision.

Similarly, in *YC Rubber*, recently argued before the Court of Appeals for the Federal Circuit, that Court explicitly took issue with similar, though less egregious action by Commerce. In that case, Commerce initially selected two respondents for individual examination in an administrative review, although the second respondent shortly thereafter withdrew from participation.  Commerce failed to select an additional, replacement mandatory respondent, and the sole remaining mandatory respondent received an individual rate of 73.63 percent.  This rate was then assigned to all other, "separate rate" respondents.   The separate rate respondents challenged Commerce's failure to select a replacement mandatory respondent for the second initially-selected company, and Commerce's decision to base the separate rate only on the one participating company's data.

At the Federal Circuit, Commerce argued that the agency's regulations give it broad authority to limit the number of companies that are individually probed and that the statute does not expressly say the agency has a "continuing obligation" to rely on data from more than one mandatory respondent to establish the dumping margin.[30]  In response, however, the Court stated that the statute suggests Commerce should examine data from a "reasonable number of exporters or producers" and that "it does not seem to suggest {a reasonable number is} at all one."[31] When asked  whether that is a fair reading of the statute, the government stated: "…it's fair that it is stated in the plural…"[32] The Court further questioned: "How do you do a weighted average for one {respondent}?...There's no real task of averaging if there's only one {respondent}. Right?"[33] However, the back-and-forth by the *YC Rubber* Court demonstrates no debate, nor dispute, as to whether Commerce must at least examine "one" exporter.  The issue in that case concerned whether Commerce should examine *more* than one exporter.

Here, Commerce did not assign rates to all other exporting entities based on the data from only one single respondent, as in *YC Rubber*, a decision itself which caused such consternation at the Court of Appeals for the Federal Circuit.  No, in this case, Commerce failed to conduct even a single individual examination.  Instead, Commerce assigned to all other exporting entities rate of 73.00 percent based solely on a single margin alleged in the Petition as total AFA.  Moreover, Commerce made this decision not in an administrative review, as in *YC Rubber*, but in an ***investigation***.  Indeed, the only basis for the imposition of the AD order on wind towers from

---

[30] *YC Rubber* Oral Argument Transcript at 14 (Akers).
[31] *YC Rubber* Oral Argument Transcript at 14 (Judge Prost).
[32] *YC Rubber* Oral Argument Transcript at 14 (Akers).
[33] *YC Rubber* Oral Argument Transcript at 15 (Judge Prost).

Spain at this time is a single margin alleged in the Petition, for which Commerce admittedly was unable to meaningfully corroborate with source data.[34]

In light of prior case law and the Court's sentiment expressed in *YC Rubber*, it is clear that Commerce is not permitted to impose an AD order where there was no examination of a single exporter, given that another participating exporter remained ready and willing for such an examination. However, in defiance of the law, that is exactly what the agency did in this matter. Therefore, respectfully, the Court must remand this case with instructions to conduct an individual examination of SGRE in accordance with the statute.

### B.     Commerce Had Both the Time and Resources to Examine SGRE

With respect to the question regarding available time and resources, the Department expressly stated it possessed "the resources to examine individually one mandatory respondent."[35] Once Vestas stated its intent to no longer participate, Commerce could and should have directed those resources to an individual examination of SGRE, which stood ready to respond fully to Commerce's requests for information. Indeed, Vestas never submitted a single response to the antidumping duty questionnaire, and therefore, the Department cannot claim that its resources would have somehow been further expended by simply re-allocating those same resources to an analysis of SGRE in the same proceeding. Moreover, based on Q&V responses, SGRE likely had fewer shipments for Commerce to review. *See Respondent Selection* Memorandum at Attachment. Therefore, the record demonstrates that an individual examination of SGRE would in fact likely require even fewer resources than Commerce initially allocated for Vestas.

---

[34] *See Preliminary Determination* and accompanying IDM at 8.
[35] *See Respondent Selection* Memorandum at 6.

Further, at the time of Vestas' notice of non-participation, there were still ***two months*** prior to the ***un-extended*** deadline for the preliminary determination.[36] As noted, this deadline could have been extended by an additional 50 days, allowing the better part of four months (or roughly 16 weeks) to render a preliminary determination based on SGRE's data. It was therefore more than reasonable for SGRE to presume at that point that the Department would itself select the next largest exporter, in accordance with its regular practice when faced with similar circumstances. As soon as it became apparent that the Department would not take this action on its own, SGRE submitted its request for individual examination. At the time of SGRE's request, there were still ***six weeks*** until the deadline for the ***un-extended*** preliminary determination, and another 75 days before the also un-extended deadline for the final determination. This is a total of 135 days for an individual examination, not including the statutorily-prescribed extensions specifically intended for circumstances such as these – which will be more fully addressed below.

