A-469-823
Remand
Slip Op. 23-18
POI:  7/1/2019 – 6/30/2020
**Public Document**
E&C/OV:  Team

***Siemens Gamesa Renewable Energy v. United States*,**
**621 F. Supp. 3d 1337 (CIT 2023)**
**Utility Scale Wind Towers from Spain**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.   SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the opinion and remand order of the U.S. Court of International

Trade (the CIT) issued in *Siemens Gamesa Renewable Energy v. United States*, 621 F. Supp. 3d

1337 (CIT 2023) (*Remand Order*).  This litigation concerns the final determination in the less-

than-fair-value (LTFV) investigation of utility scale wind towers (wind towers) from Spain.[1]

The CIT remanded Commerce's decision not to individually examine Siemens Gamesa

Renewable Energy (SGRE) and stated that "that unlawful decision must be remedied by an

individual investigation" of SGRE.[2]

Therefore, pursuant to the *Remand Order*, Commerce has now individually investigated

SGRE.  In the course of this individual investigation, Commerce has determined that:  (1) SGRE

is affiliated with another producer and exporter of wind towers in Spain, Windar Renovables

S.A. (Windar), under section 771(33)(E) of the Tariff Act of 1930, as amended (the Act);[3] and

---

[1] *See Utility Scale Wind Towers from Spain:  Final Determination of Sales at Less Than Fair Value*, 86 FR 33656
(June 25, 2021) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[2] *See Remand Order*, 621 F. Supp. 3d at 1349.
[3] *See* Memorandum, "Preliminary Affiliation and Collapsing Memorandum for Siemens Gamesa Renewable Energy
S.A. and Windar Renovables S.A.," dated April 25, 2023 (Collapsing Memorandum).

(2) it is appropriate to treat SGRE and Windar (and certain Windar subsidiaries)[4] as a single entity, because their operations with respect to the sale and production of subject merchandise are intertwined.[5]

      Windar received an individual dumping margin of 73.00 percent, based on the application of adverse facts available (AFA), for purposes of the *Final Determination*[6] and this decision was not challenged before Commerce or the CIT.  Therefore, consistent with Commerce's practice, we have applied that rate (*i.e.*, 73.00 percent) to the SGRE/Windar entity, which includes SGRE. This results in no change to the all-others rate.

## II.    BACKGROUND

      Commerce initiated its LTFV investigation of wind towers from Spain on November 9, 2020.[7]  On December 23, 2020, Commerce selected Vestas Eolica S.A.U. (Vestas Eolica) as the sole company to receive a full questionnaire in the investigation.[8]  On January 28, 2021, Vestas Eolica notified Commerce that it was ceasing participation in the proceeding.[9]  Although SGRE subsequently requested that it be selected as a replacement respondent,[10] Commerce determined that it was unable to grant SGRE's request.[11]  Consequently, Commerce preliminarily assigned SGRE the rate for companies not selected for individual examination, *i.e.*, 73.00 percent.[12]

---

[4] These subsidiaries are:  Tadarsa Eolica SL; Windar Offshore SL; Windar Wind Services SL; Aemsa Santana SA; and Apoyos Metalicos SA.  *Id*.  In the Collapsing Memorandum, Commerce noted that the names of these wholly owned subsidiaries would be made public as part of the collapsing decision, and no party objected to this approach.

[5] *Id*.

[6] *See Utility Scale Wind Towers from Spain:  Antidumping Duty Order*, 86 FR 45707, 45708 (August 16, 2021).

[7] *See Utility Scale Wind Towers from India, Malaysia, and Spain:  Initiation of Less-Than-Fair-Value Investigations*, 85 FR 73023 (November 16, 2020).

[8] *See* Memorandum, "Respondent Selection," dated December 23, 2020.

[9] *See* Vestas Eolica's Letter, "Notice of Decision to Not Participate in the Investigation," dated January 28, 2021.

[10] *See* SGRE's Letter, "Request for Mandatory Respondent Selection," dated February 17, 2021.

[11] *See Final Determination* IDM at Comment 1.  At the time of SGRE's request, only 40 days remained before the statutory deadline for the *Preliminary Determination* of March 29, 2021.  *See Utility Scale Wind Towers from Spain: Preliminary Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 17354, 17355 (April 2, 2021) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

[12] *See Preliminary Determination* PDM; *see also Final Determination* IDM at Comment 1.

Separately, Commerce assigned an individual rate based on AFA to five companies (including Windar) for failing to respond to Commerce's quantity and value (Q&V) questionnaire.[13] Commerce made no changes to its *Preliminary Determination* with respect to its treatment of SGRE and Windar in the *Final Determination.*[14]

      SGRE subsequently appealed Commerce's *Final Determination* to the CIT, arguing that: (1) Commerce unlawfully refused to examine SGRE individually and, thereby, failed to examine a reasonable number of exporters; and (2) Commerce's assignment of an all-others rate on the basis of a single exporter (*i.e.*, Vestas Eolica), which received a rate based on AFA, was unreasonable.[15]   The CIT ultimately agreed with SGRE, holding that Commerce's selection of a single respondent, and its decision not to select SGRE as a replacement respondent, was unlawful pursuant to intervening precedent from the U.S. Court of Appeals for the Federal Circuit (Federal Circuit), in *YC Rubber*.[16]   Consequently, the CIT remanded to Commerce to individually examine SGRE and to ensure that the "all others" rate is determined in a reasonable manner.[17]

---

[13] *See Final Determination* IDM at Comment 2; *see also, e.g.*, *Organic Soybean Meal from India:  Final Affirmative Determination of Sales at Less Than Fair Value*, 87 FR 16458 (March 23, 2022) (*Soybean Meal from India*), and accompanying IDM at 5 ("Nine companies did not respond to the Q&V questionnaire, despite confirmation that this questionnaire was successfully delivered to them. … Accordingly, for this final determination, we find that the use of facts available is warranted in determining the dumping margin for these companies, pursuant to sections 776(a)(1) and (a)(2)(A)-(C) of the Act."); and *Certain Lined Paper Products from India:  Preliminary Results of Antidumping Duty Administrative Review; Rescission of Administrative Review, in Part; and Preliminary Determination of No Shipments; 2020-2021*, 87 FR 60650 (October 6, 2022) (*Lined Paper from India Preliminary*), and accompanying PDM at 8 ("Because {Magic International Pvt. Ltd. and Marisa International} did not file timely responses to Commerce's Q&V questionnaire, we are applying adverse facts available (AFA) to both companies for these preliminary results"), unchanged in *Certain Lined Paper Products from India:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021*, 88 FR 21971 (April 12, 2023) (*Lined Paper from India Final*).
[14] *See Preliminary Determination* PDM at 5; and *Final Determination* IDM at 8.
[15] *See Remand Order* at 12-13.
[16] *Id.* at 22 (citing *YC Rubber Co. (North America) LLC v. United States*, Court No. 21-1489 (Fed. Cir. 2022) (*YC Rubber*)).
[17] *See Remand Order* at 23.

Consistent with the *Remand Order*, on February 17, 2023, we reopened the administrative record and issued our standard antidumping duty (AD) questionnaire to SGRE.[18] On March 10, 2023, in its response to section A of the AD questionnaire (*i.e.*, the section related to general information about a company), SGRE:  (1) explained, for the first time, the full scope of its relationship with its "co-producer" Windar, detailing the companies' relationship and overlapping operations; and (2) stated its intention to file a consolidated response on behalf of itself, Windar, and Windar's subsidiaries.[19]

On March 28, 2023, Commerce requested additional information from SGRE related to its corporate structure and relationship with Windar.[20]  SGRE provided a portion of this information on March 30, 2023, and the remainder on April 3, 2023.[21]

On March 30, 2023, Commerce directed SGRE not to provide information sourced from Windar, and instructed SGRE to limit its reporting to the company's own information.[22]  SGRE, nonetheless, filed a joint response to the remaining sections of Commerce's questionnaire, all of which contained Windar's information.[23]  Because SGRE submitted an unsolicited questionnaire response containing extensive data sourced from Windar, we rejected SGRE's response and afforded SGRE an opportunity to resubmit it in the form and manner requested in our March 30, 2023, instruction.[24]  SGRE resubmitted this information on April 14, 2023.[25]

---

[18] *See* Commerce's Letter, "Antidumping Questionnaire," dated February 17, 2023 (AD Questionnaire).
[19] *See* SGRE's Letter, "Siemens Gamesa Renewable Energy Section A Questionnaire Response," dated March 10, 2023 (SGRE March 10, 2023 AQR).
[20] *See* Commerce's Letter, "Section A Supplemental Questionnaire," dated March 28, 2023.
[21] *See* SGRE's Letters, "Siemens Gamesa Renewable Energy Section A Supplemental Questionnaire Response," dated March 30, 2023 (SGRE March 30, 2023 SQR); and "Siemens Gamesa Renewable Energy Section A Supplemental Questionnaire Questions 1-22," dated April 3, 2023 (SGRE April 3, 2023 SQR).
[22] *See* Memorandum, "Submission of Questionnaire Response," dated March 30, 2023.
[23] *See* Memorandum, "Reject and Remove Sections B through D Questionnaire Response," dated April 11, 2023.
[24] *Id.*
[25] *See* SGRE's Letter, "Resubmission of Sections B-D," dated April 14, 2023.  On April 20, 2023, Commerce requested additional cost data from SGRE, related to our treatment of Windar as an affiliated producer, in light of the fact that we had not yet collapsed SGRE and Windar; SGRE submitted this information on April 26, 2023.  *See*

On April 25, 2023, Commerce issued a memorandum preliminarily finding that SGRE and Windar are affiliated under section 771(33)(E) of the Act and determining that the companies should be treated as a single entity pursuant to 19 CFR 351.401(f).[26]  At this time, we also solicited comments from interested parties on this determination.

