**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE**

| | |
|---|---|
| Siemens Gamesa Renewable Energy, )<br><br>Plaintiff, )<br><br>v. )<br><br>United States, )<br><br>Defendant, )<br><br>Wind Tower Trade Coalition, )<br><br>Defendant-Intervenor. ) | Court No.  21-00449<br><br>Public Version |

**PLAINTIFF SIEMENS GAMESA RENEWABLE ENERGY'S**
**COMMENTS ON DRAFT REMAND REDETERMINATION**

Daniel Cannistra
Pierce Lee

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
(202) 624-2500

*Counsel for Siemens Gamesa Renewable*
*Energy*

July 17, 2023

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

SUMMARY OF ARGUMENT ........................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.     COMMERCE UNLAWFULLY REJECTED SGRE'S QUESTIONNAIRE
RESPONSE................................................................................................................ 3

II.    COMMERCE UNLAWFULLY DISREGARDED SECTIONS OF SGRE'S
SECTION A RESPONSE WHILE RELYING ON OTHER SECTIONS ...................... 6

III.   COMMERCE'S DETERMINATION THAT WINDAR DID NOT SUBMIT
QUANTITY AND VALUE DATA IS NOT SUPPORTED BY SUBSTANTIAL
EVIDENCE................................................................................................................ 7

IV.   THERE IS NO REMAINING INFORMATIONAL GAP AND NO BASIS FOR
APPLYING ADVERSE FACTS AVAILABLE TO WINDAR REMAINS ................. 10

V.    THE DEPARTMENTS REASONING RELIES ON AN ARGUMENT
ALREADY DISREGARDED BY THE COURT ......................................................... 13

VI.   THE ADVERSE FACTS AVAILABLE RATE USED BY THE DEPARTMENT
IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND IS NOT IN
ACCORDANCE WITH THE LAW.............................................................................. 15

VII.  COMMERCE DOES NOT COLLAPSE ENTITIES FOR RESPONDENT
SELECTION............................................................................................................. 20

VIII. THE COLLAPSED ENTITY IS A NEW ENTITY FOR WHICH A
DETERMINATION HAS NOT BEEN MADE ........................................................... 21

CONCLUSION.................................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Agro Dutch Industries Ltd. v. United States,* Court. No. 02-00499, Slip Op. 07-185
(Ct. Int'l Trade Dec. 26, 2007) ................................................................................11

*Am. Farm Lines v. Black Ball Freight Service*,
397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970)..............................................21

*Changzhou Trina Solar Energy Co. v. United States*,
352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) ............................................................12

*CS Wind Vietnam Co. v. United States*,
832 F.3d 1367 (Fed. Cir. 2016)..................................................................................8

*De Cecco di Filippo Fara S. Martino S.p.A. v. United States*,
216 F.3d 1027 (Fed. Cir. 2000)..................................................................15, 16, 17

*East Sea Foods LLC, v. U.S. and Catfish Farmers of America*,
714 F. Supp. 2d 1243 (Ct. Int'l Trade 2010) ............................................................22

*Gallant Ocean (Thailand) Co., Ltd. v. United States*,
602 F.3d 1319 (Fed. Cir. 2010)..........................................................................15, 16

*Gerber Food (Yunnan) Co. v. United States*,
387 F. Supp. 2d 1270 (Ct. Int'l Trade 2005) ...........................................................11

*KYD, Inc. v. United States*,
607 F.3d 760 (Fed. Cir. 2010)...................................................................................15

*Maverick Tube Corp. v. United States*,
857 F.3d 1353 (Fed. Cir. 2017)..................................................................................8

*Nippon Steel Corp. v. U.S.*,
337 F.3d 1373 (Fed. Cir. 2003)..................................................................................11

*Nucor Corp. v. United States*,
594 F.Supp.2d 1320 (Ct. Int'l Trade 2008) ..............................................................7

*Nucor Corp. v. United States*,
601 F.3d 1291 (Fed.Cir. 2010)...................................................................................7

*Shandong Huarong Machinery v. United States*,
435 F.Supp.2d 1261 (Ct. Int'l Trade 2006) ............................................................10

*Shenzhen Xinboda Industrial Co., Ltd. v. United States*,
279 F.Supp.3d 1265 (Ct. Int'l Trade 2017) ..............................................................7

*Stupp Corp. v. United States*,
359 F.Supp.3d 1293 (Ct. Int'l Trade 2019) ............................................................12

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
   44 F.3d 978 (Fed. Cir. 1995)8

*Wind Vietnam Co., Ltd. v. United States*,
   971 F.Supp.2d 1271 (Ct. Int'l Trade 2014) ............................................................7

*YC Rubber Co. (North America) LLC v. United States*,
   Court No. 21-1489 (Fed. Cir. 2022). ............................................................1, 2

*Zhejiang Dunan Hetian Metal Co. v. United States*,
   652 F.3d 1333 (Fed. Cir. 2011)............................................................12

**Federal Statutes**

19 U.S.C. § 1673d(c)(5)(B) ............................................................1, 3

19 U.S.C. § 1677a(e)............................................................18

19 U.S.C. § 1677e(a)............................................................11, 12

19 U.S.C. § 1677e(b)............................................................15

19 U.S.C. § 1677e(c)............................................................15

19 U.S.C. § 1677f-1(c)(2)............................................................1

**Regulations**

19 C.F.R § 351.104(a)(2)............................................................4

19 C.F.R § 351.204(d)(2)............................................................4

19 C.F.R. § 351.301(c)(1)............................................................4, 6

19 C.F.R. § 351.302(d)............................................................4

PUBLIC VERSION
Confidential information removed from square brackets

# INTRODUCTION

Plaintiff Siemens Gamesa Renewable Energy ("SGRE") hereby comments on the Department of Commerce's (the "Department's" or "Commerce's") Final Results of Redetermination Pursuant to Court Remand ("Remand Results") issued pursuant to the opinion and remand order of the U.S. Court of International Trade (the "CIT" or "Court") issued in *Siemens Gamesa Renewable Energy v. United States*, 621 F. Supp. 3d 1337 (CIT 2023) ("Remand Order").[1]  This litigation concerns the final determination in the antidumping investigation of utility scale wind towers from Spain.  *See Utility Scale Wind Towers from Spain: Final Determination of Sales at Less Than Fair Value*, 86 FR 33656 (June 25, 2021) ("Final Determination"), and accompanying Issues and Decision Memorandum.[2]

