A-469-823
Remand
Slip Op 23-149
**Public Document**
E&C/OV:  Team

**Siemens Gamesa Renewable Energy v. United States**,
**659 F. Supp. 3d 1343 (CIT 2023)**
**Utility Scale Wind Towers from Spain**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO SECOND COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the opinion and second remand order of the U.S. Court of International Trade (the Court) in *Siemens Gamesa Renewable Energy v. United States*, 659 F. Supp. 3d 1343 (CIT 2023) (*Second Remand Order*).  These final results of redetermination concern Commerce's final determination in the less-than-fair-value (LTFV) investigation of utility scale wind towers (wind towers) from Spain.[1]  The Court remanded for Commerce to either determine a new margin for Siemens Gamesa Renewable Energy (SGRE) that would be applied to the SGRE/Windar[2] collapsed entity, or reverse its collapsing decision with regard to SGRE and Windar and submit a new rate for SGRE, while leaving standing the rate calculated for Windar.[3]

On remand, consistent with the *Second Remand Order* and under respectful protest,[4] we individually examined SGRE/Windar, conducted verification, and calculated a dumping margin

---

[1] *See Utility Scale Wind Towers from Spain:  Final Determination of Sales at Less Than Fair Value*, 86 FR 33656 (June 25, 2021) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).

[2] The collapsed entity SGRE/Windar consists of:  SGRE; Windar Renovables S.A. (Windar); and five of Windar's affiliates (*i.e.*, Tadarsa Eolica SL; Windar Offshore SL; Windar Wind Services SL; Aemsa Santana SA; and Apoyos Metalicos SA).

[3] *See Second Remand Order*, 659 F. Supp. 3d at 1351.

[4] *See Viraj Group, Ltd. v. United States*, 343 F.3d 1371, 1376-77 (Fed. Cir. 2003).

for the collapsed entity of SGRE/Windar.  For these final results of redetermination, we determine that SGRE/Windar sold wind towers from Spain in the United States at LTFV, as provided in section 735 of the Tariff Act of 1930, as amended (the Act).  The estimated dumping margin for SGRE/Windar, as well as the rate for all other producers/exporters, is 28.55 percent.

## II.   BACKGROUND

On September 30, 2020, Commerce received an antidumping duty (AD) petition concerning imports of wind towers from Spain, filed in proper form, on behalf of the Wind Tower Trade Coalition (the petitioner).[5]  Commerce initiated this investigation on November 9, 2020.[6]

On December 23, 2020, we limited the number of respondents selected for individual examination to the largest producer/exporter of the subject merchandise by value, Vestas Eolica (Vestas),[7] and issued the AD questionnaire to this company.[8]  On January 28, 2021, Vestas notified Commerce of its intention not to participate in this investigation.[9]  Although SGRE requested to be selected as a mandatory respondent three weeks later, on February 17, 2021,[10] Commerce denied this request, in light of the statutory deadlines in the investigation and the late timing of SGRE's request.[11]

On April 2, 2021, Commerce issued its *Preliminary Determination* and assigned a margin of 73.00 percent based on adverse facts available (AFA) to Vestas as well as to six companies

---

[5] *See* Petitioner's Letter, "Utility Scale Wind Towers from India, Malaysia and Spain:  Petitions for the Imposition of Antidumping and Countervailing Duties," dated September 30, 2020 (Petition).  The Wind Tower Trade Coalition is composed of Arcosa Wind Towers Inc. and Broadwind Towers, Inc.

[6] *See Utility Scale Wind Towers from India, Malaysia, and Spain:  Initiation of Less Than-Fair-Value Investigations*, 85 FR 73023 (November 16, 2020) (*Initiation Notice*).

[7] *See* Memorandum, "Respondent Selection," dated December 23, 2020 (Respondent Selection Memorandum).

[8] *See* Commerce's Letter, "Initial AD Questionnaire," dated December 23, 2020.

[9] *See* Vestas' Letter, "Notice of Decision to Not Participate in the Investigation," dated January 28, 2021.

[10] *See* SGRE's Letter, "Request for Mandatory Respondent Selection," dated February 17, 2020.

[11] *See* Commerce's Letter, "Request to Select Replacement Mandatory Respondent," dated March 5, 2021.

that did not respond to the quantity and value (Q&V) questionnaires, including Windar.[12] Because there were no participating respondents, the all-others rate was the sole rate alleged in the petition, 73.00 percent.[13]  In June 2021, Commerce issued its *Final Determination*, in which we continued to apply AFA to Vestas and the other non-responsive companies and continued to use the petition rate as the all-others rate.[14]

In August 2021, SGRE challenged Commerce's *Final Determination*, arguing that:  (1) the agency unlawfully refused to examine it individually during the investigation; and (2) the all-others rate assigned was not representative of the dumping experience of all other exporters.[15]  In the *First Remand Order*, the Court agreed with SGRE, finding that Commerce's selection of only one mandatory respondent was unreasonable and further that Commerce failed to determine the all-others rate by a reasonable method.[16]  In line with Commerce's decision to conduct respondent selection by largest export volume, the Court instructed Commerce to individually investigate SGRE.[17]

The day after the Court issued the *First Remand Order*, Commerce issued an initial AD questionnaire to SGRE.[18]  SGRE filed a consolidated response to this questionnaire on behalf of itself and its affiliated wind tower suppliers, Windar and Windar's subsidiaries.[19]  In response, Commerce conducted a collapsing analysis and determined that SGRE, Windar, and Windar's

---

[12] *See Utility Scale Wind Towers from Spain:  Preliminary Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 17354 (April 2, 2021), and accompanying Preliminary Decision Memorandum (PDM).
[13] *Id*.
[14] *See Final Determination*.  Commerce no longer applied total AFA to Proyectos Integrales Y Logisticos, S.A., one of the non-responsive Q&V companies, but the rates for Vestas, the other non-responsive Q&V companies, and all-others remained unchanged.
[15] *See Siemens Gamesa Renewable Energy v. United States*, 621 F. Supp. 3d 1337 (CIT 2023) (*First Remand Order*).
[16] *Id*.
[17] *Id*.
[18] *See* Commerce's Letter, "Initial AD Questionnaire," dated February 17, 2023 (Initial Questionnaire).
[19] *See* SGRE/Windar's Letter, "Siemens Gamesa Renewable Energy Section A Questionnaire Response," dated March 10, 2023 (SGRE/Windar March 10, 2023 AQR).

subsidiaries should be treated as a single entity.[20]  Neither the petitioner nor SGRE/Windar

disagreed with the collapsing of SGRE and Windar in comments submitted to Commerce.[21]  In

the *First Remand Redetermination*, Commerce applied Windar's existing rate to the newly

combined SGRE/Windar entity.[22]

On October 11, 2023, the Court held that Commerce's *First Remand Redetermination*

was not supported by substantial evidence and not in accordance with the law.  Specifically, the

Court found that:  (1) any decision that involves the collapsing of seven companies would render

null and void the rate assigned to Windar, one of the aforementioned collapsed companies, and

supplant it with a newly-determined rate for the collapsed entity; (2) SGRE did not fail to

provide information when Commerce reopened the record during the remand; and (3) Commerce

unlawfully applied the 73.00 percent SGRE/Windar rate (which was derived from the petition) as

the all-others rate.[23]  Therefore, the Court instructed Commerce to individually examine SGRE,

either as an individual respondent (leaving the rate assigned to Windar as is) or as part of a

collapsed entity.[24]

On second remand, Commerce issued supplemental questionnaires to SGRE/Windar

between October 2023 and January 2024 and received responses from October 2023 through

---

[20] *See* Memorandum, "Remand for the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers: Preliminary Affiliation and Collapsing Memorandum for Siemens Gamesa Renewable Energy S.A. and Windar Renovables S.A.," dated April 25, 2023 (SGRE/Windar Collapsing Memorandum).

[21] *See* Petitioner's Letters, "Comments on Preliminary Affiliation and Collapsing Memo," dated May 1, 2023; and "Comments on Draft Remand Redetermination," dated May 12, 2023 (Petitioner May 12, 2023 Comments); and SGRE/Windar's Letter, "Request for Extension and Clarification of Reporting Requirements {*sic*}," dated May 1, 2023 (SGRE/Windar May 1, 2023 Comments).

[22] *See Final Results of Redetermination Pursuant to Court Remand, Siemens Gamesa Renewable Energy v. United States*, 621 F. Supp. 3d 1337 (CIT 2023), dated June 15, 2023 (*First Remand Redetermination*), available at https://access.trade.gov/resources/remands/23-18.pdf. at 6-9 (citing *e.g.*, *Certain Steel Nails from Malaysia:  Final Results of the Changed Circumstances Review*, 82 FR 34476 (July 25, 2017), and accompanying IDM at Comment 3; and *Aluminum Extrusions from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 76 FR 18524 (April 4, 2011), and accompanying IDM at Comment 5 (*aff'd Zhaoqing New Zhongya Aluminum Co. v United State*s, 887 F. Supp. 2d 1301, 1310 (CIT 2012))).

[23] *See Second Remand Order*.

[24] *Id*.

February 2024.  Further, Commerce conducted verification of these responses in Spain and Orlando, Florida, in February and March 2024, respectively.[25]

Although the Court permitted Commerce to examine SGRE alone, rather than continuing with the decision to collapse SGRE and Windar,[26] we do not find this option to be warranted, given the degree of affiliation among the parties and the intertwined nature of their operations.[27] Therefore, we have, under respectful protest, determined that the only viable option is to compute a new weighted-average dumping margin for the collapsed entity.  Our analysis of SGRE/Windar's data is below.

On May 9, 2024, Commerce issued its Draft Results.[28]  On May 20, 2024, the petitioner and SGRE/Windar submitted comments on the Draft Results.[29]  On June 5, 2024, the Court issued an order extending the deadline for filing this final remand redetermination until June 21, 2024.[30]

[25] Commerce and SGRE/Windar had originally scheduled verification of SGRE's U.S. affiliate, SGRE Inc., for January 2024.  However, SGRE Inc. filed a letter stating that it was not prepared to proceed with verification on the scheduled dates.  *See* SGRE/Windar's Letter, "SGRE Inc. Verification Agenda," dated January 22, 2024; and Memorandum, "Meeting with SGRE/Windar's Counsel," dated January 25, 2024.  Accordingly, Commerce rescheduled the verification for March 2024.
[26] *See Second Remand Order*, 659 F. Supp. 3d at 1350-52.
[27] *See* SGRE/Windar Collapsing Memorandum.
[28] *See* Draft Results of Redetermination Pursuant to Court Remand, *Siemens Gamesa Renewable Energy v. United States*, Court No. 21-00449, Slip Op. 23-149 (CIT October 11, 2023), dated May 9, 2024 (Draft Results).
[29] *See* Petitioner's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated May 20, 2024 (Petitioner Draft Remand Comments); and SGRE/Windar's Letter, "Comments on Draft Remand Determination," dated May 20, 2024.  Commerce requested that SGRE/Windar provide record citations for figures which it included in its comments, which SGRE/Windar did.  *See* SGRE/Windar's Letter, "Citations for Comments on Draft Remand Determination," dated May 23, 2024 (SGRE/Windar Draft Remand Comments).
[30] *See* Extension Order, *Siemens Gamesa Renewable Energy v. United States*, Court No. 21-00449 (CIT), dated June 5, 2024.

III.    **PERIOD OF INVESTIGATION**

The period of investigation (POI) is from July 1, 2019, through June 30, 2020. This period corresponds to the four most recent fiscal quarters prior to the month of the filing of the Petition.[31]

IV.    **SCOPE OF THE INVESTIGATION**

The products covered by this investigation are wind towers from Spain. For a full description of the scope of this investigation, *see* the appendix to these final results of redetermination.[32]

V.    **CHANGES SINCE THE DRAFT RESULTS**

Based on our review of the record and comments received from interested parties, we have made the following changes to our Draft Results calculations:[33]

- We revised our calculations to use a U.S. short-term borrowing rate from the Federal Reserve.

- We used the revised indirect selling expense ratio from SGRE/Windar's February 1, 2024 SQR.[34]

- We used the cost of production (COP) database submitted by SGRE/Windar on November 28, 2023.[35]

---

[31] *See* 19 CFR 351.204(b)(1).

[32] We note that the scope from the investigation was unchanged in the scope of the order. *See Utility Scale Wind Towers from Spain: Final Determination of Sales at Less Than Fair Value*, 86 FR 33656 (June 25, 2021), at Appendix I; and *Utility Scale Wind Towers from Spain: Antidumping Duty Order*, 86 FR 45707 (August 16, 2021), at Appendix.

[33] *See* Memorandum, "Redetermination Results Analysis Memorandum for SGRE/Windar," dated concurrently with these final results of redetermination (SGRE/Windar Sales Final Results Analysis Memorandum).

[34] *See* SGRE/Windar's Letter, "Third Section C Supplemental Questionnaire Response," dated February 1, 2024 (SGRE/Windar February 1, 2024 SQR), at 7-8 and Exhibit SC3-4.

[35] *See* SGRE/Windar Letter, "Section D Supplemental Questionnaire Response," dated November 28, 2023, at Exhibit SD-8b.

- We revised the allocation of the U.S. price to be based on: (1) a ratio of each wind tower section's COP to the COP of the entire wind tower; and (2) a ratio of the cost of the wind tower as a percentage of the total cost of the wind turbine project.

- As a result of the changes noted above, the rate which we are applying as AFA to certain sales (*i.e.*, the highest, non-aberrational, transaction-specific margin) changed and was updated in the margin calculations.

