NON-CONFIDENTIAL VERSION

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

SIEMENS GAMESA RENEWABLE ENERGY,

Plaintiff,

v.

UNITED STATES,

Defendant,

and

WIND TOWER TRADE COALITION,

Defendant-Intervenor.

Before:  Hon. Timothy C. Stanceu,
Senior Judge

Court No. 21-00449

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information Removed from Pages 7, 8, 12-15, 17-24, and 27

<u>**DEFENDANT-INTERVENOR WIND TOWER TRADE COALITION'S COMMENTS ON SECOND REMAND REDETERMINATION**</u>

Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.
Derick G. Holt, Esq.
John Allen Riggins, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Wind Tower Trade Coalition*

Dated: July 22, 2024

Ct. No. 21-00449                                                    NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................1

II.   BACKGROUND ................................................................................................1

III.  ARGUMENT ....................................................................................................5

    A.   Commerce's Decision to Treat SGRE S.A. as a Producer of Subject
        Merchandise is Unsupported by Substantial Evidence and Not In
        Accordance with Law ..............................................................................6

        1.   SGRE S.A. Is the Plaintiff and the Only Potential
             Respondent Under Investigation ..................................................6

        2.   SGRE S.A. Is A Holding Company, not a Producer of
             Exporter of the Subject Merchandise ...........................................9

        3.   Because SGRE S.A. Is Not a Producer or Exporter of the
             Subject Merchandise, Commerce Can Not Collapse SGRE
             S.A. and Windar ......................................................................16

    B.   Commerce's Second Final Remand Results Use a U.S. Price That is
        Unrepresentative of the Subject Merchandise ..........................................19

        1.   Commerce Employed the Correct General Calculation
             Methodology Used to Establish Gross Unit Price ....................................20

        2.   Commerce's Chosen Revenue Figure to Allocate a Price Per
             Section for the Subject Wind Tower Sections is Unsupported
             By Substantial Evidence and Not in Accordance with Law .....................20

IV.   CONCLUSION..................................................................................................28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Hyundai Steel Co. v. United States,*
        518 F.Supp.3d 1309 (Ct. Int'l Trade 2021) ..............................................................16

*Loper Bright Enterprises v. Raimondo,*
        Ct. No. 22-451, slip. op. R-54 (U.S. June 28, 2024).............................................10

*Louyang Bearing Corp. v. United States,*
        28 CIT 733 (2004) .................................................................................................24

*Rebar Trade Action Coalition v. United States,*
        398 F. Supp. 3d 1359 (Ct Int'l Trade 2019) ...........................................................17

*Siemens Gamesa Renewable Energy v. United States,*
        659 F. Supp. 3d 1343 (Ct. Int'l Trade 2023) (June 21, 2024), ECF No. 77 .............4

*Taiwan Semiconductor Manufacturing Co., Ltd. v. United States,*
        143 F. Supp. 2d 958 (Ct. Int'l Trade 2001) ......................................................14, 15

**Statutes**

19 U.S.C. § 1677(28) ..........................................................................................................10

19 U.S.C. § 1677f-1(c)(1) ..............................................................................................5, 9, 10

19 U.S.C. § 1677f-1(c)(2) .....................................................................................................3

19 U.S.C. § 1677f-1(c)(2)(B) ................................................................................................3

Tariff Act of 1930 ..........................................................................................................3, 10

**Regulations**

19 C.F.R. § 351.401(f) ........................................................................................................16

19 C.F.R. § 351.401(f)(2) ...............................................................................................16, 17

19 C.F.R. § 351.401(h) ........................................................................................................14

**Administrative Materials**

*Import Administration, Withdrawal of Regulations Governing the Treatment of
        Subcontractors ("Tolling" Operations),*
        73 Fed. Reg. 16,517 (Dep't Commerce Mar. 28, 2008) ........................................14

Ct. No. 21-00449                                                NON-CONFIDENTIAL VERSION

*Certain Orange Juice from Brazil,*
    75 Fed. Reg. 50,999 (Dep't Commerce Aug. 18, 2010)..........................................23

*Certain Vertical Shaft Engines Between 99cc and Up to 225cc, and Parts Thereof,*
    *from the People's Republic of China,* 86 Fed. Reg. 14,077 (Dep't Commerce
    Mar. 12, 2021)..........................................................................................................24

*Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey,*
    86 Fed. Reg. 67,681 (Dep't Commerce Nov. 29, 2021)........................................16

*Freshwater Crawfish Tail Meat from the People's Republic of China,*
    77 Fed. Reg. 21,529 (Dep't Commerce Apr. 10, 2012).........................................10

*Silicon Metal from Brazil,*
    83 Fed. Reg. 9,835 (Dep't Commerce Mar. 8, 2018) ...........................................26

*Utility Scale Wind Towers from the Republic of Korea,*
    85 Fed. Reg. 40,243 (Dep't Commerce July 6, 2020) ..........................................15

*Utility Scale Wind Towers from Spain,*
    86 Fed. Reg. 17,354 (Dep't Commerce Apr. 2, 2021)...........................................3

*Utility Scale Wind Towers from Spain,*
    86 Fed. Reg. 33,656, 33,657 (Dep't Commerce June 25, 2021) ...........................3

## Other Authorities

*Holding Company,* Black's Law Dictionary (12th ed. 2024) ......................................11

## I.    <u>INTRODUCTION</u>

On behalf of the Wind Tower Trade Coalition ("WTTC"), we respectfully submit the following comments on the second final results of redetermination pursuant to remand issued by the Department of Commerce ("Commerce") regarding the antidumping duty investigation into utility scale wind towers ("wind towers") from Spain. Final Results of Redetermination Pursuant to Second Court Remand, *Siemens Gamesa Renewable Energy v. United States*, 659 F. Supp. 3d 1343 (Ct. Int'l Trade 2023) (June 21, 2024), ECF No. 77 ("Second Final Remand Results"). In its second remand determination, Commerce determined a new dumping margin for Siemens Gamesa Renewable Energy S.A. ("SGRE S.A.") of 28.55 percent and applied it to a "SGRE/Windar" collapsed entity. *See id.* at 1-2. For the reasons provided herein, the WTTC respectfully requests that the Court find that Commerce's decision to treat SGRE S.A. as a producer and exporter of subject merchandise was not supported by substantial evidence or in accordance with law. Should the Court rule in the alternative, we submit to the Court that Commerce's Second Final Remand Results should be sustained subject to certain corrections to the Commerce's margin calculation.