**Timeline of Actions in Investigation**

| Date | Event |
|---|---|
| *January 28, 2021* | *Vestas Withdrawal* |
| Feb 17, 2021 | SGRE Request for Selection as Mandatory Respondent |
| March 5, 2021 | Commerce Declines SGRE Request |
| **March 29, 2021** | **Un-Extended Preliminary Determination Deadline** |
| *May 17, 2021* | *Extended Preliminary Determination Deadline* |
| **June 14, 2021** | **Un-Extended Final Determination Deadline** |
| *August 13, 2021* | *Extended Final Determination Deadline* |

---

[36] *See* Vestas' Withdrawal Letter.

Considering the allowable extensions, Commerce had more than six months to conduct an individual examination of SGRE. Therefore, Commerce had both the time and resources to conduct a fulsome individual examination of SGRE in this investigation.

### C. Commerce's Reasons for Denying to Individually Examine SGRE are Unreasonable

In its March 5, 2021 letter declining to select SGRE as mandatory respondent, Commerce stated that SGRE's delay in requesting individual examination resulted in a loss of valuable time to seek and analyze the necessary information.[37] As noted, Vestas withdrew from participation in this investigation on January 28, 2021. SGRE in turn submitted its request that Commerce select SGRE as a mandatory respondent on February 17, 2021. A mere *13 business days* had passed between the time Vestas withdrew and SGRE submitted its request to Commerce. It is unreasonable for Commerce to claim that a period of 13 business days resulted in a loss of valuable time to seek and analyze the necessary information in this investigation. Indeed, Commerce took exactly 13 business days itself to respond to SGRE's request in kind.

Further, in that very same letter, Commerce claimed that SGRE did not seek to participate as a voluntary respondent and had it done so, it would have provided Commerce with a questionnaire response for SGRE at a far earlier date. This flies in the face of Commerce's own declarations made earlier in investigation. In its *Respondent Selection* memorandum, Commerce stated that, after consideration of the complexity of the issues involved in this investigation, it found that it had the resources to examine individually one mandatory respondent – Vestas. What Commerce then claimed in its March 5, 2021 response is that SGRE should have ignored Commerce's declaration selecting only Vestas, and should have submitted a questionnaire response anyway, despite Commerce already stating that it would not consider such a response.

---

[37] *See* Commerce's Denial Letter.

Commerce further ignored the impact that the COVID-19 pandemic would have on a first-time respondent's ability and incentive to submit a wholly voluntary response in this case, for which counsel would be unable to provide on-site assistance, especially in light of Commerce's statement that such a submission would be entirely futile. In any case, SGRE stood ready for an individual examination by Commerce in accordance with the statute – and indeed timely requested such an examination – as soon as Vestas declared its non-participation.

In addition, as this Court has held, Commerce may not rely upon its workload in deciding that individual examinations are impracticable. Specifically, in this context, "Commerce cannot rewrite the statute based on its staffing issues." *See Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States*, 637 F.Supp. 2d. 1260, 1263-4 (CIT 2009). However, Commerce did just that in this investigation. In its *Respondent Selection* memorandum, Commerce stated that: "in addition to this investigation, the AD/Countervailing Duty (CVD) Operations Office V, the office to which this investigation was assigned, was conducting numerous concurrent AD and CVD proceedings and the complexity of the investigation, combined with overlapping statutory deadlines of other AD and CVD proceedings, as well as Office V's additional workload, placed a significant constraint on the number of analysts that can be assigned to this case and, thus, limited the number of respondents Commerce could reasonably examine."[38] While such factors may be allowable considerations in determining the "reasonable number" of respondents to individually examine, they cannot uphold a failure to conduct even a single examination.

### D. The Department's Determination is Contrary to Public Policy

In its January 28, 2021 letter withdrawing from participation in the investigation, Vestas asserted that petitioner's dumping allegations were meritless and lacked any credibility. *See*

---

[38] *See Respondent Selection* Memorandum at 6.