On May 1, 2023, we received comments from SGRE and the petitioner[27] in this proceeding.[28]  In their comments, both SGRE and the petitioner agreed with Commerce's decision to treat SGRE, Windar, and Windar's affiliates as a single entity.[29]  Further, the petitioner argued that Commerce should include additional SGRE affiliates in the SGRE/Windar single entity, and it made various arguments with respect to the reporting requirements in this segment of the proceeding.[30]

On May 10, 2023, Commerce issued its Draft Results.[31]  On May 12, 2023, the petitioner and SGRE/Windar submitted comments on the Draft Results.[32]  On May 17, 2023, the CIT issued an order extending the deadline for filing these final results of redetermination; in doing so, the CIT directed the agency to provide interested parties an additional opportunity to

---

Commerce's Letter, "Section D Supplemental Questionnaire," dated April 20, 2023; *see also* SGRE's Letter, "Section D Supplemental Questionnaire Response," dated April 26, 2023.

[26] *See* Collapsing Memorandum.

[27] The petitioner is the Wind Tower Trade Coalition.

[28] *See* SGRE's Letter, dated May 1, 2023 (SGRE May 1, 2023 Comments); *see also* Petitioner's Letter, "Comments on Preliminary Affiliation and Collapsing Memo," dated May 1, 2023 (Petitioner May 1, 2023 Comments).

[29] *See* SGRE May 1, 2023 Comments; and Petitioner May 1, 2023 Comments.

[30] *Id*.

[31] *See* Draft Results of Redetermination Pursuant to Court Remand, *Siemens Gamesa Renewable Energy v. United States*, Court No. 21-00449, Slip Op. 23-18 (CIT February 16, 2023), dated May 10, 2023 (Draft Results).  On May 11, 2023, the United States also filed a motion with the CIT for a 30-day extension of the deadline for Commerce to file its final remand redetermination with the Court.

[32] *See* Petitioner's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated May 12, 2023 (Petitioner May 12, 2023 Comments); and SGRE/Windar's Letter, "Comments on Draft Remand Determination," dated May 12, 2023 (SGRE/Windar May 12, 2023 Comments).

comment on the Draft Results.  The petitioner and SGRE submitted additional comments on May 24, 2023.[33]

## III.   ANALYSIS

As detailed above, we preliminarily determined that SGRE and Windar (and certain Windar subsidiaries) comprise the SGRE/Windar entity.[34]  SGRE agreed with that determination.[35]  Further, despite arguing that Commerce should expand this entity to include SGRE's parent company, the petitioner did not question the central premise of the finding itself – that SGRE and Windar are affiliated and act in concert with respect to the production and sale of subject merchandise.[36]  As a result, we have determined that SGRE and Windar comprise a single entity.

That determination (*i.e.*, that SGRE, Windar, and certain Windar subsidiaries comprise the SGRE/Windar entity) significantly impacts our analysis on remand.  Specifically, our examination of SGRE is, *by necessity*, inextricably intertwined with our findings with respect to Windar, a company for which Commerce made a final determination, and to which Commerce assigned an individual final dumping margin, albeit an AFA rate, of 73.00 percent.

Commerce's practice when collapsing two companies into a single entity, where one of the constituent companies has an existing AFA rate, is to assign the existing rate to the collapsed entity.[37]  As we explained in *Nails from Malaysia CCR*:

---

[33] *See* Petitioner's Letter, "Supplemental Comments on Draft Results of Redetermination Pursuant to Court Remand," dated May 24, 2023 (Petitioner May 24, 2023 Comments); and SGRE/Windar's Letter, "Comments on Draft Remand Determination," dated May 24, 2023 (SGRE/Windar May 24, 2023 Comments).

[34] *See* Collapsing Memorandum.

[35] *See* SGRE/Windar May 1, 2023 Comments.

[36] *See* Petitioner Comments.

[37] *See, e.g.*, *Certain Steel Nails from Malaysia:  Final Results of the Changed Circumstances Review*, 82 FR 34476 (July 25, 2017) (*Nails from Malaysia CCR*), and accompanying IDM at Comment 3; and *Aluminum Extrusions from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 76 FR 18524 (April 4, 2011), and accompanying IDM at Comment 5 (*aff'd Zhaoqing New Zhongya Aluminum Co. v United States*, 887 F. Supp. 2d 1301, 1310 (CIT 2012) (*New Zhongya Aluminum*)).

The fact that the Inmax Sdn's AD cash deposit rate is based on AFA is irrelevant. Inmax Sdn was investigated and received an AFA rate, which was not judicially challenged. Inmax Sdn cannot use a related company to produce and sell subject merchandise as a shield to prevent the application of its AFA rate by claiming that the newly producing company has not been found to have cooperated to the best of its ability. Such an interpretation would undermine the effect of any order. Respondents who received high rates during a proceeding could merely set up production and sales in another related company to obtain the benefits of a lower all-others rate.

…

In accordance with past precedent, we find that when the decision has been made to collapse entities, {Commerce} must consider the actions of one member of the entity to represent the actions of the whole because the intent of collapsing entities is to prevent potential manipulation that may arise with orders. *In this regard, it is {Commerce's} practice that, even if we made an AFA determination with respect to one member of a collapsed entity, that AFA decision would apply to the entire entity.*[38]

Commerce's practice, in this regard, has been upheld by the CIT.[39] As the court explained in

*New Zhongya Aluminum*:

When calculating a rate for a collapsed entity, Commerce's practice is to apply AFA to the entire entity when one producer within it fails to cooperate.

…

Plaintiffs do not challenge Commerce's established practice of applying AFA to the entire collapsed entity when one company within it has met the statutory requirements for warranting an AFA rate. Nor do they challenge Commerce's finding that Xinya was not responsive to Commerce's AD questionnaires. … {I}t was therefore proper for Commerce to apply AFA to the entire collapsed entity.[40]

That practice is directly applicable here.

---

[38] *See Nails from Malaysia CCR* IDM at Comment 3 (emphasis added).
[39] *See, e.g.*, *New Zhongya Aluminum*, 887 F. Supp. 2d at 1310 (citing *Notice of Final Determination of Sales at Less Than Fair Value:  Bicycles from the People's Republic of China*, 61 FR 19026, 19036 (April 30, 1996) (*Bicycles from China*) ("If any company fails to respond, the entire entity receives a rate based on facts available."); and *Light-Walled Rectangular Pipe and Tube from Turkey:  Notice of Final Determination of Sales at Less Than Fair Value*, 69 FR 53675, 53677 (September 2, 2004) (*Pipe and Tube from Turkey*)).
[40] *See New Zhongya Aluminum*, 887 F. Supp. 2d at 1310-11.

In the underlying LTFV investigation, Windar received an AFA rate for failing to respond to Commerce's Q&V questionnaire,[41] in accordance with our practice.[42]  Consistent with section 776(b)(1) of the Act, as AFA, we assigned Windar a margin of 73.00 percent – the highest margin alleged in the petition.[43]  Although Windar's rate was not challenged before Commerce or the CIT, Commerce highlights that, as explained in the *Preliminary Determination* PDM, Windar's rate is based on a finding that it "withheld information requested by Commerce, failed to provide information by the specified deadlines, and significantly impeded the proceeding by failing to respond to our Q&V questionnaires."[44]  Commerce further elaborated in its final determination that "{i}t is standard practice to assign margins based on AFA to companies that fail to respond to Q&V questionnaires, and Commerce has done so regularly, including in recent investigations."[45]  Because Windar received an unchallenged 73.00 percent dumping margin, and SGRE is collapsed with Windar, both companies are subject to a single rate.

Regarding the rate for entities not selected for individual examination (the "all-others" rate), pursuant to section 735(c)(5)(B) of the Act, if the estimated weighted-average dumping margins established for all exporters and producers individually examined are zero, *de minimis*, or determined entirely under section 776 of the Act, Commerce may use any reasonable method to establish the estimated weighted-average dumping margin for all other producers or exporters. The Act specifies that such a method includes "averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated,"[46] which

---

[41] *See* Commerce's Letter, "Quantity and Value Questionnaire," dated November 25, 2020 (Q&V Questionnaire).
[42] *See, e.g.*, *Soybean Meal from India* IDM at 5; and *Lined Paper from India Preliminary* PDM at 8, unchanged in *Lined Paper from India Final*.
[43] *See Final Determination*, 86 FR at 33657.
[44] *See Preliminary Determination* PDM at 5.
[45] *See Final Determination* IDM at 8.
[46] *See* section 735(c)(5)(B) of the Act.

is identified in the SAA as the "expected method."[47]  As the rate assigned to the SGRE/Windar entity (and, therefore, for all individually-examined exporters and producers) is determined entirely under section 776 of the Act, Commerce continues to use the only dumping margin alleged in the Petition (*i.e.*, 73.00 percent) as the all-others rate.[48]

## IV.    INTERESTED PARTY COMMENTS

As noted above, on May 12, 2023, and on May 24, 2023, the petitioner and SGRE/Windar submitted comments on the Draft Results.[49]  We address these comments below.