# SUMMARY OF ARGUMENT

The CIT remanded the Final Determination to Commerce on two grounds:  First, "{t}he assignment of the 73.00% rate to Siemens Gamesa was unlawful because it resulted from an unlawful respondent selection method, Commerce having limited its individual examination to a single respondent, contrary to 19 U.S.C. § 1677f-1(c)(2) as interpreted in *YC Rubber*."[3]  Second, the "73.00% rate also was unlawful as an 'all-others' rate because it was not determined according to a reasonable method as required by 19 U.S.C. § 1673d(c)(5)(B)."[4]  The Remand Results fail to remedy either of these deficiencies and continue to be in violation of 19 U.S.C. § 1677f-1 and 19 U.S.C. § 1673d.

---

[1] ECF No. 53.  Citations to the confidential remand record ("CRR") and public remand record ("PRR") reflect document numbers in the administrative record index for the remand proceeding, ECF No. 84.  Citations to the confidential record ("CR") and public record ("PR") reflect document numbers in the administrative record index for the underlying investigation, ECF No. 15.

[2] PR 152; PR 149.

[3] *See* Remand Order, at 22.

[4] *Id.*

Pursuant to 19 U.S.C. § 1677f-1, Commerce must investigate more than one exporter in order for a respondent selection method to be reasonable.   The CIT held that, in light of the Court of Appeals for the Federal Circuit's holding in *YC Rubber*, the Department's respondent selection method in the underlying investigation was unlawful and ordered Commerce to conduct an individual investigation on SGRE.[5]   Commerce failed to do so on remand.   During the remand proceeding, Commerce unlawfully rejected SGRE's questionnaire response, claiming, incorrectly, that it constituted an unsolicited questionnaire response.

In the Remand Results, Commerce treated SGRE and Windar Renovables S.A. ("Windar") as a single entity and assigned Windar's dumping margin of 73.00 percent, found in the Final Determination based on the application of adverse facts available ("AFA"), to the collapsed SIGE/Windar entity.   However, no remaining basis for applying AFA to Windar remains.   As the record establishes, Windar had no exports of wind towers to the United States other than through SGRE; and its quantity and value of exports through SGRE have been provided to Commerce.   Thus, no basis remains for continuing to apply AFA to Windar.

Commerce's collapsing analysis does not provide a new basis for applying AFA to SGRE.   The relationship of Windar to SGRE was well-known to Commerce in the underlying investigation and was brought before the Court during briefing.   Collapsing, rather than a finding of affiliation, changes nothing.   If the Court believed that SGRE could not have been investigated on remand because of its relationship with Windar, it would have caveated its order as such.   However, the Court did not.

Finally, the Remand Results run afoul of 19 U.S.C. § 1673d in the same manner the Court described in its opinion remanding the Final Determination to Commerce.   In its opinion,

---

[5] *Id.*, citing *YC Rubber Co. (North America) LLC v. United States*, Court No. 21-1489 (Fed. Cir. 2022).

PUBLIC VERSION
Confidential information removed from square brackets

"the 73.00% rate also was unlawful as an 'all-others' rate because it was not determined according to a reasonable method as required by 19 U.S.C. § 1673d(c)(5)(B)."[6]  In the Remand Results, Commerce continues to apply the same 73% all-others rate and Commerce made no effort to corroborate that rate, despite the statutory mandate to do so.

## ARGUMENT

### I.    COMMERCE UNLAWFULLY REJECTED SGRE'S QUESTIONNAIRE RESPONSE

The Department claims in its Remand Results that SGRE submitted an unsolicited questionnaire response.[7]  That is inaccurate.  On February 17, 2023, the Department issued a questionnaire to SGRE in the above-referenced investigation.[8]  That questionnaire contained the following instruction:

> Prepare only a single response for **you and your affiliates** involved with the production or sale of the products under investigation during the period of investigation (POI) in the foreign market or the United States. In other words, report the sales and cost information of these affiliates and your sales and cost information in the same computer data files and submit only one narrative response. However, clearly separate your answers regarding each company for which you are reporting information. Likewise, each record in your electronic sales databases should indicate which company is the manufacturer and which is the seller. Each record in your cost database should indicate the manufacturer.[9]

The questionnaire defines an affiliate as any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and that organization.[10]  As has been acknowledged by all parties

---

[6] *See* Remand Order, at 22.
[7] *See* Remand Results, at 4.
[8] PRR 1.
[9] Initial Questionnaire issued to SGRE (February 17, 2023) (PRR 1) ("Initial Questionnaire"), at G-10 (emphasis added).
[10] *Id.* at Appendix I.

Case 1:21-cv-00449-TCS   Document 56   Filed 07/17/23   Page 8 of 28
PUBLIC VERSION
Confidential information removed from square brackets

since 2021, Windar is an affiliate of SGRE.[11]  Therefore, Windar data was required in SGRE's

questionnaire response.[12]

Commerce cites 19 C.F.R. § 351.301(c)(1)[13] and § 351.302(d)(1)(ii)[14] as the basis for

rejecting SGRE's questionnaire response.[15]  But both provisions address unsolicited

questionnaire responses.  The Windar data included in SGRE's questionnaire responses was

clearly solicited by Commerce and SGRE followed the explicit instruction provided by

---

[11] *See infra* section III of this comment.