## VI.    USE OF FACTS AVAILABLE WITH ADVERSE INFERENCES

As noted above, as part of our reexamination of SGRE/Windar on remand, we verified the data reported by SGRE/Windar.[36]  At the start of this verification exercise at Windar's location, company officials presented a variety of corrections to SGRE/Windar's responses, characterizing them as minor in nature.[37]  While we accepted a number of these changes,[38] we declined to accept the ones which we found to be significant, consistent with Commerce's general practice of not accepting substantial revisions to information submitted in questionnaire responses at verification.[39]

### a.    *Misreported Control Numbers (CONNUM)*

Windar notified Commerce at the start of its verification that it had incorrectly determined the weight of the towers that it produced and sold to Sweden (*i.e.*, the market used as the basis for normal value (NV)) for a substantial number of transactions.[40]  According to

---

[36] *See* section 782(i)(1) of the Act.
[37] *See* Memorandum, "Verification of SGRE/Windar's Sales Response in the Remand of the Less Than Fair Value Investigation of Utility Scale Wind Towers from Spain," dated March 19, 2024 (SGRE/Windar Sales Verification Report), at 3.
[38] *Id.* at SVE-1.
[39] *See* Commerce's Letter, "Sales Verification Outline," dated January 31, 2024 (Sales Verification Outline), at 4.
[40] *See* SGRE/Windar Sales Verification Report at 3 and 8 and SVE-6, SVE-7, and SVE-14 through SVE-23.  This error affected 36.9 percent of SGRE/Windar's comparison market wind tower models (also known as "control numbers" or "CONNUMs").  *See* SGRE/Windar Sales Verification Report at 3 ("For 75 comparison market sequence numbers, Windar incorrectly reported the weight, a component of the control number.").

Windar officials, certain of Windar's five production entities failed to follow the instruction from the questionnaire to report the weight product characteristic on a theoretical basis, instead relying on the actual weight of the towers shown on the packing lists.[41]  Here, using the theoretical weight can move a sale from one weight code, and, consequently, one CONNUM, to another; additionally, products that had identical theoretical weights could have been reported under different, incorrect weight codes as a result of using actual weights from the packing lists.[42]  Such an error can distort the results of the margin program in multiple respects.

Commerce requires respondents to report costs on a CONNUM-specific basis.  Such reporting is necessary given that Commerce relies on such costs for purposes of its "cost test" in the comparison market program and in its identification of "identical" or "similar" products (for price-to-price matching purposes) in the margin program.  The weight product characteristic is the second most important physical characteristic in the development of the CONNUMs, as well as in the product matching hierarchy in this proceeding.[43]  As a result, it is determinative of many of the "matches" between comparison market and U.S. models.  Given the significant number of transactions impacted by the error and the fundamental importance of the associated models to the dumping calculation, as discussed further below, we found that Windar's proffered replacement data did not constitute a "minor" correction.  Therefore, we did not accept the information necessary to correct the misreported CONNUMs.

---

[41] *Id*. at 2, 3, and 11.

[42] For example, weight code "14" represents weights equal to or greater than 42.5 tons but less than 45 tons, while weight code "15" represents weights from 45 tons to less than 47. 5 tons.  If the theoretical weight of a particular wind tower was 45 tons, but the packing list reflected a weight of 44.9 tons, Windar should have reported a CONNUM for that model that included "15" as the third and fourth digits and a corresponding WEIGHTT/U code of "15"; however, if it used the packing list weight to determine the reported figures, it would have, instead, reported the weight component of the CONNUM as "14" and WEIGHTT/U codes of "14."

[43] *See* Initial Questionnaire at B-8 to B-9 and C-7 to C-8.  In this regard, we note that the first product characteristics (*i.e.*, product "Type"), is uniformly coded as "02 = section" for all of SGRE/Windar's sales in the U.S. and comparison markets.  Therefore, for the purposes of matching sales in the margin program, the weight characteristic is, functionally, the most important product characteristic.

b. *Unreported Discounting/Factoring Expenses*

Additionally, during our review of selected sales at verification, we noted that SGRE/Windar discounted certain comparison market invoices, and factored all selected U.S. invoices, with its banks.[44],[45]  SGRE/Windar had not previously noted that it discounted or factored invoices and did not report the associated expenses in either of its sales databases.[46] Because Windar had failed to report this wholly-new expense to Commerce, we did not collect any data related to it at verification (beyond the data examined in the context of the sales selected for individual examination).

1.  <u>Application of Facts Available</u>

Section 776(a) of the Act provides that, subject to section 782(d) of the Act, Commerce shall apply "facts otherwise available" if:  (1) necessary information is not on the record; or (2) an interested party or any other person (A) withholds information that has been requested, (B) fails to provide information by the deadlines established, or in the form and manner requested by Commerce, subject to subsections (c)(1) and (e) of section 782 of the Act, (C) significantly impedes a proceeding, or (D) provides information that cannot be verified as provided by section 782(i) of the Act.

---

[44] *See* SGRE/Windar Sales Verification Report at 2, 11, and 12.  Factoring relates to the sale of accounts receivable to a third party for collection of the covered invoices.  Expenses associated with factoring constitute direct selling expenses.  *See, e.g., Welded Carbon Steel Standard Pipe and Tube Products from Turkey:  Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 79665 (December 31, 2013), and accompanying IDM at Comment 3 ("Borusan's reported FACTORH {factoring expense} field should be included as a direct selling expense adjustment to U.S. price to correctly reflect Borusan's factoring costs.  By including these factoring expenses, {Commerce} will follow its practice …").

[45] In this instance, the factoring was on the transfer sale between Windar and SGRE Inc.  While these expenses are not related to the invoice to the ultimate customer, they relate to that sales transaction and are appropriately accounted for in our calculations.

[46] *See* SGRE/Windar Sales Verification Report at 2, 11, and 12.

a. *Misreported CONNUMs*

As noted above, SGRE/Windar failed to report accurate weight product characteristics data for its wind towers sold to Sweden and, correspondingly the CONNUMs for those towers, for over one third of its comparison market sales.[47]  As a result, we find that SGRE/Windar provided information that could not be verified as provided by section 782(i) of the Act. Accordingly, pursuant to section 776(a)(2)(D) of the Act, we are relying upon facts otherwise available to determine SGRE/Windar's dumping margin for U.S. sales which matched to the faulty CONNUMs reported in the comparison market.

In reaching this decision, we have considered the implications of SGRE/Windar's misreporting.  A substantial percentage of U.S. sales match to comparison market sales with misreported CONNUMs, thus distorting the margin calculation.  However, because we can identify the U.S. sales that would be impacted by the error[48] – and because none of the U.S. sales themselves are misreported in this manner – we find that partial facts available is warranted.

b. *Unreported Factoring Expenses*

Also as noted above, SGRE/Windar did not report the discounting and factoring expenses that it incurred on sales.[49]  Discounting and factoring expenses are typically treated as direct selling expenses in the margin calculations.  As noted above, although the factoring was on the transfer sale between Windar and SGRE Inc., SGRE/Windar would not have incurred those

---

[47] *Id*. at 2, 3, and 11.

[48] SGRE/Windar sold six models to the U.S. market during the POI.  One model matches to CV; this match would not change because all of the comparison market models failed the DIFMER test (*i.e.*, all had variable costs of manufacture greater than 20 percent different from that of the U.S. model).  Three U.S. CONNUMs match to models not impacted by the error, and we find that these matches would not change based on our analysis of the matching criteria, in conjunction with the cost test results.  Therefore, according to our analysis, it is reasonable to conclude that 67 percent of the U.S. sales models would not be affected by changes to the comparison market models.  The final two U.S. CONNUMs currently match to misreported comparison market CONNUMs, and we have applied AFA to the U.S. sales that match to the models impacted by the error.

[49] *Id*. at 2, 11, and 12.

expenses but for the fact that it made the corresponding downstream sale to the unaffiliated customer; therefore, SGRE/Windar should have reported those expenses in its submissions to Commerce.

As a result, we find that SGRE/Windar both withheld information from Commerce and failed to provide information by the specified deadlines requested (*i.e.*, the discount and factoring expenses). Accordingly, pursuant to sections 776(a)(2)(A) and (B) of the Act, we are relying upon facts otherwise available to determine the unreported expenses for sales to the United States, as discussed further below.

2. Use of Adverse Inference

Section 776(b) of the Act provides that, if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available.[50] The "best of its ability" standard of section 776(b) of the Act means to put forth maximum effort to provide full and complete answers to all inquiries.[51] In *Nippon Steel*, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) held that:

> Compliance with the 'best of the ability' standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation. While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping.[52]

---

[50] *See* 19 CFR 351.308(a); *see, e.g.*, *Notice of Final Results of Antidumping Duty Administrative Review: Stainless Steel Bar from India*, 70 FR 54023, 54025-26 (September 13, 2005); *Notice of Final Determination of Sales at Less Than Fair Value and Final Negative Critical Circumstances: Carbon and Certain Alloy Steel Wire Rod from Brazil*, 67 FR 55792, 55794-96 (August 30, 2002); and *Nippon Steel Corp. v. United States*, 337 F. 3d 1373, 1382-83 (Fed. Cir. 2003) (*Nippon Steel*).
[51] *See Nippon Steel*, 337 F.3d at 1373, 1382-83.
[52] *Id*., 337 F.3d at 1383.

Further, when assessing whether a respondent has cooperated to the best of its ability, Commerce is not required to determine, or make any adjustments to, the dumping margin based on any assumptions about information the interested party would have provided if the interested party had complied with the request for information.[53]  In addition, the SAA provides that Commerce may employ an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[54]  Finally, affirmative evidence of bad faith on the part of a respondent is not required before Commerce may make an adverse inference in selecting from the facts available.[55]  It is Commerce's practice to consider, in employing AFA, the extent to which a party may benefit from its own lack of cooperation.[56]

a.  *Misreported CONNUMs*

As discussed above, Commerce discovered at verification that SGRE/Windar had failed to report accurate weight information and, therefore, accurate CONNUMs, for a significant portion of its comparison market sales as instructed by the Initial Questionnaire.  As we have previously emphasized, the ability to make appropriate product comparisons is fundamental to Commerce's dumping analysis, and without such comparisons, Commerce cannot calculate an accurate overall dumping margin for a respondent company.[57]  Therefore, the requested

---

[53] *See* section 776(b)(1)(B) of the Act.

[54] *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc 103-316, vol. 1 (1994) (SAA), at 870; *see also Certain Polyester Staple Fiber from Korea:  Final Results of the 2005-2006 Antidumping Duty Administrative Review*, 72 FR 69663, 69664 (December 10, 2007).

[55] *See, e.g.*, *Nippon Steel Corp. v. United States*, 337 F.3d at 1382-83; and *Notice of Final Determination of Sales at Less Than Fair Value:  Circular Seamless Stainless Steel Hollow Products from Japan*, 65 FR 42985 (July 12, 2000) (*SS Hollow Products from Japan*).

[56] *See, e.g.*, *Steel Threaded Rod from Thailand:  Preliminary Determination of Sales at Less Than Fair Value and Affirmative Preliminary Determination of Critical Circumstances*, 78 FR 79670 (December 31, 2013), and accompanying PDM at 4, unchanged in *Steel Threaded Rod from Thailand:  Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 79 FR 14476 (March 14, 2014).

[57] *See, e.g.*, *Certain Carbon and Alloy Steel Cut-to-Length Plate from Italy:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 82 FR 16345 (April 4, 2017), and accompanying IDM at Comment 2 (stating "the ability to make appropriate product comparisons goes to the heart of {Commerce's} dumping methodology"); and *Stainless Steel Flanges From India:  Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 FR 47619 (August 26, 2021), and accompanying IDM at Comment 1.

information is critical to Commerce's price-to-price margin calculation, as the best NV "match" for U.S. sales; it is also essential to the accurate performance of the sales-below-cost test for comparison market sales.

The failure of SGRE/Windar to provide the requested information in response to Commerce's questionnaires precluded Commerce from performing the necessary analysis to calculate a weighted-average dumping margin entirely based on SGRE/Windar's own data, as is otherwise required by the Act. Accordingly, Commerce finds that SGRE/Windar failed to cooperate to the best of its ability to comply with Commerce's requests for information.

As a result, Commerce is determining SGRE/Windar's dumping margin using partial AFA because accurate product characteristic weight information for Windar's wind towers was within SGRE/Windar's possession and SGRE/Windar failed to supply it. As noted above, Commerce does not require perfection in the reported data; however, we cannot condone inattentiveness, carelessness, or inadequate record keeping,[58] especially in the reporting of CONNUM-related data, which are fundamental to the calculation of an accurate dumping margin.

Therefore, as partial AFA, we applied the highest non-aberrational transaction-specific margin to the U.S. sales which matched to comparison market models with misreported weights.[59] This rate is 40.96 percent.[60]

   b. *Unreported Factoring Expenses*

Also as discussed above, Commerce discovered at verification that SGRE/Windar failed to accurately describe its payment process for sales to its customers in both Sweden and the

---

[58] *See Nippon Steel*, 337 F.3d at 1383.
[59] *See* SGRE/Windar Sales Verification Report at SVE-1 for a list of comparison market sales with misreported CONNUMs.
[60] *See* SGRE/Windar Sales Final Results Analysis Memorandum.

United States, which resulted in the reporting of inaccurate imputed credit expenses, and it also omitted from its reported data the expenses that it incurred to discount or factor its invoices. Thus, we find that facts available, under sections 776(a)(2)(A), (B), and (D) of the Act, is warranted.