## II.    <u>BACKGROUND</u>

On September 30, 2020, the WTTC submitted the underlying antidumping Petition, identifying three Spanish wind tower producers believed to be selling wind towers in the United States at less-than-fair value—GRI Towers, Haizea Wind Group, and Windar. *See* Petition for the Imposition of Antidumping Duties, *Utility Scale Wind Towers from Spain*, Vol. IV (Sept. 30, 2020), C.R. 1-8, P.R. 1-7 at 4.[1] Commerce generally will individually examine the largest

---

[1]      Documents on the public record of the underlying investigation are identified by "P.R." followed by the number assigned to the relevant document in the administrative record index filed with the Court on September 14, 2021. Documents in the confidential administrative record are identified by "C.R." followed by the corresponding record number. Documents on the public record of the remand proceeding are identified by "P.R.R." followed by the number assigned to

producers or exporters in the subject country, typically based on the companies with the most entries in U.S. Custom and Border Protection's ("CBP") import data. To deal with inconsistencies in the CBP import data, Commerce issued quantity and value ("Q&V") questionnaires to all companies identified in the petition, parties' comments, and the CBP data, "{i}n light of the comments from the parties, and to ensure the accuracy of the export volume data that {it would} rely upon for respondent selection." Letter from Benito Ballesteros, Int'l Trade Compl. Analyst, Off. V, AD/CVD Operations, through Robert Galantucci, Program Manager, Off. V, AD/CVD Operations, to The File, re: *Antidumping Duty Investigation of Utility Scale Wind Towers from Spain: Issuance of Quantity and Value Questionnaires* (Nov. 25, 2020), P.R. 49. SGRE, Windar, Vestas, and other Spanish companies received this questionnaire, which emphasized that failure to provide a response would result in the application of an adverse inference. *Id.* at 2. Commerce's questionnaire also emphasized that each party should report separately and not aggregate data, "even if {they} believe {they} should be treated as a single entity along with other exporters." *Id.* at Attachment 1. Windar, however, was one of six companies that did not respond to Commerce's request for information.

Commerce issued an additional questionnaire on December 10, 2020, clarifying its reporting instructions and affording parties an additional opportunity to respond. *See* Letter from Benito Ballesteros, Int'l Trade Compl. Analyst, Off. V, AD/CVD Operations, to The File, re: *Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from Spain: Quantity and Value Questionnaire – Clarification and Extension* (Dec. 7, 2020), P.R. 83. Once again, Windar failed to submit a Q&V questionnaire response. As a result, Commerce preliminarily assigned a rate to

---

the relevant document in the administrative record index filed with the Court on July 5, 2024. Documents on the confidential administrative record are identified by "C.R.R."

Windar and five other noncooperating companies that was based on adverse inferences, pursuant to Section 776 of the Tariff Act of 1930, *as amended* (the "Act"). Preliminary Issues and Decision Memorandum accompanying *Utility Scale Wind Towers from Spain*, 86 Fed. Reg. 17,354 (Dep't Commerce Apr. 2, 2021) (prelim. affirm. deter. of sales at less than fair value) at 4-7 ("Preliminary Determination Memo"), P.R. 134. After mandatory respondent Vestas declined to participate in the agency's review, Commerce preliminarily assessed the 73.00 percent "Petition rate" to both Vestas and non-individually examined companies, including SGRE S.A., pursuant to Section 735(c)(5) of the Act, a result which was continued for the final determination of the investigation. *See id.* at 9-10. *See also Utility Scale Wind Towers from Spain*, 86 Fed. Reg. 33,656, 33,657 (Dep't Commerce June 25, 2021) (final deter. of sales at less than fair value). SGRE S.A. appealed Commerce's decision not to "conduct an individual examination of SGRE," Brief of Pl. Siemens Gamesa Renewable Energy S.A. in Support of Its Mot. for J. on the Agency R. (Jan. 14, 2022), ECF No. 28 at 2-3.

After considering Commerce's underlying investigation, the Court issued a remand for the agency to "correct the error it made when it decided, contrary to 19 U.S.C. § 1677f-1(c)(2), to examine individually only one respondent and, having also decided to proceed according to largest export volume under 19 U.S.C. § 1677f-1(c)(2)(B), not to examine Siemens Gamesa in particular." Court Order (Feb. 16, 2023), ECF No. 47 at 22. Consistent with the Court's remand order, Commerce issued an antidumping questionnaire to SGRE S.A., as it would any mandatory respondent. Letter from Dep't Commerce to SGRE S.A., re: *Request for Information, Antidumping Duty Investigation* (Feb. 17, 2023), P.R.R. 1. In its response to Section A of Commerce's questionnaire, SGRE S.A. explained that "Windar is an SGRE affiliate holding company based in Spain which wholly-owns several subsidiary producers globally" and that "SGRE and Windar are

co-producers of wind towers in Spain." Letter from Crowell & Moring LLP to Sec'y Commerce, re: *Antidumping Duty Investigation of Utility Scale Wind Towers from Spain: Siemens Gamesa Renewable Energy Section A Questionnaire Response* (Mar. 10, 2023) at 8, 15 ("SGRE AQR"), C.R.R. 63, P.R.R. 8.

As a result, Commerce preliminarily found that these two companies were affiliated, presented a significant potential for manipulation of price or production, and should be collapsed (*i.e.*, treated as a single entity for purposes of the antidumping duty analysis). *See generally* Memorandum from Christopher Maciuba, Int'l Trade Compl. Analyst, Off. V, AD/CVD Operations, through Robert Galantucci, Program Manager, Off. V, AD/CVD Operations, to Shawn Thompson, Dir., Off. V, AD/CVD Operations, re: *Remand for the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers: Preliminary Affiliation and Collapsing Memorandum for Siemens Gamesa Renewable Energy S.A. and Windar Renovables S.A.* (Apr. 25, 2023), C.R.R. 176, P.R.R. 69 ("DOC Collapsing Memo"). Commerce continued to collapse SGRE S.A. and Windar in its First Final Remand Results, assigning the single entity the uncontested 73.00 percent rate Windar received for its failure to participate in the underlying proceeding. *See* Second Final Remand Results at 2-3.

After reviewing the agency's remand redetermination, the Court found that Commerce's decision to assign Windar's adverse facts available ("AFA") rate to the cooperating entity SGRE S.A. was unlawful and instructed Commerce to either: (1) "submit a new determination that would apply to {SGRE S.A.} alone;" or (2) "substitute for Windar's existing rate a new rate that it would apply to a collapsed entity." *See Siemens Gamesa Renewable Energy v. United States*, 659 F. Supp. 3d 1343, 1351 (Ct. Int'l Trade 2023). Importantly, the Court did not state that a "new determination" that would apply to SGRE S.A. was required to be a calculated dumping margin.

On remand, Commerce fully investigated the selected respondent SGRE S.A. along with Windar and its wholly owned manufacturing subsidiaries. In the Second Final Remand Results, Commerce calculated a dumping margin of 28.55 percent *ad valorem* for the SGRE S.A./Windar collapsed entity. Second Final Remand Results at 2. The price used to calculate the respondent's dumping margin was not supported by substantial evidence because it reflected revenue unattributable to the subject merchandise. Also, in the Second Final Remand Results, Commerce rejected WTTC's arguments that SGRE S.A. is not a producer or exporter of subject merchandise, and its investigation is contrary to law. For the reasons provided herein, the WTTC respectfully requests that the Court hold Commerce's redetermination as unsupported by substantial evidence and otherwise not in accordance with law.