Vestas' Withdrawal Letter. Vestas attributed its withdrawal solely to petitioner's longstanding pattern of vexatious administrative litigation to choke competition and force competitors to expend extraordinary resources to defend open markets and healthy supply chains. Indeed, Vestas subsequently challenged the Department's initial determination of the share of the domestic industry support regarding the Petitions. *See* Vestas' Letter, "Utility Scale Wind Towers from Spain: Response to Petitioner's January 26, 2021 Letter Regarding Industry Support," dated February 5, 2021. Under these circumstances, the refusal by Commerce to replace Vestas with a ready and willing alternative respondent is especially unjustifiable.

Indeed, Commerce's decision to embrace petitioner's untested allegations, imposing an industry-wide 73.00 percent duty, without having conducted a single individual examination, is indefensible on public policy grounds. Aside from the concerns in equity, Commerce's failure to adhere to its statutory responsibilities in this case effectively creates a monopoly in the market for clean energy, making wind energy less competitive against conventional fossil-based energy sources, which runs counter to U.S. emission reduction goals, and conflicts with the Administration's call for federal agencies to facilitate the development and expansion of renewable energy projects by all means.

Specifically, on January 27, 2021, President Biden issued an Executive Order placing a high priority on clean energy and the environment, and calling for the construction of a new American infrastructure and a clean energy economy that will create millions of new jobs. *See* Executive Order 14008, dated January 27, 2021, "Tackling the Climate Crisis at Home and Abroad," 86 Fed. Reg. 7619-7633 (Feb. 1, 2021). In particular, the President's Order commits the government to expand opportunities for the offshore wind industry, and directs agencies to identify ways to double offshore wind output in the next decade. The Administration has set a goal of 30

gigawatts (GW) of offshore wind power capacity in U.S. waters by 2030. *See* The White House, FACT SHEET: *President Biden Sets 2030 Greenhouse Gas Pollution Reduction Target Aimed at Creating Good-Paying Union Jobs and Securing U.S. Leadership on Clean Energy Technologies* (April 22, 2021).[39]

In this case, Commerce should be instructed to perform its Congressionally-mandated function. Commerce's decisions to 1) refuse to conduct an individual investigation of a single exporter, 2) adopt the untested dumping margin plied by petitioners, and 3) impose that margin as AFA on all exporters industry-wide, is an egregious administrative outcome in terms of public policy. Plaintiff submits that in all cases – not least where the industry is supportive of the Administration's emission reduction goals – the statutory procedures prescribed by law must be followed.

II. **THE DEPARTMENT'S REFUSAL TO CONDUCT AN INDIVIDUAL EXAMINATION OF SGRE IS ARBITRARY AND CAPRICIOUS**

Commerce's refusal to conduct an individual examination of SGRE is arbitrary and capricious. Agency action is arbitrary and capricious if the agency offers insufficient reasons for treating similar situations differently. *Am. All. for Hardwood Plywood v. United States*, 392 F. Supp. 3d. 1298, 1371 (CIT 2019); 5 U.S.C. § 706(2)(A). The Department routinely selects additional mandatory respondents in similar situations – generally, the next largest exporter. In this proceeding, despite Vestas' withdrawal, the Department refused to select the next largest and only other known exporter, SGRE, for individual examination. For example, in the AD investigation of *Cast Iron Soil Pipe Fittings from China*, Commerce undertook a similarly

---

[39] Available at https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/22/fact-sheet-presidentbiden-sets-2030-greenhouse-gas-pollution-reduction-target-aimed-at-creating-good-paying-union-jobs-andsecuring-u-s-leadership-on-clean-energy-technologies/.

prolonged respondent selection process.[40] In that case, Commerce selected *three* companies for individual examination based on Q&V questionnaire responses, and did not issue the Department's AD questionnaire until 41 days after initiation.[41] One of the largest exporters of subject merchandise selected for individual examination subsequently stated its intent to no longer participate.[42] Commerce therefore selected an additional mandatory respondent for individual examination, based in part on its previous declaration regarding the "resources to examine individually three mandatory respondents."[43]

Additionally, in the 2016-2017 AD administrative review of *Multilayered Wood Flooring from China*, Commerce did not select mandatory respondents until 117 calendar days after initiation.[44] However, one of the two selected mandatory respondents was subsequently excluded from the order.[45] Nevertheless, *158 days* after initiation, Commerce proceeded to select another mandatory respondent, at that point just 38 days prior to the deadline for the preliminary results.[46] Notably, due to the complexities of that review, Commerce eventually extended the date for the preliminary results, as it was similarly within its discretion to do so here.[47]

---

[40] *See* Memorandum, "Antidumping Duty Investigation of Cast Iron Soil Pipe Fittings from the People's Republic of China: Selection of Additional Mandatory Respondent," dated September 19, 2017 (*CISPF Respondent Selection*). *See also Cast Iron Soil Pipe Fittings from the People's Republic of China: Initiation of Less-Than-Fair Value Investigations,* 82 FR 37053 (August 8, 2017).