*SGRE/Windar Comments*

- Commerce's Draft Results are inconsistent with the *Remand Order*, because they fail to address the concerns of the CIT regarding respondent selection in light of the recent Federal Circuit precedent in *YC Rubber*.  In *YC Rubber*, the Federal Circuit held that Commerce must investigate more than one exporter for a respondent selection method to be reasonable.[50]

- Commerce did not properly conduct an individual investigation of SGRE, as instructed by the CIT, because it did not allow SGRE to fully respond to the questionnaire issued to it.[51]

- Commerce's rejection of SGRE's original questionnaire response was unlawful. Commerce's questionnaire requested information related to SGRE's affiliates, and SGRE timely submitted this information with respect to Windar.  However, Commerce

---

[47] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Rep. 103-316, Vol. 1 (1994) (SAA), at 873.
[48] *See Preliminary Determination* PDM at 9-10; and *Final Determination*, 86 FR at 33657.
[49] *See*, *generally*, Petitioner May 12, 2023 Comments; Petitioner May 24, 2023 Comments; SGRE/Windar May 12, 2023 Comments; and SGRE/Windar May 24, 2023 Comments.
[50] *See* SGRE/Windar May 12, 2023 Comments at 2-3.
[51] *Id*. at 2-3 (citing *YC Rubber*, No. 21-1489).

subsequently refused to accept Windar's information, despite explicitly requesting it, on the grounds that it contained unsolicited new factual information.  It is nonsensical to suggest that a questionnaire that explicitly requests information from affiliates can become an unsolicited questionnaire response when the requested data are provided.[52]

- The CIT did not include any exceptions or carve-outs when ordering Commerce to investigate SGRE.  Further, the issue of Windar was brought before the CIT during briefing.  Had the Court believed that Windar should not have been investigated, it would have caveated its order as such.  However, the CIT did not.[53]

- There is no basis for applying AFA to Windar.

  o Commerce's claim that Windar's rate was not challenged before the agency and the CIT is false.  The heading of Section III of SGRE's case brief was entitled "{Commerce} Erred by Not Selecting SGRE/Windar for Individual Examination."[54]

  o Windar did not fail to respond to Commerce's Q&V questionnaire, because Windar is neither a producer nor an exporter of wind towers.  Any confusion on Commerce's part is a direct result of its unlawful determination at the inception of the investigation.  Had Commerce actually undertaken the investigation of SGRE as required by law, the factual circumstances would have been vetted by the agency in the first instance.[55]

  o In this case, a procedural error arose at the inception of the investigation, because SGRE/Windar was not permitted to demonstrate that the Q&V questionnaire

---

[52] *Id*. at 7-11.
[53] *Id*. at 3.
[54] *Id*. at 4.
[55] *Id*. at 4-5 (noting that Windar's affiliates produced the towers at issue).

submitted by SGRE was complete with respect to both SGRE and Windar.  This error prejudiced SGRE/Windar.[56]

o   There is no basis to apply AFA to Windar or any other SGRE affiliate.[57]  SGRE's response to section A of the questionnaire confirmed that Windar had no exports to the United States.  SGRE is the exporter of wind towers to the United States and SGRE reported all exports by the combined entity in this response, as well as in its initial response to the Q&V questionnaire.  Commerce cannot disregard these facts, and, to the extent there was ever a meaningful information gap, it has been closed by the information requested, and submitted, in the remand segment of this proceeding.[58]

o   Section 776(a) of the Act provides for the use of facts otherwise available if necessary information is not on the record or withheld, which is not applicable here.  Section 776(b) of the Act also provides that, when a party fails to act to the best of its ability to comply with a request for information, Commerce may use inferences adverse to the party's interest in selecting from the facts available.  SGRE's section A questionnaire response remains on the record, and information contained within confirms that Windar had no shipments during the period of investigation (POI) other than those through SGRE.  The necessary information is

---

[56] *See* SGRE/Windar May 24, 2023 Comments at 8 (citing *American Farm Lines v. Black Ball Freight,* 397 U.S. 532 (1970); *United States v. Great American Insurance Company of New York*, 738 F. 3d 1320 (2013); and *Shinseki v. Sanders*, 556 U.S. 396 (2009)).
[57] *See* SGRE/Windar May 12, 2023 Comments at 3-5 (noting that, in response to Commerce's request for SGRE and its affiliates' Q&V information, SGRE's response provided information for both Windar and SGRE).
[58] *Id*. at 7.

on the record and thus cannot have been withheld and, therefore, Commerce

cannot apply facts otherwise available pursuant to section 776(a) of the Act.[59]

o  Commerce cannot apply AFA to deter non-cooperation and cannot disregard

information on the record.[60]  The CIT has held that ignoring such information

results in a determination based on incomplete and inaccurate information.[61]

Consequently, a determination that flows from an improper application of AFA to

Windar is unlawful and unsupported by substantial evidence.

o  Commerce's concern that the SGRE-Windar relationship presents a potential

complicating factor that would make an investigation on an abbreviated timeline

difficult were dismissed by the CIT; Commerce's final determination was

remanded to individually investigate SGRE.[62]

o  Since December 7, 2020, Commerce has known that:  (1) SGRE, not Windar or

any of its affiliates, exports subject wind towers to the United States; and (2) the

wind towers exported by SGRE were produced by the company's affiliates.

Commerce's "investigation" did not reveal any new information in this regard,

and Commerce's collapsing determination does not make the agency's argument

more meaningful.[63]

o  The legal basis for applying AFA in the original investigation is no longer

applicable in light of Commerce's collapsing analysis.  In the underlying

---

[59] *See* SGRE/Windar May 24, 2023 Comments at 3-4 (citing *Celik Halat Ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1363 (CIT 2022)).

[60] *See* SGRE/Windar May 12, 2023 Comments at 6 (citing *Changzhou Trina Solar Energy Co. v. United States*, 255 F. Supp. 3d 1312, 1313 (CIT 2017)).

[61] *Id*. (citing *Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 126 (CIT 2018); and *Gerber Food (Yunnan) Co. v. United States*, 387 F. Supp. 2d 1270 (CIT 2005); and *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011)).

[62] *Id*. at 11.

[63] *Id*. at 12.

investigation, Commerce applied AFA to Gamesa Energy Transmission and
Windar and stated that "Commerce has not made any affiliation or collapsing
determination with respect to these companies," and "{a}accordingly, both were
required to provide a response to our Q&V questionnaire and did not do so."[64]
Now, given that:  (1) Commerce has made a finding of affiliation and collapsing
for SGRE and Windar; and (2) SGRE timely submitted a Q&V response covering
SGRE/Windar's exports, the prior rationale for AFA is no longer applicable.
Commerce cannot use its collapsing determination for one element of its
determination (*i.e.*, AFA), and disregard the same collapsing determination for
other elements of its determination (*i.e.*, requiring a Q&V response).[65]

o   The administrative record shows that the producers of subject merchandise are
Tadarsa Eólica, S.L.U., Aemsa Santana, S.A.U., and Windar Wind Services,
S.L.U.   Commerce never reached a determination regarding these companies, and,
as such, they remain subject to the all-others rate if they export directly, or subject
to SGRE's rate if SGRE exports their production.[66]

o   Given that Windar did not export subject towers to the United States, it could not
have been selected as a mandatory respondent, and had Windar been collapsed
with SGRE, SGRE would remain the selected mandatory respondent, not
Windar.[67]

- In its Draft Results, Commerce articulated an impermissible *post hoc* rationalization for
AFA based on its analysis of affiliation; this constitutes a new and different rationale than

---

[64] *See* SGRE/Windar May 24, 2023 Comments at 5 (quoting *Final Determination* IDM at 9).
[65] *Id*. at 4-5.
[66] *See* SGRE/Windar May 12, 2023 Comments at 12-13.
[67] *Id*. at 14.

that articulated in the underlying investigation.  If Commerce claims that this AFA determination was based on new information developed in the remand proceeding, it must explain why the same new information is not being used to revise its determination regarding AFA with respect to Windar (or to be used in the context of corroboration).[68]

- The collapsed SGRE/Windar is a new entity for which a determination has not been made and is not the same entity as Windar for cash deposit purposes.  In the context of a successor-in-interest analysis, a negative determination normally means that the entity found not to be the successor may not post cash deposits at the rate calculated for the alleged predecessor; Commerce generally applies the all-others rate to the new entity by default.[69]

- It is inappropriate to apply AFA to all companies comprising the collapsed entity based on one company's behavior.  Indeed, Commerce often applies partial AFA to companies whose affiliates fail to provide requested information.  Further, Commerce must ensure that the rate selected as AFA does not overreach reality in seeking to maximize deterrence or use information that is punitive, aberrational, or uncorroborated.

---

[68] *See* SGRE/Windar May 24, 2023 Comments at 7-8 (citing *Department of Homeland Security v. Regents of University of California*, 140 S. Ct. 1891 (2020); *Vermont Yankee Nuclear Power Corp. v. NRDC*, 98 S. Ct. 1197 (1978); *Department of Commerce, et al. v. New York, et al.*,139 S. Ct. 2551 (2019); and *Invenergy Renewables LLC v. United States*, 476 F. Supp. 3d 1323 (CIT 2020)).

[69] *Id*. at 5-7 (citing *East Sea Seafoods LLC v. United States*, 703 F. Supp. 2d 1336 (CIT 2010); *Notice of Preliminary Results of Antidumping Duty Changed Circumstances Review:  Polychloroprene Rubber from Japan*, 69 FR 61796, 6198 (October 21, 2004), unchanged in *Notice of Final Results of Antidumping Duty Changed Circumstances Review:  Polychloroprene Rubber from Japan*, 69 FR 67890 (November 22, 2004); *Frozen Warmwater Shrimp from Vietnam:  Notice of Preliminary Results of Antidumping Duty Changed Circumstances Reviews*, 74 FR 31698, 31700 (July 2, 2009), unchanged in *Frozen Warmwater Shrimp from Vietnam:  Notice of Final Results of Antidumping Duty Changed Circumstances Reviews*, 74 FR 42050, 42051 (September 20, 2009); and *Wooden Bedroom Furniture from the People's Republic of China:  Preliminary Results of Antidumping Duty Changed Circumstances Review*, 72 FR 41492, 41495 (July 30, 2007), unchanged in *Wooden Bedroom Furniture from the People's Republic of China:  Final Results of Antidumping Duty Changed Circumstances Review*, 72 FR 60812, 60813-60814 (October 26, 2007)).

Commerce must also consider the overall facts and circumstances of each case as part of its AFA analysis, including the level of culpability of the non-cooperating party.[70]

- Commerce's collapsing analysis is incomplete, given that there is no explanation as to which Windar entities were included in, or excluded from, the collapsed entity.[71]

- The AFA rate selected by Commerce was improper. Commerce must corroborate its selection, and it made no effort to undertake such an exercise in the Draft Results. Importantly, Commerce cannot disregard information developed on remand suggesting the 73.00 percent rate is inaccurate. SGRE's average selling price and production costs, combined with the profit rate used in the Petition, indicate that SGRE's dumping margin should be substantially lower (*i.e.*, 9.4 percent).[72]

- The Draft Results do not address the CIT's concerns regarding the selection of an "all-others" rate. Commerce continues to apply the same rate of 73.00 percent on remand.