[12] The questionnaire also contains the following requests for information from affiliates:

- Identify all business transactions that may directly or indirectly affect the development, production, sale and/or distribution of the merchandise under review which your company has or had with any affiliate (except to the extent you have provided this in response to one of the questions above). PRR 1, at A-6.
- List the major inputs purchased from affiliated parties that are used to produce the merchandise under consideration during the cost calculation period. *Id.* at D-3, D-4.
- In reporting CONNUM specific per unit COP and CV figures under section IV below, report the cost of affiliated purchases in accordance with the amounts as recorded in your normal accounting records. Base the percentage on the volume purchased from each affiliate to the total volume purchased from all parties (i.e., affiliated and unaffiliated). *Id.* at D-4.
- The product specific per-unit cost of production should include movement costs incurred by the affiliated supplier for shipping the good to the respondent and a portion of the affiliate's SG&A. Include an amount for the affiliated supplier's interest expenses unless that affiliated supplier is included in the consolidated financial statements being used to report financial expenses for the producer in the COP buildup for the merchandise under consideration. *Id.*
- In accordance with the instructions provided below, provide one computer data file reporting the costs incurred for the merchandise under consideration. The file should contain per-unit cost information for the products sold in the U.S. market and the comparison market. If you are reporting a single response for multiple affiliates involved with the production of the merchandise under consideration, per II.E on page G-8 of the General Instructions, provide separate computer data files for each affiliated producer of the MUC as well as a weighted-average file combining all affiliated producers. *Id.* at D-15, D-16.

[13] "During a proceeding, the Secretary may issue to any person questionnaires, which includes both initial and supplemental questionnaires. The Secretary will not consider or retain in the official record of the proceeding unsolicited questionnaire responses, except as provided under § 351.204(d)(2), or untimely filed questionnaire responses. The Secretary will reject any untimely filed or unsolicited questionnaire response and provide, to the extent practicable, written notice stating the reasons for rejection (see § 351.302(d))." 19 C.F.R. § 351.301(c)(1)

[14] "Unless the Secretary extends a time limit under paragraph (b) of this section, the Secretary will not consider or retain in the official record of the proceeding: (i) Untimely filed factual information, written argument, or other material that the Secretary rejects, except as provided under § 351.104(a)(2); or (ii) Unsolicited questionnaire responses, except as provided under § 351.204(d)(2)." 19 C.F.R. § 351.302(d)(1).

[15] *See* Remand Results, at 24 (fn 107).

Case 1:21-cv-00449-TCS   Document 56   Filed 07/17/23   Page 9 of 28
PUBLIC VERSION
Confidential information removed from square brackets

Commerce to "{p}repare only a single response for you and your affiliates" regarding data from affiliates.[16]  Indeed, not including affiliate data in its questionnaire response would directly conflict with the questionnaire instructions.  It is simply nonsensical to suggest that a response to a questionnaire that requests information from affiliates can become an unsolicited questionnaire response when the specifically requested affiliate data is provided.  Given that the Windar data was solicited by Commerce, Commerce cannot lawfully invoke its regulations related to unsolicited responses as a basis for rejecting SGRE's questionnaire response containing data for its affiliates.

Moreover, Commerce's selective acceptance and use of Windar information was arbitrary.  In its Section A response, SGRE provided information on its and Windar's operations, per the instructions in the questionnaire to provide information on its affiliates.[17]  Commerce does not object to such information being provided in the Section A response, and relied upon the incorporated Windar information in its analysis.[18]  In fact, Commerce cites the SGRE/Windar Section A response 13 times in its remand determination.[19]  The same instruction to provide information for SGRE and its affiliates was relied upon in SGRE's Section B-D submissions.  However, despite accepting SGRE's Section A response providing data for SGRE and its affiliates, Commerce claims that SGRE's Section B-D response providing data for SGRE and its affiliates is an unsolicited questionnaire response.  Commerce does not explain why a Section B-C response incorporating requested affiliate information is unsolicited, while a Section A response incorporating requested affiliate information is solicited.

---

[16] Initial Questionnaire (PRR 1), at G-10.
[17] SGRE's Section A Response (March 10, 2023) (CRR 1-62; PRR 8-40) ("SGRE AQR").
[18] *See* Remand Results, at 25, 28, 30, 33.
[19] *See id.* at 4, 11, 24, 25, 28, 30

Case 1:21-cv-00449-TCS   Document 56   Filed 07/17/23   Page 10 of 28
PUBLIC VERSION
Confidential information removed from square brackets

Instead, Commerce simply claims that it can modify questionnaires as its basis for spontaneously treating solicited information as unsolicited.[20]  But Commerce's original questionnaire was never retracted or modified.  Instead, it was SGRE that contacted the Department for guidance on how to respond to its questionnaire in light of Commerce's redaction instruction which directly conflicted with both the general instruction and a series of specific instructions regarding affiliates.[21]  Commerce never substantively responded to this request, choosing instead to simply reiterate that SGRE must remove information/data sourced from Windar "at this time."[22]  Commerce's original questionnaire remains the only questionnaire issued to SGRE.  As such, the Windar data included in SGRE's response was improperly rejected as "unsolicited."

## II.   COMMERCE UNLAWFULLY DISREGARDED SECTIONS OF SGRE'S SECTION A RESPONSE WHILE RELYING ON OTHER SECTIONS

As instructed, SGRE provided in its Section A response quantity and value data related to exports to the U.S. by SGRE and Windar.  Despite exhaustively relying on other Section A data, Commerce disregarded Windar's quantity and value data contained within the same

---

[20] *See* Memorandum, "Submission of Questionnaire Response," dated March 30, 2023 (PRR 45) ("Questionnaire Instruction Memorandum") ("Commerce hereby wishes to clarify that we are not soliciting any information from Windar Renovables at this time. Additionally, any questionnaire response that includes information from Windar Renovables will be rejected in accordance with 19 C.F.R. § 351.301(c)(1) and 351.302(d)(1)(ii).").

[21] *See* Letter from Commerce to SGRE, "Rejection of Sections B through D Questionnaire Response" (April 11, 2023) (PRR 52); *see also* Letter from SGRE to Commerce, "Request for Extension and Clarification of Reporting Requirements" (April 12, 2023) (PPR 55).