Further, the requested information was within SGRE/Windar's possession, and it had the ability to provide it to Commerce. For this reason, Commerce finds that SGRE/Windar's failure to respond demonstrates that it behaved below the standard of a reasonable respondent and did not act to the best of its ability. Therefore, pursuant to section 776(b)(1) of the Act, Commerce has determined that partial AFA is appropriate because SGRE/Windar failed to cooperate to the best of its ability to comply with Commerce's requests for information in this investigation. Consequently, pursuant to section 776(b) of the Act, we have used an adverse inference when selecting from among the facts otherwise available.[61] As AFA, for the U.S. factoring expenses, we relied on the highest factoring expense observed at verification for all U.S. sales, except those sales for which we obtained sales-specific information; for those latter sales, we used the verified figures in our calculations.[62]

With respect to SGRE/Windar's sales to Sweden, we have made no adjustment for the unreported discounting expenses (other than the expenses observed at verification), because SGRE/Windar's failure to report these expenses was conservative.

---

[61] *See, e.g.*, *Non-Oriented Electrical Steel from Germany, Japan, and Sweden: Preliminary Determinations of Sales at Less Than Fair Value, and Preliminary Affirmative Determinations of Critical Circumstances, in Part*, 79 FR 29423 (May 22, 2014), and accompanying PDM at 7-11, unchanged in *Non-Oriented Electrical Steel from Germany, Japan, the People's Republic of China, and Sweden: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determinations of Critical Circumstances, in Part*, 79 FR 61609 (October 14, 2014); and *SS Hollow Products from Japan*, 65 FR at 42986.

[62] For further discussion, *see* Memorandum, "Analysis for the Draft Remand Redetermination Concerning the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from Spain," dated May 9, 2024 (SGRE/Windar Draft Results Sales Analysis Memorandum).

## VII.    ALL-OTHERS RATE

Section 735(c)(5)(A) of the Act provides that the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted-average dumping margins established for exporters and producers individually investigated, excluding any rates that are zero, *de minimis*, or determined entirely under section 776 of the Act.  Pursuant to section 735(c)(5)(B) of the Act, if the estimated weighted-average dumping margins established for all exporters and producers individually examined are zero, *de minimis*, or determined entirely under section 776 of the Act, Commerce may use any reasonable method to establish the estimated weighted-average dumping margin for all other producers or exporters.

As we indicated above, Vestas did not participate in the investigation, and its estimated dumping margin was determined entirely under section 776 of the Act.  Further, as a result of these final results of redetermination, Commerce has now calculated an individual estimated weighted-average dumping margin for SGRE/Windar.  Because SGRE/Windar's margin is not zero, *de minimis*, or based entirely on facts otherwise available, the estimated weighted-average dumping margin calculated for SGRE/Windar is the margin assigned to all other producers and exporters, pursuant to section 735(c)(5)(A) of the Act.

## VII.    DISCUSSION OF THE METHODOLOGY

A.    <u>Comparisons to Normal Value</u>

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), in order to determine whether SGRE/Windar's sales of wind towers from Spain to the United States during the POI were made at LTFV, Commerce compared the constructed export prices (CEP) to NV, as described in the "Constructed Export Price" and "Normal Value" sections of this memorandum.

1.    Determination of Comparison Method

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates weighted-average dumping margins by comparing weighted-average NVs to weighted-average export prices (EP) or CEPs, *i.e.*, the average-to-average method, unless Commerce determines that another method is appropriate in a particular situation.  In LTFV investigations, Commerce examines whether to compare weighted-average NVs with the EPs or CEPs of individual sales, *i.e.*, the average-to-transaction method, as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act.

In numerous investigations and administrative reviews, Commerce has applied a "differential pricing" analysis for determining whether application of the average-to-transaction method is appropriate in a particular situation consistent with 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act.[63]  Commerce finds that the differential pricing analysis is instructive for purposes of examining whether to apply an alternative comparison method in these final results of redetermination.  Commerce will continue to evaluate its approach in this area based on comments received in these final results of redetermination and the application of the differential pricing analysis on a case-by-case basis, and on Commerce's additional experience with addressing the potential masking of dumping that can occur when Commerce uses the average-to-average method in calculating a respondent's weighted-average dumping margin.

The differential pricing analysis used on remand examines whether there exists a pattern of EPs (or CEPs) for comparable merchandise that differ significantly among purchasers,

---

[63] *See, e.g.*, *Xanthan Gum from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013); *see also Steel Concrete Reinforcing Bar from Mexico:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 79 FR 54967 (September 15, 2014); and *Welded Line Pipe from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value*, 80 FR 61362 (October 13, 2015).

regions, or time periods. The analysis evaluates all export sales by purchasers, regions, and time periods to determine whether a pattern of prices that differ significantly exists. If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the average-to-average method to calculate the weighted-average dumping margin. The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise. Purchasers are based on the reported consolidated customer codes. Regions are defined using the reported destination code (*i.e.*, ZIP code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau. Time periods are defined by the quarter within the POI based upon the reported date of sale. For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP or CEP and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "Cohen's *d* test" is applied. The Cohen's *d* coefficient is a generally recognized statistical measure of the extent of the difference between the mean, *i.e.*, weighted-average price, of a test group and the mean, *i.e.*, weighted-average price, of a comparison group. First, for comparable merchandise, the Cohen's *d* coefficient is calculated when the test and comparison groups of data for a particular purchaser, region, or time period each have at least two observations and when the sales quantity for the comparison group accounts for at least five percent of the total sales quantity of the comparable merchandise. Then, the Cohen's *d* coefficient is used to evaluate the extent to which the prices to the particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise. The extent of these differences can be quantified by one of

three fixed thresholds defined by the Cohen's *d* test: small, medium, or large (0.2, 0.5, or 0.8, respectively). Of these thresholds, the large threshold provides the strongest indication that there is a significant difference between the mean of the test and comparison groups, while the small threshold provides the weakest indication that such a difference exists. For this analysis, the difference is considered significant, and the sales in the test group are found to pass the Cohen's *d* test, if the calculated Cohen's *d* coefficient is equal to or exceeds the large, *i.e.*, 0.8, threshold.

Next, the "ratio test" assesses the extent of the significant price differences for all sales, as measured by the Cohen's *d* test. If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test accounts for 66 percent or more of the value of total sales, then the identified pattern of prices that differ significantly supports the consideration of the application of the average-to-transaction method to all sales as an alternative to the average-to-average method. If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test accounts for more than 33 percent and less than 66 percent of the value of total sales, then the results support consideration of the application of an average-to-transaction method to those sales identified as passing the Cohen's *d* test as an alternative to the average-to-average method and application of the average-to-average method to those sales identified as not passing the Cohen's *d* test. If 33 percent or less of the value of total sales passes the Cohen's *d* test, then the results of the Cohen's *d* test do not support consideration of an alternative to the average-to-average method.

If both tests in the first stage, *i.e.*, the Cohen's *d* test and the ratio test, demonstrate the existence of a pattern of prices that differ significantly such that an alternative comparison method should be considered, then, in the second stage of the differential pricing analysis, Commerce examines whether using only the average-to-average method can appropriately

account for such differences.  In considering this question, Commerce tests whether using an alternative comparison method, based on the results of the Cohen's *d* and ratio tests described above, yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the average-to-average method only.  If the difference between the two calculations is meaningful, then this demonstrates that the average-to-average method cannot account for differences such as those observed in this analysis, and, therefore, an alternative comparison method would be appropriate.  A difference in the weighted-average dumping margins is considered meaningful if:  (1) there is a 25 percent relative change in the weighted-average dumping margins between the average-to-average method and the appropriate alternative method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the average-to-average method and the appropriate alternative method move across the *de minimis* threshold.

2.    Results of the Differential Pricing Analysis

For SGRE/Windar, based on the results of the differential pricing analysis, Commerce finds that 100.00 percent of the value of U.S. sales pass the Cohen's *d* test, which confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  However, Commerce determines that there is no meaningful difference between the weighted-average dumping margin calculated using the average-to-average method and the weighted-average dumping margin calculated using an alternative comparison method based on applying the average-to-transaction method to all U.S. sales.  Thus, for these final results of redetermination, Commerce is applying the average-to-average method for all U.S. sales to calculate the weighted-average dumping margin for SGRE/Windar.

B.    Product Comparisons

Commerce gave parties an opportunity to comment on the appropriate hierarchy of physical characteristics used to define each product, including for product matching purposes.[64] Commerce identified eight criteria for the physical characteristics of the subject merchandise: (1) type; (2) weight of tower/section; (3) height of tower/section; (4) total number of sections; (5) type of paint coating; (6) type of metalizing; (7) electrical conduit – bus bars; (8) electrical conduit – power cables; (9) existence of elevators; (10) number of platforms; and (12) other internal components.[65]  We instructed SGRE/Windar to use these product characteristics in its responses to the Initial Questionnaire.[66]

In accordance with section 771(16) of the Act, we considered all products produced and sold by SGRE/Windar in the comparison market during the POI that fit the description in the "Scope of the Investigations" section of the *Initiation Notice* to be foreign like products for purposes of determining appropriate product comparisons to U.S. sales.  We compared U.S. sales to sales made in the comparison market for the respondent, where appropriate.  In instances in which there was neither an identical nor similar comparison product, we compared the products sold in the United States to constructed value (CV).

C.    Date of Sale

Section 351.401(i) of Commerce's regulations states that, "{i}n identifying the date of sale of the subject merchandise or foreign like product, {Commerce} normally will use the date of invoice, as recorded in the exporter's or producer's records kept in the ordinary course of business.  Additionally, Commerce may use a date other than the date of invoice if it is satisfied

---

[64] *See Initiation Notice*, 85 FR at 73024.
[65] *See* Initial Questionnaire at B-8 to B-13 and C-7 to C-12.
[66] *Id.*

that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.[67]  Commerce has a long-standing practice of finding that, where the shipment date precedes the invoice date, the shipment date better reflects the date on which the material terms of sale are established.[68]

Consistent with 19 CFR 351.401(i) and Commerce's practice, we have used the earlier of invoice date or shipment date as the date of sale for SGRE/Windar's sales of wind towers in both the U.S. and comparison markets.  As the date of shipment for sales in both markets, we have relied on the date at which the merchandise left Windar's storage yard in Spain.[69]

D.    Constructed Export Price

Section 772(a) of the Act defines EP as "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States," as adjusted under subsection 772(c) of the Act.  Section 772(b) of the Act defines CEP as "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d)."  In accordance with section 772(b) of the

---

[67] *See* 19 CFR 351.401(i); and *Allied Tube & Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1090 (CIT 2001).

[68] *See, e.g.*, *Certain Frozen Warmwater Shrimp from Thailand:  Final Results and Final Partial Rescission of Antidumping Duty Administrative Review*, 72 FR 52065 (September 12, 2007), and accompanying IDM at Comment 11; and *Notice of Final Determination of Sales at Less Than Fair Value:  Structural Steel Beams from Germany*, 67 FR 35497 (May 20, 2002), and accompanying IDM at Comment 2.

[69] *See* SGRE/Windar Sales Verification Report at 2 and 7; *see also* SGRE/Windar's Letter, "Siemens Gamesa Renewable Energy Sections B-E Questionnaire Response," dated October 16, 2023 (SGRE/Windar October 16, 2023 BCDQR), at 20 of Section B and 20 of Section C.

Act, Commerce used CEP methodology for SGRE/Windar's U.S. sales because all such sales were invoiced and sold by its U.S. affiliate.

We calculated CEP based on packed prices to unaffiliated purchasers in the United States.  Because SGRE/Windar sells wind towers as part of a completed wind turbine project, we allocated an appropriate portion of that price to the wind tower components.  We revised the calculation of this allocated price for these final results of redetermination, as detailed below in Comment 3, to be based on:  (1) a ratio of each wind tower section's COP to the COP of the entire wind tower; and (2) a ratio of the cost of the wind tower as a percentage of the total cost of the wind turbine project.[70]

We revised SGRE/Windar's U.S. sales data to take into account changes noted at verification.  We made adjustments, where appropriate, to the starting price for billing adjustments, pursuant to 19 CFR 351.401(c).  We made deductions for movement expenses in accordance with section 772(c)(2)(A) of the Act; these expenses include, where appropriate, foreign inland freight, service-related expenses associated with storage (*i.e.*, placement of transport cradles and lifting lugs, movement of sections, and washing of sections), international freight, U.S. brokerage and handling, U.S. inland freight, loading charges, logistics charges, and other freight expenses.

In accordance with section 772(d)(1) of the Act, we made deductions for selling expenses associated with economic activities occurring in the United States.  These expenses include direct selling expenses (credit and factoring expenses) and other U.S. indirect selling expenses (inventory carrying costs and U.S. indirect selling expenses).  As noted above, we based certain factoring expenses on AFA; as AFA, we used the highest factoring expense observed at

---

[70] *See* SGRE/Windar Sales Final Results Analysis Memorandum at Attachment 3.

verification.  We revised SGRE/Windar's reported sales data to take into account our findings at verification.[71]

Finally, pursuant to section 772(d)(3) of the Act, we further reduced the starting price of CEP sales by an amount for profit to arrive at CEP.  In accordance with section 772(f) of the Act, we calculated the CEP profit rate using the expenses incurred by SGRE/Windar and its U.S. affiliate, SGRE Inc., on their sales of the subject merchandise in the United States and the profit associated with those sales.