## III.  **ARGUMENT**

Certain aspects of Commerce's second remand results are unsupported by substantial evidence and not in accordance with law. In particular, Commerce's decision to investigate SGRE S.A., a non-producing holding company, as a "producer" of subject merchandise is inconsistent with 19 U.S.C. § 1677f-1(c)(1) and not supported by substantial evidence. Likewise, because SGRE S.A. is not a producer or exporter of subject merchandise, Commerce's decision to continue collapsing SGRE S.A. and Windar is inconsistent with Commerce's regulations. To the extent that the Court finds Commerce's decision to calculate a margin for the SGRE S.A./Windar collapsed entity is appropriate, Commerce's selection of the revenue figure used to allocate the gross unit prices of the subject merchandise is not supported by substantial evidence.

## A.    Commerce's Decision to Treat SGRE S.A. as a Producer of Subject Merchandise is Unsupported by Substantial Evidence and Not In Accordance with Law

In its Second Final Remand Results, Commerce incorrectly continues to treat Siemens Gamesa Renewable Energy S.A. (*i.e.*, SGRE S.A.) as a producer and collapse this entity with Windar. As discussed below, SGRE S.A. is the sole plaintiff in this investigation and is the entity that Commerce was instructed to investigate in the second remand. While SGRE S.A.'s mischaracterizations have obscured SGRE S.A.'s role, this entity is a holding company with no production facilities to produce the subject merchandise. Commerce's decision to select this company as a respondent is based on the agency's misreading of the record and incorrect interpretation of the statute's requirement to investigate producers of subject merchandise.

### 1.    SGRE S.A. Is the Plaintiff and the Only Potential Respondent Under Investigation

As an initial matter, the Coalition clarifies for the Court that Siemens Gamesa Renewable Energy S.A. is the plaintiff and only potential mandatory respondent in this case. Plaintiff's extreme lack of precision when referring to the individual Siemens Gamesa entities muddles which entity is subject to this investigation. But identifying the correct entity under investigation is critical to determining whether the potential mandatory respondent (*i.e.*, SGRE S.A.) is a "producer" or "exporter" of subject merchandise and, therefore, a viable mandatory respondent.

The plaintiff routinely states that it is submitting documents on behalf of "Siemens Gamesa Renewable Energy," but there is no such entity. Any "SGRE" entity necessarily includes some type of corporate designation (*e.g.*, Ltd., Inc., GmbH, S.A., A/S). SGRE AQR at Exhibit A-4S. Throughout the various remands, plaintiff has used the "SGRE" initialism to refer to various entities and groups of entities relevant to this proceeding:

- "I, Domenico Barger, currently employed by Siemens Gamesa Renewable Energy, Inc. (SGRE), certify that I prepared or other wise supervised, on behalf of SGRE and its affiliates (collectively, 'SGRE') . . . ." *Id.* at Company Certification.

- ". . . SGRE is part of the Siemens Gamesa group of companies owned by Siemens Gamesa Renewable Energy, S.A. . . . In a few regions, SGRE is also engaged in project development. SGRE is present in more than 90 countries around the world . . . ." *Id.* at 6.

- "Specifically Siemens Gamesa Renewable Energy, S.A. ('SGRE SA') headquartered in Madrid, Spain, is the holding company of the Siemens Gamesa Group, which includes Siemens Gamesa Renewable Energy, Inc. (USA), and Siemens Gamesa Renewable Energy Eolica, S.L.U. (Spain) (collectively, 'SGRE'), both entities involved in the production and sale of subject merchandise during the POI". *Id.* at 11-12.

- "[
                    ]" *Id.* at 20.

- "[                                        ]". *Id.* at Exhibit A-27W, Part 4.

- "As noted above, all wind tower sections exported and imported by SGRE . . . ." Letter from Crowell & Moring LLP to Sec'y of Commerce, re: *Antidumping Duty Investigation of Utility Scale Wind Towers from Spain:  Siemens Gamesa Renewable Energy Sections B-E Questionnaire Response* (Oct. 16, 2023) at C-17, 2C.R.R. 11-12, 2P.R.R. 5-6 ("SGRE BCDQR").

- "Please see Exhibit C-14 for SGRE's Indirect Selling Expenses"; and "SGRE, rather than Windar, provides its indirect selling expenses incurred in the United States"; indicating that the SGRE in the first quote is actually Windar. *Id.* at C-46-C-47.

SGRE S.A's lack of specificity has made it difficult to understand which entities were performing each function—a key fact in determining whether the plaintiff is a "producer." *See also Letter from Wiley Rein LLP to Sec'y of Commerce, re: Utility Scale Wind Towers from Spain:  Comments on Draft Results of Redetermination Pursuant to Court Remand* (May 20, 2024) at 15-16 ("WTTC 2nd Draft Remand Comments"), 2C.R.R. 250, 2P.R.R. 73.

Indeed, even Commerce occasionally refers to "SGRE" as a catch-all for companies other than SGRE S.A. In the Second Final Remand Results, Commerce claims that "SGRE identified

itself as the manufacturer associated with POI entries in the entry data obtained from {CBP} at the outset of the investigation." Second Final Remand Results at 35. But this data merely lists entries from "[                                                    ]." Memorandum from Benito Ballesteros, Int'l Trade Compl. Analyst, AD/CVD Operations, Off. V, to The File, re: *Antidumping Duty Petition on Utility Scale Wind Towers from Spain: Release of U.S. Customs and Border Protection Data* (Nov. 2, 2020) at Attachment ("CBP Data"). The CBP Form 7501 entry documentation SGRE S.A. provided confirms that [

], and sales documentation lists both [

] as the "[          ]". *See* SGRE AQR at A-26S. [

]. *Id.* at Exhibit A-4S.

SGRE S.A.'s has conflated these Siemens Gamesa entities and caused Commerce to fall into the same trap.

Untangling references to individual entities is an important first step to determining whether the plaintiff (*i.e.*, SGRE S.A.) can appropriately be treated as a "producer" under the statute. In short, the entity participating in this appeal as a plaintiff is "Siemens Gamesa Renewable Energy S.A." Disclosure of Corporate Affiliations and Financial Interest, *Siemens Gamesa Renewable Energy v. United States*, Ct. No. 21-449 (Ct. Int'l Trade Aug. 18, 2021), ECF No. 3. This company is a publicly-traded Spanish company majority-owned by the German company Siemens Energy AG. *Id.* Plaintiff refers to itself (*i.e.*, SGRE S.A.) as a "holding company" of "Siemens Gamesa Group." SGRE AQR at 11-12. Siemens Gamesa Renewable Energy Inc. ("SGRE Inc.") (a U.S. "production and distribution company" and importer), Siemens Gamesa Renewable Energy Eolica, S.L. ("SGRE Eolica") (a Spanish "holding company"), and Siemens Gamesa Renewable Energy A/S ("SGRE A/S") (a Danish "production and distribution company")

are all separate entities from SGRE S.A. *Id.* at Exhibit A-4S. Throughout this proceeding, SGRE S.A. has misleadingly treated these legally distinct entities as a single whole under the ambiguous reference "SGRE."