[41] *See* Commerce's Letter re: Antidumping Duty Questionnaire to Shanxi Xuanshi Industrial Group, Co., Ltd., dated September 13, 2017.

[42] *See CISPF Respondent Selection* at 2.

[43] *Id*.

[44] *See* Memorandum, "2016 – 2017 Administrative Review of Multilayered Wood Flooring from the People's Republic of China: Selection of Respondents," dated June 19, 2018. *See also Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 83 FR 8058 (February 23, 2018).

[45] *See* Memorandum, "Administrative Review of Multilayered Wood Flooring from the People's Republic of China: Selection of Additional Mandatory Respondent," dated July 30, 2018 at 2.

[46] *Id*. at 3. "Given that sufficient time remains before the scheduled date of our preliminary determination… we find that it is feasible to select as an additional mandatory respondent the exporter or producer which accounts for the next largest volume of subject merchandise during the POR."

[47] *See* Memorandum, "Multilayered Wood Flooring from the People's Republic of China: Extension of Deadline for Preliminary Results of Antidumping Administrative Review; 2016-2017," dated August 2, 2018.

Therefore, as illustrated, if Commerce routinely selects *additional* mandatory respondents, in cases where other entities remained as fully participating mandatory respondents – still allowing for a lawful calculation of a dumping margin representative of the non-selected entities – and further, if Commerce is willing to extend agency determinations due to prolonged respondent selection processes and other unique complexities as evident in this case, it stands to reason that Commerce would do the same in an ***investigation*** under the circumstances presented, where no other initially-selected mandatory respondents remained and the prejudicial impact on SGRE stood to be that much greater.[48]

Further, the Department failed to articulate sufficient reasons for its refusal to conduct an individual examination in this proceeding. Specifically, the Department claimed that insufficient time remained for issuing questionnaires, obtaining and analyzing responses, and preparing the preliminary determination.[49] Additionally, the Department claimed that numerous other ongoing proceedings limited Commerce's ability to select a replacement mandatory respondent. *Id*. However, at the time of Vestas' withdrawal, two months remained prior to the un-extended

---

[48] *See also  Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Final Results and Final Determination of No Shipments of Antidumping Duty Administrative Review; 2018–2019*, 84 Fed. Reg. 64,457 (Nov. 22, 2019); *Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Preliminary Results, Partial Rescission, and Preliminary Determination of No Shipments, of Antidumping Duty Administrative Review; 2018–2019*, 84 Fed. Reg. 48,109 (Sept. 12, 2019); *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Final Results and Partial Rescission of Review; 2017-2018*, 85 Fed. Reg. 9,459 (Feb. 19, 2020); *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Preliminary Results and Intent To Rescind the Review in Part; 2017–2018*, 84 Fed. Reg. 41,701 (Aug. 15, 2019) and accompanying Preliminary Decision Memorandum; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 Fed. Reg. 36,886 (Jul. 30, 2019); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016–2017*, 83 Fed. Reg. 67,222 (Dec. 28, 2018) and accompanying Preliminary Decision Memorandum; *Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 Fed. Reg. 11,690 (Mar. 16, 2018); *Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Rescission, in Part; 2015–2016*, 82 Fed. Reg. 42,281 (Sept. 7, 2017) and accompanying Preliminary Decision Memorandum.
[49] *See* Commerce's Denial Letter.

deadline for the preliminary determination, and an additional 75 days prior to the un-extended final

determination. This time was in addition to the statutorily-prescribed extensions available to the

Department. Moreover, while Commerce itself relied upon "the complexity of the issues involved

in this investigation"[50] to justify its initial determination to select only one mandatory respondent

in the first place, apparently this would not be a sufficient reason to extend the regulatory deadlines

despite Commerce's claimed time constraints. Further, the Department already declared in the

*Respondent Selection* memorandum its ability, and available resources, to individually examine

one mandatory respondent. Therefore, the reasons as articulated by the Department are at odds

with the facts and established Department practice, and do not offer sufficient justification for

treating this situation differently, as required by 5 U.S.C. § 706(2)(A).