- SGRE's comments are provided under protest because: (1) Commerce issued the Draft Results with no advance notice and provided inadequate time to comment on them; (2) the timing of Commerce's request for additional time from the CIT (which lacked a schedule for further comment) effectively precluded the parties from receiving that additional time.[73]

---

[70] *See* SGRE/Windar May 12, 2023 Comments at 15-16 (citing *BMW of North America LLC v. United States*, 926 F.3d 1291, 1301 (Fed. Cir. 2019).
[71] *Id*. at 16.
[72] *Id*. at 14-15.
[73] *Id*. at 1.

*Petitioner Comments*

- Commerce should continue finding that the collapsed SGRE/Windar entity receives Windar's 73.00 percent rate, given Windar's failure to cooperate with Commerce's requests in the underlying investigation.  Commerce's decision is lawful and complies with the *Remand Order*.[74]

- In the underlying LTFV investigation, Windar failed to respond to Commerce's Q&V questionnaire, despite the agency's instructions and warning that:  (1) Windar should separately report its Q&V data, even if it believed it should be treated as a single entity along with other exporters; and (2) Commerce may use an adverse inference against "any party" that failed to respond to or provide Q&V information by the deadline.[75]

- The information Windar failed to provide was critical to Commerce's respondent selection process.  In the Q&V questionnaire, Commerce explained that Q&V data "pertaining to other, possibly affiliated, companies should be reported separately by those companies" and reminded parties that failure to respond could result in the application of AFA.[76]  Windar did not submit a Q&V questionnaire response and, therefore, it deprived Commerce of relevant information at an early stage of the proceeding.[77]

- SGRE/Windar's claim that "Windar did not 'fail' to respond to the quantity and value questionnaire" because "Windar Renewables is neither a producer nor exporter," is

---

[74] *See* Petitioner May 12, 2023 Comments at 1-2.
[75] *Id*. at 3-4 (citing Q&V Questionnaire).  The petitioner explains that other parties who received the Q&V questionnaire complied with these instructions, even in the absence of reportable transactions.  *See, e.g.*, Prince Edward's Energy Corporation's Letter, "Response to Quantity and Value Questionnaire," dated November 30, 2020.
[76] *See* Petitioner May 24, 2023 Comments at 9 (citing Q&V Questionnaire).
[77] *Id*. at 9.

irrelevant.  Commerce explicitly asked for the information that Windar withheld.  It is Commerce's decision, not SGRE/Windar's, to decide what information is relevant.[78]

- Multiple other companies responded to Commerce's Q&V questionnaire and indicated that they did not export wind towers to the United States.  This includes GRI Renewable Industries S.L. (GRI), a "non-operating parent company of two operating affiliates" that, together, "operate both as a producer/exporter of wind towers, and as a toller for the production of the subject merchandise."[79]  GRI received a single Q&V questionnaire, yet the company responded separately on behalf of both of these production facilities.  Windar received its own Q&V questionnaire, but it did not respond for itself or its subsidiaries.  This clearly demonstrates that Windar failed to cooperate to the best of its ability.

- SGRE failed to exhaust its administrative remedies regarding Windar's dumping margin, and cannot raise an issue before the court that it failed to raise before Commerce.[80]  As noted in *Mittal Steel*, "courts should not topple over administrative decisions unless the administrative body not only has erred but has erred *against objection made at the time appropriate under its practice*."[81]

---

[78] *Id*. at 10.
[79] *Id*. (citing GRI's Letter, "GRI's Response to the Department's Quantity and Value Questionnaire," dated December 7, 2020).
[80] *Id*. at 2 (citing *Palladian Partners, Inc. v. United States*, 783 F. 3d 1243, 1254 (Fed. Cir.2015) and *McKart v. United States*, 89 S. Ct. 1657 (1969)).
[81] *Id*. at 2-3 (citing *Mittal Steel Point Lisas, Ltd. V. United States*, 548 F. 3d 1375, 1383-1383 (Fed. Cir. 2008) (*Mittal Steel*); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952); *Boomerang Tube LLC v. United States*, 856 F. 3d 908, 912 (Fed. Cir.2017); *Corus Staal BV v. United States*, 502 F. 3d 1370, 1379 (Fed. Cir. 2007); *Budd Co., Wheel & Brake Div. v. United States*, 773 F. Supp. 1549, 1555 (CIT 1991); *Xi'an Metals & Minerals Import & Export Co. v. United States*, 256 F. Supp. 3d 1346, 1356 (CIT 2017); *Essar Steel, Ltd. V. United States*, 753 F. 3d 1368, 1374-1375 (CAFC 2014); *JBF RAK LLC v. United States*, 790 F. 3d 1358, 1366 (Fed. Cir. 2015); 19 CFR 351.309(c)(2); and 28 U.S.C. § 2637(d)).

- In its case brief submitted for the final determination, SGRE acknowledged that Windar did not submit a Q&V response, and it also did not contest Commerce's determination to apply the 73.00 percent Petition rate to Windar.[82] SGRE did not appeal Commerce's decision to apply AFA to Windar, add Windar as party to the court appeal, mention Windar in its briefing before the CIT, or notify the CIT that its "co-producer" failed to respond to Commerce's Q&V questionnaire in the underlying LTFV investigation. As a result, on appeal, the CIT instructed Commerce to correct its decision to examine only one respondent by individually examining SGRE.[83]

- Assuming, *arguendo*, that SGRE did not fail to exhaust its administrative remedies, SGRE also waived its ability to contest Windar's rate when it omitted the issue from its principal brief to the CIT.[84] Windar is not a party to the CIT appeal and there is no mention of Windar in SGRE's complaint; Windar and Windar's Q&V non-cooperation were similarly absent from SGRE's principal brief.[85]

- SGRE, appearing to recognize that it did not raise the issue at the CIT, attempts to expand the CIT's remand instruction, saying that "if the Court believed that Windar should not have been investigated, it would have caveated its order as such."[86] This is an unreasonable interpretation of the plain language of the CIT's remand order, which makes no mention of Windar. Commerce's remand results comply with the *Remand*

---

[82] *See* Petitioner May 12, 2023 Comments at 5-6 (citing Complaint, *Siemens Gamesa Renewable Energy v. United States*, Court No. 21-00449, ECF No. 8 (CIT 2021)).

[83] *Id*. *See also* Petitioner May 24, 2023 Comments at 4-5.

[84] *See* Petitioner May 24, 2023 Comments at 5 (citing *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir.2022) (noting that "{a} party does not preserve or waive an issue based on the arguments it presented to an administrative agency; a party merely exhausts that issue before the agency so as to give a court the proper basis to review that issue on appeal or via a complaint.")).

[85] *Id*. at 5-6.

[86] *Id*. at 6.

*Order*.  Commerce has individually investigated SGRE, determined it is intertwined with Windar, and assigned the latter's dumping margin to the single entity.[87]

- Windar's failure to submit its Q&V questionnaire response by the requested deadline was sufficient for Commerce to assign Windar the AFA rate.[88]  Commerce has inherent authority to establish and enforce deadlines to administer its proceedings efficiently, especially where the Act is silent (*e.g.*, the deadline for Q&V questionnaires), and the Federal Circuit has upheld this principle.[89]

- The CIT has also held that a respondent's failure to provide Q&V questionnaire data creates a "gap" in the record, because it deprives Commerce of necessary information during the respondent selection stage.[90]  Commerce's standard practice is to apply AFA to parties, like Windar, that did not provide a Q&V questionnaire response.[91]  The gap on the record here was of Windar's own making, and it deprived Commerce of information necessary to select an appropriate respondent.[92]  SGRE's own Q&V questionnaire

---

[87] *See* Petitioner May 12, 2023 Comments at 6-7.
[88] *Id*. at 7.
[89] *Id*. (citing *M S International, Inc. v. United States*, 32 F.4th 1145, 1153 (Fed. Cir. 2022) (citing *Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1351 (Fed. Cir. 2015) (*Dongtai Peak Honey*); *Bebitz Flanges Works Priv. Ltd. v. United States*, 433 F. Supp. 3d 1309, 1326-28 (CIT 2019) (*Bebitz Flanges Works*); *Kirovo-Chepetsky Khimichesky Kombinat, JSC v. United States*, 58 F. Supp. 3d 1397, 1409-10 (CIT 2015); *SKF USA Inc. v. United States*, 675 F. Supp. 2d 1264, 1274 (CIT 2009); *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978) ("Absent constitutional constraints or extremely compelling circumstances, the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties."); *Repwire LLC v. United States*, Court No. 22-00016 (CIT March 20, 2023), at 3 (citing *Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 815 F. Supp. 2d 1342, 1365 (CIT 2012) ("Commerce has discretion both to set deadlines and to enforce those deadlines by rejecting untimely filings.")); and *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1206–07 (Fed. Cir. 1995)).
[90] *Id*. at 7-8 (citing *Ferrostaal Metals Gmbh v. United States*, 518 F. Supp. 3d 1357, 1374 (CIT 2021) (*Ferrostaal*)).
[91] *Id*. (citing Draft Results at 3 (fn. 14)).
[92] *Id*. at 8.

response does not substitute for a properly-filed Q&V questionnaire response from Windar itself.[93]

- The CIT has previously upheld Commerce's decision to apply AFA to a company that failed to submit a timely Q&V response and to reject that respondent's later attempt to remedy its initially-deficient response.  In *Ferrostaal*, a respondent filed a deficient Q&V response at the outset of a proceeding and filed an untimely correction.  The CIT found that Commerce's decision to apply AFA was reasonable and in accordance with law.  Windar's failure was even more egregious because Windar never attempted to file a Q&V response in the first instance.[94]

- Commerce recognizes the necessity of applying AFA to the entire collapsed entity to prevent the non-cooperating company within the entity from benefiting from its non-cooperation.  Here, SGRE went through the process (and the expense) of an appeal in an attempt to obtain a lower dumping rate as an exporter, when it was well aware that its affiliated "co-producer," from which it sourced subject merchandise during the POI, was lawfully subject to the higher AFA rate.  Commerce's collapsing practice prevents this type of gamesmanship, and, as a result, Commerce appropriately applied Windar's AFA rate to the other company in the single entity (*i.e.*, SGRE).[95]

- The "{SAA} makes clear that the application of AFA is a tool given to {Commerce} to ensure that a party does not obtain a more favorable result by failing to cooperate than if

---

[93] We note that the petitioner provides arguments regarding SGRE's assertion that "it is the only exporter from Spain of wind towers produced by it and its affiliates," in support of its position that the SGRE Q&V response substitutes for a properly-filed Q&V response from Windar.  The petitioner's argument on this point contains proprietary information and is summarized and addressed separately in the proprietary addendum accompanying these final results of redetermination.  *See* Memorandum, "Proprietary Addendum," dated June 16, 2023 (Proprietary Addendum).