[22] On April 13, 2023, Commerce officials conducted a virtual meeting with counsel for SGRE.  During the meeting, Commerce officials reiterated the reporting requirements set forth in Commerce's March 30, 2023 memorandum and requested SGRE to resubmit its Section BCD questionnaire response without information sourced from Windar, despite the explicit questionnaire instructions.  *See* Memorandum, "Utility Scale Wind Towers from Spain: Clarification of Reporting Requirements – Meeting with SGRE's Counsel" (April 13, 2023) (PRR 57).

submission.  Commerce's use of data for one purpose and the disregard of the same information for another purpose is unlawful.

For example, in CS *Wind Vietnam Co., Ltd. v. United States*, 971 F.Supp.2d 1271, 1284 (Ct. Int'l Trade 2014), Commerce's inconsistent use of importer's proffered surrogate data for valuing steel plate, by relying on data set for some purposes but not others without providing any rationale as to why data were reliable for only selected purposes, was found to be impermissible. Commerce is required to consider data to extent they both supported and detracted from Commerce's chosen surrogate value.  *Id.*  Moreover, "Commerce is not permitted to reach its determinations by selectively citing some evidence with ignoring the rest."  *Shenzhen Xinboda Industrial Co., Ltd. v. United States*, 279 F.Supp.3d 1265, 1298 (Ct. Int'l Trade 2017). Commerce "must consider the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence." *Nucor Corp. v. United States*, 594 F.Supp.2d 1320, 1332 (Ct. Int'l Trade 2008), aff'd, 601 F.3d 1291 (Fed.Cir. 2010).

As noted above, SGRE's Section A response was central to the Department's affiliation analysis.  Commerce's failure to utilize the same questionnaire response for other purposes was unlawful.

### III.   COMMERCE'S DETERMINATION THAT WINDAR DID NOT SUBMIT QUANTITY AND VALUE DATA IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

Among other data points, Commerce's questionnaire to SGRE solicited quantity and value data for SGRE and its affiliates.  In response to the questionnaire, quantity and value data was provided for both Windar and SGRE.  Commerce claims that SGRE's submission does not

constitute a "Q&V response from Windar."[23]  This claim is not supported by substantial

evidence.

     A finding is supported by substantial evidence if a reasonable mind might accept the

evidence as sufficient to support the finding." *Maverick Tube Corp. v. United States*, 857 F.3d

1353, 1359 (Fed. Cir. 2017) (citing *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229

(1938)).  "The substantiality of evidence must take into account whatever in the record fairly

detracts from its weight."  *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir.

2016).  This includes "contradictory evidence or evidence from which conflicting inferences

could be drawn."  *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985

(Fed. Cir. 1994) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951))

     In its Section A questionnaire, Commerce requested that SGRE "{c}omplete a combined

chart for merchandise produced and sold by your company and its <u>affiliates</u>…"[24]  In response,

"SGRE provides at Exhibit A-1 the quantity and value chart for the sales of tower sections made

by Windar to affiliated and unaffiliated customers during the POI."[25] SGRE explained that

"{d}uring the POI, Windar sold tower sections to its affiliate [                         ].".[26]

Exhibit A-1 of SGRE's Section A response  is titled "SGRE/Windar's Q&V chart."[27]

Commerce then explicitly acknowledged that SGRE provided quantity and value data on behalf

of both Windar and SGRE in a supplemental questionnaire when it noted that "{i}n Exhibit A-1,

<u>you provide a quantity and value chart for SGRE and Windar Renovables (Windar)</u> which lists

---

[23] *See* Remand Results, at 32.
[24] *See* Initial Questionnaire (PRR 1) at A-1 (emphasis added).
[25] SGRE AQR (CRR 1-62; PRR 8-40), at 2.
[26] *Id.*
[27] *Id.*at Exhibit A-1.

the total quantity sold with a unit of measure as pieces."[28]  It then asks a number of follow-up

questions regarding Windar quantity and value data:

> On page 2, you state that SGRE made no sales of utility scale wind towers
> (wind towers) in the home market or third country markets during the POI;
> however, you state that SGRE's affiliate, Windar Renewables (Windar),
> sold towers to third countries on either [                    ] Incoterms® bases.
> You stated that, for this reason, Windar would treat all of its sales not made
> to SGRE's U.S. entity as home market sales. However, on page 3, you state
> that these sales made by Windar were made to an [.
>
>                                                                              ]. Although
> these sales were made on a [        ] basis, we note that Windar's sample
> sale documentation provided in Part 2 of Exhibit A-26W lists [        ] as
> the destination of the wind tower. Therefore, for all sales of complete wind
> towers or sections of wind towers with a known delivery location to third-
> country markets during the POI: (1) identify all third-country markets that
> individually accounted for more than five percent by quantity of U.S. sales
> during the POI; and (2) include these countries in your responses to the
> questions below.[29]

Commerce then requests that SGRE provide a separate detailed quantity and value chart

for SGRE and Windar during the POI by destination.  The requested separate quantity and value

charts for Windar and SGRE was provided on April 3, 2023.[30]  Thus, not only was Windar's

quantity and value data provided by the Department, the Department acknowledged that Windar

quantity and value date was provided, asked follow-questions on Windar's quantity and value

data, and then asked for Windar's quantity and value data to be reformatted.[31]  As such, SGRE's

submissions provided Windar's quantity and value data in the course of the remand proceeding

at Commerce's request.  Commerce's claim that SGRE's submissions did not constitute a

quantity and value submission on behalf of Windar is unsupported by substantial evidence.

---

[28] Supplemental Questionnaire (March 28, 2023) (PRR 44), at 1 (emphasis added).
[29] *Id.* at 2.
[30] SGRE's Supplemental Section A Response (April 3, 2023) (CRR 76, 79, 80; PRR 47, 49, 50), at 6.
[31] Supplemental Questionnaire of March 28, 2023, page 2.