E.     Normal Value

1.     Home Market Viability and Selection of Comparison Market

In order to determine whether there is a sufficient volume of sales in the home market to serve as a viable basis for calculating NV, *i.e.*, the aggregate volume of home market sales of the foreign like product is equal to or greater than five percent of the aggregate volume of U.S. sales, we normally compare the respondent's volume of home market sales of the foreign like product to the volume of U.S. sales of the subject merchandise, in accordance with sections 773(a)(1)(A) and (B) of the Act.  If we determine that no viable home market exists, we may, if appropriate, use a respondent's sales of the foreign like product to a third country market as the basis for comparison market sales, in accordance with section 773(a)(1)(C) of the Act and 19 CFR 351.404.

We compared the volume of SGRE/Windar's home market sales of the foreign like product to the volume of its U.S. sales of subject merchandise, in accordance with section 773(a)(1)(C)(ii) of the Act.  Based on this comparison, we determined that the aggregate volume of home market sales of the foreign like product for SGRE/Windar was not greater than five

---

[71] *See* SGRE/Windar Draft Results Sales Analysis Memorandum.

percent of the entity's sales of subject merchandise to the United States and, thus, was insufficient to permit a proper comparison with U.S. sales of the subject merchandise.[72]  We selected Sweden as the comparison market because its sales of foreign like product in Sweden were the most similar to the subject merchandise and it was a viable comparison market.[73]  Therefore, we used Sweden as the comparison market for SGRE/Windar, in accordance with section 773(a)(1)(C) of the Act and 19 CFR 351.404.

2.    Level of Trade

Section 773(a)(1)(B)(i) of the Act states that, to the extent practicable, Commerce will calculate NV based on sales at the same level of trade (LOT) as the U.S. sales.  Sales are made at different LOTs if they are made at different marketing stages (or their equivalent).[74]  Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stages of marketing.[75]  In order to determine whether the comparison market sales are at different stages in the marketing process than the U.S. sales, we examine the distribution system in each market, *i.e.*, the chain of distribution, including selling functions and class of customer (customer category), and the level of selling expenses for each type of sale.

Pursuant to section 773(a)(1)(B)(i) of the Act, in identifying LOTs for EP and comparison market sales, *i.e.*, NV based on either home market or third country prices,[76] we consider the starting prices before any adjustments.  For CEP sales, we consider only the selling

---

[72] *See* Memorandum, "Selection of an Appropriate Third Country Market," dated October 23, 2023, at 2.
[73] *Id*. at 4-5 and Attachment I.
[74] *See* 19 CFR 351.412(c)(2).
[75] *Id.*; *see also Certain Orange Juice from Brazil:  Final Results of Antidumping Duty Administrative Review and Notice of Intent Not to Revoke Antidumping Duty Order in Part*, 75 FR 50999 (August 18, 2010) (*OJ from Brazil*), and accompanying IDM at Comment 7.
[76] Where NV is based on CV, we determine the NV LOT based on the LOT of the sales from which we derive selling, general and administrative expenses, and profit for CV, where possible.  *See* 19 CFR 351.412(c)(1).

activities reflected in the price after the deduction of expenses and profit under section 772(d) of the Act.[77]

When Commerce is unable to determine NV based on the sale prices of the foreign like product in the comparison market at the same LOT as the EP or CEP, Commerce may determine NV based on sale prices at a different LOT in the comparison market.  In comparing EP or CEP to NV based on sale prices at a different LOT in the comparison market, where available data make it possible, we make an LOT adjustment under section 773(a)(7)(A) of the Act.  Finally, for CEP sales only, if the NV LOT is at a more advanced stage of distribution than the LOT of the CEP and there is no basis for determining whether the difference in LOTs between NV and CEP affects price comparability, *i.e.*, no LOT adjustment is possible, Commerce will grant a CEP offset, as provided in section 773(a)(7)(B) of the Act.[78]

In this investigation, we solicited information from SGRE/Windar regarding the marketing stages involved in making its reported comparison market and U.S. sales, including a description of the selling activities performed for each channel of distribution.[79]  SGRE/Windar stated that it sold wind towers in a single channel of distribution in the comparison market, and its responses provide no indication that there were differences in sales functions/intensities for customers in that market.[80]  Accordingly, we find that there is one LOT in the comparison market for SGRE/Windar.

SGRE/Windar also stated that it sold wind towers in a single channel of distribution in the U.S. market (*i.e.*, to SGRE Inc.), and its responses provided no indication that there were

---

[77] *See Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1314-16 (Fed. Cir. 2001).
[78] *See, e.g.*, *OJ from Brazil* IDM at Comment 7.
[79] *See* Initial Questionnaire at A-6 through A-8 and A-15.
[80] *See* SGRE/Windar October 16, 2023 BCDQR at B-19; and SGRE/Windar's Letter, "Section A-C Supplemental Questionnaire Response," dated November 14, 2023 (SGRE/Windar November 14, 2023 SQR), at Exhibit SA-2.

differences in sales functions/intensities for sales in that channel.[81]  Accordingly, we find that there is one LOT in the U.S. market for SGRE/Windar.

Finally, we examined the record evidence to compare the U.S. LOT to the comparison market LOT.  We found that SGRE/Windar generally performed similar selling functions, at similar intensities, for comparison market and U.S. sales, which is consistent with SGRE/Windar's reporting that there was only one LOT for its sales to the U.S. and comparison market during the POI.[82]  Therefore, consistent with 19 CFR 351.412(c)(2), we determine that SGRE/Windar's U.S. and comparison market sales during the POI were made at the same LOT and, as a result, no LOT adjustment is warranted.[83]

3.    Cost of Production Analysis

Pursuant to section 773(b)(2)(A)(ii) of the Act, Commerce required that SGRE/Windar provide COP and CV information to determine if its sales of the foreign like product had been made at prices that represented less than the COP of the product.  We are applying our standard methodology of using annual average costs based on SGRE/Windar's reported data.

a.    Calculation of COP

In accordance with section 773(b)(3) of the Act, we calculated COP based on the sum of the costs of materials and fabrication for the foreign like product, plus amounts for general and administrative (G&A) and financial expenses.  We relied on the reported annual cost data submitted by SGRE/Windar, except as follows:[84]

---

[81] *See* SGRE/Windar October 16, 2023 BCDQR at C-19; and SGRE/Windar November 14, 2023 SQR at Exhibit SA-2.
[82] *See* SGRE/Windar November 14, 2023 SQR at Exhibit SA-2.
[83] *See* 19 CFR 351.412(b).
[84] *See* Memoranda, "Verification of the Cost Response of Windar Renovables in the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from Spain," dated April 2, 2024; and "Cost of Production and Constructed Value Calculation Adjustments for the Draft Remand – SGRE/Windar," dated May 9, 2024.

- SGRE/Windar obtained steel plates from an affiliate but reported in its cost file the affiliate's cost of this input rather than the price SGRE/Windar paid to the affiliate (*i.e.*, the transfer price). We have revised SGRE/Windar's COP so that it reflects the higher transfer price of these affiliated purchases.

- We made certain revisions to SGRE/Windar's reported G&A expense rate.

- We revised the financial expense rate calculation to include foreign exchange gains and losses.

  b.  Test of Comparison Market Prices and COP

On a product-specific basis, pursuant to section 773(b) of the Act, we compared the adjusted weighted-average COP to the comparison market sales prices of the foreign like product, in order to determine whether sales had been made at prices below the COP. For purposes of this comparison, we used COP exclusive of selling and packing expenses. The prices were exclusive of any applicable billing adjustments, movement charges, actual direct and indirect selling expenses, and packing expenses.

  c.  Results of the COP Test

In determining whether to disregard comparison market sales made at prices below the COP, we examined, in accordance with sections 773(b)(1)(A) and (B) of the Act, whether: (1) within an extended period of time, such sales were made in substantial quantities; and (2) such sales were made at prices which permitted the recovery of all costs within a reasonable period of time in the normal course of trade. In accordance with sections 773(b)(2)(B) and (C) of the Act, where less than 20 percent of the respondent's comparison market sales of a given product were at prices less than the COP, we do not disregard any below-cost sales of that product because we determine that, in such instances, the below-cost sales were not made within an extended period

of time and in "substantial quantities." Where 20 percent or more of a respondent's sales of a given product are at prices less than the COP, we disregard the below-cost sales when: (1) they were made within an extended period of time in "substantial quantities," in accordance with sections 773(b)(2)(B) and (C) of the Act; and (2) based on our comparison of prices to the weighted-average COPs for the POI, they were at prices which would not permit the recovery of all costs within a reasonable period of time, in accordance with section 773(b)(2)(D) of the Act.

We found that, for certain products, more than 20 percent of SGRE/Windar's comparison market sales during the POI were at prices less than the COP and, in addition, such sales did not provide for the recovery of costs within a reasonable period of time.[85] We, therefore, excluded these sales and used the remaining sales as the basis for determining NV, in accordance with section 773(b)(1) of the Act.

F.    Calculation of NV Based on Comparison-Market Prices

We calculated NV for SGRE/Windar based on packed, ex-factory prices to unaffiliated customers in Sweden. We revised SGRE/Windar's comparison market sales data to take into account changes noted at verification. We adjusted the starting price, where appropriate, for billing adjustments, in accordance with 19 CFR 351.401(c). We made deductions from the starting price for movement expenses in accordance with section 773(a)(6)(B)(ii) of the Act, which included, where appropriate, foreign inland freight and service-related expenses associated with storage (*i.e.*, placement of transport cradles and lifting lugs, movement of sections, and washing of sections).

For comparisons to CEP sales, we made deductions for comparison market direct selling expenses (*i.e.*, imputed credit expenses and discounting expenses, where appropriate) in

---

[85] *See* SGRE/Windar Sales Final Results Analysis Memorandum at Attachment 1.

accordance with section 773(a)(6)(C) of the Act.  We also deducted comparison market packing costs and added U.S. packing costs, in accordance with sections 773(a)(6)(A) and (B) of the Act. We revised SGRE/Windar's reported sales data to take into account our findings at verification.[86]

When comparing U.S. sales with comparison market sales of similar merchandise, we also made adjustments for physical characteristics of the merchandise, in accordance with section 773(a)(6)(C)(ii) of the Act and 19 CFR 351.411.  We based this adjustment on the difference in the variable cost of manufacturing for the foreign like product and subject merchandise.[87]

G.    Calculation of NV Based on CV

Section 773(a)(4) of the Act provides that, where NV cannot be based on comparison market sales, NV may be based on CV.  In accordance with section 773(e) of the Act, we used CV as the basis for NV for sales for which we could not base NV on comparison market sales prices of identical or similar merchandise.  In accordance with section 773(e) of the Act, we calculated CV based on the sum of the cost of materials and fabrication, SG&A expenses, profit, and U.S. packing costs.  In accordance with section 773(e)(2)(A) of the Act, we based selling expenses and profit on the amounts that SGRE/Windar incurred and realized in connection with the production and sale of the foreign like product, in the ordinary course of trade, for consumption in the comparison market.

For comparisons to SGRE/Windar's CEP sales, we deducted from CV direct selling expenses incurred on comparison market sales, in accordance with section 773(a)(6)(B)(ii) of the Act.

---

[86] *Id.*
[87] *See* 19 CFR 351.411(b).

H.    Currency Conversion

In accordance with section 773A of the Act and 19 CFR 351.415(a), we converted foreign currencies into U.S. dollars based on the exchange rates in effect on the dates of the U.S. sales, as certified by the Federal Reserve Bank.

## VIII.    INTERESTED PARTY COMMENTS

As noted above, on May 20, 2024, the petitioner and SGRE/Windar each submitted comments on the Draft Results.[88]  We address their comments below.

**Comment 1:  Rescinding the Investigation of SGRE**

In the *First Remand Redetermination*, Commerce determined that SGRE and Windar (and Windar's manufacturing subsidiaries) should be treated as a single entity, and this determination was not disturbed by the Court.[89]  In the Draft Results, we continued to treat the companies as a single entity.[90]

*Petitioner's Comments*

The following is a verbatim summary of the argument submitted by the petitioner.  For further details, *see* the Petitioner Draft Remand Comments at 3-49.

- {Commerce}, under {section 777A}(c)(1) {of the Act}, is only permitted to investigate 'exporter{s} and producer{s} of the subject merchandise' in conducting an antidumping proceeding.  The current respondent, {SGRE} submitted a quantity and value (Q&V) questionnaire response in the investigation, claiming to be an exporter of the subject merchandise during the POI.  In the course of these remands, {SGRE} has also claimed

---

[88] *See generally* Petitioner Draft Remand Comments; and SGRE/Windar Draft Remand Comments.
[89] *See Second Remand Order*, 659 F. Supp. 3d at 1351 ("The court neither requires nor prohibits Commerce, in going forward, from using a collapsing analysis.").
[90] *See* Draft Results at 5 ("Therefore, we have, under respectful protest, determined that the only viable option is to compute a new weighted-average dumping margin for the collapsed entity").

to be a producer of the subject merchandise.  As explained throughout this submission, both of {SGRE}'s claims are materially false.  In fact, no {SGRE} entity acted as a producer or an exporter during the POI.  Each and every U.S. sale being investigated by {Commerce} in this remand was produced and exported by Windar and its wholly-owned manufacturing subsidiaries.

- A substantial amount of documentation, both placed on the record by {SGRE}, and collected by {Commerce} at verification, demonstrates that Windar, and not {SGRE}, was both the producer and exporter of the subject merchandise during the POI.