However, only SGRE S.A. is being investigated. SGRE S.A. filed this appeal and is the only company listed as plaintiff. The Court's first remand opinion directed Commerce to "investigate plaintiff" and the Court's second remand opinion specified that Commerce must correct its "investigative error through an individual investigation of Siemens Gamesa—the only plaintiff in this litigation." *Siemens Gamesa Renewable Energy v. United States*, Ct. No. 21-449, slip op. 23-149 (Ct. Int'l Trade Oct. 11, 2023) at 14, 23. Commerce has also indicated that it understands SGRE S.A. is the only company under investigation. For example, Commerce's collapsing memorandum notes that "SGRE had a 32 percent ownership in Windar," referencing the Section A Response at Exhibit A-4S, *see* DOC Collapsing Memo at 7, which shows that SGRE S.A. is the entity with a 32 percent ownership in Windar. SGRE AQR at Exhibit A-4S. SGRE S.A. is also the only Siemens Gamesa entity listed as part of the collapsed entity with Windar and its subsidiaries. DOC Collapsing Memo at 1-2 and n.4. SGRE S.A. has never corrected the Court or Commerce with respect to SGRE S.A.'s status as the company under investigation in either the first or second remand. Instead, SGRE S.A. uses slippery references to "SGRE" to conflate several entities—none of which are party to this appeal. As such, the focus of Commerce's inquiry is whether SGRE S.A. is a producer or exporter of subject merchandise.

### 2.    SGRE S.A. Is A Holding Company, not a Producer of Exporter of the Subject Merchandise

Commerce's decision to select SGRE S.A. was not in accordance with law because SGRE S.A. is neither a producer nor an exporter of the subject merchandise. In its Second Final Remand Results, Commerce misapplies 19 U.S.C. § 1677f-1(c)(1) to include non-producing companies

such as SGRE S.A. This is a meaning the plain language of the statute simply does not support. Moreover, the second remand record shows that SGRE S.A. is a holding company that is not involved in the production, sales, or export of subject merchandise. As a result, it is improper to treat the plaintiff as a mandatory respondent—a status reserved for producers and exporters.

The Tariff Act of 1930, *codified as amended* at 19 U.S.C. § 1677f-1(c)(1) instructs Commerce to "determine the individual weighted average dumping margin for each known exporter and producer of subject merchandise." Elsewhere in the statute, "exporter or producer" is defined as "the exporter of the subject merchandise, the producer of the subject merchandise, or both where appropriate." 19 U.S.C. § 1677(28). Commerce has traditionally claimed that this lack of detailed description constitutes a "gap" that Commerce must "fill" with its own interpretation. *See* Issues and Decision Memorandum accompanying *Freshwater Crawfish Tail Meat from the People's Republic of China*, 77 Fed. Reg. 21,529 (Dep't Commerce Apr. 10, 2012) (final results of antidumping duty admin. rev. and rescission of rev. in part) at cmt. 1 (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984) ("{Commerce} may determine who is an 'exporter' in a reasonable manner in order to effectuate the purposes of the antidumping duty law.")). However, this Court need not defer to Commerce's interpretation of the law "simply because a statute is ambiguous." *Loper Bright Enterprises v. Raimondo*, Ct. No. 22-451, slip. op. R-54 (U.S. June 28, 2024) at 35. SGRE S.A. cannot reasonably be considered a producer or exporter, and therefore, is not qualified to be a respondent under 19 U.S.C. § 1677f-1(c)(1).[2] *See generally* WTTC 2nd Draft Remand Comments at 3-49.

---

[2]    Commerce does not appear to assert that SGRE S.A. was an exporter of the subject merchandise. As WTTC explained, "{t}he record of this proceeding clearly and unambiguously demonstrates that every {period of review} sale claimed by SGRE S.A. was, in fact, exported by Windar." WTTC 2nd Draft Remand Comments at 23; *see also id.* at 23-34 (explaining why SGRE S.A., nor any other SGRE entity, could be considered the exporter of subject merchandise).

In the Second Final Remand Results, Commerce claims that SGRE S.A. is a producer because it "performs an essential role in the production of wind towers." Second Final Remand Results at 34. Commerce explains that "when the design and the manufacturer of subject merchandise are completed by separate entities, the manufacturer is not the sole party that may qualify as a producer." *Id.* (citing *Taiwan Semiconductor Manufacturing Co., Ltd. v. United States*, 143 F. Supp. 2d 958, 965-969 (Ct. Int'l Trade 2001). From this, Commerce extrapolates that the term "producer" should include companies that create and own their proprietary models or are "fundamentally involved in the production" of subject merchandise. *Id.* at 35. Commerce's reasoning is incorrect in several respects.

To start, Commerce is mistaken that SGRE S.A. is involved in the design specifications of subject merchandise. SGRE S.A. is a holding company, supervising the equity of other entities. SGRE S.A. has no production facilities and does not participate in the day-to-day operations or sales decisions of the entities for which it supervises. *See* SGRE AQR at Exhibit A-8S (SGRE S.A. 2019 Consolidated Financial Statement at 6) (indicating that SGRE S.A.'s purpose is "to promote and foster companies" through "{t}he subscription and purchase of shares or stocks{,}" "{t}he subscription and purchase of fixed-income securities or any other securities{,}" and "{t}o directly provide advisory services and technical assistance"); *see also Holding Company*, Black's Law Dictionary (12th ed. 2024) ("A company formed to control other companies, usu. confining its role to owning stock and supervising management. It does not participate in making day-to-day business decisions in those companies.") The mere fact that SGRE S.A. has equity ownership in

Commerce did not address this evidence in its Second Final Remand Results, and instead focused exclusively on whether SGRE is "a 'producer' by virtue of its design (and other aspects of its participation in the production process"). Second Final Remand Results at 35. Because Commerce did not address whether SGRE S.A. was an exporter of the subject merchandise, this is another basis of why the second remand results is unsupported by substantial evidence.

BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED

companies that provide design specifications and assistance with negotiating the price and delivery of inputs does not transform SGRE S.A. into a producer of subject merchandise.