Thus, the Department's refusal to select SGRE as an additional mandatory respondent and

failure to conduct an individual examination of a single exporter in this investigation is arbitrary

and capricious.

III. **THE DEPARTMENT'S REFUSAL TO EXTEND THE DEADLINES FOR THE PRELIMINARY AND FINAL DETERMINATIONS DESPITE CLAIMED TIME CONSTRAINTS IS ARBITRARY AND CAPRICIOUS**

Section 733(c)(1) of the Act permits Commerce to postpone the preliminary determination

by an additional 50 days when the parties concerned are cooperating, the investigation is

extraordinarily complicated, and additional time is needed to make a preliminary determination.[51]

Further, section 735(a)(2)(A) of the Act states that Commerce must postpone a final determination

by an additional 60 days where, in the case of an affirmative preliminary determination, exporters

---

[50] *See Respondent Selection* Memorandum at 6.
[51] 19 U.S.C. 1673b(c)(1)(B)(ii).

or producers who account for a significant proportion of exports, submit such a request and there are no compelling reasons to deny the request.[52]

With respect to the preliminary determination, SGRE was a fully cooperating party, and the Department claimed that additional time may have been needed to make a determination.[53] Moreover, the Department already cited extraordinary complexities in this investigation when determining to extend the statutory deadline to initiate the investigation (*See Initiation Extension*, 85 Fed. Reg. at 65,028), and in outlining its reasons to limit individual examination to a single exporter (*See Respondent Selection* memorandum at 6) in the first place.

The Department further failed to articulate a single reason for denying SGRE's request to extend the final determination, despite the affirmative preliminary determination. *See* SGRE's Case Brief at 5. *See also Final Determination,* and accompanying IDM at 4-8. Moreover, the Department routinely extends such determinations when faced with similar circumstances, as shown in the companion proceedings in this very investigation. *See, e.g.*, *Utility Scale Wind Towers from India and Malaysia: Postponement of Preliminary Determinations in the Less-Than-Fair-Value Investigations*, 86 Fed. Reg. 14,071 (March 12, 2021); *Utility Scale Wind Towers from India: Postponement of Final Determination of Sales at Less Than Fair Value Investigation*, 86 Fed. Reg. 38,274 (July 20, 2021), *et al.* Indeed, the Department twice recently tolled all deadlines for the preliminary and final determinations in every ongoing antidumping and countervailing duty administrative review due to the COVID-19 pandemic, first by 50 days and later by an additional 60 days. *See* Memorandum, "Tolling of Deadlines for Antidumping and Countervailing Duty Administrative Reviews," dated April 24, 2020 and July 21, 2020, respectively.

---

[52] 19 U.S.C. 1673d(a)(2).
[53] *See Respondent Selection* Memorandum.

The Department failed to articulate sufficient reasons for refusing to extend the period remaining for these determinations, despite Commerce's past practice in this respect, SGRE's requests, and the broad statutory discretion to do so. Therefore, the Department's refusal to extend the deadlines for the preliminary and/or final determinations despite the Department's claimed time constraints as required by the statute is arbitrary and capricious. *See Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 815 F.Supp 2d. 1342, 1365 (CIT 2012) ("…Commerce has discretion to both set and enforce its deadlines…).

## IV.  THE DEPARTMENT'S ASSIGNMENT OF AN ANTIDUMPING DUTY RATE TO ALL PARTIES BASED ENTIRELY ON AFA IS NOT REPRESENTATIVE OF ALL OTHER EXPORTERS AND IS NOT IN ACCORDANCE WITH LAW

As stated above, the statute provides that Commerce may limit its examination to a "reasonable number of exporters" only when it is not practicable to determine individual margins for each known exporter. 19 U.S.C. 1677f-1(c)(2). This understanding of Congressional intent concerning the nature of the respondent selection process under the limiting exception is further reinforced elsewhere in the statute – in particular with respect to the provision followed by Commerce in assigning margins of dumping to companies not individually investigated (*i.e.*, the all-others rate). 19 U.S.C. § 1673d(c)(5) establishes the method for determining an all-others rate in this circumstance:

**(5) Method for determining estimated all-others rate**

**(A) General rule**

For purposes of this subsection and section 1673b(d) of this title, the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under section 1677e of this title.