[94] *See* Petitioner May 24, 2023 Comments at 8-9 (citing *Ferrostaal*, 518 F. Supp. 3d at 1364-1365.

[95] See Petitioner May 12, 2023 Comments at 9.

it had cooperated fully."[96]  Moreover, the CIT has reiterated Commerce's observation

that the failure to submit usable Q&V responses allows companies to "avoid certain

immediate costs and inconvenience by ignoring {Commerce's} requests for information

while having no reason to fear any specific future negative consequences from their

unwillingness to cooperate."[97]  Deterring non-cooperation, and avoiding inappropriately

beneficial results, is even more important where a collapsed entity is involved because of

the potential for manipulation of dumping rates.  If Commerce assigned separate rates to

different affiliated entities, these entities could simply channel shipments through the

affiliate with the lowest rate.[98]

- Application of the Petition rate to Windar is lawful and properly corroborated.  Windar's

  rate was based on the rate calculated in the Petition, pursuant to section 776(b) of the

  Act.  Importantly, Windar did not provide any response to the Q&V questionnaire, and

  Commerce is not required to make any adjustments to the calculated margin based on

  any information Windar might have provided had it cooperated.  In the investigation,

  Commerce provided a reasonable explanation for its decision to rely on the Petition as

  the source of the AFA rate applied to noncooperating companies, which SGRE did not

  challenge.  As a result, this rate was properly corroborated.  SGRE/Windar's claim that

  Commerce should use price and cost of production information collected on remand is

  misplaced, because this information was derived from Windar—the same company that

  was assessed a final, unchallenged AFA rate for its failure to cooperate with

  Commerce's inquiry.[99]

---

[96] *See* Petitioner May 24, 2023 Comments at 12-13 (internal citations/quotations omitted).
[97] *Id.* at 12 (citing *Ferrostaal,* 518 F. Supp. 3d 1357, 1374 (quoting SAA at 870)).
[98] *Id.*
[99] *Id.* at 11-12.

- SGRE/Windar's attempt to blame Commerce for an "unlawful determination at the inception of the investigation" downplays Windar's clear failure to comply with basic instructions from Commerce and its own failure to raise this issue before Commerce or the CIT.[100]

**Commerce Position:**  Commerce continues to find that applying an AFA rate to the SGRE/Windar entity (and, therefore, to SGRE) is appropriate.  Specifically, because Windar: (1) received an unchallenged 73.00 percent dumping margin, based on AFA; and (2) SGRE is collapsed with Windar (and its wholly owned manufacturing subsidiaries), both companies are subject to Windar's already-determined rate.  As detailed in the Draft Results and set forth in the "Analysis" section above, this determination is consistent with extensive agency practice.[101] While SGRE/Windar disagrees with this finding and raises several substantive and procedural concerns related to it, none of these concerns warrant modification to our analysis or conclusions.  We discuss each of SGRE/Windar's concerns, in turn, below.

As a threshold matter, SGRE/Windar claims that the CIT remanded Commerce's final determination with the explicit direction to individually examine SGRE and Commerce failed to comply.  SGRE/Windar alleges that, in making its remand decision, the CIT was fully aware of SGRE's relationship with Windar, as well as the complexity of individually investigating SGRE, given that it sourced all of its wind towers from this affiliate (which had already received a final dumping margin based on AFA).  SGRE/Windar bases its conclusion on the fact that Commerce raised the latter concern in its brief to the Court, stating that "an individual examination of SGRE

---

[100] *Id.* at 7 (citing SGRE/Windar May 12, 2023 Comments at 4).
[101] *See* the "Analysis" section, *supra*; *see also* Draft Results at 5-8.

would be complicated at the very least by SGRE's sourcing of subject wind towers  from an unaffiliated supplier that failed to respond to Commerce's Q&V questionnaire."[102]

However, contrary to SGRE/Windar's arguments, there is no evidence that Commerce's current concerns regarding Windar were actively considered and affirmatively "disregarded by the Court."[103]  In the administrative proceeding, and in the subsequent litigation, Commerce asserted that various factors make this a complicated case such that conducting an investigation on an abbreviated timeline would be unrealistic; as noted above, one complicating factor identified by Commerce was SGRE's relationship with Windar.[104]  Although the CIT disagreed with Commerce's determination that it was no longer feasible to select a replacement respondent by the time SGRE signaled its interest in participating as a mandatory respondent, the CIT did not weigh in on how Windar's existing AFA rate would impact SGRE; the extent of the relationship between SGRE and Windar was yet to be established.  Because Commerce had not yet individually examined SGRE as a mandatory respondent, the agency could potentially have found Windar to be:  (i) affiliated and collapsed with SGRE; (ii) affiliated but not collapsed; or (iii) not affiliated with SGRE at all.  It was only on remand that the record was developed with respect to the SGRE-Windar relationship.  Thus, we disagree with SGRE/Windar that this was an already-decided issue.

We also disagree with SGRE/Windar that Commerce's investigation of SGRE was inadequate, or that the agency's decision to disallow data sourced from Windar was improper.

---

[102] *See* SGRE/Windar May 12, 2023 Comments at 11 (citing Defendant's Response to Plaintiff's Motion for Judgement on the Agency Record).  According to SGRE/Windar, Commerce, in its brief to the Court, characterized Windar as an *unaffiliated* supplier.  Although the evidence relied on by SGRE/Windar is not on the record of this remand proceeding, we acknowledge that such a statement by Commerce would be unsupported by the facts on the record.  Regardless, such an error *weighs against SGRE/Windar's assertion* that the Court was well aware of the affiliation and affirmatively considered it when remanding the issue to Commerce for further disposition.
[103] *Id.*
[104] *See*, *e.g.*, *Final Results* IDM at 6.

The CIT remanded Commerce's final determination, with the instruction for Commerce to select SGRE for individual examination as the second mandatory respondent for purposes of the underlying LTFV investigation.  Consistent with the *Remand Order*, Commerce issued its standard AD questionnaire to SGRE the next day (*i.e.*, February 17, 2023).  On March 28, 2023, after receiving SGRE's response to section A of that questionnaire, Commerce issued a supplemental questionnaire to clarify certain aspects of SGRE's corporate structure, as well as its relationship and interactions with Windar.[105]  Through these questionnaires, Commerce collected extensive information regarding SGRE's structure and operations; this information revealed that SGRE's business practices with respect to wind towers were inextricably intertwined with Windar (and its subsidiaries).

Given that SGRE's responses to these questionnaires revealed that SGRE was functioning as a single entity with Windar – a company that received a margin based on AFA in the LTFV investigation – Commerce immediately instructed SGRE not to provide data sourced from Windar.  In the interim, Commerce continued to consider the implications of single entity treatment.[106]  Separately, given the impending deadline for the remainder of SGRE's questionnaire response, Commerce notified the company that it could request an extension, if necessary, to adjust SGRE's reporting consistent with Commerce's instructions.[107]  SGRE elected not to request an extension, and it submitted its response inclusive of Windar's sales and

---

[105] *See* Commerce's Letter, "Section A Supplemental Questionnaire," dated March 28, 2023.
[106] *See* Memorandum, "Submission of Questionnaire Response," dated March 30, 2023 (Questionnaire Instruction Memorandum) ("Commerce hereby wishes to clarify that we are not soliciting any information from Windar Renovables at this time.  Additionally, any questionnaire response that includes information from Windar Renovables will be rejected in accordance with 19 CFR 351.301(c)(1) and 351.302(d)(1)(ii).").
[107] *See* Commerce's Letter, "Rejection of Sections B through D Questionnaire Response," dated April 11, 2023, at Attachment (containing the email conversation with SGRE/Windar's counsel prior to the deadline for SGRE/Windar's response to sections B through D of the questionnaire (*i.e.*, the sections which relate to comparison market sales, U.S. sales, and cost of production/constructed value); this email notes that Commerce will do its best to accommodate any extension requests necessary to remove Windar's data from the questionnaire response).

cost data, which Commerce had explicitly instructed SGRE not to provide.  As a consequence, Commerce rejected SGRE's submission as an unsolicited questionnaire response, and we afforded the company an opportunity to resubmit in the form and manner requested.[108]

SGRE/Windar objects to this decision, asserting that Commerce was required to accept Windar's data because Commerce initially requested information regarding its affiliates in the original AD questionnaire.[109]  However, SGRE/Windar misconstrues Commerce's practice, as well as the purpose behind what is, at best, a generic instruction given to all questionnaire respondents.  Although Commerce's standard AD questionnaire requests certain data relating to affiliates, this instruction is intended to cover routine, non-controversial situations.  Where different facts dictate different actions, as they did here, Commerce may alter these instructions.  Thus, given the particular facts of this case, which fully came to light only after SGRE submitted its section A response, Commerce (as is its prerogative) instructed SGRE to exclude data sourced from Windar – an affiliate that received an AFA rate for failing to cooperate in the underlying LTFV investigation; this action was deemed appropriate only after Commerce learned the full extent of the relationship between SGRE and Windar (and its wholly-owned manufacturing subsidiaries).