PUBLIC VERSION
Confidential information removed from square brackets

IV.    **THERE IS NO REMAINING INFORMATIONAL GAP AND NO BASIS FOR APPLYING ADVERSE FACTS AVAILABLE TO WINDAR REMAINS**

In the remand proceeding, the Department solicited, and Windar provided, quantity and value data on its exports to the U.S.[32]  In the underlying investigation, the Department based its application of AFA to Windar solely on their perceived absence of Windar's quantity and value data.  Because Windar's quantity and value information is now on the record, there is no remaining gap to justify the use of facts available, let alone adverse facts available.  The Department continued to use AFA for the all-other rate, and expanded its use to SGRE despite the absence of an informational gap permitting the use of AFA.

Commerce first must determine that it is proper to use facts otherwise available before it may apply an adverse inference.  *See e.g., Shandong Huarong Machinery v. United States*, 435 F.Supp.2d 1261, 1289 (Ct. Int'l Trade 2006) ("absent a valid decision to use facts otherwise available, Commerce may not use an adverse inference.").  The use of facts otherwise available, moreover, is only appropriate to fill gaps when Commerce must rely on other sources of information to complete the factual record.  There must be a gap in the record that requires filling in order to justify resort to facts otherwise available.  Information must therefore be "necessary" to and "missing" from the proceeding in order for there to be a failure on the part of a respondent to comply with a request therefor.  *See* 19 U.S.C. § 1677e(a).  "The Statement of Administrative Action accompanying Pub.L. 103–465 states that '{w}here a party has not cooperated, Commerce ... may employ adverse inferences *about the missing information* to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated

---

[32] *See* Initial Questionnaire (PRR 1), at A-1, A-2 ("Complete a combined chart for merchandise produced and sold by your company and its affiliates …."); *see also* SGRE AQR, at 1-4, Exhibit A-1.

fully.' *Agro Dutch Industries Ltd. v. United States*, Court. No. 02-00499, Slip Op. 07-185 (Ct.

Int'l Trade Dec. 26, 2007), at 21, citing H.R. Doc. No. 103-316 (1994) at 870.  After Commerce

has determined that the use of facts otherwise available is proper, it can "'use an inference that is

adverse to the interests of {a respondent} in selecting from among the facts otherwise available,'

only if Commerce makes the separate determination that the respondent 'has failed to cooperate

by not acting to the best of its ability to comply.'"  *Nippon Steel Corp. v. U.S.*, 337 F.3d 1373,

1381 (Fed. Cir. 2003), quoting 19 U.S.C. § 1677e(b).

The administrative record contains Windar's quantity and value data; and SGRE's

questionnaire response in the remand proceeding confirmed that Windar had no exports to the

United States.[33]  SGRE is the exporter of wind towers to the United States and Windar provided

its quantity and value data confirming the absence of independent shipment to the U.S.  These

facts cannot be disregarded by the Department; nor can it continue to find that any informational

gap exists.  Moreover, Commerce cannot disregard the fact that Windar's quantity and value data

had no impact on Commerce's respondent selection process.  As originally reported, SGRE

exported wind towers produced by its affiliate (Windar).

While Commerce is empowered to use adverse inferences, "it may not do so in disregard

of information of record that is not missing or otherwise deficient."  *Gerber Food (Yunnan) Co.

v. United States*, 387 F. Supp. 2d 1270, 1288 (Ct. Int'l Trade 2005); *see also Changzhou Trina

Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1327-1328 (Ct. Int'l Trade 2018)("The

use of facts available allows Commerce to render determinations when information is missing

and it may use an adverse inference if respondents fail to cooperate, but is not permitted to skip

either of these steps on the way to use of AFA."); *Zhejiang Dunan Hetian Metal Co. v. United*

---

[33] *See* SGRE AQR, at 1-4, 16-17, Exhibit A-1.

*States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011)("For the reasons stated in *Gerber*, and under the plain language of § 1677e(a), it is clear that Commerce can only use facts otherwise available to fill a gap in the record"); *Stupp Corp. v. United States*, 359 F.Supp.3d 1293, 1312 (Ct. Int'l Trade 2019) ("Although Commerce has the discretion to set and enforce its own deadlines to ensure finality, it may abuse its discretion by rejecting information that would not be burdensome to incorporate and which would increase the accuracy of the calculated dumping margins.").

In its questionnaire issued to SGRE, the Department specifically requested information on the quantity of value of exports.  This request encompassed both SGRE and its affiliates.  SGRE's questionnaire response provided quantity and value information for both SGRE and its affiliate (Windar).  As explained by its Section A response, SGRE exported from Spain wind towers produced by Windar.  Moreover, record evidence demonstrates that Windar had no exports to the United States.  This was first confirmed by the CBP data which identified SGRE, not Windar, as the exporter of wind tower from Spain.[34]  This was then confirmed in SGRE's quantity and value response in the underlying investigation, which indicated that it was reporting exports of wind towers produced by Windar.[35]  This was then reconfirmed in SGRE's Section A response and in Windar's quantity and value response in the remand proceeding, then confirmed again in supplemental questionnaires during the remand proceeding.[36]  At no point in the underlying investigation or the remand proceeding has any record evidence been generated indicating that Windar exported wind towers to the United States beyond the wind towers sold via SGRE.  Therefore, the underlying factual basis relied upon by the Department is rendered moot by the provision of quantity and value information for Windar in the remand proceeding

---

[34] CR 22.
[35] CR 27; PR 84.
[36] *See* SGRE AQR, at 1-4, 16-17, Exhibit A-1.

Case 1:21-cv-00449-TCS   Document 56   Filed 07/17/23   Page 17 of 28
PUBLIC VERSION
Confidential information removed from square brackets

and the underlying predicate for the application of adverse facts available to Windar has been removed.