- Further, when {Commerce} is unable to examine all known exporters and producers of the subject merchandise, the statute still limits {Commerce's} respondent selection process to only 'exporters and producers' under {section 777A}(c)(2) {of the Act}. Because no SGRE entity was a producer or exporter of the subject merchandise during the POI, {Commerce's} selection of {SGRE} as a mandatory respondent is contrary to law.  Likewise, because {Commerce} only conducts its collapsing analysis of affiliated entities into a single entity after respondent selection and the agency's collapsing analysis is limited to those entities within an affiliated group of companies that are engaged in the production and sale of subject merchandise to the United States, the statute prohibits {Commerce} from collapsing {SGRE} or the SGRE entities with Windar and its subsidiaries.  And {Commerce's} collapsing analysis and memorandum during this remand does not remedy this deficiency.

- {The p}etitioner, {Commerce}, and the Court were misled by {SGRE's} materially false statements and this issue did not become fully apparent until the {*sic*} {SGRE's} U.S. facility initially refused verification and instructed {Commerce} to verify Windar instead.

As such, the full record as developed in this remand proceeding demonstrates that

{Commerce} must find that {SGRE} is incapable of being examined in this proceeding

under the antidumping law because it is neither an exporter nor producer of subject

merchandise.  Thus, in {Commerce's} remand results, the agency should continue to

assign Windar the 73.00 percent dumping margin based entirely on AFA due to its lack

of cooperation and failure to respond and {Commerce} should terminate this

investigation with respect to {SGRE}, as it has no valid U.S. sales to examine.

No other interested party commented on this issue.

**Commerce's Position:**  We disagree with the petitioner and have continued to treat SGRE and

Windar as a collapsed entity that produced and exported wind towers from Spain.  Because we

continue to examine the single entity of SGRE/Windar which, collectively, produces and exports

wind towers from Spain, there is no basis to rescind the investigation with respect to SGRE.

In the *First Remand Redetermination*, Commerce found SGRE and Windar, as well as

Windar's manufacturing subsidiaries, to be affiliated and determined that they should be treated

as a single entity due to SGRE's ownership of 32 percent of Windar and indirect ownership of

Windar's manufacturing subsidiaries, as well as the companies' overlapping boards of directors

and managers and their intertwined operations.[91]  We also noted SGRE's role in the design and

intellectual property aspects of wind tower production and its supporting role in the

manufacturing process.[92]

---

[91] *See* SGRE/Windar Collapsing Memorandum at 7.  The petitioner argues that SGRE's ownership is insufficient to control Windar because SGRE is the minority shareholder.  *See* Petitioner Draft Remand Comments at 42-44.  That fact is not in question and was noted in the SGRE/Windar Collapsing Memorandum; additional considerations such as the overlapping boards of directors and managers, and well as intertwined operations of the companies, also factored into the decision.

[92] *Id*. at 8.

As noted above, in the SGRE/Windar Collapsing Memorandum, Commerce specifically contemplated the potential for treating non-producing parties as constituents of a single entity. Further, both the petitioner and SGRE/Windar provided comments either supporting (in the case of SGRE/Windar)[93] or not objecting to (in the case of the petitioner)[94] Commerce's decision to consider SGRE, Windar, and Windar's manufacturing subsidiaries as a single entity. We find that none of the information submitted since that decision undermines that finding.

The petitioner cites 10 specific pieces of information as support for its argument that SGRE is neither a producer nor exporter. However, eight of those facts were on the record prior to the decision to collapse SGRE and Windar.[95] The other two facts relied on by the petitioner relate to which party was responsible for movement expenses, documentation for which was obtained at verification;[96] however, Commerce generally does not find this type of information relevant in its affiliation and collapsing determinations.[97] Insofar as the petitioner argues that assumption of these movement expenses or the arranging of logistics demonstrates that Windar exported the wind towers in question, that information was already present in the SGRE/Windar March 10, 2023 AQR in the form of Spanish export documentation and U.S. entry documentation.[98] Similarly, the verifications of SGRE/Windar's responses confirmed the

---

[93] *See* SGRE/Windar May 1, 2023 Comments at 1 (stating "SGRE concurs with {Commerce's} preliminary determination regarding collapsing in the instant investigation for the reasons outline in its memorandum of April 25, 2023").

[94] *See* Petitioner May 12, 2023 Comments at 9 (stating "Indeed, {Commerce's} practice is essential to prevent companies from obtaining a lower rate by claiming a different company within the entity is the producer of the merchandise. This consideration is applicable here, as SGRE reports that it and Windar are 'co-producing' towers." (citations omitted)).

[95] Specifically, these sources relate to: agreements between SGRE and Windar; sales documentation; shipping documentation; and export and import documentation. *See* SGRE/Windar March 10, 2023 AQR at Exhibits A-26S, A-26W – Part 1, A-27W – Part 3, and A-27W – Part 4.

[96] *See* SGRE/Windar Sales Verification Report at 2, 11-12, and Exhibits SVE-19 through SVE-23; and Memorandum, "Verification of the SGRE Sales Response in the Remand of the Less Than Fair Value Investigation of Utility Scale Wind Towers from Spain," dated March 26, 2024 (SGRE Inc. Verification Report), at 10-11 and Exhibits VE-4 and VE-5.

[97] *See* 19 CFR 351.401(f) (outlining the criteria for Commerce's collapsing analysis).

[98] *See* SGRE/Windar March 10, 2023 AQR at Exhibits A-26S and A-26W – Part 1.

information on the record without changes to the relationship between SGRE and Windar in either ownership or the functions, transactions, and roles between the companies.

Although the petitioner argues that SGRE does not meet the definition of "producer" or "exporter," we disagree that these arguments provide a basis to alter our finding that SGRE and the Windar entities are properly treated as a single exporter/producer in the investigation.  While SGRE does not physically craft the wind towers, as the owner of its proprietary wind tower specifications, it designs the towers and provides the technical drawings and specifications to Windar and its manufacturing subsidiaries to fabricate them.[99]  Thus, SGRE performs an essential role in the production of the wind towers.[100]

The petitioner claims that, to find a company to be a producer, "{Commerce's} threshold requirement is that a company maintain production facilities."[101]  This is incorrect; the Court and Commerce have previously found that, when the design and the manufacture of subject merchandise are completed by separate entities, the manufacturer is not the sole party that may qualify as producer.[102]  The design of the product to be produced is a critical part of the production process.  Windar could not, of its own accord, produce the wind towers which the

---

[99] *Id.* at 28.

[100] *See Notice of Final Determination of Sales at Less Than Fair Value:  Static Random Access Memory Semiconductors From Taiwan*, 63 FR 8909, 8916 (February 23, 1998) (finding:  (1) the design of the merchandise to be its essential component; and (2) U.S. design houses to be the appropriate respondents because they control the production of the subject merchandise, as well as its ultimate sale).

[101] *See* Petitioner Draft Remand Comments at 11 (citing 19 CFR 351.401(f)).

[102] *See Taiwan Semiconductor Manufacturing Co., Ltd. v. United States*, Slip Op. 01-39, Court No. 98-05-02184 (CIT 2001) ("*This Court agrees with Commerce that its interpretation of 'producer' is consistent with section 772(a) and (b) of the Tariff Act of 1930, as amended, which defines 'export price' and 'constructed export price' as the price at which the subject merchandise is first sold (or agreed to be sold) by the producer or exporter of such merchandise to an unaffiliated purchaser in, or for exportation to, the United States … the subcontractor's customer who owns the design, rather than the subcontractor, controls all relevant elements of value … TSMC's non-ownership of the wafer design constitutes the determinative factor in Commerce's and this Court's analysis … Substantial evidence on the record supports Commerce's position that, 'in an industry that is shaped by intellectual property considerations{,} ... design is one of the primary determinants of the value of individual products.'"* (citations omitted)).

customers have ordered because they are proprietary models created and owned by SGRE.[103]

Therefore, SGRE is fundamentally involved in the production of wind towers.  In fact, SGRE

identified itself as the manufacturer associated with the POI entries in the entry data obtained

from U.S. Customs and Border Protection at the outset of the investigation.[104]

Notwithstanding the discussion above regarding production, SGRE and its U.S.

subsidiary SGRE Inc. also set the U.S. sales price, as they were the entities who entered into

sales contracts and invoiced the first unaffiliated U.S. customer.[105]  Section 772 of the Act

requires Commerce to base U.S. price on the price to the first unaffiliated customer in the United

States; thus, while Windar may have had knowledge of the final destination of the wind towers

that it shipped, this knowledge is not relevant here.[106]

Even assuming *arguendo* that SGRE is not a "producer" by virtue of its design (and other

aspects of its participation in the production process[107]), for purposes of serving as a respondent

in an AD proceeding, Commerce can, and frequently does, collapse resellers and other non-

producing entities (*i.e.*, those without production facilities) into single entities that are subject to

individual examination, as noted in the SGRE/Windar Collapsing Memorandum.[108]  There, we

specifically stated that,

> while section 19 CFR 351.401(f) explicitly applies to producers, Commerce has
> found it to be instructive in determining whether non-producers should be collapsed

---

[103] *See* SGRE/Windar Collapsing Memorandum at 6.

[104] *See* Respondent Selection Memorandum at Attachment.

[105] *See* SGRE/Windar March 10, 2023 AQR at 20 and Exhibit A-27S; and SGRE Inc. Verification Report at 5 Exhibits VE-3, VE-7, and VE-8.

[106] That said, we agree with the petitioner that Windar was an appropriate respondent selected in the underlying LTFV investigation, and its failure to participate in that investigation seriously impeded the proceeding.  As we stated in the *First Remand Redetermination*, Windar's rate was appropriately based on a finding that it "withheld information requested by Commerce, failed to provide information by the specified deadlines, and significantly impeded the proceeding by failing to respond to our Q&V questionnaires."

[107] *See* SGRE/Windar Collapsing Memorandum at 8.

[108] *Id.* at 5 (citing *Notice of Final Determination of Sales at Less Than Fair Value:  Certain Frozen and Canned Warmwater Shrimp from Brazil*, 69 FR 76910 (December 23, 2004) (*Shrimp from Brazil*), and accompanying IDM at Comment 5) ("Thus, while 19 CFR 351.401(f) uses the term "producers," Commerce's practice is to apply this regulation to resellers and other affiliated companies as well.").

and has used the criteria in the regulation in such analyses.[109]  Thus, while 19 CFR 351.401(f) uses the term 'producers,' Commerce's practice is to apply this regulation to resellers and other affiliated companies as well.[110]

In such cases where there exists a significant potential for manipulation of prices and/or export decisions, Commerce has considered these affiliated entities to be part a single entity, where appropriate.[111]  The Court has held that, once a finding of affiliation is made, affiliated entities can be considered a single entity where their relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise.[112]  Such concerns, including Commerce's mandate to determine margins accurately and to prevent manipulation that would undermine the effectiveness of the AD laws, support the continued treatment of SGRE and the Windar companies as a single entity.

The petitioner also argues that Commerce's "selection of SGRE S.A. as a mandatory respondent" was contrary to law[113] because Commerce only collapsed SGRE and Windar *after* respondent selection.  Here, although we agree with the general proposition that collapsing does not take place at the respondent selection stage, this argument's relevance to our treatment of SGRE is moot.  The Court, in the *First Remand Order*, stated that Commerce's investigation,

---

[109] *Id*. at 5 (citing *Honey from Argentina:  Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review*, 77 FR 1458, 1461-62 (January 10, 2012), unchanged in *Honey from Argentina:  Final Results of Antidumping Duty Administrative Review*, 77 FR 36253 (June 18, 2012); and *Shrimp from Brazil* IDM at Comment 5.  The courts have found that collapsing exporters is consistent with a "reasonable interpretation of the antidumping duty statute."  *See Hontex Enterprises, Inc. v. United States*, 248 F. Supp. 2d. 1323, 1338 (CIT 2003) (*Hontex*)).

[110] *Id*. at 5-6 (citing *Shrimp from Brazil* IDM at Comment 5) (addressing the criteria of the similarity of production facilities for situations with a non-producing entity and an affiliated producer).

[111] *See, e.g*., *Certain Cold-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil; Notice of Final Determination at Sales at Less Than Fair Value*, 65 FR 5554 (February 4, 2000); *Certain Welded Carbon Steel Pipes and Tubes from Thailand:  Final Results of Antidumping Duty Administrative Review*, 63 FR 55578 (October 16, 1998),  at Comment 2; and *Certain Preserved Mushrooms from the People's Republic of China:  Final Results of Sixth Antidumping Duty New Shipper Review and Final Results and Partial Rescission of the Fourth Antidumping Duty Administrative Review*, 69 FR 54635 (September 9, 2004), and accompanying IDM at Comment 1.  *See also Hontex*, 248 F. Supp. 2d. at 1338.

[112] *See Hontex*, 248 F. Supp. 2d. at 1343.

[113] *See* Petitioner Draft Remand Comments at 4.

wherein we selected a single mandatory respondent, "must be remedied by an individual investigation of Siemens Gamesa during the remand proceeding the court is ordering."[114]  Thus, there was no respondent selection here – there was a court directive to examine SGRE.

Similarly, the petitioner emphasizes that Windar's failure to properly file a separate Q&V questionnaire response – so it could be separately considered as a potential respondent in this investigation – tainted the original respondent selection process.  Commerce expressed such concerns in the *First Remand Redetermination*.[115]  The Court rejected this analysis and found that Commerce improperly "overlooked the point that questionnaire responses Siemens Gamesa submitted during the remand proceeding remedied any deficiency that could have arisen from Windar's earlier failure to provide the Q&V response."[116]

In sum, we find that SGRE[117] continues to be appropriately considered a member of the SGRE/Windar entity, and a producer/exporter of subject merchandise.  As such, we need not address petitioner's arguments that both the Incoterms® between Windar and SGRE Inc. and a lack of a principal-agent relationship between Windar and SGRE fail to demonstrate that SGRE is a producer or exporter of subject merchandise.[118]  For the reasons stated, we continue to treat SGRE and the Windar entities as a single entity subject to the investigation.  We have,

---

[114] *See First Remand Order*, 621 F. Supp. 3d at 1349.