Further, sales documentation confirms that SGRE S.A. is not involved in the relevant sales or production decisions. SGRE S.A. provided the framework agreement [                    ] at Part 4 of Exhibit A-27W in its Section A questionnaire response. The agreement is [

                ], but between [

        ] and [        ]. SGRE AQR at Exhibit A-27W, Part 3. Moreover, for U.S. sales, the [                                        ] and would therefore [

        ] to Windar. *See* SGRE BCDQR at D-5 ("Windar receives from the customer a complete documentation package which includes the detailed drawings and specifications for the fabrication."); *see also* SGRE AQR at Exhibit A-27S ("[

            ]"). [                            ], could clearly not be a "foreign producer" of subject merchandise. Neither could [

                ]. While Commerce claims that SGRE S.A. is "fundamentally involved in the production of wind towers," Second Final Remand Results at 34, the record shows that only [                                        ] were tangentially involved in production of wind towers under Commerce's expansive theory (*i.e.*, [

            ]). Commerce's reasons for finding that SGRE S.A. is a "producer" is, therefore, not based on substantial evidence.

Moreover, as discussed in the WTTC's comments on the second draft remand, SGRE S.A.'s responses and information collected at verification and closing the universe of documents on record demonstrate that Windar, not SGRE S.A., was the producer and exporter of the subject merchandise during the period of investigation. In addition to the "[                    ]"

**BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED**

discussed above, record evidence includes: (1) [

]; (6) information collected from SGRE Inc. at verification showing that [

]; (7) [

]. *See* WTTC 2nd Draft Remand Comments at 4; SGRE AQR at Exhibit A-26S, A-26W, and A-27W; Letter from Crowell & Moring LLP to Sec'y of Commerce, re: *Antidumping Duty Investigation of Utility Scale Wind Towers from Spain: Verification Exhibits Submission* (Feb. 27, 2024) at Sales Verification Exhibits 19-23, 2C.R.R. 208-211; Letter from Crowell & Moring LLP to Sec'y of Commerce, re: *Antidumping Duty Investigation of Utility Scale Wind Towers from Spain: Verification Exhibits Submission* (Mar. 12, 2024) at Exhibits 3-7 ("CEP Verification Exhibits"), 2C.R.R. 215-219. The record evidence demonstrates that Windar was the producer and exporter of this merchandise, not SGRE S.A. or any other Siemens Gamesa entity (*e.g.*, SGRE Inc., [              ], or [                  ]).

Additionally, even if SGRE S.A. [

], Commerce's expansive interpretation is not in accordance with law. Commerce interprets "producers" to cover companies that design and own the specifications for subject

merchandise, relying exclusively on *Taiwan Semiconductor Manufacturing Co., Ltd. v. United States*. But this case is inapposite.

In *Taiwan Semiconductor*, the Court considered whether Commerce permissibly excluded a subcontractor from the definition of "producer" because it did not own the product's design. *Taiwan Semiconductor*, 143 F. Supp. 2d 958, 965 (Ct. Int'l Trade 2001) (quoting *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. at 843). Based on an analysis under *Chevron*, the Court noted that "Commerce's construction of the statute is found in proposed regulation 19 C.F.R. § 351.401(h) and its preamble, by which Commerce publicized its change of practice from treating the subcontractor as producer to treating the contractor as producer." *Id.* However, Commerce ultimately withdrew 19 C.F.R. § 351.401(h) after the CIT ruled that the regulation "ha{d} the unintended effect of bestowing the status of 'foreign manufacturer' or 'producer' upon parties in the United States that otherwise would have assumed the status of purchasers of subject merchandise." *Import Administration, Withdrawal of Regulations Governing the Treatment of Subcontractors ("Tolling" Operations)*, 73 Fed. Reg. 16,517 (Dep't Commerce Mar. 28, 2008) (citing *USEC Inc. v. United States*, 281 F. Supp. 2d 1334 (2003), *aff'd on other grounds, Eurodif v. United States*, 411 F.3d 1355, 1364 (Fed. Cir. 2005)). This could "require {Commerce} to identify the incorrect entity as the seller of subject merchandise." That would be the case here as well, as under Commerce's impermissibly broad interpretation of the term "producer" it could find that SGRE Inc., [                    ], to be a 'foreign manufacturer' or 'producer.' Thus, the reasoning underpinning Commerce's interpretation is based on a regulation found to conflate foreign producers and U.S. purchasers.[3]

---

[3]      Indeed, relying on this interpretation would lead to similarly absurd results in this proceeding. [          ] is the [                    ], but under Commerce's interpretation, [          ] could also be the foreign producer because it owns the design of the subject

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Moreover, the facts of *Taiwan Semiconductor* are not analogous to the present case. The CIT explained that Commerce's interpretation was supported by substantial evidence, in part, because "design is one of the primary determinants of the value of individual products." *Taiwan Semiconductor*, 143 F. Supp. 2d at 968 (quoting Remand Response at 11); *see also* Second Final Remand Results at 34 n.102. As a result, the subcontractor had no control over the price of the merchandise and could not be a "price-setter" for the merchandise. *Taiwan Semiconductor*, 143 F. Supp. 2d at 968. This is not the case with wind towers. Unlike the highly technical semiconductors at issue in the underlying review, wind towers are essentially large, welded steel pipes with additional fabrication and painting. The design of the tower does not determine its value. Rather, wind tower designs exist to accommodate a wind farm's location, terrain, optimal height, and other factors for the larger turbine. An original equipment manufacturer's ("OEM") intellectual property is not determinative of the price of the wind tower; rather, it is the raw materials (*e.g.*, steel plate and flanges) and labor that determine the price. *Cf.* Issues and Decision Memorandum accompanying *Utility Scale Wind Towers from the Republic of Korea*, 85 Fed. Reg. 40,243 (Dep't Commerce July 6, 2020) (final deter. of sales at less than fair value and final affirm. deter. of critical circumstances) at cmt. 7 (correcting for timing differences in steel plate cost purchases to ensure accurate pricing comparisons between products).

SGRE S.A. is not a "producer" under a reasonable interpretation of the statute. Contrary to law, Commerce's interpretation has stretched a statutory reference to a "producer" of the subject merchandise to cover a "non-producer's" (specifically, a holding company) equity in a [

]. *See* Second Final Remand Results at 35. If a company is selected

---

merchandise. [                              ] would likewise be considered a [                    ]
producer.

as a mandatory respondent, but is not a producer or exporter, its selection is invalid, and the Commerce must end its investigation with respect to that company. *See Hyundai Steel Co. v. United States*, 518 F.Supp.3d 1309, 1332 (Ct. Int'l Trade 2021) (holding that as soon as Commerce found that a company subject to review was neither a producer nor exporter, it did not need to wait for the party that requested the review of that company to request a rescission to find that it was unable to examine the non-producer non-exporter); Issues and Decision Memorandum accompanying *Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey*, 86 Fed. Reg. 67,681 (Dep't Commerce Nov. 29, 2021) (final results and rescission, in part, of countervailing duty admin. rev.; calendar year 2019) at "V. Non-Shipment Claims and Rescission, in Part" ("Thus, because 'Borusan Mannesmann' is not a legal entity, and because Borusan Mannesmann Pipe US, Inc. is a U.S.-based firm that is not a producer or exporter of the subject merchandise, we are rescinding the review with respect to these two companies pursuant to 19 CFR 351.213(d)(3)."). Continuing to treat SGRE S.A. as a petitioner would be contrary to law because it is not a producer or exporter of the subject merchandise.