**(B) Exception**

If the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or de minimis margins, or are determined entirely under section 1677e of this title, the administering authority may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated.

19 U.S.C. § 1673d(c)(5) (emphasis added).

Speaking in the plural, Congress intended that the "all others" and separate rate margins should generally be determined as weighted-average of the multiple margins calculated for the individually examined companies, exclusive of margins based entirely on adverse facts available or zero or de minimis margins. *See also* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103–316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201 ("SAA") ("Recognizing the impracticality of examining all producers and exporters in all cases, Article 9.4 of the Antidumping Agreement permits the use of an all others rate to be applied to non-investigated firms. To implement the Agreement, section 219(b) of the bill adds section 735(c)(5)(A) to the Act {19 U.S.C. § 1673d(c)(5)(A)} which provides that the all others rate will be equal to the weighted-average of the individual dumping margins calculated for those exporters and producers that are individually investigated, exclusive of any zero and de minimis margins, and any margins determined entirely on the basis of the facts available. Currently, in determining the all others rate, Commerce includes margins determined on the basis of the facts available.") Commerce's decision in this investigation to assign a rate to all parties based solely on AFA, and not a single exporter's data, was directly contrary to the text of the statute as described above.

Congress clearly did not intend for Commerce's examination of companies to be merely "optional." The statute specifies further that in determining an all-others rate, Commerce should "{average} the estimated weighted average dumping margins determined for the exporters and producers individually investigated." 19 U.S.C. § 1673d(c). It is not possible to "average" a single data point, or for that matter, **_no_** data points as in this case. Commerce's interpretation of this provision therefore impermissibly takes the instruction to "average" multiple dumping margins out of the statute. Indeed, Commerce's interpretation of the provision that it is not required to conduct even a single examination of participating exporters reads the statute *ad absurdum*.

Commerce's action also violated the statutory and precedential requirement for representativeness. In instances where Commerce cannot individually examine all producers and exporters, the representativeness of investigated exporters constitutes the justification for an "all-others" rate. As stated in *Albemarle Corp. v. United States*, 821 F.3d 1345 (CAFC 2016), the very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters. The statute assumes that, absent evidence to the contrary, reviewing a limited number of exporters will enable Commerce to reasonably approximate the margins of all known exporters. As such, "{t}he representativeness of the investigated exporters is the essential characteristic that justifies an 'all others' rate based on a weighted average for such respondents." *Id.*

In this case, once the largest exporter declared its intent to no longer participate as a mandatory respondent, the Department declined to select the next largest exporter, SGRE, as the replacement mandatory respondent for examination. Instead, the Department issued a final affirmative antidumping duty determination based on a single, untested margin alleged in the Petition as total AFA. Indeed, in selecting this rate, Commerce admitted the record was woefully

incomplete as to corroborate this margin in meaningful any way: "Due to the nature of wind tower sales and the industry, actual prices and quotes were unavailable to determine calculations."[54] This statement stands in stark contrast to SGRE's timely request for individual examination six weeks prior. Had Commerce simply acted in accordance with the statute, and its established practice, actual prices and cost data would have been made available to the Department – in SGRE's questionnaire responses. Commerce then would have been able to determine an accurate and representative margin for both SGRE and all-other exporters. However, Commerce curiously failed to consider SGRE's data in this case.

Thus, Commerce's imposition of an AD order and assignment of a rate to all parties based entirely on AFA, in the absence of an individual examination of a single exporter, is not representative of all other exporters, and is not in accordance with law and directly contrary to the Court's determination in *Albemarle*.

V.       **CONCLUSION**

For the reasons set forth herein, Plaintiff, Siemens Gamesa Renewable Energy, respectfully submits that its Rule 56.2 Motion for Judgment on the Agency Record should be granted.

Respectfully submitted,

Daniel Cannistra
Simeon Yerokun
Michael Bowen

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595

---

[54] *See Preliminary Determination* and accompanying IDM at 8.

(202) 624-2500
*Counsel for Siemens Gamesa*
*Renewable Energy*

Dated: January 14, 2022

**CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 10,947 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2017 used to prepare this brief.

Respectfully submitted,

Daniel Cannistra
Simeon Yerokun
Michael Bowen

Counsel for Siemens Gamesa
Renewable Energy