SGRE/Windar asserts that the new information regarding Windar was "not news" and that Commerce's investigation "did not reveal any new information in this regard."[110]  Specifically, it asserts that SGRE reported in its Q&V response that the "sales reported in Attachment I reflect SGRE's purchases from Windar Renovables, an affiliated supplier in Spain," and, thus, contends

---

[108] *Id.*
[109] *See* SGRE's Letter, "Request for Extension and Clarification of Reporting Requirements," dated April 12, 2023, which does not include any reference to the instructions not to include Windar's data provided in the earlier March 30, 2023 Questionnaire Instruction Memorandum.
[110] *See* SGRE/Windar May 12, 2023 Comments at 12.

that since December 7, 2020, Commerce "has been well aware that… the wind towers exported by SGRE were produced by affiliates," including Windar.[111]  However, the fact that SGRE stated that it was affiliated with Windar is not the same as *a determination by Commerce* that the companies constitute a single entity.  Such decisions (*i.e.*, affiliation vs. affiliation/collapsing) have different implications in terms of reporting requirements and rate assignment in AD proceedings.  SGRE/Windar's attempt to minimize the importance of the extensive information solicited on remand is not only self-serving, but it is also ultimately unpersuasive.

Additionally, SGRE/Windar objects to Commerce's underlying application of AFA to Windar.  These arguments are unsupported by the *Remand Order* – the Court did not require (or even permit) the agency to revisit its final/unchallenged decision applying AFA to Windar.  Consequently, there is no legal or factual basis for Commerce to revisit this decision on remand.

As an initial matter, no party challenged Commerce's application of AFA to Windar in the underlying LTFV investigation.  Indeed, despite referencing various parties that received an AFA rate in its underlying administrative case brief, SGRE/Windar failed to raise any argument specific to Windar for consideration in the final determination (thereby failing to exhaust SGRE/Windar's administrative remedies before the agency).  SGRE/Windar's contention to the contrary (*i.e.*, a claim grounded in a cursory reference to the potential selection of "SGRE/Windar" as a respondent, made in the context of SGRE's administrative case brief) falls short of a developed argument as to whether the application of AFA to Windar was appropriate.  SGRE/Windar's failure in this regard is hardly surprising, given that Windar, its "co-producer," ignored Commerce's request for information (*i.e.*, the Q&V questionnaire) altogether.  As elaborated in the Draft Results, and above,[112] it is Commerce's long-standing practice to apply

---

[111] *Id.*
[112] *See* Draft Results at 7; *see also* 7-8, *supra*.

AFA when a party fails to respond to a request for information, including a Q&V questionnaire.[113]  This approach has been upheld by the CIT on multiple occasions, and the court has explicitly acknowledged the critical role that accurate and timely Q&V responses play in Commerce's administrative proceedings.[114]

Despite these facts, SGRE/Windar now asserts, for the first time, that Windar was never required to submit a Q&V response, because "{it} is neither a producer or exporter of subject merchandise."[115]  However, this claim is both disingenuous and puzzling, given that SGRE *itself* has, on numerous occasions, referenced Windar as a "producer" and "co-producer" of the wind towers that SGRE exported to the United States:

---

[113] *See, e.g.*, *Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review and Rescission of Administrative Review in Part*, 75 FR 10207 (March 5, 2010) (*CTL Plate from Korea*), and accompanying IDM at Comment 2 ("As discussed above, our record indicates that Hyosung received our Q&V questionnaire in two forms on May 11, 2009, and May 12, 2009.  Hyosung failed to respond to our Q&V questionnaire within the specified due date, … we continue to conclude that a response to a Q&V questionnaire was required from Hyosung and that Hyosung did not act to the best of its ability by providing a timely and properly filed response to our request for information.  Therefore, we have continued to apply the AFA rate to Hyosung for the final results of this review."); and *Hardwood and Decorative Plywood from the People's Republic of China:  Final Affirmative Countervailing Duty Determination; 2011*, 78 FR 58283 (September 23, 2013) ("These companies chose not to participate in this investigation, and thus application of AFA is warranted.  By failing to provide information regarding their quantity and value of shipments during the POI, {Commerce} was unable to evaluate the full universe of potential respondents.").

[114] *See Hyosung Corp. v. United States*, 35 CIT 343, 349 (March 31, 2011) (*Hyosung*) ("Commerce's determination not to accept Hyosung's untimely and improperly filed Q&V questionnaire response is supported by substantial evidence and otherwise in accordance with law.  … Therefore, Commerce's determination to assign Hyosung an AFA rate is supported by substantial evidence and otherwise in accordance with law."); *Ferrostaal*, 518 F. Supp. 3d at 1364 ("On October 5, 2018, Commerce issued Q&V questionnaires to 31 Vietnamese producers and exporters of {cold-rolled steel} that Commerce identified as potential respondents.  … 25 companies did not respond or did not respond in a timely manner … the court concludes that Commerce applied the statutes and its regulations reasonably in its determinations with regard to the rejection of the Q&V responses and the application of AFA."); and *Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*, 28 F. Supp. 3d 1317, 1328-29 (CIT November 20, 2014) ("But as Commerce explained, the agency unambiguously and consistently requires respondents to properly and timely file Q&V responses as a precondition for separate-rate eligibility, because doing so prevents respondents from circumventing the mandatory respondent selection process and benefitting from the all-others separate rate without the risk or burden of individual investigation.  Because Commerce has broad discretion to set the procedures it needs in order to adequately perform and enforce its regulatory role, and because the agency's basis for this particular procedure is reasonable, Commerce's policy of requiring timely Q&V responses as a precondition of separate-rate eligibility is not a prima facie abuse of the agency's discretion.").

[115] *See* SGRE/Windar May 12, 2023 Comments at 13 (internal citations omitted).

- On May 3, 2021, in its case brief in the underlying investigation, SGRE referenced "GRI Towers, Haizea Wind Group, Windar Renovables and Vestas" as "the identified *producers* in the petition."[116]

- On March 10, 2023, in its section A response, SGRE referred to Windar as a producer of subject merchandise numerous times, including, but not limited to, the following statements:  "we are also submitting this response on behalf of SGRE's affiliate-*producer* Windar"; "SGRE imported *Windar/SGRE produced* wind tower sections into the United States"; "SGRE also purchased other *Windar/SGRE produced* wind tower sections"; "SGRE negotiates directly with raw material suppliers in Spain, and sub-contracts its affiliate *tower producer* Windar"; "Windar specializes in *the manufacturing of* sections of onshore and offshore towers"; "{f}or SGRE, *Windar is its affiliated tower producer*"; and "*Windar produced* all subject merchandise sold by SGRE."[117]

- On March 30, 2023, SGRE referred to Windar as "SGRE's *affiliate-producer* Windar."[118]

- On April 3, 2023, SGRE explained that "{t}he wind tower sections imported in the United States are *co-produced* by SGRE and Windar."[119]

Indeed, as Commerce explained in its Collapsing Memorandum:

> SGRE describes itself and Windar as "co-producers" of wind towers … .  Windar (in conjunction with its wholly-owned subsidiaries) is the entity which physically produces the wind towers.  SGRE stated that SGRE itself does not produce subject merchandise, while Windar functions as the sub-contracted producer.[120]

---

[116] *See* SGRE's Letter, "SGRE's Case Brief," dated May 3, 2021, at 9-10 (emphasis added).
[117] *See* SGRE March 10, 2023 AQR at cover letter, 2, 4, 12, 15, 16, and 26 (emphasis added).
[118] *See* SGRE March 30, 2023 SQR at cover letter (emphasis added).
[119] *See* SGRE April 3, 2023 SQR at 9 (emphasis added).
[120] *See* Collapsing Memorandum at 3 (citing SGRE March 10, 2023 AQR at 12, 15, 16, and 26).

SGRE/Windar provided one sentence in response to the agency's collapsing decision: "SGRE concurs with {Commerce}'s preliminary determination regarding collapsing in the instant investigation for the reasons outlined in its memorandum of April 25, 2023."[121]

SGRE/Windar's current stance, that Windar does not produce wind towers, runs afoul its own characterizations of these facts before the agency (as recently as April 2023). Further, while SGRE/Windar asserts that the actual producers of those towers are Windar's subsidiaries, this claim is irrelevant.[122] Whether Windar or its subsidiaries produced the wind towers at issue is a red herring; as noted above, Commerce has collapsed SGRE, Windar, and its "subsidiaries involved in the production of wind towers."[123] Thus, in accordance with Commerce's long-standing practice, these companies are treated as a single entity, and all companies within that entity are subject to the same cash deposit rate.[124]

SGRE/Windar implies, but does not explicitly state, that it disagrees with Commerce's practice on this point. According to SGRE/Windar, Commerce should take into account the fact that Windar neither exports subject merchandise itself, nor does it physically produce wind towers it at its own facilities. However, as the petitioner observes, Commerce's collapsing practice:

> …is essential to prevent companies from obtaining a lower rate by claiming a different company within the entity is the producer of the merchandise. This consideration is applicable here, as SGRE reports that it and Windar are "co-producing" towers. To put this into context, SGRE went through the process (and the expense) of an appeal in an attempt to obtain a lower dumping rate as an exporter, when it was well aware that its affiliated "co-producer," from which it sourced subject merchandise during the POI, was lawfully subject to the higher AFA rate. {Commerce}'s collapsing practice prevents this type of gamesmanship

---

[121] *See* SGRE May 1, 2023 Comments at 1.