Moreover, Windar's quantity and value data was not subject to Commerce's redaction request and no party contests that Windar's quantity and value data is part of the administrative record. The Department claims that Windar's rate "was not challenged before Commerce or the CIT."[37]  That is not correct.  The heading of Section III of the administrative case brief submitted jointly by SGRE *and* Windar to the agency was entitled "The Department Erred by Not Selecting SGRE/Windar for Individual Examination."[38]

## V.   THE DEPARTMENTS REASONING RELIES ON AN ARGUMENT ALREADY DISREGARDED BY THE COURT

The remand determination insists that the relationship between Windar and SGRE is new information, which justifies the application of AFA to both companies.[39]  It does not. The affiliation between Windar and SGRE has been well-known to the Department.  In its original quantity and value submission, SGRE noted that it exported wind towers produced by its affiliate – Windar.[40]  The affiliation between Windar are SGRE was also referenced by the Department in its final determination.[41]  Before the Court, Commerce argued that the relationship between Windar and SGRE presented a "complicating factor" that precluded an investigation of SGRE,

---

[37] Remand Results, at 2.
[38] *See* Administrative Case Brief (CR 40; PR 141), at 2.  This document is entitled, "Brief from Crowell & Moring LLP to Sec. of Commerce Pertaining to SGRE *and* Windar."  *See* Administrative Record Index, ECF No. 15 (emphasis added).
[39] Remand Results, at 4, 25-26.
[40] In response to the Department's request to provide information on exports, SGRE provided its "U.S. sales reported in Attachment I reflect SGRE's purchases from Windar Renovables, an affiliated supplier in Spain."  *See* SGRE Q&V Response (December 7, 2020) (CR 27; PR 84), at 1.
[41] Preliminary Issues and Decision Memorandum ("Prelim IDM") (March 30, 2021) (PR 134), at ____ ; Final Issues and Decision Memorandum ("Final IDM") (June 15, 2021) (PR 149) at 2, 6, 9.

despite the statutory mandate to do so.[42]  Indeed, before the Court, the Department argued that an

individual examination of SGRE would be complicated at the very least by SGRE's sourcing of

subject wind towers from an unaffiliated supplier that failed to respond to Commerce's Q&V

questionnaire. See IDM at 6 n.31 (explaining that this would be a "complicating factor, requiring

additional time and resources to address").[43]

In its reply brief, SGRE explained that respondents routinely source merchandise from

domestic suppliers for export to the United States.[44]  SGRE also explained that Commerce

investigates and assigns AD rates to individual exporters, and quantity and value questionnaires

are solicited for data with respect to exports.[45]  Finally, the opinion issued by this court notes the

affiliation between Windar and SGRE.[46]

Thus, since December 7, 2020, it was well-known that wind towers exported by SGRE

were produced by its affiliate (Windar).[47]  Yet, in its remand determination, Commerce feigns

surprise at the affiliation between Windar and SGRE.  SGRE and Windar have always been

recognized to be affiliated and any collapsing determination by Commerce does not alter the

fundamental fact that SGRE and Windar are affiliated, a fact long recognized by all parties.

---

[42] Defendant's Response Brief (April 14, 2022), at 23.
[43] Reply Brief at 23. Plaintiffs' assume that the paragraph above contains a typographical error in Defendant's brief and should reference "affiliated supplier" rather than "unaffiliated supplier."
[44] Plaintiff's Reply Brief (May 12, 2022), at 17 (fn 6).
[45] *Id.*  That was precisely the case in this matter, where the Department specifically requested, "Please include only sales exported by your company directly to the United States."  *See* Memorandum, "Issuance of Quantity and Value Questionnaires" (November 25, 2020) (PR 49), at Attachment, Attachment I ("Format for Reporting Quantity and Value of Sales").
[46] Remand Order, at 10 (fn 5).
[47] *See* SGRE Q&V Response (December 7, 2020) (CR 27; PR 84), at 1.

### VI.    THE ADVERSE FACTS AVAILABLE RATE USED BY THE DEPARTMENT IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND IS NOT IN ACCORDANCE WITH THE LAW

The rate that Commerce continues to use is unlawful.  In selecting an AFA rate, Commerce may use information from the petition, investigation, prior administrative reviews, or "any other information placed on the record." 19 U.S.C. § 1677e(b); *see Gallant Ocean (Thailand) Co., Ltd. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010) ("{I}n the case of uncooperative respondents," Commerce has discretion to "select from a list of secondary sources as a basis for its adverse inferences."); *see also F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).  However, when Commerce "relies on secondary information rather than on information obtained in the course of an investigation or review," it "shall, to the extent practicable, corroborate that information from independent sources that are reasonably at {its} disposal." 19 U.S.C.§ 1677e(c). To corroborate secondary information, Commerce must find that the information has "probative value," *KYD, Inc. v. United States*, 607 F.3d 760, 765 (Fed. Cir. 2010), by demonstrating that the rate is both reliable and relevant, *Gallant Ocean*, 602 F.3d at 1323–25.

Commerce claims in its remand determination that it undertook a corroboration analysis in the underlying investigation.[48]  However, that "corroboration" analysis merely compared information contained in the petition with another information contained in the petition.[49]  Thus, Commerce relied exclusively on the petition in establishing the AFA rate.  In the preliminary

---

[48] Remand Results, at 35.
[49] Commerce claims that the AFA rate "was corroborated as part of Commerce's preliminary determination."  However, the AFA rate "is derived from information in the Petition (as well as supplements thereto) …."  *See* Prelim IDM, at 8.

determination of the underlying investigation, Commerce explained that the petition was the only

information on the record from which to derive a dumping margin.[50]  That is no longer the case.

Commerce may not simply rely on the petition where more reliable information is

available.  *See Gallant Ocean*, 602 F.3d at 1323 (overturning an adverse facts available margin

based on an adjusted petition rate where "Commerce incorrectly presumed that the adjusted

petition rate was reliable in the face of much more reliable information"); *see also F.lli De

Cecco*, 216 F.3d at 1032 ("{Congress} intended for an adverse facts available rate to be a

reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase

intended as a deterrent to noncompliance. Congress could not have intended for Commerce's

discretion to include the ability to select unreasonably high rates with no relationship to the

respondent's actual dumping margin.").

The administrative record contains information that is more reliable than the information

provided in the petition.  Record evidence clearly demonstrates that the cost and sales

information in the petition is wildly inaccurate.