[115] *See First Remand Redetermination* at 32-34.

[116] *See First Remand Order*, 621 F. Supp. 3d at 1353.

[117] The petitioner makes several comments regarding the identity of "SGRE."  As stated in the SGRE/Windar Collapsing Memorandum, the entity that we have considered as SGRE within SGRE/Windar is Siemens Gamesa Renewable Energy S.A.  Regarding any other worldwide affiliated entities, because an antidumping proceeding involves merchandise from one country, Commerce typically does not collapse across country lines.  *See Notice of Final Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the Republic of Korea*, 71 FR 29310 (May 22, 2006), and accompanying IDM at Comment 15 (citing *Slater Steels Corp., Fort Wayne Speciality Alloys Division; Carpenter Technology Corp., Crucible Specialty Metals Division, Crucible Materials Corp.; Electralloy Corp.; and United Steel Workers of America, AFL-CIO/CLC, Plaintiffs, v. United States*, 297 F. Supp. 2d 1362, (CIT 2003)).  Insofar as the petitioner's arguments are that agreements between parties involve SGRE affiliates not located in Spain, the agreements cover SGRE and are applicable to it.  *See* SGRE/Windar March 10, 2023 AQR at Exhibits A-27W – Part 3 and A-27W – Part 4.

[118] *Id.* at 36-42.

37

accordingly, rendered a determination in compliance with the Court's *First Remand Order*, which stated that Commerce's "unlawful decision must be remedied by an individual investigation of Siemens Gamesa during the remand proceeding the court is ordering."[119]

**Comment 2:  Rejection of Corrected Weights and Application of AFA**

As noted above, Commerce based SGRE/Windar's recalculated dumping margin on partial AFA as a result of SGRE/Windar's reporting discrepancies identified at verification.[120]  In the most significant of these discrepancies, we found that SGRE/Windar failed to report accurate weight product characteristics data for its wind towers sold to Sweden and, correspondingly the CONNUMs for those towers, for over one third of its comparison market sales.  As a result, we applied the highest non-aberrational transaction-specific margin to the U.S. sales which matched to comparison market models with misreported weights.

*Petitioner's Comments*

The following is a verbatim summary of the argument submitted by the petitioner.  For further details, *see* the Petitioner Draft Remand Comments at 49-56.

- Should {Commerce} not terminate this investigation with respect to {SGRE}, {Commerce} appropriately applied partial AFA to two corrections presented at verification.[121]  The corrections offered by SGRE/Windar to its reported data were substantial as they related to the misreporting of nearly 37 percent of third country sales {CONNUMs} as well as unreported expenses.[122]  Because of the pervasive nature of these issues, the corrections presented by SGRE/Windar cannot be considered minor and the discrepancies are rightfully plugged with an adverse inference.  Thus, if {Commerce}

---

[119] *See First Remand Order*, 621 F. Supp 3d at 1349.
[120] *See* Draft Results at 6-13.
[121] *Id*.
[122] *Id*. at 6-7.

continues to calculate a margin for the SGRE/Windar collapsed entity for the final

remand redetermination, it should continue to apply partial AFA to SGRE/Windar.

*SGRE/Windar's Comments*

The following is a verbatim summary of the argument submitted by SGRE/Windar.  For

further details, *see* the SGRE/Windar Draft Remand Comments at 9-10.

- {Commerce} improperly rejected Windar's corrected tower weights.

**Commerce's Position:**  We disagree with SGRE/Windar and continue to find that application of

partial AFA is warranted in these final results of redetermination.[123]  Although we have made

certain changes to our margin calculations, we have not modified the methodology used to

implement our application of partial AFA with respect to Windar's misreported tower weights.

Commerce's typical practice is to accept corrective information at verification only for

minor errors discovered during a company's preparation for verification.  As noted in the

verification agenda, "{n}ew information will be accepted at verification only when:  (1) the need

for that information was not evident previously; (2) the information makes *minor corrections* to

information already on the record; or (3) the information corroborates, supports, or clarifies

information already on the record."[124]  This practice, as applied at verification, strikes a balance

between finality and accuracy.  Importantly, it is within Commerce's discretion to decide which

interest outweighs the other on a case-by-case basis.[125]

Here, as noted above, certain SGRE/Windar production entities failed to properly report

the product characteristic for tower weight on a theoretical basis, instead relying on the actual

---

[123] SGRE/Windar does not challenge Commerce's application of partial AFA with respect to the previously-unreported factoring expenses, and we have continued to base the amount of these expenses on AFA.
[124] *See* Sales Verification Outline at 2 (emphasis added).
[125] *See Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997) ("Congress has implicitly delegated to Commerce the latitude to derive verification procedures ad hoc."); and *Am. Alloys, Inc. v. United States*, 30 F.3d 1469, 1475 (Fed. Cir. 1994) ("{T}he statute{} give{s} Commerce wide latitude in its verification procedures.").

weight of the towers shown on the packing lists.[126]  This was in direct contradiction to the

instructions set forth in the Initial Questionnaire, which directed SGRE/Windar to "{i}ndicate

the total *theoretical* weight of the tower or section sold," for the weight field in the U.S. and

comparison market databases.[127]  Using the actual weight was not a negligible error, as such

misreporting could move a sale from one weight code (and, consequently, one CONNUM) to

another.  Additionally, products could be assigned to wholly new CONNUMs for which

SGRE/Windar did not report cost information or to divide CONNUMs with separate cost

information when they should have in fact been reported under, and had their costs combined

with those of, existing CONNUMs.  Errors of this type impact multiple stages of Commerce's

margin analysis, including in the application of our cost test (in the comparison market program)

and in the matching process (in the margin calculation program).  It also bears noting that the

scope of this error was substantial; it impacted over one third of SGRE/Windar's comparison

market wind tower models.[128]

      Under these circumstances, and contrary to SGRE/Windar's argument, it was appropriate

for Commerce to decline to accept the revised weight coding at verification.  Doing so was also

consistent with Commerce practice, which has been upheld by the courts.  For instance, in

*Goodluck*, the Federal Circuit explained:

> Commerce acted within its discretion in rejecting Goodluck's revised submissions
> on the day of verification because substantial evidence supports Commerce's
> determination that Goodluck's revisions were not minor.  Goodluck's revisions
> were a systemic change to the entire reported database.  The revisions were not
> singular, such as a missing word or an error in arithmetic.  The record reflects that
> Goodluck's coding errors resulted in 24 misreported CONNUMs and 13 unreported
> CONNUMs, thereby resulting in misreported CONNUMs for 682 sales in
> Goodluck's home market database. … {T}he control number is fundamental to

---

[126] *See* SGRE/Windar Sales Verification Report at 2, 3, and 11.
[127] *See* Initial Questionnaire at B-8 and C-7 (emphasis added).
[128] *See* SGRE/Windar Sales Verification Report at 3 ("For 75 comparison market sequence numbers, Windar incorrectly reported the weight, a component of the control number.").

Commerce's calculation, as it controls the allocation of costs and determines the product matches between U.S. and home markets.' It was therefore rational for Commerce to find that 'any attempts to correct these errors would involve both extensive SAS programming and complex calculations to Goodluck's cost database.' Such corrections are not 'minor.'[129]

The facts here are analogous. SGRE/Windar's comparison market database and the CONNUMs contained therein were not accurate, and the respondent attempted to make a significant modification to its reporting at verification. Although the nature of the reporting error here permitted Commerce to apply a partial AFA application, constituting a distinction from *Goodluck*,[130] the nature and extent of the errors were not minor.

SGRE/Windar asserts that Commerce had "ample time" to verify the correct weight data and should have done so. We disagree. As discussed above, Commerce must strike the balance between closing the administrative record in a timely fashion and obtaining corrective data. Examining the CONNUMs for over a third of the comparison market sales database is a significant undertaking. For instance, SGRE/Windar would need to provide revised costs and create new CONNUMs. Additionally, although the reporting error was with respect to the weight characteristic, SGRE/Windar assigned values to other fields on a CONNUM basis, and Commerce would have had to subject the newly-revised fields to additional verification procedures. All of these procedures would take time, which was already limited, from the numerous other items covered by the scheduled verification. It is inappropriate to permit a respondent to essentially modify/reprioritize the agenda for verification through the proposal of significant corrections to its database. Therefore, Commerce was fully justified in declining to

---

[129] *See Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343 (Fed. Cir. 2021) (*Goodluck*).
[130] In *Goodluck*, where the respondent's reporting errors relating to CONNUM assignment were extensive, the Federal Circuit upheld Commerce's application of *total* AFA to the respondent.

accept at verification corrections of this nature and magnitude. Doing so was consistent with practice and court precedent.

As support for its argument, SGRE/Windar cites *National Steel*,[131] suggesting that Commerce should deem SGRE/Windar's weight miscoding to be minor. We disagree that the standards outlined in *National Steel* apply in this proceeding. There, the Court found the errors in that proceeding to be minor (referring to "the miscalculation of thickness by eight millionths of an inch"), and it noted two considerations: "how {errors} occurred, and more importantly, in light of their significance."[132] The misreporting in *National Steel* resulted from a computer error in converting data from millimeters to inches.[133] Conversely, SGRE/Windar made a methodological error when reporting the information for a third of its comparison market sales, instead reporting the information in a manner different from the manner explicitly requested by Commerce. Further, the scope of the error is substantial here. SGRE/Windar's error implicated the weight field that was, functionally, the most important product characteristic in terms of determining matches to U.S. products in this investigation (because there was no variation on the first product characteristic related to "product type"). SGRE/Windar's misreporting of weight in the comparison market affected almost 37 percent of the comparison market sales; as the U.S. sales are matched to the comparison market sales for the margin calculations, a significant number of U.S. sales are affected by the error because they were matched to misreported comparison market CONNUMs, which affects the calculated dumping rate.

---

[131] *See National Steel Corp. v. United States*, 870 F. Supp. 1130, 1137-38 (CIT 1994) (*National Steel*). Commerce notes that SGRE/Windar did not provide a full citation for the case, and presumes this case to be that referenced in the party's remand comments.
[132] *Id*., 870 F. Supp. at 1137.
[133] *Id.*

SGRE/Windar's reliance on *National Steel* to assert that Commerce must draw a distinction between accepting misreported data and omitted data when determining whether to accept or reject a minor correction is misplaced.[134]  In *National Steel*, the Court considered whether Commerce properly characterized the severity of the respondent's misreporting in determining how to fill the gap of information.[135]  In these final results of redetermination, the question is whether Commerce appropriately and within its discretion rejected SGRE/Windar's corrected tower weights at verification on the basis that such corrections were not minor.  As discussed above, Commerce determined, within its discretion, that the misreporting in tower weights exceeded the threshold for minor correction.  In determining whether corrective information presented at verification constitutes a minor correction, Commerce need not distinguish whether the information is misreported or previously omitted.[136]  Further, *National Steel* was decided by the Court nearly 30 years ago, whereas the Federal Circuit has examined this issue recently in *Goodluck*, cited above.  As explained above, the latter case is on point and constitutes binding precedent regarding Commerce's discretion in the area of rejecting systemic corrections to data at verification.

Finally, SGRE asserts that "{i}t was only on the fifth day that the weight information was removed from the verification packages and deemed to be rejected," and thus, the "correct weight data cannot be considered to be unverified."[137]  This argument, too, is without merit.  As

---

[134] *See* SGRE/Windar Draft Remand Comments at 9-10 (citing *National Steel*, generally).

[135] *See National Steel*, 870 F. Supp. at 1133.

[136] *See, e.g.*, *Yantai Steel Structure Co., Ltd. v. United States*, Slip Op. 15-103 (CIT September 15, 2015), at 7 ("Here, it is undisputed that, by supplying inaccurate mill test certificates, Jiulong failed to cooperate to the best of its ability during the investigation and that necessary information was missing from the record, thereby warranting the use of AFA to calculate Jiulong's countervailing duty rate."); and *Taian Ziyang Food Company, Ltd. v. United States*, 637 F. Supp. 2d 1093, 1112 ("Indeed, 'Commerce could not have informed Ziyang that information was missing from its harvest of production data when it did not know that the information submitted by Ziyang in the New Shipper Review and its various questionnaire responses was incorrect.'").

[137] *See* SGRE/Windar Draft Remand Comments at 10.

discussed above, Commerce has significant discretion in conducting its verification procedures, including in determining whether a correction constitutes a minor correction. In this instance, the timing of when the information was removed from the sales packets (which were prepared and proffered by SGRE/Windar itself) is immaterial. Verifiers frequently confirm which documents will be accepted as verification exhibits toward the end of a verification process, and the meaningful action here is Commerce's deliberate decision to reject the new factual information that SGRE/Windar attempted to provide, rather than the timing of that rejection. In any event, SGRE/Windar's assertion that the correct data should be considered verified is plainly incorrect. The verification team accepted only a list of mis-coded CONNUMs; the verifiers did not seek or obtain documentation demonstrating that the proposed revised coding relating to the numerous impacted sales transactions was correct, nor did they solicit or accept a new COP database. Thus, we find SGRE/Windar's arguments to be without merit.