### 3.    Because SGRE S.A. Is Not a Producer or Exporter of the Subject Merchandise, Commerce Can Not Collapse SGRE S.A. and Windar

Commerce claims that, even if SGRE S.A. is not a producer (and therefore ineligible to be a respondent) it can still collapse SGRE S.A. and Windar. Second Final Remand Results at 35. This is incorrect. Commerce's regulations instruct the agency to "treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and the Secretary concludes that there is a significant potential for the manipulation of price or production." 19 C.F.R. § 351.401(f). Despite the regulation's references to "producers" and "facilities," Commerce interprets this 19 C.F.R. § 351.401(f)(2) to apply to

"non-producing entities" such as resellers and "other affiliated companies." Second Final Remand Results at 35 (citing Collapsing Memorandum at 5). However, Commerce may only extend the regulation to non-producers "under limited circumstances" (*i.e.*, when a "non-producer could nonetheless behave like a producer"). *See Rebar Trade Action Coalition v. United States*, 398 F. Supp. 3d 1359, 1369 (Ct Int'l Trade 2019).[4] Commerce's "practice of extending 19 C.F.R. § 351.401(f)(2) beyond 'the four corners of the regulation to affiliated non-producing exporters and distributors' is triggered when evidence shows that the non-producer could shift sales or production to evade antidumping duties." *See id.* at 1367. As the record has now become clear that SGRE S.A. and Windar are not "co-producers" of the subject merchandise, nothing on the record indicates that SGRE S.A. possesses that ability in the instant case.

Commerce's full investigation of SGRE S.A. revealed that this company is a non-producing holding company. Contrary to SGRE S.A.'s insinuation, it is separate from those [

] entities interfacing with Windar, and even then, Windar produces and exports the subject merchandise. Further, the record does not demonstrate that SGRE

---

[4]    The circumstances in which Commerce will collapse producers with non-producers is limited to instances where the companies unquestionably have sufficiently intertwined operations presenting a concern that there may be a "significant potential for the manipulation of price or production" and in situations where "the non-producer could nonetheless behave like a producer." *See Rebar Trade Action Coalition v. United States*, 398 F. Supp. 3d at 1358-59 (citing 19 C.F.R. § 351.401(f)(2)(i)-(ii)). Such concerns are not apparent in the instant case as SGRE S.A. is demonstrably uninvolved in the production and sale of the wind towers at issue, and no record evidence demonstrates a desire on the behalf of SGRE S.A. for future involvement in such endeavors. Indeed, SGRE S.A. would have to overcome significant barriers (*i.e.*, set up production facilities, hire a work force, retain a customer base, and procure machinery, raw materials, and other supplies) to establish itself as a producer. WTTC also notes that Commerce's collapsing of non-producers with producers is generally limited to a producer's affiliated exporters, and not uninvolved holding companies. Thus, Commerce's practice with respect to collapsing affiliated producers and non-producers maintains the statutory scheme of requiring that Commerce investigate only producers and exporters of subject merchandise through the exclusion of non-producing and non-exporting affiliates from collapsed entities.

S.A. exercises significant leverage over Windar's operations. SGRE AQR at Exhibits A-3S and

A-27W Part 3; WTTC 2nd Draft Remand Comments at 42-44. SGRE S.A. has no facilities that

could be retooled for production and does not set the prices or oversee day-to-day operations of

the companies in which it holds equity as a minority shareholder. The Court's second remand gave

Commerce the option to "submit a new final determination that would apply to {SGRE S.A} alone

and allow to stand as 'final' the uncontested, 73.00 percent rate assigned to Windar{,}" which

would "foreclose any collapsing" of SGRE S.A. and Windar. Uncollapsing SGRE S.A. based on

the full universe of documents (including those verified by the Department) is therefore consistent

with law and consistent with the Court's instructions on remand.

Finally, the WTTC acknowledges that this decision will require Commerce to rescind its

previous collapsing memorandum. As discussed above, the record shows that no Siemens Gamesa

entity can be considered a producer or exporter. This leads to two interrelated results:  (1) no

Siemens Gamesa entity can be investigated by Commerce, nor can they be assigned weighted-

average dumping margins; and (2) [

], only Windar could have been the proper respondent to investigate with respect to the

sales at issue in this remand, but Windar failed to respond to the Q&V questionnaire. If SGRE

S.A. becomes a producer and/or an exporter of the subject merchandise in future review periods,

it can then request an administrative review of itself if it desires its own weighted-average dumping

margin.

The confusion that led to Commerce's initial collapsing decision is largely of SGRE S.A.'s

making. As discussed, SGRE S.A. misleadingly and interchangeably referred to several entities

and combinations of entities as "SGRE" throughout the underlying investigation and subsequent

appeal, despite knowledge that SGRE S.A. was a wholly separate legal entity with little more than

oversight over stocks and securities of other Siemens Gamesa entities. This gave the Court and Commerce the impression that SGRE S.A. was a producer and/or exporter of the merchandise.

In the first remand, based on the initial information that was available, the WTTC stressed that "SGRE is not a viable respondent because it does not produce wind towers in Spain (*i.e.*, it does not produce subject merchandise)," which resulted in Commerce's "novel collapsing decision." Letter from Wiley Rein LLP to Sec'y Commerce, re: *Utility Scale Wind Towers from Spain: Comments on Preliminary Affiliation and Collapsing Memo* (May 1, 2023) at 2, 2C.R.R. 180, 2P.R.R. 75. However, Commerce's decision to collapse SGRE entities with Windar ended the inquiry before the nature of SGRE S.A. relationship with Windar and other SGRE S.A. entities could be fully developed. In the second remand Commerce issued clarifying questionnaires about SGRE S.A.'s reporting and conducted onsite verification of SGRE S.A.'s records, which the full universe of documentation on the record conclusively demonstrated that SGRE S.A. was neither a producer nor exporter of subject merchandise. In light of the fully developed record in the second remand, it became apparent that SGRE S.A. cannot be considered a producer for the purposes of respondent selection or collapsing. At that point, Commerce should have reversed its decision to collapse SGRE S.A. and Windar, reinstated Windar's original 73.00 percent margin, and found that it cannot investigate SGRE S.A.

### B.    Commerce's Second Final Remand Results Use a U.S. Price That is Unrepresentative of the Subject Merchandise

In its Second Final Remand Results, Commerce calculated CONNUM-specific prices that are unrepresentative of the subject merchandise produced and exported by Windar. These CONNUM-specific prices contain revenue for [

].