[122] We also note that SGRE/Windar's claim is not strictly true, as the record demonstrates that Windar was, in fact, involved in production-related activities/oversight. *See* SGRE March 10, 2023 AQR at Exhibits A-3W, A-4W, and A-8W (under "General information"); and Collapsing Memorandum at 8.

[123] *See, generally,* Collapsing Memorandum.

[124] *Id.*

and the agency appropriately applied Windar's AFA rate to the other company in the single entity (*i.e.*, SGRE).[125]

While Windar and its subsidiaries may have had different bases for their cash deposit rates after Commerce's original final determination,[126] this principle still holds true; these companies function in concert with respect to the production of subject merchandise and any divergence in the cash deposit rate can lead to gamesmanship.  As we stated in the Collapsing Memorandum, "{w}e also find that each of Windar's wholly-owned subsidiaries that produce wind towers is governed by top management within the Windar group,"[127] and Windar's section A response is replete with examples of Windar's role in the design, production, and oversight relating to manufacture/sale of subject merchandise.[128]

Ultimately, SGRE/Windar's attempt to re-write the narrative is unavailing; the administrative record supports Commerce's decision that Windar and its subsidiaries, all of which were involved in the production of subject merchandise, comprise the collapsed SGRE-Windar entity and, therefore, should receive a single rate.[129]

We find similarly unavailing SGRE/Windar's argument that "there is no lawful explanation of how the application of facts available to one affiliated entity should be extended to all entities."[130]  SGRE need look no further than Commerce's Draft Results (repeated in the "Analysis" section, above), which dealt with precisely this issue.  As the Draft Results explain,

---

[125] *See* Petitioner May 12, 2023 Comments at 9.

[126] We note that this point is a technicality, since Windar and its subsidiaries are all required to post cash deposits at the same rate, *i.e.*, 73.00 percent of the entered value.

[127] *See* Collapsing Memorandum at 7-8 and footnote 37.  We note that SGRE/Windar argued that Commerce's collapsing analysis is incomplete because Commerce provided no explanation as to which Windar entities were included in, or excluded from, the collapsed entity.  *See* SGRE/Windar May 12, 2023 Comments at 16.  However, this is untrue.  In the Collapsing Memorandum, we identified the names each of Windar's subsidiaries involved in the production of wind towers.  *Id.* at footnotes 4 and 37.  These companies are:  Tadarsa Eolica SL; Windar Offshore SL; Windar Wind Services SL; Aemsa Santana SA; and Apoyos Metalicos SA.

[128] *See, e.g.*, SGRE March 10, 2023 AQR at Exhibit A-3W, A-4W, A-8W (under "General information"), and Exhibit A-28W.

[129] *See, generally*, Collapsing Memorandum.

[130] *See* SGRE/Windar May 12, 2023 Comments at 15-16.

Commerce's practice, when collapsing two companies, one of which has an existing AFA rate, into a single entity, is to assign the existing rate to the collapsed entity.[131]  The Draft Results reference multiple administrative proceedings,[132] as well as CIT precedent,[133] in support of this proposition.[134]  Rather than engage with Commerce's analysis, SGRE merely claims it was unlawful.  Consequently, we continue to apply the uncontroverted precedent on this point.[135]

We disagree with SGRE/Windar that Commerce's collapsing decision renders it a new entity, whereby Windar's existing cash deposit rate no longer pertains.  Contrary to SGRE/Windar's claim, SGRE and Windar are not potential (non-)predecessor companies to a newly-formed SGRE/Windar; instead, both SGRE and Windar remain separate legal entities, even though collapsed for AD purposes.  As a result, it would be inappropriate to conduct a successor-in-interest analysis here, because there is no successor in interest.[136]  As noted above, Commerce has precedent, upheld by the CIT, which addresses the same factual scenario, and we continue to follow that practice here.[137]

---

[131] *See* Draft Results at 6-7; *see also* 6-8, *supra*.

[132] *See Nails from Malaysia CCR* IDM at Comment 3; *Bicycles from China*, 61 FR at 19036; and *Pipe and Tube from Turkey*, 69 FR at 53677.

[133] *See New Zhongya Aluminum*, 887 F. Supp. 2d at 1310.

[134] *See* Draft Results at 6-7; and 6-8, *supra* (citing *Nails from Malaysia CCR*; *New Zhongya Aluminum*; *Bicycles from China*; and *Pipe and Tube from Turkey*).

[135] We disagree with SGRE/Windar that Commerce's assignment of AFA to SGRE/Windar in this redetermination involves impermissible *post hoc* rationalization.  In fact, Windar continues to have a rate based on total AFA for the same reasons stated in the *Final Determination*.  *See Final Determination*, 86 FR at 33656-33657.  On remand, the CIT directed Commerce to individually examine SGRE for the first time, during which Commerce discovered, also for the first time, the extent of SGRE's relationship with Windar.  Indeed, Windar's failure to participate in the LTFV investigation effectively precluded Commerce from weighing in on this matter until now.

[136] *See, e.g.*, *Nails from Malaysia CCR* IDM at Comment 3 ("{I}t would be inappropriate to conduct a successor-in-interest analysis because there is no successor in interest.  Both companies remain separate legal entities, even though collapsed for AD purposes.").

[137] *See, e.g.*, *Nails from Malaysia CCR*, 82 FR 34476 ("{W}e continue to find that Inmax Sd. Bhd. (Inmax Sgn) and Inmax Industries Sdn. Bhd. (Inmax Industries) (collectively, Inmax Companies) should be collapsed.  The combined entity's antidumping duty cash deposit rate is the current antidumping duty cash deposit rate assigned to Inmax Sdn"); *Bicycles from China*, 61 FR at 19036; and *Pipe and Tube from Turkey*, 69 FR at 53677.  *See also Stainless Steel Butt-Weld Pipe Fittings from the Philippines: Final Results of Changed Circumstances Review*, 83 FR 50894, 50895-50896 (October 10, 2018) ("{W}e find that Enlin, Vinox, and E N Corporation are affiliated parties which should be treated as a single entity…As a result of this determination, we find that both Vinox and E N Corporation are subject to the cash deposit rate currently assigned to Enlin."); and *New Zhongya Aluminum*.

We also disagree with SGRE/Windar's claim that its section A response filed on remand (which provided data on exports to the United States) cured any failure on the part of Windar to submit a response to the Q&V questionnaire.[138]  SGRE's submission does not constitute a Q&V response from Windar.  As both the Federal Circuit and the CIT have held, respondents "cannot establish Commerce's deadlines or dictate to Commerce whether and when Commerce actually needs the requested information."[139]  Indeed, Commerce has repeatedly declined to accept late Q&V responses, and the CIT has upheld Commerce's practice in this regard.  As the CIT explained in *Kam Kiu Aluminium*:

> Commerce issued Q&V questionnaires to companies in order to aid its selection of the mandatory respondents in this countervailing duty review.  … Kam Kiu filed its Q&V questionnaire response… over seven months late and on the day Commerce signed the preliminary results.
>
> Using the Q&V questionnaire responses, Commerce selected the mandatory respondents in early November 2012, a decision that informed Commerce's entire administrative review.… requiring Commerce to consider the late-filed response without using facts available or adverse inferences would undermine the integrity of the procedures Commerce has put in place and the system itself.  A respondent could simply choose not to submit a Q&V questionnaire response if it wished to avoid being selected as a mandatory respondent in the hopes it might obtain a more favorable rate.   Allowing the respondents to opt out of compliance with Commerce's request in such a fashion would run counter to the purpose of providing Commerce with the discretion to impose adverse inferences, and would affect Commerce's ability to conduct administrative reviews.[140]

---

[138] The AD Questionnaire instructs:  "Complete a combined chart for merchandise produced and sold by your company and its affiliates."  *See* AD Questionnaire at A-5.

[139] *See, e.g.*, *Dongtai Peak Honey*, 777 F. 3d at 1352; and *Bebitz Flanges Works*, 433 F. Supp. 3d at 1326.

[140] *See, e.g.*, *Tai Shan City Kam Kiu Aluminium Extrusion Co. v. United States*, 58 F. Supp. 3d 1384, 1387-89 (March 20, 2015) (*Kam Kiu Aluminium*); *see also Uniroyal Marine Exps., Ltd. v. United States*, 626 F. Supp. 2d 1312, 1316 (June 24, 2009) ("On this record, therefore, it is uncontested that {Commerce} issued three notices that Uniroyal was required to return a Q&V questionnaire, and that Uniroyal received at least two of these notices … . Nonetheless, no completed questionnaire was returned.  … Considered in light of this record, as a whole, Commerce's action, in applying its regulatory time limits to this proceeding, is reasonable."); *Hyosung*, 35 CIT at 349 ("Commerce's determination not to accept Hyosung's untimely and improperly filed Q&V questionnaire response is supported by substantial evidence); and *CTL Plate from Korea* IDM at Comment 2.

Here, Windar was required to submit a Q&V response approximately two and a half years ago, in December 2020.  Specifically, Commerce issued Q&V questionnaires to all of the companies listed in the Petition and those appearing in the U.S. Customs and Border Protection entry data.[141]  The deadline for submission of responses to the Q&V questionnaire was extended on two occasions.[142]  The majority of companies that received the Q&V questionnaire responded, and those that did not, like Windar, received AFA consistent with the administrative practice discussed above.[143]

The underlying rationale of Commerce's practice regarding the requirement for timely Q&V responses is on full display in this case.  Windar (in conjunction with its wholly-owned subsidiaries) was not only the producer of subject merchandise; it was the first company in the chain of distribution with knowledge of the U.S. destination for such sales – therefore, it was *Windar*'s Q&V response that was relevant for respondent selection purposes, not SGRE's Q&V response.

Given Windar's failure to provide a response to the Q&V questionnaire, Windar effectively prevented itself from consideration as an individually examined respondent in the LTFV investigation.  Nothing on the record remedies this deficiency.  SGRE's section A response, in turn, only confirms that Windar was the source of SGRE's exports; it neither constitutes a timely Q&V response from Windar nor necessarily identifies the full extent of

---

[141] *See* Memorandum, "Issuance of Quantity and Value Questionnaires," dated November 25, 2020.