SGRE's submission of April 26, 2023 provides the following:

Average Selling Price:                    [        ] per unit

Average Cost of Production:        [        ] per unit

SGRE's Supplemental Section D Response ("SDQR") (April 26, 2023) (CRR 177-179; PRR 71),

at 1.  Adding the same profit rate used in the petition (10.518 percent)[51] to the average cost of

production results in a normal value based on constructed value of [          ] Euros per unit.[52]

---

[50] *See* Prelim IDM, at 8.
[51] Petition (September 30, 2020) (PR 1-7; CR 1-8), at Exhibit IV-27.
[52] The example above is illustrative on the unrepresentativeness of the margin calculation used by the Department and SGRE takes no position at this time regarding the profit rate proffered by Petitioner.

Case 1:21-cv-00449-TCS   Document 56   Filed 07/17/23   Page 21 of 28
PUBLIC VERSION
Confidential information removed from square brackets

This, in turn, results in a dumping calculation of 9.4 percent, not 73 percent.[53] There is ample record evidence to corroborate the information contained in the petition. Commerce's failure to do so is unlawful.

The AFA rate used by Commerce is nearly 8 times higher than the dumping margin calculated using SGRE/Windar's actual cost and sales information. An AFA rate must be "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." *F.lli De Cecco*, 216 F.3d, at 1032. The purpose of the AFA rate "is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." *Id.* Therefore, although a higher AFA rate creates a stronger deterrent, Commerce may not select unreasonably high rates having no relationship to the respondent's actual dumping margin. *Id.* Congress tempered the deterrent purpose with the corroboration requirement so as "to prevent the petition rate (or other adverse inference rate), when unreasonable, from prevailing and to block any temptation by Commerce to overreach reality in seeking to maximize deterrence." *Id.*

Commerce claims that it would be inappropriate to corroborate the AFA rate (despite the statutory mandate) because: (1) the prices provided by SGRE are based on transfer prices; (2) the cost data is an average cost; (3) Commerce did not analyze the reported costs; (4) Commerce did not collect information related to home or third country sales; and (5) Commerce did not establish a deadline for alleging that the multinational provisions applied.[54] Each of these

---

[53] SGRE notes that this calculation overstates the actual projected dumping as it compares average U.S. selling prices with average production costs for sales to all markets. To the extent that production costs associated with third country sales are higher than the average production costs associated with U.S. sales, the resulting margin would be overstated.

[54] Remand determination at 35-36.

PUBLIC VERSION
Confidential information removed from square brackets

reasons fails to excuse Commerce from the statutory corroboration requirement and consideration of record evidence related to the actual dumping margin.

First, section 772(e) authorizes Commerce to determine export price based on alternative methods when it appears that the value added after importation is likely to "exceed substantially" the value of the imported product.  19 U.S.C. §1677a(e).  In this case, the value after importation substantially exceeded the value of the imported product and there were no sales into the U.S. where the value did not substantially exceed the value of the imported product.  As such, the alternative method provision is triggered.  In this scenario, the Statement of Administrative Action explains that the alterative price may be "based upon the price paid to the exporter or producer by the affiliated person {i.e. the transfer price} for the subject merchandise, if Commerce determines that such a price is appropriate."[55]  Commerce's concerns regarding the use of transfer prices for the margin calculation are misplaced as transfer prices are permitted in certain circumstances, including the circumstances of this particular matter.

Second, Commerce's claim that an average cost prevents it from corroborating the AFA rate neglects the fact that the current AFA is likewise based on a singular cost data point.  Moreover, SGRE and Windar submitted extensive product-specific cost information for each tower produced during the period of investigation, but such cost data was improperly rejected by Commerce.  The fact that Commerce is left with a singular average cost is directly a result of its unlawful rejection of Windar cost data, as discussed above.  The explanation that Commerce did not analyze the reported costs fails for the same reason.  It was Commerce, not SGRE or Windar that improperly rejected and failed to analyze the submitted cost data.  Moreover, Commerce's

---

[55] Statement of Administrative Action, (3) Special Rule for Merchandise with Value Added After Importation.

Case 1:21-cv-00449-TCS   Document 56   Filed 07/17/23   Page 23 of 28
PUBLIC VERSION
Confidential information removed from square brackets

claim that it "did not collect information related to home or third country sales" is inaccurate. Commerce issued a questionnaire requesting information on home and third country sales, and SGRE and Windar responded. Commerce's explanation that it did not analyze the submitted cost data is the direct result of its improper rejection of the detailed cost data. While Commerce unlawfully rejected the submitted home and third market sales data as it related to Windar, it is not accurate to claim that such information was not collected.

Finally, Commerce claims that it "did not establish a deadline for alleging that the multinational provisions applied" and therefore, it could not corroborate its AFA rate.[56] Setting aside the absence any relationship between a deadline alleging the application of the multinational corporation ("MNC") provision and the statutory requirement to corroborate the AFA rate, there is no need for Commerce to "establish" a deadline for the petitioners because such a deadline already existed. As recognized by Defendant-Intervenor, in general, allegations regarding the basis for determining normal value are due 10 days after the respondent's "response to the relevant section of the questionnaire, unless the Secretary alters this time limit."[57] Commerce did not alter the time and the last relevant submission was made on March 31, 2023.[58] Therefore, the deadline to submit an MNC allegation was April 10, 2023.[59] Petitioner had an opportunity to submit an MNC allegation within the deadline, but chose not to do so. As such, this issue is now moot.

---

[56] Remand Results, at 36.
[57] Letter from Wind Tower Coalition, March 20, 2023 (PRR 41).
[58] Citribel filed its Sections B-D responses on March 31, 2023, which were unlawfully rejected by Commerce. *See* Memorandum, "Utility Scale Wind Towers from Spain: Reject and Remove Sections B through D Questionnaire Response" (April 1, 2023) (PRR 53).
[59] Even if the deadline for submitting an MNC allegation triggered from the resubmission of SGRE's questionnaire response, the established deadline would be April 24, 2013 (10 days from SGRE's submission of April 14, 2013). *See* SRGE's Resubmission of Sections B-D Responses (April 14, 2023) (CRR 81-174; PRR 58-66).