**Comment 3: U.S. Price**

SGRE/Windar reported that the first sale of subject merchandise to an unaffiliated customer in the United States was the sale of a turbine project (rather than just a wind tower). Therefore, Commerce allocated a portion of the project price to the wind tower section to derive a U.S. price for the margin analysis.[138] Commerce's analysis relied, in part, on the transfer price between Windar and SGRE; however, as noted in the Draft Results, such prices are disfavored in Commerce's analysis and we typically do not rely on U.S. transfer prices in our analysis because there is no way to test whether they are set on an arm's-length basis. We further stated, however, that: (1) given that this is the LTFV investigation segment of the proceeding and SGRE/Windar established these transfer prices prior to the filing of the petition, we accepted SGRE/Windar's

---

[138] *See* Draft Results at 21.

methodology for the purposes of our calculations; and (2) we intended to further evaluate the

appropriateness of this methodology in any future segments.

*Petitioner's Comments*

      The following is a verbatim summary of the argument submitted by the petitioner.  For

further details, *see* the Petitioner Draft Remand Comments at 56-70.[139]

- If {Commerce} continues to calculate a margin for the SGRE/Windar collapsed entity, it

    must revise the gross unit prices used to calculate those margins.  First, the gross unit

    price relied upon for the Draft Results was based on affiliated transfer pricing.[140]  As

    {Commerce} recognized, it does not use affiliated transfer pricing because it is not

    reflective of market realities and normal pricing structures.[141]  Moreover, {Commerce's}

    insistence that it is fine to rely on them for the instant case because SGRE/Windar did not

    know about the coming Petition is unavailing.[142]  Thus, {Commerce} should recalculate

    the cost ratios used to derive gross unit price based on the CONNUM-specific costs of

    production, or at the very least, the project-specific {COP}.  If {Commerce} continues to

    use prices based upon affiliated transfer pricing between Windar and SGRE Inc. then

    certain changes to the calculation are still necessary to correct improper inclusions of

    revenues and costs by {SGRE} to arbitrarily inflate its U.S. prices.

---

[139] We note that we requested that interested parties provide a public, executive summary for each issue raised in their briefs.  *See* Draft Results at 30.  The petitioner included text designated as business proprietary information in its executive summary; however, because this text constitutes public information (*see, e.g.*, Petitioner Draft Remand Comments at 64), we have removed the brackets from the summary.
[140] *See* SGRE/Windar's Letter, "Second Sections A-C Supplemental Questionnaire Response," dated January 10, 2024 (SGRE/Windar January 10, 2024 SQR), at 7.
[141] *See* Draft Results at 21.
[142] *Id.*

*SGRE/Windar's Comments*

The following is a verbatim summary of the argument submitted by SGRE/Windar. For further details, *see* the SGRE/Windar Draft Remand Comments at 2-5.

- In its {Draft Results}, Commerce calculated a net U.S. price for wind towers based on the resale value of assembled wind turbines. In calculating the net U.S. price, wind turbine logistic costs were subtracted. However, the starting price did not capture the revenue attributable to such logistics costs. As such, the calculated U.S. price should be adjusted to fully account for the disproportionate logistics costs for wind towers. In addition, {Commerce's} differential price analysis should be refined to account for U.S. prices based on further manufactured sales.

**Commerce's Position:** We agree with both the petitioner and SGRE/Windar, in part. We have revised the calculation of U.S. price to: (1) exclude transportation charges[143] associated with the wind towers and other turbine components before apportioning the total project costs and revenue across the wind tower/non-wind tower components; (2) allocate the resulting price to the individual tower sections based on each section's COP; and (3) treat certain expenses that SGRE Inc. incurred for the wind towers as direct selling expenses, apportioned, where necessary, between subject and non-subject merchandise.

In the Draft Results, we used SGRE/Windar's allocation of the total price charged to the unaffiliated U.S. customer to derive the gross unit price. This allocation was based on the ratio of SGRE Inc.'s cost for the wind towers to the cost of the completed wind turbine project.[144] We noted at the time that, while the allocation relied, in part, on transfer prices between Windar and

---

[143] These charges are including logistics costs recorded separately under the wind tower heading on SGRE Inc.'s cost worksheets. *See* SGRE/Windar November 14, 2023 SQR at Exhibits SC-21a (rows 26 and 34) and SC-21b (rows 30, 31, and 41).
[144] *See* SGRE/Windar January 10, 2024 SQR at Exhibit 10.

SGRE Inc., we would accept the methodology because the investigation occurred after SGRE/Windar had established the transfer prices.[145]  Commerce typically does not rely on U.S. transfer prices in its analysis because such prices may not be set on an arm's-length basis.[146]

Following the Draft Results, the petitioner asserted that Commerce should allocate gross unit price based on a CONNUM-specific ratio based on SGRE/Windar's COP.  We agree that using actual costs is appropriate, and we have revised our methodology for purposes of the final redetermination.[147]  This revised methodology allows Commerce to differentiate the prices for each wind tower section type, by assigning a higher percentage of the price to those products for which SGRE/Windar incurs greater costs.  Doing so is consistent with analogous approaches we have adopted in the past,[148] and it also allows for greater accuracy in deriving the gross unit price.  Accordingly, we have revised the gross unit price used in our margin calculations to be based on a CONNUM-specific, COP-based ratio.  To do this, we summed the reported total COP for each of the section types for each U.S. project to obtain a total COP for the entire wind tower (*i.e.*, the complete multi-section wind tower as sold to the unaffiliated U.S. customer).  We then determined the ratio that each section type was of the total wind tower COP.  Using the total

---

[145] *See* Draft Results at 21.

[146] *Id.* at 21; and Petitioner Draft Remand Comments at 57-59.

[147] While we agree with the petitioner's arguments regarding allocating price based on costs, we have not adopted the petitioner's particular proposed calculation.  That calculation:  (1) excludes transportation costs from SGRE Inc.'s costs in the allocation ratio but includes the transportation costs in the revenue (*see* below for further discussion); (2) uses SGRE Inc.'s "anticipated" charges (*see* SGRE/Windar February 1, 2024 SQR at 9); (3) uses a price that is not the verified, invoiced project price to the unaffiliated U.S. customer; and (4) uses COP as reported in the cost database by SGRE/Windar rather than the revised COP calculated in the comparison market program.  *See* Petitioner Draft Remand Comments at Exhibit 2; and SGRE/Windar Sales Final Results Analysis Memorandum at Attachment 3.  Although the petitioner argues that Commerce should exclude services from the initial price allocation, we note that this conflicts with its prior argument regarding transfer prices and profit.  *See* Petitioner Draft Remand Comments at 61-63 and 65-67.  Further, if we exclude components of the invoiced price, there is a possibility that a respondent may shift profits from one component to another.  Therefore, the appropriate stating price is the total invoiced price.

[148] *See, e.g.*, *Certain Vertical Shaft Engines Between 99cc and Up to 225cc, and Parts Thereof, from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 86 FR 14077 (March 12, 2021), and accompanying IDM at Comment 4, and *Certain Fabricated Structural Steel from Canada:  Final Determination of Sales at Less Than Fair Value*, 85 FR 5373 (January 30, 2020), and accompanying IDM at Comment 2.

revenue attributable to the wind towers for each U.S. project (*see* discussion below), we applied the individual CONNUM cost ratios for the section type categories to the total tower revenue. We then divided the resulting value by the number of sections of that CONNUM sold in each U.S. project to arrive at a price per section.

Regarding the allocation of the total project revenue to wind tower versus non-wind tower components, we also have modified our approach from the Draft Results. Because SGRE/Windar sells complete projects (*i.e.*, multiple assembled wind turbines) to unaffiliated U.S. customers, we instructed SGRE/Windar to allocate the price it charged for these projects to the individual components of the wind turbines. We instructed SGRE/Windar to use the granular project worksheets, which contain project costs by component (some of which are based on transfer price) and project revenue, to do so.[149] For the same reasons stated above with respect to the tower sections, we have reconsidered this approach and are now relying on the reported COP for SGRE/Windar's wind towers in our calculation of the project costs, rather than the transfer prices for these towers, where possible.[150]

Further, although we instructed SGRE/Windar to allocate the project cost to both "the relevant components (*e.g.*, tower, blades, nacelle) and services (*e.g.*, delivery, commissioning)," we did not instruct SGRE/Windar to specifically exclude any items from the allocation.[151] SGRE/Windar now claims that the allocated price it provided[152] excludes the freight attributable to wind towers when it determined the proportion of the project revenue to assign to wind towers, and that this exclusion thereby double counted the deduction for freight costs (*i.e.*, by

---

[149] *See* Commerce's Letter, "Second Sections ABC Supplemental Questionnaire," dated December 29, 2023 (ABC Supplemental Questionnaire), at 5.
[150] We note that SGRE Inc. also purchased wind towers and wind tower accessories from unaffiliated suppliers, and it combined these purchases with its purchases of SGRE/Windar's wind towers/accessories for some of the cost elements in its project sheets. In such cases, we accepted SGRE Inc.'s data, as reported.
[151] *See* ABC Supplemental Questionnaire at 5.
[152] *See* SGRE/Windar January 10, 2024 SQR at Exhibit 10.

first excluding them from the gross unit price derivation and then again deducting the reported freight expense fields in the calculation of U.S. net price in the margin program). However, we disagree. While SGRE/Windar may have allocated a portion of U.S. revenue to the wind towers based on a ratio that excluded freight from both the numerator and the denominator, this calculation did not result in the double counting of any freight costs. Instead, it merely allocated the price (which included delivery to the customer's location) between the subject wind towers and the remaining components, resulting in an allocated delivered price for the wind towers and an allocated delivered price for the other components. Therefore, it was both necessary and appropriate for Commerce to deduct freight expenses from the allocated price for the wind towers when computing SGRE/Windar's dumping margin. That said, we have looked at the calculation anew, based on SGRE/Windar's comments. Given that the freight expenses differ, sometimes markedly, between the wind towers and the other components, we find that it is more accurate to remove the freight expenses from the project price before performing the allocation. Therefore, we have excluded the logistics costs[153] for both the wind tower and non-wind tower components of the turbines sold in the United States (*i.e.*, we derived the equivalent of an ex-works price) before allocating a portion of the project revenue to the subject wind towers. Because we recomputed the allocated price to be exclusive of freight expenses, we made no additional deductions from the allocated U.S. price for freight.[154]

---

[153] We included additional logistics expenses listed separately under the wind towers subheading on SGRE Inc.'s cost worksheet as part of this calculation. *See* SGRE/Windar November 14, 2023 SQR at Exhibits SC-21a (rows 26 and 34) and SC-21b (rows 30, 31, and 41).

[154] We note that the transportation expenses are included in the sale price to the U.S. customer per the delivery terms and are not additional transportation revenue charged separately from the sale, which Commerce caps under its normal methodology. *See* SGRE/Windar March 10, 2023 AQR at Exhibit A-27S; SGRE/Windar November 14, 2023 SQR at Exhibits SC-21.a, SC-21.b, and SC-32; and SGRE Inc. Verification Report at Exhibits VE-3 and VE-7.

Finally, SGRE Inc. listed certain other direct expenses related to wind towers under the wind tower heading on SGRE Inc.'s cost worksheets.[155]  We apportioned these expenses to the Windar-produced wind tower sections on as specific a basis as possible for each project.[156]  For further details of our calculations, *see* the SGRE/Windar Sales Final Results Analysis Memorandum.

Although we agree with SGRE/Windar that a revision to the allocation is necessary, the revised calculation that SGRE/Windar includes in its comments (to incorporate the wind towers transportation expenses) attributes the entirety of the profit from the wind turbine project in the calculation of the wind tower price and assigns none of the profit to any of the other components.[157]  Thus, we have further revised the proposed allocation to ensure an accurate price, using the methodology noted above.[158]

**Comment 4:  U.S. Short-Term Borrowing Rate**

The following is a verbatim summary of the argument submitted by the petitioner.  For further details, *see* the Petitioner Draft Remand Comments at 70-72.

*Petitioner's Comments*

- {Commerce} incorrectly used {SGRE/Windar's} submitted short-term borrowing rate for the calculation of credit and U.S. inventory carrying costs.[159]  {Commerce} should instead use {the p}etitioner's submitted short-term U.S. {d}ollar-denominated commercial lending rate published by the Federal Reserve for the final remand

---

[155] *See* SGRE/Windar November 14, 2023 SQR at Exhibits SC-21a (rows 23 and 27) and SC-21b (row 28).
[156] *See* SGRE/Windar Sales Final Results Analysis Memorandum.
[157] *See* SGRE/Windar Draft Results Comments at 4-5 (noting its proposed wind tower price as the total project revenue less the cost for components other than wind towers and less logistics costs for components other than wind towers and then dividing that remaining revenue by the number of wind tower sections in each project).
[158] *See* SGRE/Windar Sales Final Results Analysis Memorandum.
[159] *See* SGRE/Windar Draft Results Sales Analysis Memorandum at 8.

redetermination.[160]  {SGRE/Windar} failed to provide any support for its rate, even
failing to identify the source of the borrowing rate it submitted.  On the other hand, {the
p}etitioner's rate is supported by sufficient evidence.  {Commerce} should recalculate
{SGRE/Windar's} U.S. imputed credit expense and inventory carrying costs using the
rate supplied by {the p}etitioner.

No other interested party commented on this issue.