### 1. Commerce Employed the Correct General Calculation Methodology Used to Establish Gross Unit Price

As an initial matter, WTTC supports the general calculation methodology of the gross unit price of the subject merchandise. In its Second Final Remand Results, Commerce calculated the gross unit prices of the subject merchandise based on a calculated CONNUM-specific ratio of the cost of production of the wind tower sections compared to the total cost of the wind tower project net of logistics costs. Second Remand Final Results at 46. Commerce then applied those ratios to the revenue associated with the relevant projects to derive project-specific and CONNUM-specific gross unit prices for the wind tower sections. *Id.* at 47-48. This methodology is generally consistent with the one proposed by WTTC in its comments on Commerce's draft remand results should Commerce continue to calculate a margin for SGRE S.A. WTTC 2nd Draft Remand Comments at 60-67 and Exhibit 2. However, in Commerce's methodology, it used the total revenue for the associated wind turbine project, ignoring substantial evidence showing that [


]. Memorandum from Brittany Bauer, Senior Int'l Trade Compl. Analyst, AD/CVD Operations, Off. V, through Robert Galantucci, Program Manager, AD/CVD Operations, Off. V, to The File, re: *Remand of the Less Than Fair Value Investigation of Utility Scale Wind Towers from Spain: Redetermination Results Analysis Memorandum for SGRE/Windar* (June 21, 2024) at Attachment 3 ("Final Analysis Memorandum").

### 2. Commerce's Chosen Revenue Figure to Allocate a Price Per Section for the Subject Wind Tower Sections is Unsupported By Substantial Evidence and Not in Accordance with Law

Due to Commerce's use of the total revenue received by SGRE Inc. for the wind turbine projects, the dumping margin calculated for SGRE S.A./Windar for the Second Final Remand Results was arbitrarily deflated as the prices assigned to the individual tower sections improperly

included revenue associated [                                                    ]. This

result was due to Commerce's failure to consider relevant evidence which demonstrated that the

appropriate revenue figures could be ascertained from specific line items to the wind turbines on

the granular project worksheets.

   As noted above, the revenue figure used by Commerce, to which the cost ratio was applied

to ascertain per section prices, consistent of the [                    ] for each project. *Id.*; Letter

from Crowell & Moring LLP to Sec'y of Commerce, re: *Antidumping Duty Investigation of Utility*

*Scale Wind Towers from Spain: Section A-C Supplemental Questionnaire Response* (Nov. 6, 2023)

at Exhibit SC-32 ("SGRE SABCQR"). However, the total invoice value includes [

]. SGRE SABCQR at Exhibits SC-21a, SC-21b, and SC-32. The [                    ] are

related to [                                                    ]. *Id.* at

Exhibit SC-32. For example, SGRE S.A. describes the revenue associated with these [

], in part, as: [                                            ];[5]

[

]. Letter

from Crowell & Moring LLP to Sec'y Commerce, re: *Antidumping Duty Investigation of Utility*

---

[5]      This does not appear to be [

].

*Scale Wind Towers from Spain: Fourth Section C Supplemental Questionnaire Response* (Feb. 29, 2024) at 10-12 (emphasis added) ("SGRE CQR"), 2C.R.R. 213, 2P.R.R. 59; *see also* CEP Verification Exhibits at Exhibits 3 and 6. Each of the above-listed items was negotiated and invoiced [                                                                                   ]. *See, e.g.*, CEP Verification Exhibits at Exhibit 3 (containing [


]). More importantly, none of these revenues are associated in whole, or in part, with the subject merchandise.

Additional other revenues associated with the project are not related to the wind tower sections, such as the elevators. SGRE S.A. states as much, noting that "{t}he cost for elevators related to costs added once the wind towers are in the United States. Windar does not include an elevator in its shipments of sections." SGRE CQR at 7. As elevators are not included in the sale of the wind tower sections and are not imported with the sections, they cannot form part of the revenue for that section. Likewise, for the SCADA Power Manager ("SCADA"), SGRE S.A. confirmed in a response to a question about [                              ], that it is "not a part of wind towers, nacelles or rotors. . . . It connects the individual turbines, the substation{,} and meteorological stations to a central computer." *Id.* at 8. Thus, this is also not related to the sale of the towers, and therefore not related to the sale of the wind towers to the unaffiliated customer. SGRE S.A. provides explanations supporting a finding that other additional revenues are not related to wind towers or turbines as well.

However, SGRE S.A. provided a more appropriate revenue line item for calculating gross unit prices, *i.e.*, [                              ]. For each of the wind turbine projects, the granular project worksheets contain a line item [

]. SGRE SABCQR at Exhibits SC-21a and SC-21b. These figures are the only revenue [

].

To properly allocate revenues in the calculation of the CONNUM-specific gross unit prices, these line items should be the only revenue on which gross unit price is based, [

]. This is the only appropriate revenue figure on the record to establish the gross unit prices of the subject merchandise. The only reason that Commerce was forced to use a revenue allocation methodology was to distinguish between revenue attributable to subject merchandise and non-subject merchandise because the completed wind turbines, including the subject wind tower sections, are billed under one line item (*i.e.*, the revenue figure advocated for by WTTC). Since the goal of this exercise is to determine the revenue associated with the wind towers, any revenue definitively unassociated with the wind towers should not be included in the allocation. If Commerce intended to include additional revenues not directly related to the sale of the subject merchandise in the calculation of U.S. price, such revenue should have been capped at the costs incurred to receive that revenue, which is Commerce's longstanding practice. *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Orange Juice from Brazil*, 75 Fed. Reg. 50,999 (Dep't Commerce Aug. 18, 2010) (final results of antidumping duty admin. rev. and notice of intent not to revoke antidumping duty order in part) at cmt. 2.

As Commerce's current calculation contains revenue not attributable to the subject merchandise (*i.e.*, [                                        ]), there is a fundamental disconnect with the potential duties imposed and the actual dumping rate of the respondent. Indeed, calculating a

dumping margin for subject merchandise using unrelated [                    ] presents a significant problem because of the diminished accuracy of the calculation. *See Navneet Education Ltd. v. United States*, Ct. No. 22-132, slip op. 23-191 (Dec. 29, 2023) at 17 ("Commerce's mandate is to calculate the most accurate dumping margin possible" (citing Taian Ziyang Food Co. v. United States, 37 CIT 947, 956 (2013))); *Louyang Bearing Corp. v. United States*, 28 CIT 733, 762 (2004). Illustrative of this, in *Small Vertical Engines from China*, Commerce held that any dumping margin calculated even in part on non-subject merchandise is distortive and disallowed. *See* Issues and Decision Memorandum accompanying *Certain Vertical Shaft Engines Between 99cc and Up to 225cc, and Parts Thereof, from the People's Republic of China*, 86 Fed. Reg. 14,077 (Dep't Commerce Mar. 12, 2021) (final affirm. deter. of sales at less than fair value and final affirm. deter. of critical circumstances, in part) at cmt. 7 (citing *Yangzhou Besipak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) ("Further, if we were to use this methodology, contrary to the petitioner's assertions, it is inherently problematic that any dumping margins calculated for the respondent may be attributable, at least in part, to the non-subject portion of the mounted merchandise, which would distort the dumping margin calculations. Commerce is required to calculate the dumping margins for respondents as accurately as possible. Thus, it would be unacceptable to allow a companies' dumping margin to be based, even in part, on non-subject merchandise where such a situation was possible to avoid because that margin would not be accurate with respect to the respondents' sales of subject merchandise during the period examined.").