[142] We initially extended the deadline to ensure that companies had adequate time to respond in light of the delayed delivery of the questionnaires.  *See* Memorandum, "Extension of Time to Respond to Q&V Questionnaire," dated December 1, 2020.  Then, we provided an additional extension at the request of several exporters.  *See* Memorandum, "Clarification and Extension," dated December 7, 2020.

[143] *See Preliminary Determination* PDM at 2 ("Commerce issued Q&V questionnaires to the three exporters/producers with complete contact information identified in the Petition, as well as to an additional 16 companies identified in the {U.S. Customs and Border Protection} data").  With the exception of one company, which we determined attempted to contact Commerce in a timely manner regarding its Q&V submission, the *Preliminary Determination* was unchanged in the *Final Determination.  See Final Determination* IDM at Comment 2.

Windar's exports to the United States (through SGRE, or otherwise).[144]  Thus, relevant information remains missing from the record.  Further, the time to supply that information has long passed.  For these reasons, SGRE's incomplete submission does not overcome Windar's failure to provide a timely Q&V questionnaire response.

With respect to the determination of SGRE/Windar's rate, we disagree with SGRE/Windar that partial AFA would be appropriate under these circumstances, and SGRE/Windar cites no case precedent for this proposition.  Commerce may rely on partial AFA where, for instance, portions of a company's reporting can be relied upon even while other portions are critically deficient, *i.e.*, where the deficiency is only with respect to a discrete category of information.[145]  Here, however, Windar outright failed to respond to a basic and foundational request for information (which also removed Windar from consideration as a mandatory respondent), and it received a final dumping margin based on total AFA as a result.  Under these circumstances, application of total AFA to the single entity is appropriate and consistent with the approach adopted in the cases referenced above.[146]

---

[144] As noted above, where Windar was the first company in the chain of distribution with knowledge that the wind towers were destined for the United States, Windar should have reported these transactions in its Q&V response, consistent with Commerce's practice.  *See Notice of Final Determination of Sales at Less Than Fair Value:  Silicon Metal from the Russian Federation*, 68 FR 6885 (February 11, 2003), and accompanying IDM at Comment 3 ("{Commerce}'s practice with respect to making a determination that knowledge of destination existed is that the producer knew or should have known at the time of the sale that the merchandise was being exported to the United States.").  For further discussion of this point, *see* the Proprietary Addendum.

[145] *See Papierfabrik August Koehler S.E. v. United States*, 7 F. Supp. 3d 1304, 1314 (CIT 2014) ("Commerce properly relies on partial AFA where the deficiency is only with respect to a discrete category of information.") (internal citations and quotations omitted).

[146] *See* Draft Results at 6-7; and 6-8, *supra* (citing *Nails from Malaysia CCR*; *New Zhongya Aluminum*; *Bicycles from China*; and *Pipe and Tube from Turkey*); *see also New Zhongya Aluminum*, 887 F. Supp. 2d at 1310-11 (sustaining application of an AFA rate based on the underlying petition); *see also Nails from Malaysia CCR* IDM at Comment 3; *Bicycles from China*, 61 FR at 19036; and *Pipe and Tube from Turkey*, 69 FR at 53677.  We note that, while Commerce may determine a cash deposit rate using partial AFA to fill discrete gaps, Commerce does not compute total dumping margins in this manner (*e.g.*, by computing, then averaging, rates for separate companies within a single entity).  As noted above, Commerce treats all companies within a collapsed entity as a single unit, and it is unclear how Commerce could, as a practical matter, act on SGRE/Windar's suggestion here, even if we agreed with it (which we do not).

We also disagree with SGRE/Windar's assertion that it is incumbent upon Commerce to corroborate anew the sole Petition rate used as AFA.  As noted above, no party to this proceeding challenged this rate in litigation, and, as a consequence, it is not subject to change. While we acknowledge that the record contains additional cost and sales price information developed through the course of this remand, we disagree that this additional information requires Commerce to revisit settled decisions.  Section 776(b)(2) of the Act allows Commerce to choose an AFA margin from the petition, the final determination in the investigation, any previous administrative review, or any other information placed on the record.  In the underlying LTFV investigation, we selected the rate from the Petition as the AFA margin, as it was the only available margin in the proceeding, and it was corroborated as part of Commerce's preliminary determination.[147]  Thus, SGRE/Windar's claim that information relating to its costs and sales prices should be considered in newly corroborating the AFA margin is without merit.[148]

In any event, even assuming, *arguendo*, that it would be appropriate to revisit the question of corroboration as a general matter, it would be inappropriate to do so here.  While the record now contains additional information with respect to SGRE's U.S. prices and Windar's costs of production, none of this information is useable as the basis for a margin calculation.  Of note, SGRE's U.S. prices are transfer prices from Windar (*i.e.*, an affiliated party), which are generally not used under section 772 of the Act as the basis for a calculated dumping margin; Windar's costs consist of a single, aggregate figure, not differentiated by product or broken into its component elements.  Further, Commerce did not analyze the reported prices or costs for

---

[147] *See Preliminary Determination* PDM at section IV.4, "Corroboration of Secondary Information," unchanged in *Final Determination*.

[148] *See* section 776(d)(3) stating that Commerce is not required:  "(A) to estimate what the countervailable subsidy rate or dumping margin would have been if the interested party found to have failed to cooperate under subsection (b)(1) had cooperated; or (B) to demonstrate that the countervailable subsidy rate or dumping margin used by the administering authority reflects an alleged commercial reality of the interested party."

accuracy or attempt to identify any deficiencies in them that needed correction.  Finally,

Commerce did not collect pricing information related to home market or third country sales

(although Windar had viable third country markets), and Commerce did not establish a deadline

for the petitioner to allege that the multinational corporation provision applied to those foreign

market sales (although the petitioner requested that Commerce permit such an allegation).  Thus,

the information on the record with respect to SGRE/Windar's U.S. prices and normal values are

potentially inaccurate, unusable, and/or incomplete.

Incomplete and unverified record information is not probative of a significantly lower

AFA margin.  SGRE and Windar, through their actions (or inactions), prevented Commerce from

fully investigating Windar's sales and costs, and the incomplete record in this case does not cure

these deficiencies.  Having assigned the SGRE/Windar entity the pre-existing rate for Windar,

consistent with agency practice, there is no basis for Commerce to rely on the SGRE response to

corroborate or otherwise adjust the Petition rate.

Additionally, we disagree with SGRE/Windar that Commerce failed to address the CIT's

concerns regarding the selection of an all-others rate.  The *Remand Order* directed Commerce to

reassess the "all-others" rate in light of an individual examination of SGRE.  Consistent with the

*Remand Order*, SGRE was selected for individual examination, which has resulted in the

assignment of a dumping margin based on AFA to the SGRE/Windar entity.  Indeed, Commerce

has examined multiple mandatory respondents in this investigation, and each received a rate

determined under sections 776(a) and (b) of the Act.  Accordingly, there is no other margin

available on which to base an all-others rate.  Pursuant to section 735(c)(5)(B) of the Act, and

consistent with our approach in AD investigations where we rely on application of AFA with

respect to the companies individually examined,[149] Commerce must base the all-others rate on the only available rate in this proceeding, *i.e.*, the Petition rate of 73.00 percent.

Finally, SGRE/Windar stated that its comments on the Draft Results were made under protest because Commerce "barely provided the parties with 48 hours to provide comments."[150] However, SGRE/Windar's concerns surrounding time constraints in this proceeding are somewhat disingenuous, given that, as the company concedes, Commerce filed a motion "with the {CIT} requesting an extension so that the parties may have time to comment."[151] SGRE/Windar, however, fails to acknowledge that:  (1) the company formally opposed Commerce's motion; and (2) Commerce allotted half of its remaining time (three of six business days) to parties for comment.[152]  In any case, as noted above, the CIT directed Commerce to provide parties an additional week to comment, rendering SGRE's concerns moot.

## V.      FINAL RESULTS OF REDETERMINATION

Pursuant to the *Remand Order*, Commerce has individually examined SGRE.  In the course of this examination, we have determined that:  (1) SGRE and Windar are affiliated under section 771(33)(E) of the Act; and (2) the companies, along with certain of Windar's subsidiaries, should be treated as a single entity, pursuant to 19 CFR 351.401(f), for purposes of this AD proceeding.  Accordingly, we have assigned the SGRE/Windar entity a single dumping

---

[149] *See, e.g., Utility Scale Wind Towers from India:  Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 56890 (October 13, 2021) (in which the all-others rate is based upon the only rate on the record); and *Prestressed Concrete Steel Wire Strand from Argentina, Colombia, Egypt, the Netherlands, Saudi Arabia, Taiwan, the Republic of Turkey, and the United Arab Emirates:  Final Affirmative Determinations of Sales at Less Than Fair Value and Final Affirmative Critical Circumstances Determinations, in Part*, 85 FR 80001 (December 11, 2020) (in which the all-others rates are based upon the only rate on the record of each respective investigation).
[150] *See* SGRE/Windar May 12, 2023 Comments at 1.
[151] *Id*. (emphasis added).
[152] We also note that, despite the time constraints on the agency throughout this remand proceeding, Commerce has sought to provided SGRE/Windar with ample time to submit its responses.  For example, SGRE/Windar has received the full time period allotted to companies for responding to Commerce's initial AD questionnaire.  *See* Commerce's Letters, "Extension of Deadline for Section A Questionnaire Response," dated March 2, 2023; "Extension of Deadline for Section BCDE Questionnaire Response," dated March 9, 2023; and "Extension of Deadline for Resubmission of Rejected Response," dated April 13, 2023.

margin, *i.e.*, 73.00 percent.  Because there are no other rates on the record of this proceeding

from which to select a different "all-others rate," the "all-others" rate remains unchanged.

6/15/2023

X _____

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
 for Enforcement and Compliance