PUBLIC VERSION
Confidential information removed from square brackets

Given the above, there is no remaining basis for Commerce to claim that it could not corroborate the AFA rate.  As such, this case should be remanded so that Commerce may fulfill its statutory obligation.  In doing so, Plaintiff's request that the resulting order specifically instruct Commerce to utilize the average cost and price information in the administrative record.

## VII.   COMMERCE DOES NOT COLLAPSE ENTITIES FOR RESPONDENT SELECTION

Commerce's unlawful act was in its selection of mandatory respondents and a procedural error at the inception of the investigation.  Any subsequent finding regarding the degree of affiliation (e.g., a finding of control), does not remedy Commerce's unlawful act because subsequent agency actions are voided by prior unlawful agency actions.

It is well-established that any analysis of affiliation or collapsing occurs after respondent selection (i.e., the timing of the procedural error), Commerce's policy is to affirmatively decline to conduct a collapsing analysis in the respondent selection process.  "In general, Commerce finds that determinations concerning whether particular companies should be 'collapsed' (i.e., treated as a single entity for purposes of calculating antidumping duty rates) require a substantial amount of detailed information and analysis, which often require follow-up questions and analysis.  Accordingly, Commerce will not conduct collapsing analyses at the respondent selection phase of a review and will not collapse companies at the respondent selection phase unless there has been a determination to collapse certain companies in a previous segment of this antidumping proceeding (i.e., investigation, administrative review, new shipper review or changed circumstances review)."[60]  "Commerce will not conduct collapsing analyses at the

---

[60] Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review and Join Annual Inquiry Service List, 87 Fed. Reg. 75 (2022)

Case 1:21-cv-00449-TCS   Document 56   Filed 07/17/23   Page 25 of 28
PUBLIC VERSION
Confidential information removed from square brackets

respondent selection phase of this review and will not collapse companies at the respondent

selection phase unless there has been a determination to collapse certain companies in a previous

segment of this antidumping proceeding...”[61]

Errors as to procedural rules void subsequent agency action if they cause the challenging

party "substantial prejudice." *Am. Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 539,

90 S.Ct. 1288, 25 L.Ed.2d 547 (1970); *see also Great Am. Ins*, 738 F.3d at 1329 ("{T}he

suspension in this case could be invalidated only if Great American showed that the agency's

procedural error caused it substantial prejudice{.}" (citing *Shinseki v. Sanders*, 556 U.S. 396,

406, 129 S.Ct. 1696, 173 L.Ed.2d 532 (2009); 5 U.S.C. § 706)).

In the instant case, the procedural error arose at the inception of the investigation during

respondent selection. The resulting prejudice was the ability to demonstrate that the quantity and

value questionnaire submitted by SGRE was complete with respect to both Windar and SGRE.

### VIII. THE COLLAPSED ENTITY IS A NEW ENTITY FOR WHICH A DETERMINATION HAS NOT BEEN MADE

A consolidated or merged entity is not considered the same entity as a predecessor entity

for cash deposit purposes. As such, any finding of collapsing of Windar, Windar's previously

unnamed affiliated producers, and SGRE entities creates a new, distinct consolidated group of

companies for which a determination was not made and no cash deposit rate was set. The

normal consequence of a negative determination in a successor-in-interest analysis is that the

entity found not to be the successor may not post cash deposits at the antidumping duty rate

calculated for the alleged predecessor; in the case of a market economy, Commerce generally

---

[61]  Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review: Aluminum Extrusions from the People's Republic of China; 2014-2015. A-570-967 (June 14, 2016)

applies the "all others rate" to the non-succeeding entity by default.  *East Sea Foods LLC, v. U.S. and Catfish Farmers of America*, 714 F. Supp. 2d 1243, 1248 (Ct. Int'l Trade 2010).  *See also* Notice of Preliminary Results of Antidumping Duty Changed Circumstances Review: Polychloroprene Rubber from Japan, 69 Fed. Reg. 61,796, 61,798 (Oct. 21, 2004) (preliminarily finding that SDK was not the successor-in-interest to SDEM/DDE, and that "SDK should not be given the same antidumping duty treatment as {SDEM/DDE}," and that SDK, as a new entity, "should continue to be assigned as its cash deposit rate the 'all others' rate").  Likewise, *see* Frozen Warmwater Shrimp From Vietnam: Notice of Preliminary Results of Antidumping Duty Changed Circumstances Reviews, 74 Fed. Reg. 31,698, 31,700 (July 2, 2009) (preliminarily finding that CAFISH was not the successor-in-interest to CATACO, and thus "should not receive CATACO's current separate rate and that the cash deposit rate for ... CAFISH should continue to be the current Vietnam-wide rate") (unchanged in final results, *see* 74 Fed. Reg. 42,050, 42,051); Wooden Bedroom Furniture from the People's Republic of China: Preliminary Results of Antidumping Duty Changed Circumstances Review, 72 Fed. Reg. 41,492, 41,495 (July 30, 2007) (preliminarily finding that Tradewinds International is not the successor-in-interest to Fortune Glory, "and, therefore, should not be given the same antidumping duty treatment as Fortune Glory") (unchanged in final results, *see* 72 Fed. Reg. 60,812, 60,813–14.).

## CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court remand this case back to Commerce with an order to place on the administrative record the questionnaire responses submitted by SGRE and improperly rejected by the Department, calculate a lawful antidumping rate for SGRE and establish the all-other rate and SGRE's rate based on the submitted data, in accordance with the antidumping duty statute.

PUBLIC VERSION
Confidential information removed from square brackets

Respectfully submitted,

Daniel Cannistra
Pierce Lee

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
202) 624-2500

*Counsel for Siemens Gamesa*
*Renewable Energy*

July 17, 2023

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 7011 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word used to prepare this brief.

Respectfully submitted,

_____
Daniel Cannistra

*Counsel for Siemens Gamesa*
*Renewable Energy*