**Commerce's Position:**  We have revised the U.S. short-term borrowing rate for SGRE/Windar
to use the rate provided by the petitioner.  This rate is identified a daily rate for short-term
business loans from the Federal Reserve.[161]  Therefore, because this rate is more specific to the
U.S. business short-term borrowing rate during the POI provided by SGRE/Windar, and is from
a source that Commerce routinely relies upon in its AD analyses, we have revised our
calculations to use this rate as the U.S. short-term borrowing rate.[162]

That said, we disagree with the petitioner that SGRE/Windar did not identify the source
of its submitted U.S. short-term borrowing rate.  SGRE/Windar stated that "{t}he interest rates
are pulled from the OECD website.  https://data.oecd.org/interest/short-term-interest-
rates.htm."[163]  SGRE/Windar provided a table of the monthly rates during the POI from this
source and used the average POI rate for its U.S. short-term borrowing rate.[164]  The record
documentation for this rate does not identify the type of borrowing(s) associated with this rate,
however, and thus, for the reasons noted above, we have relied on the Federal Reserve data
instead.

---

[160] *See* Petitioner's Letter, "Petitioner's Comments and Rebuttal Factual Information on SGRE's February 1, 2024
Supplemental Section C Questionnaire Response and Objection to Rescheduling of Verification," dated February 5,
2024, at Exhibit 3.
[161] *Id.* at Exhibit 3.
[162] *See* SGRE/Windar Sales Final Results Analysis Memorandum.
[163] *See* SGRE/Windar October 16, 2023 BCDQR at 42 of Section C.
[164] *Id*. at Exhibit C-13.

**Comment 5:  Indirect Selling Expense Rate**

*SGRE/Windar's Comments*

The following is the verbatim summary of the argument submitted by SGRE/Windar.[165]

For further details, *see* the SGRE/Windar Draft Remand Comments at 10.

- {Commerce} did not utilize the revised indirect selling expense rate {submitted by SGRE/Windar}.

No other interested party commented on this issue.

**Commerce's Position:**  We revised our calculation of U.S. indirect selling expenses to use the indirect selling expense ratio from SGRE/Windar's February 1, 2024 SQR.[166]

**Comment 6:  Application of Differential Pricing Analysis**

In the Draft Results, Commerce applied its standard differential pricing methodology to determine whether application of the average-to-transaction method is appropriate in this investigation.[167]  Commerce found that 100.00 percent of the value of SGRE/Windar's U.S. sales pass the Cohen's *d* test, confirming the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  Further, Commerce determined that the average-to-average method could not account for such differences.  Thus, in the Draft Results, we applied the average-to-transaction method to all U.S. sales to calculate the weighted-average dumping margin for SGRE/Windar.

---

[165] We note that we requested that interested parties provide a public, executive summary for each issue raised in their briefs.  *See* Draft Results at 30.  SGRE/Windar's summary contained business proprietary information, which we have removed herein.

[166] *See* SGRE/Windar February 1, 2024 SQR at Exhibit SC3-4; *see also* SGRE/Windar Sales Final Results Analysis Memorandum.

[167] *See* Draft Results at 18.  Because Commerce found that 100 percent of SGRE/Windar's U.S. sales passed the Cohen's *d* test, the margin program only calculates average-to-average and average-to-transaction margin rates.  The mixed method is not valid when 100 percent of sales pass the Cohen's *d* test because there are no sales that failed and would thus receive the average-to-average rate instead of the average-to-transaction rate.

*SGRE/Windar's Comments*

The following is the verbatim summary of the argument submitted by SGRE/Windar.[168] For further details, *see* the SGRE/Windar Draft Remand Comments at 5-9.

- {Commerce}'s differential price analysis should be refined to account for U.S. prices based on further manufactured sales.

No other interested party commented on this issue.

**Commerce's Position:** We disagree with SGRE/Windar's assertion that application of the Cohen's *d* test in inappropriate in this context. Accordingly, we continue to apply Commerce's standard differential pricing analysis in the margin calculation for SGRE/Windar.

Commerce applies its differential pricing analysis, including the Cohen's *d* test, to determine whether the use of the average-to-average method is appropriate pursuant to section 777A(d)(1)(A) of the Act and 19 CFR 351.414(c)(1) or whether the application of an alternative comparison method is warranted to address masked dumping pursuant to section 777A(d)(1)(B) of the Act.[169] The purpose of section 777A(d)(1)(B) of the Act is to evaluate whether the average-to-average method is the appropriate method to determine if, and if so, to what extent, a given respondent is dumping the subject merchandise in the U.S. market.[170] SGRE/Windar raises several arguments regarding the application of our differential pricing methodology, but none of the arguments compel a different approach in this investigation.

First, SGRE/Windar assert that "Commerce used a further manufactured price as the basis for testing price differentials" and because "prices in this case were based on a price of

---

[168] We note that we requested that interested parties provide a public, executive summary for each issue raised in their briefs. *See* Draft Results at 30. SGRE/Windar's summary contained business proprietary information, which we have removed herein.
[169] *See* Draft Results at 14-15.
[170] *See* 19 CFR 351.414(c)(1).

non-subject merchandise and … substantially exceeded the price of the imported product ... the standard test for price variability may not be used in this case."[171]  The underlying basis for this argument is incorrect.[172]  We did not use a further manufactured price in this instance.[173]  Rather, we relied on the price at which SGRE/Windar sold the subject merchandise (as part of a completed wind turbine project) to the first unaffiliated customer.[174]  We allocated a portion of such a price to isolate the unit price specifically associated with the wind tower component. Thus, the price was not a "further manufactured price" or a "price of non-subject merchandise," as SGRE/Windar asserts.  Rather, it was a constructed export price that was derived based on the sale of a product that contained subject merchandise.  Therefore, SGRE/Windar's assertion that Commerce "must determine the degree to which price differential exists for the non-subject {merchandise} and the degree to which profitability and the cost of non-subject components impacted test results"[175] is without merit.

Second, SGRE/Windar asserts that "no explanation is provided as to why the {transfer} price between Windar and SGRE {Inc.} is not the appropriate basis for determining the degree

---

[171] *See* SGRE/Windar Draft Remand Comments at 6-7.

[172] While SGRE/Windar argues that the degree of value-added in the United State was substantial (*i.e.*, fulfills the qualifications for the "special rule" per section 772(e) of the Act and 19 CFR 351.402(c)), SGRE/Windar also argues that the price for further manufactured sales is calculated using prices and costs from a Section E database. *See* SGRE/Windar Draft Remand Comments at 2-3.  This is correct for general further manufactured sales, but that is not the case if the "special rule" is being applied for further manufactured sales.  Section 772(e) of the Act states that prices for such value-added further manufactured sales will be calculated using the price of identical subject merchandise or other subject merchandise (or a CEP price determined on any other reasonable basis if there are insufficient quantities of such sales).

[173] In its comments, SGRE/Windar incorrectly states that Section E questionnaires are not automatically issued (and that one was not issued to SGRE/Windar) and that respondents are not instructed to respond to Section E unless specifically instructed to do so.  However, Section E questionnaires are automatically issued and a Section E questionnaire was sent to SGRE/Windar (*see* Initial Questionnaire at Section E).  SGRE/Windar is correct that respondents do not need to automatically complete a Section E response.  Respondents are, however, instructed to "contact the official in charge immediately" if they further manufacture merchandise in the United States; SGRE/Windar did not provide such notification of further manufactured sales upon receiving the questionnaire.

[174] *See* Draft Results at 21 ("Because SGRE/Windar sells wind towers as part of a completed wind turbine project, which includes more than just the subject merchandise (*i.e.*, nacelle, blades, installation, *etc.*), we used SGRE/Windar's allocation of a portion of the price to the unaffiliated U.S. customer based on the ratio of SGRE Inc.'s cost for the wind towers to the cost of the completed wind turbine project.").

[175] *See* SGRE/Windar Draft Remand Comments at 7.

of price variability."[176]  However, Commerce conducts its differential pricing analysis based on the EPs and/or CEPs covered by the investigation.  These are:  (1) for EPs, the prices at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States; or (2) for CEPs, the prices at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter.  As the transfer price is not the price we are using as the U.S. price in the margin analysis, it would not make sense to rely on that transfer price to examine price differentials – any such analysis of transfer price differentials would be entirely unrelated to the actual prices that give rise to dumping.  Just as in the context of any EP or CEP sales, we are examining SGRE/Windar's sales to the first unaffiliated customer.[177]

Third, SGRE/Windar asserts that "the methodology adopted by {Commerce} is not a transaction-specific price test for price variability" because "{t}he calculated price for the two projects is an average, not transaction specific, price."[178]  This again reflects a misreading of the U.S. price (and concomitant differential pricing analysis) relied upon here.  The CEPs that

---

[176] *Id.* at 7.

[177] *See, e.g.*, *Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Determination of Sales at Less Than Fair Value*, 81 FR 53419 (August 12, 2016), and accompanying IDM at Comment 2 ("Contrary to Petitioners' portrayal, the transfer price between POSCO and UPI plays no part in the differential pricing analysis; the prices used in that analysis are the net U.S. prices of the further-manufactured products sold to the first unaffiliated customer."); and *Steel Propane Cylinders from Thailand:  Final Determination of Sales at Less Than Fair Value*, 84 FR 29168 (June 21, 2019), and accompanying IDM at Comment 5 ("The purpose of Commerce's analysis is based on SMPC's pricing behavior to SMPC's first unaffiliated U.S. customer, primarily to determine whether SMPC sold subject merchandise at prices that are less than normal value, and as part of that analysis whether SMPC's U.S. sale prices exhibited a pattern of prices that differed significantly during the period of investigation.").

[178] *See* SGRE/Windar Draft Remand Comments at 8.  We note that the prices to which SGRE/Windar refers were the average, allocated U.S. prices it itself provided.  *See* SGRE/Windar January 10, 2024 SQR at Exhibit 10.

Commerce calculated and relied upon for the margin calculated in the Draft Results were based on an "average" price in the sense that they were the result of an allocation, and the derived price was applied to all tower sections on a project-specific basis. However, this was not an "average price" as that term is used in the context of differential pricing analysis, as SGRE/Windar appears to believe.[179] In any case, SGRE/Windar's argument regarding the impact of price variability is moot given that: (1) Commerce has now relied on a segment type-specific price rather than an average price for all segments; and (2) we have found that application of the average-to-average method is appropriate in the margin calculation.

For these reasons, SGRE/Windar's assertion that the standard differential pricing analysis, in particular application of the Cohen's *d* test, is inappropriate in this instance is without merit.[180] Commerce's examination of price differentials is entirely consistent with its analysis in countless cases involving CEP sales, *i.e.*, when the sale is to a downstream unaffiliated customer.

## IX.    FINAL RESULTS OF REDETERMINATION

Pursuant to the *Second Remand Order*, we individually examined SGRE/Windar and have calculated a dumping margin for the company in the manner described above. For these final results of redetermination, we determine that SGRE/Windar sold wind towers from Spain in the United States at LTFV. The estimated dumping margin for SGRE/Windar, as well as the rate for all-other producers/exporters which do not have their own individual rates, is 28.55 percent.

---

[179] *Id*. ("Commerce should explain … why a price variability test designed and used to test transaction-specific price variability is appropriate for testing average prices.").

[180] SGRE/Windar also argued that the Act requires Commerce to explain why differences cannot be taken into account using a method described in 777A(d)(1)(A)(i) or (ii), which it claims Commerce did not do in the Draft Results. Commerce did explain why the average-to-average method cannot account for such differences when the Cohen's *d* rate is greater than 66 percent. *See* Draft Results at 14-18.

Should the Court affirm these final results of redetermination, Commerce intends to

publish a notice of amended final determination and issue appropriate customs instructions to

U.S. Customs and Border Protection, consistent with the redetermination above.

6/21/2024

X _____

Signed by: RYAN MAJERUS

Ryan Majerus
Deputy Assistant Secretary
 for Policy and Negotiations,
 performing the non-exclusive functions and duties
 of the Assistant Secretary for Enforcement and Compliance

## Appendix

## Scope of the Investigation

The merchandise covered by this investigation consists of certain wind towers, whether or not tapered, and sections thereof. Certain wind towers support the nacelle and rotor blades in a wind turbine with a minimum rated electrical power generation capacity in excess of 100 kilowatts and with a minimum height of 50 meters measured from the base of the tower to the bottom of the nacelle (*i.e.*, where the top of the tower and nacelle are joined) when fully assembled.

A wind tower section consists of, at a minimum, multiple steel plates rolled into cylindrical or conical shapes and welded together (or otherwise attached) to form a steel shell, regardless of coating, end-finish, painting, treatment, or method of manufacture, and with or without flanges, doors, or internal or external components (*e.g.*, flooring/decking, ladders, lifts, electrical buss boxes, electrical cabling, conduit, cable harness for nacelle generator, interior lighting, tool and storage lockers) attached to the wind tower section. Several wind tower sections are normally required to form a completed wind tower.

Wind towers and sections thereof are included within the scope whether or not they are joined with non-subject merchandise, such as nacelles or rotor blades, and whether or not they have internal or external components attached to the subject merchandise.

Specifically excluded from the scope are nacelles and rotor blades, regardless of whether they are attached to the wind tower. Also excluded are any internal or external components which are not attached to the wind towers or sections thereof, unless those components are shipped with the tower sections.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheading 7308.20.0020 or 8502.31.0000. Wind towers of iron or steel are classified under HTSUS 7308.20.0020 when imported separately as a tower or tower section(s). Wind towers may be classified under HTSUS 8502.31.0000 when imported as combination goods with a wind turbine (*i.e.*, accompanying nacelles and/or rotor blades). While the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of the investigation is dispositive.