In the Second Final Remand Results, Commerce rejected this reasoning based on two separate, but equally illogical, distinctions. First, Commerce states that WTTC's methodology uses an unverified price, that of the invoiced project price to the unaffiliated customer. Second Final

Remand Results at n.147. Commerce verified the revenues received from SGRE S.A./Windar's unaffiliated U.S. customer and noted no discrepancies regarding revenue in its verification report. Memorandum from Brittany Bauer, Senior Int'l Trade Compl. Analyst, AD/CVD Operations, Off. V and Jose Rivera, Int'l Trade Compl. Analyst, AD/CVD Operations, Off. VII, through Robert Galantucci, Program Manager, AD/CVD Operations, Off. V, to The File, re: *Verification of the SGRE Sales Response in the Remand of the Less Than Fair Value Investigation of Utility Scale Wind Towers from Spain* (Mar. 26, 2024). The line items WTTC identifies as the appropriate revenues attributable to the wind tower sections necessarily forms a part of total project revenue that Commerce considers fully verified. If the total project revenue is considered fully verified by Commerce, then its constituent parts must also be fully verified. Moreover, in its calculation of the gross unit prices for the Second Final Remand Results, Commerce cites in multiple instances to the exact same sources of information from which the revenue identified by WTTC is sourced. Final Analysis Memorandum at Attachment 3 n. 2-4 and 7-10. In particular, the logistics costs removed from the total revenue figure is another line item on those granular project sheets. Commerce fails to explain in the Second Final Remand Results why the granular project sheets are an acceptable source for logistics expenses but not for the revenue attributable to wind towers. Thus, Commerce's rejection of WTTC's revenue figure on the grounds of being unverified is unsupported by Commerce's own findings in this remand.

Commerce's second reason for rejecting the revenue figure advocated for by WTTC is similarly illogical. Commerce stated that "Although the petitioner argues that Commerce should exclude services from the initial price allocation, we note that this conflicts with its prior argument regarding transfer prices and profit. Further, if we exclude components of the invoiced price, there is a possibility that a respondent may shift profits from one component to another. Therefore, the

appropriate sta{r}ting price is the total invoiced price." Second Final Remand Results at n.147 (citation omitted). The exclusion of services from the initial price allocation does not conflict with WTTC's arguments related affiliated transfer prices, nor does the exclusion of components of invoiced price introduce the possibility that a respondent may shift profits around, particularly in the instant case. First, the prior arguments Commerce cites pertain to affiliated transfer pricing, not pricing between unaffiliated parties. As Commerce has repeatedly recognized, affiliated transfer pricing is inherently subject to manipulation; a position which Commerce confirmed again in this proceeding in another context and then again in the Second Final Remand Results. Memorandum from Yan Zhang, Senior Accountant, Off. of Accounting, Off. of Policy and Negotiations, to Stephanie Arthur, Dir., Off. of Accounting, Off. of Policy and Negotiations, re: *Remand of the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from Spain: Cost of Production and Constructed Value Calculation Adjustments for the Draft Remand – SGRE/Windar* (May 9, 2024) at 1 ("Under section {19 U.S.C. § 1677b(f)(3)}, Commerce normally evaluates whether the price paid to affiliated suppliers for an input (*i.e.*, the transfer price, as reflected in the respondent's reported costs) is on an arm's-length basis by comparing it to the affiliated suppliers' cost of production for the input and to the market price. In this case, rather than reporting the price it paid to the affiliated supplier to obtain the input (i.e., the transfer price), Windar reported the supplier's own cost of the pretreated steel plates. In analyzing these transactions, we found that the transfer price paid by Windar was higher than the affiliated manufacturer's cost for the pretreated steel plates. Therefore, we increased Windar's cost of manufacturing by \*\*\* percent to reflect the transfer price for this input."); Second Final Remand Results at 46-47; *see also, e.g.*, Issues and Decision Memorandum accompanying *Silicon Metal from Brazil*, 83 Fed. Reg. 9,835 (Dep't Commerce Mar. 8, 2018) (affirm. final. deter. of sales at

less than fair value) at cmt. 1. Prices to unaffiliated customers are necessarily at arm's length and the shifting of profits between different line items is less of a concern.

In the instant situation there is no evidence that profits were shifted to attribute additional profit to the wind towers. Indeed, evidence points to the fact that the prices were not manipulated by SGRE S.A./Windar to frustrate the dumping investigation. First, [

]. Thus, SGRE S.A./Windar could not shift profit associated with those [                    ] to the subject merchandise. Second, as previously acknowledged by Commerce, "this is the {less-than-fair-value} investigation segment of the proceeding and SGRE/Windar established these { } prices prior to the filing of the Petition." Draft Results of Redetermination Pursuant to *Siemens Gamesa Renewable Energy v. United States*, 659 F.Supp.3d 1343 (Ct. Int'l Trade 2023) (May 9, 2024) at 21, 2P.R.R. 66. As there is no evidence SGRE S.A./Windar had advanced knowledge of the dumping investigation on wind towers from Spain, SGRE S.A./Windar cannot be said to have manipulated its prices to shift profits to the subject wind tower sections in this investigation. To the extent that SGRE S.A./Windar may shift such profits in the future is an issue for a separate segment of this proceeding and can be accounted for upon discovery of such manipulation. However, in the instant situation, the revenue specified by SGRE S.A./Windar as being attributable to the completed wind turbines, and thus the subject wind tower sections, is the appropriate starting revenue figure to allocate the gross unit prices. Thus, in the event that the Court sustains Commerce's finding that SGRE S.A. is a producer of subject merchandise, the Court should hold that Commerce's use of the total invoice price (which includes services and components that do not relate to wind tower sections) as the figure used to

allocate the CONNUM-specific gross unit prices of the subject merchandise to be unsupported by substantial evidence.

## IV.    <u>CONCLUSION</u>

For the reasons detailed above, the WTTC respectfully submits that this Court should remand for reconsideration Commerce's Second Remand Redetermination to either rescind review of SGRE S.A. as a mandatory respondent or revise its methodology for allocating SGRE S.A./Windar's revenue.

Respectfully submitted,

*/s/ Alan H. Price*
Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.
Derick G. Holt, Esq.
John Allen Riggins, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Wind Tower Trade Coalition*

Dated: July 22, 2024

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Wind Tower Trade Coalition's Comments on the Second Remand Redetermination, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 8,813 words.

*/s/ Alan H. Price*
(Signature of Attorney)

Alan H. Price
(Name of Attorney)

Wind Tower Trade Coalition
(Representative Of)

July 22, 2024
(Date)