IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | |
|---|---|
| SIEMENS GAMESA RENEWABLE ENERGY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Court No. 21-00449 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| WIND TOWER TRADE COALITION, ) | |
| ) | |
| Defendant-Intervenor. ) | |

## **DEFENDANT'S COMMENTS IN SUPPORT OF REMAND REDETERMINATION**

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:
FEE PAUWELS
Office of the Chief Counsel
    for Trade Enforcement and Compliance
U.S. Department of Commerce

STEPHEN CARL TOSINI
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-5196
E-mail: Stephen.tosini@usdoj.gov

August 21, 2024             Attorneys for the United States

## TABLE OF CONTENTS

BACKGROUND ................................................................................................................ 2

ARGUMENT ................................................................................................................... 4

I.  Standard Of Review ................................................................................... 4

II.  Commerce Complied With *SGRE II* ......................................................... 5

III.  Treatment Of SGRE And Windar As A Single Entity Is Supported by Substantial Evidence ................................................................................... 6

    A.  The Coalition Waived Its Collapsing Challenge ................................... 6

    B.  Substantial Evidence Supports Commerce's Collapsing Decision .................... 8

IV.  Commerce's Finding That SGRE Is A Foreign Producer Is Supported By Substantial Evidence ................................................................................. 10

    A.  Whether SGRE Is A Producer Is A Factual Question Reviewed Under The Substantial Evidence Standard ........................................................ 10

    B.  Commerce's Finding That SGRE Is a Producer Is Supported By Substantial Evidence And In Accordance With Law ........................................ 13

V.  Commerce's Allocation Of Price Per Section For Wind Tower Sections Is Supported By Substantial Evidence ...................................................... 15

CONCLUSION ............................................................................................................. 18

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                **Page(s)**

*Bohler Bleche GmbH & Co. KG v. United States*,
   324 F. Supp. 3d 1344 (Ct. Int'l Trade 2018) ............................................................... 4

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. am. Cast Iron Pipe Co.*,
   5 F.4th 1367 (Fed. Cir. 2021).......................................................................... 12

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) ....................................................................................... 4

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) ................................................................................. 4, 16

*Fujitsu General Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996) ................................................................... 12

*Gray v. Powell*,
   314 U.S. 402 (1941) ..................................................................................... 12

*Hontex Enters., Inc. v. United States*,
   248 F. Supp. 2d. 1323 (Ct. Int'l Trade 2003) ............................................. 8

*I.N.S. v. Elias-Zacarias,*
   502 U.S. 478 (1992) ..................................................................................... 5

*Loper Bright Enters. v. Raimondo*,
   144 S. Ct. 2244 (2024) ................................................................... 10, 11, 12

*MacLean-Fogg Co. v. United States,*
   100 F.Supp.3d 1349 (Ct. Int'l Trade 2015)................................................. 4

*Novosteel SA v. United States,*
   284 F.3d 1261 (Fed. Cir. 2002) .................................................................. 7

*Rebar Trade Action Coalition v. United States*,
   398 F. Supp. 3d 1359 (Ct. Int'l Trade 2019) ............................................. 9

*Siemens Gamesa Renewable Energy v. United States*,
   621 F.Supp.3d 1337 (Ct. Int'l Trade 2023) ............................................... 2

*Siemens Gamesa Renewable Energy v. United States*,
   659 F.Supp.3d 1343 (Ct. Int'l Trade 2023) ....................................... *passim*

*Smith-Corona Group v. U.S.*,
    713 F.2d 1568 (Fed. Cir. 1983) ........................................................................ 11

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) ........................................................................ 7

*Taiwan Semiconductor Manufacturing Co. v. United States*,
    143 F.Supp.2d 958 (Ct. Int'l Trade 2001) ........................................................ 14

**Statutes**

19 U.S.C. § 1516a(b) ............................................................................................ 4

19 U.S.C. § 1673d(a) ............................................................................................ 6

19 U.S.C. § 1673d(c) ............................................................................................ 6

19 U.S.C. § 1677(16) ............................................................................................ 4

19 U.S.C. § 1677(28) ............................................................................................ 11

19 U.S.C. § 1677e(a) ............................................................................................ 5

19 U.S.C. § 1677f-1(c) ................................................................................... *passim*

**Regulations**

19 C.F.R. § 351.401(f) ..................................................................................... 5, 8

**Administrative Determinations**

*Import Administration, Withdrawal of Regulations Governing the Treatment of Subcontractors*,
    73 Fed. Reg. 16,517 (Dep't of Commerce Mar. 28, 2008) ........................... 14

*Utility Scale Wind Towers from Spain: Final Determination of Sales at Less Than Fair Value*,
    86 Fed. Reg. 33,656 (Dep't of Commerce June 25, 2021) .......................... 2

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

---

| | |
|---|---|
| SIEMENS GAMESA RENEWABLE ENERGY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Court No. 21-00449 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| WIND TOWER TRADE COALITION, ) | |
| ) | |
| Defendant-Intervenor. ) | |

---

**DEFENDANT'S COMMENTS
IN SUPPORT OF THE SECOND REMAND REDETERMINATION**

Defendant, the United States, respectfully submits its response to the comments filed by defendant-intervenor, Wind Tower Trade Coalition (Coalition), ECF No. 81, challenging the Department of Commerce's (Commerce) final results of redetermination filed in accordance with this Court's decision and remand order in *Siemens Gamesa Renewable Energy v. United States*, 659 F.Supp.3d 1343 (Ct. Int'l Trade 2023) (*SGRE II*), ECF No. 68.  Final Results of Redetermination Pursuant to Second Court Remand, ECF No. 77, June 21, 2024 (*Second Remand Redetermination*), ECF No. 77-1.  The Court should sustain Commerce's *Second Remand Redetermination* because it complies with *SGRE II*, is supported by substantial evidence, and is otherwise in accordance with law.

## BACKGROUND

Siemens Gamesa Renewable Energy (SGRE) challenges the final affirmative determination in the less-than-fair-value (LTFV) investigation of utility scale wind towers (wind towers) from Spain. *Utility Scale Wind Towers from Spain: Final Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 33,656 (Dep't of Commerce June 25, 2021) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM), P.R. 149.[1]

Commerce had limited the number of respondents selected for individual examination to the largest producer/exporter of the subject merchandise by value, which declined to participate in the investigation. P.R. 124. SGRE later requested selection as mandatory respondent, and Commerce denied the request. P.R. 128, 132.

SGRE challenged Commerce's decision not to individually investigate it, and the Court remanded, directing Commerce to individually investigate SGRE. *Siemens Gamesa Renewable Energy v. United States*, 621 F.Supp.3d 1337, 1348-49 (Ct. Int'l Trade 2023) (*SGRE I*).

On remand, SGRE filed consolidated questionnaire responses on behalf of itself and its affiliated wind tower suppliers, Windar and Windar's manufacturing subsidiaries. Commerce conducted a collapsing analysis and found that SGRE, Windar, and Windar's manufacturing subsidiaries should be treated as a single entity. Preliminary Collapsing Memo, P.1R.R. 69, C.1R.R. 176. Neither the Coalition nor SGRE/Windar disagreed with Commerce's collapsing decision at the time. Because Windar had received a rate based entirely on the usage of adverse facts available for failing to respond to Commerce's quantity and value questionnaire during the

---

[1] "P.R." and "C.R." refer to public and confidential documents, respectively, in the investigation record, while "P.1R.R." and "C.1R.R." refer to documents in the public first remand record and confidential first remand record, and "P.2R.R." and "C.2R.R." refer to documents in the public second remand record and confidential second remand record.

initial investigation, Commerce applied Windar's existing rate to the collapsed entity.  *First Remand Redetermination*, ECF No. 53.

The Court held that the *First Remand Redetermination* was unsupported by substantial evidence and not in accordance with law.  *SGRE II*, 659 F.Supp.3d at 1359.  First, the Court concluded that any decision that involves the collapsing of seven companies would render null and void the rate assigned to Windar and supplant it with a newly determined rate for the collapsed entity.  *Id.* at 1350-52.  Second, the Court reasoned that SGRE did not fail to provide information when Commerce reopened the record during the remand.  *Id.* at 1352-54.  Third, the Court held that Commerce had unlawfully applied the 73.00 percent SGRE/Windar rate (which was derived from the petition) as the all-others rate.  *Id.* at 1359.  Therefore, the Court instructed Commerce to individually examine SGRE, either as an individual respondent (leaving the rate assigned to Windar as is) or as part of a collapsed entity.  *Id.*

On remand, Commerce concluded that SGRE and Windar should remain collapsed and thus, under respectful protest, it individually examined the collapsed entity of SGRE/Windar, conducted verification, and calculated a dumping margin for the entity.  In its comments to Commerce during the remand proceedings, the Coalition contended that SGRE is neither a producer nor exporter within the meaning of 19 U.S.C. § 1677f-1(c) and thus cannot lawfully be selected as a mandatory respondent.  P.2R.R. 73.  Accordingly, the Coalition asserted that Commerce should rescind its review of SGRE as a mandatory respondent, rescind the collapsing of SGRE, Windar, and Windar's manufacturing subsidiaries, and reinstate the 73.00 percent rate assigned to Windar in the underlying investigation.  *Id.* at 44-49.  Alternatively, the Coalition urged that, if Commerce continued to individually examine the collapsed entity of SGRE/ Windar, then Commerce should alter its use of affiliated transfer pricing to calculate gross unit

price for U.S. sales and instead recalculate the price using CONNUM-specific[2] cost ratios. *Id.* at 56-70.

In the *Second Remand Redetermination*, Commerce rejected the Coalition's arguments and determined that SGRE and Windar should be treated as a single entity. *Second Remand Redetermination* at 32-36. Further, Commerce concluded that SGRE was a producer of subject merchandise based on its role in the design of subject merchandise and contracting with unaffiliated parties to produce the product. *Id.* at 34-35. Commerce calculated a 28.55 percent estimated dumping margin for SGRE/Windar and assigned this rate as the rate for all other producers/exporters. *Id.*

## ARGUMENT

### I.    Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order," and are "supported by substantial evidence, and are otherwise in accordance with law." *MacLean-Fogg Co. v. United States,* 100 F.Supp.3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938). Under this standard, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n,* 383 U.S. 607, 620 (1966) (citations omitted). Instead, when, as is applicable to

---

[2] Under 19 U.S.C. § 1677(16), Commerce looks to a descending hierarchy of preferential modes that Commerce selects for matching purposes. To identify such merchandise, Commerce uses a "model-match" methodology consisting of a hierarchy of product characteristics used to sort products into groups, which are then assigned a unique control number, or CONNUM. *Bohler Bleche GmbH & Co. KG v. United States*, 324 F. Supp. 3d 1344, 1347 (Ct. Int'l Trade 2018).

this cases, Congress has entrusted an agency to administer a statute that demands inherently fact-intensive inquiries, Commerce's conclusions may be set aside only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *I.N.S. v. Elias-Zacarias,* 502 U.S. 478, 483-84 (1992).

## II.    Commerce Complied With *SGRE II*

Commerce complied with *SGRE II*. The Court offered "a choice between two options." 659 F.Supp.3d at 1351. The first was to "submit a new determination that would apply to {SGRE} alone and allow to stand as 'final' the uncontested, 73.00 percent rate it assigned to Windar in the Final LTFV Determination." *Id.* The second option was "to substitute for Windar's existing rate a new rate that it would apply to a collapsed entity." *Id.* Because Commerce determined that the record continued to support collapsing, Commerce, under respectful protest, chose the second option, that is, substituting the rate assigned to Windar with a new rate on the basis of an individual investigation of the collapsed entity.

In *SGRE II*, the Court held that the collapsing of SGRE, Windar, and Windar's manufacturing subsidiaries "necessarily would render null and void the original assignment of the 73.00 percent rate to Windar." *SGRE II*, 659 F.Supp.3d at 1350. Further, the Court held unlawful applying facts otherwise available to *SGRE* under 19 U.S.C. § 1677e(a). *Id.* at 1352-54. The Court did not foreclose Commerce from maintaining its collapsing determination. *SGRE II*, 659 F.Supp.3d at 1351.

The Coalition contends that, because SGRE is neither a producer nor exporter within the meaning of 19 U.S.C. § 1677f-1(c), the collapsing determination is unlawful. Coalition Cmts. at 5, ECF No. 81. The Coalition also asserts that a collapsing determination on the basis that SGRE is a non-producer that should be collapsed into the entity consistent with 19 C.F.R. § 351.401(f)

is similarly unlawful.  *Id.* at 16-19.  On these bases, the Coalition asserts that Commerce need not calculate a dumping margin for SGRE to comply with *SGRE II*, and instead should comply by rescinding its investigation with regard to SGRE.  *Id.* at 4.

However, aside from being incorrect, finding that SGRE is neither a producer nor exporter and declining to investigate the company, as the Coalition proposes, would be contrary to the Court's directive to determine a rate for SGRE (either "alone" or as part of a collapsed entity).  *SGRE II*, 659 F.Supp.3d at 1351; *see also* Coalition Cmts. at 4, ECF No. 81 ("Importantly, the Court did not state that a 'new determination' that would apply to SGRE {} was required to be a calculated dumping margin.").  Section 1673d(a)(1), Title 19 United States Code, directs Commerce to "make a final determination of whether the subject merchandise is being, or is likely to be, sold in the United States at less than its fair value."  Similarly, under 19 U.S.C. § 1673d(c)(1)(B)(i)(I), upon an affirmative determination, Commerce must "determine the estimated weighted average dumping margin for each exporter or producer individually investigated."  Thus, although we agree that the Court did not direct Commerce to determine a margin for the collapsed entity in any particular way, the Court did not permit Commerce to decline to examine SGRE at all.

## III.  Treatment Of SGRE And Windar As A Single Entity Is Supported By Substantial Evidence

Commerce's collapsing determination complies with the Court's directive in *SGRE II* and is supported by substantial evidence.  Moreover, any challenge to that determination Commerce has been waived by the Coalition.

### A.    The Coalition Waived Its Collapsing Challenge

As a preliminary matter, the Coalition has waived its challenge to Commerce's collapsing decision by advocating in favor of collapsing in response to the first remand redetermination.

Indeed, given the Coalition's silence, the Court did not disturb Commerce's collapsing determination in *SGRE II*, nor take issue with Commerce's treatment of SGRE as a producer. *SGRE II*, 659 F.Supp.3d at 1349-50. Further, the Coalition did not object, either during the remand or to this Court in comments upon the remand determination, to Commerce's decision in the *First Remand Redetermination* to collapse SGRE, Windar, and Windar's manufacturing subsidiaries into a single entity. *Second Remand Redetermination* at 33. In fact, rather than contending that SGRE is not a producer or that SGRE as a non-producer cannot be collapsed with Windar, the Coalition asked the Court to sustain that determination. Coalition Cmts., ECF No. 59.

Now, however, in the context of the second remand, the Coalition has reversed course and urges that the collapsing decision–which it once defended–was unlawful. Although the Coalition attempts to get around its about-face by accusing SGRE of providing "misleading{}" and incomplete information on the record before the *Second Remand Redetermination* that led it to rethink its prior position, the material facts upon which the Coalition's argument depends were known during the first remand. *Second Remand Redetermination* at 33-34. Indeed, in response to Commerce's Preliminary Collapsing Memo during the first remand, the Coalition asserted that "SGRE is not a viable respondent because it does not produce wind towers in Spain (*i.e.*, it does not produce subject merchandise)." Coalition Collapsing Cmts., P.1R.R. 75. Thereafter, the Coalition abandoned its arguments that SGRE is not a producer and that it should not be collapsed and, instead, elected to defend Commerce's first remand determination, with its higher dumping margin. Accordingly, the Coalition has waived any challenge to SGRE's legal status as a producer. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006); *Novosteel SA v. United States*, 284 F.3d 1261, 1273-74 (Fed. Cir. 2002).

### B.    Substantial Evidence Supports Commerce's Collapsing Decision

Substantial evidence supports Commerce's finding that SGRE, Windar, and Windar's wholly owned subsidiaries should be treated as a single entity and, on that basis, assigned an antidumping duty rate as a collapsed "producer" and "exporter." *Second Remand Redetermination* at 32-36; *see also* Preliminary Collapsing Memo.  Thus, irrespective of whether SGRE is individually a producer within the meaning of 19 U.S.C. § 1677f-1(c), the Court should sustain Commerce's decision because Commerce "can, and frequently does, collapse resellers and other non-producing entities (*i.e.*, those without production facilities) into single entities that are subject to individual investigations." *Second Remand Redetermination* at 35.

Section 351.401(f) of Commerce's regulations, 19 C.F.R. § 351.401(f), provides a non-exhaustive list of factors to be considered on a case-by-case basis in determining whether to treat companies as a single entity or to "collapse" them.  Preliminary Collapsing Memo at 4, P.1R.R. 69, C.1R.R. 176.  A collapsing determination does not require finding that all listed criteria are met.  *Id.*  Rather, Commerce considers the case-specific relationships between the companies under examination to determine whether there exists a significant potential for manipulation of price or production between affiliates.  *Id.* at 4-5.  Further, although 19 C.F.R. § 351.401(f) explicitly applies to producers, Commerce has found it instructive in determining whether non-producers should be collapsed.  *Second Remand Redetermination* at 5 (citing, *e.g.*, *Hontex Enters., Inc. v. United States*, 248 F. Supp. 2d. 1323, 1338 (Ct. Int'l Trade 2003)).

During the period of investigation, SGRE and Windar were affiliated and shared significant common ownership, had overlapping managers and boards of directors, and heavily intertwined operations, thus supporting a finding that there is a significant potential for manipulation of price or production between SGRE and Windar.  Preliminary Collapsing Memo

8

at 6-8, P.1R.R. 69, C.1R.R. 176.  Commerce explained that SGRE sub-contracted Windar to produce all the wind towers that SGRE exported to the United States, both entities were jointly involved in the procurement of inputs for wind towers, and both companies shared sales and cost data given that they filed a joint response in the proceeding.  *Id*.

The evidence also demonstrates that SGRE, as the owner of proprietary wind tower specifications, plays an integral role alongside Windar in production of subject merchandise. *Second Remand Redetermination* at 34.  For example, marketing materials provided by SGRE demonstrate that the company, albeit a holding company, has sole ownership of the designs necessary for Windar to be able to produce subject merchandise.  *See* SGRE Section A Questionnaire Resp. at Ex. A-25S at 13 ("All the content of the document is protected by intellectual and industrial property rights owned by Siemens Gamesa Renewable Energy, S.A."), P.1R.R. 40.  Thus, Commerce lawfully treated these companies as a single entity to avoid calculating an inaccurate margin and inviting the manipulation of price or production between SGRE and Windar.

Although Commerce does not collapse non-producers under all circumstances, collapsing was warranted in this case.  Coalition Cmts. at 17, ECF No. 81 (citing *Rebar Trade Action Coalition v. United States*, 398 F. Supp. 3d 1359, 1369 (Ct. Int'l Trade 2019)).  In *Rebar Trade Action Coalition*, the Court held that, when collapsing non-producing entities, Commerce must ask "whether because of intertwined operations a non-producer can presently act as a producer and, as a result, significantly manipulate sales or production."  398 F.Supp.3d at 1369. Additionally, the Court recognized that "Commerce's practice has been to treat a non-producer as capable of acting like a producer when its operations are sufficiently intertwined with those of a producer."  *Id.*  Commerce met that standard by finding that SGRE and Windar had extensively

9

intertwined operations.  *Second Remand Redetermination* at 34-36.  And in part based on this finding of intertwined operations, Commerce concluded that there is a significant potential for manipulation of price or production between SGRE and Windar.  *Id.*; Preliminary Collapsing Memo at 8, P.1R.R. 69, C.1R.R. 176.  As such, the finding that SGRE and Windar are appropriately treated as one entity is supported by substantial evidence and in accordance with law.  And because SGRE and Windar are, collectively, a producer and exporter, Commerce complied with the statute.

## IV.    Commerce's Finding That SGRE Is A Foreign Producer Is Supported By Substantial Evidence

The Coalition contends that 19 U.S.C. § 1677f-1(c)(1) limits individual investigation to exporters and producers, which SGRE purportedly is not.  But because Commerce permissibly collapsed SGRE and Windar, and because the collapsed entity is a producer and exporter of subject merchandise, this Court need not reach whether SGRE is individually a producer of subject merchandise.  Nonetheless, substantial evidence supports Commerce's conclusion that SGRE itself is a producer.

### A.    Whether SGRE is a Producer Is A Factual Question Reviewed Under The Substantial Evidence Standard

The substantial evidence standard of review applies to whether SGRE is a producer of subject merchandise.  Although the Coalition cites the Supreme Court's decision in *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024), that decision has no bearing on the Court's analysis of this issue.  Commerce did not purport to interpret the statute in its *Second Remand Redetermination*, nor does the Coalition identify any particular definition of "producer" that it believes Commerce should have applied in this case.  Instead, while citing *Loper Bright*, the Coalition largely devotes its brief to challenging Commerce's factual findings that led to

Commerce's conclusion that SGRE is a producer.  Coalition Cmts. at 11-15, ECF No. 81.  Such factual findings are reviewed under the substantial evidence standard, which is unchanged by *Loper Bright*.

Even if *Loper Bright* were relevant, that the Court must construe the statute without deference to Commerce would not follow  To the contrary, because the statute delegates authority to Commerce, "courts must respect the delegation."  *Loper Bright*, 144 S. Ct. at 2273.

The best reading of the statute is that Congress intended to delegate adjudicative authority to Commerce.  Section 1677f-1(c), title 19 United States Code, directs Commerce to "determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise."  A finding by Commerce that a specific entity constitutes a producer or exporter is inherently fact-dependent and Congress entrusted Commerce with such technical and case-specific questions.  This is supported by the definition of "producer" in the statute:

> The term "exporter or producer" means the exporter of the subject merchandise, the producer of the subject merchandise, or both where appropriate.  For purposes of {19 U.S.C. §1677b}, the term "exporter or producer" includes both the exporter of the subject merchandise and the producer of the same subject merchandise to the extent necessary to accurately calculate the total amount incurred and realized for costs, expenses, and profits in connection with production and sale of that merchandise.

19 U.S.C. § 1677(28).  Thus, the definition of "exporter or producer" emphasizes the purpose of the terms, that is, to identify all entities that need to be investigated to ensure "accurate" calculations.  *Id*.  Congress entrusted Commerce with the responsibility of calculating dumping margins, and as such, Commerce has discretion to establish procedures that carry out its statutory responsibilities.  The statute "reveals tremendous deference to the expertise of {} Commerce in administering the antidumping law."  *Smith-Corona Grp. v. U.S.*, 713 F.2d 1568 at 1582 (Fed.

11

Cir. 1983).  Given the "number of factors involved, complicated by the difficulty in quantification of these factors and the foreign policy repercussions of a dumping determination," "{Commerce} has broad discretion in executing the law." *Id.* at 1571.  The discretion to conduct complex, fact-specific determinations necessarily includes discretion to ascertain and to identify the relevant entities that must be investigated to accurately calculate dumping margins.

Further, although *Loper Bright* overruled *Chevron* deference to agency interpretations of silent or ambiguous statutes under the Administrative Procedure Act, it did not disturb the Federal Circuit's longstanding recognition that Commerce determinations in antidumping duty matters are entitled to deference distinct from *Chevron*, due to the statute's complex and technical nature.  *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.,* 5 F.4th 1367, 1374-75 (Fed. Cir. 2021) (recognizing "deference {that} is both greater than and distinct from that accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise"); *Fujitsu General Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (same).

And at minimum, a determination that a company constitutes a producer is inextricably "intertwined with the agency's factfinding" such that it is entitled to deference.  *Loper Bright*, 144 S. Ct. at 2259-60.  Indeed, the situation before the Court now is akin to that faced by the Supreme Court in *Gray v. Powell*, 314 U.S. 402 (1941).  In *Gray v. Powell*, the Supreme Court considered whether a railway company constituted a producer within the meaning of the Bituminous Coal Code and thus was eligible for an exception to a coal tax.  Because the determination of whether an entity was a producer necessarily informed the decision to approve or deny an application for exemption, the Court found the determination to "belong{} to the usual administrative routine." *Id.* at 411.  In particular, the Court determined that the

Department of the Interior's determination should be left "undisturbed" but for a finding that the facts upon which the determination was made were "so unrelated to the tasks entrusted by Congress . . . as in effect to deny a sensible exercise of judgment." *Id*. at 413.  Instead of articulating specific exemptions to the code, the Supreme Court found, Congress opted instead to delegate the function to an agency with "experience in a particular field." *Id.* at 411-12.

An interpretation of the word "producer" untethered from the facts of any individual record could lead to absurd results that are contrary to the intention of Congress.  Such an outcome undergirds the logic for affording Commerce deference in interpreting statutory terms in "factbound determinations" like the one at issue in this case.  In the case at hand, Commerce acted within its delegated authority to identify the entities relevant to its investigation of wind towers from Spain and, as detailed below, reasonably found that SGRE is a producer and should be collapsed with Windar.  Accordingly, the Court should sustain Commerce's determination.

**B.    Commerce's Finding That SGRE Is A Producer Is Supported By Substantial Evidence And In Accordance With Law**

Record evidence indicates that SGRE is a producer for purposes of the LTFV investigation of wind towers from Spain.  *Second Remand Redetermination* at 32-38; *see also* SGRE/Windar Section A Questionnaire Response at 12, 15-16, 20, 22, 26, P.1R.R. 8.  SGRE performs an essential role in the production of the wind towers attributed to SGRE/Windar. *Second Remand Redetermination* at 32, 34.  As the owner of its proprietary wind tower specifications, SGRE designs the towers and provides the technical drawings and specifications to Windar and its subsidiaries to fabricate them.  *Id.* at 34.  Without these specifications, Windar could not otherwise produce the wind towers ordered by customers because those proprietary models are created and owned by SGRE.  *Id.* at 34-35.  Further, SGRE and its wholly owned U.S. subsidiary, SGRE Inc., set the U.S. sales prices; they were the entities who entered into

sales contracts and invoiced the first unaffiliated U.S. customer. *Id.* at 35. Because of the company's intertwined operations, Commerce could not examine either SGRE or Windar without receiving information from both companies. Therefore, by treating SGRE as a producer alongside Windar, Commerce was able to accurately determine a margin for the collapsed entity.

And Commerce did not "extrapolate" the term producer to "include companies that create and own their proprietary models or are fundamentally involved in the production of subject merchandise." Coalition Cmts. at 11, ECF No. 81. Instead, as explained, Commerce conducted a case-specific analysis and determined that SGRE is appropriately considered a producer of wind towers from Spain for the purposes of investigating the entity and assigning it a rate.

The Court has held that, when the design and the manufacture of subject merchandise are completed by separate entities, the manufacturer is not the sole party that *may* qualify as producer. *Second Remand Redetermination* at 34 (citing *Taiwan Semiconductor Mfg. Co. v. United States*, 143 F.Supp.2d 958 (Ct. Int'l Trade 2001)). In *Taiwan Semiconductor*, the Court sustained Commerce's conclusion – relying on a now-withdrawn regulation – that a semiconductor foundry that did not own the design to the semiconductors was not a producer because it could not control relevant sales of subject merchandise. *Taiwan Semiconductor*, 143 F.Supp.2d at 968. SGRE's ownership of the wind tower designs and role in sales contracts and invoicing likewise support a finding that SGRE is a producer. *Compare Second Remand Redetermination* at 34-35; *with Taiwan Semiconductor*, 143 F.Supp.2d at 968-69.

The Coalition contends that *Taiwan Semiconductor* is unpersuasive because the Court's analysis in that case relied on a now-withdrawn regulation and deference to Commerce's regulation under *Chevron*. Coalition Cmts. at 13-14. However, Commerce withdrew the regulation relied on in *Taiwan Semiconductor* out of concern that a rigid definition might

14

"confound{} the Department's ability to make {} a determination" of dumping. *Import Administration, Withdrawal of Regulations Governing the Treatment of Subcontractors ("Tolling" Operations)*, 73 Fed. Reg. 16,517 (Dep't of Commerce Mar. 28, 2008). Thus, Commerce abandoned its definition in favor of the same type of fact dependent "case-by-case adjudication" that was applied in this case. *Id.* Accordingly, that Commerce withdrew the regulation at issue in *Taiwan Semiconductors* merely underscores that determinations regarding whether a company is a producer or exporter are fact dependent. Consistent with the interest in accurate dumping margins and in line with Commerce's discretion to ascertain and identify the relevant entities that must be investigated, Commerce's determination is supported by substantial evidence.

**V.    Commerce's Allocation Of Price Per Section For Wind Tower Sections Is Supported By Substantial Evidence**

Contrary to the Coalition's contentions at pages 19-27 of its comments, Commerce's methodology used to calculate U.S. price is supported by substantial evidence. SGRE/Windar reported that the first sale of subject merchandise to an unaffiliated customer in the United States was the sale of a turbine project, as distinct from the sale of just a wind tower. To derive a U.S. price of the wind tower for the margin analysis, Commerce needed to separate the wind tower price from the entire project price. In assessing the information on the record, the best basis for determining the U.S. price was to allocate a portion of the project price to the wind tower section using a CONNUM-specific, cost of production-based (COP-based) ratio of the overall project price. *Second Remand Redetermination* at 47-48. Commerce found that the ratio allocated to the wind tower was most accurately calculated using the total invoiced price for each U.S. project. *Id.* The verified, invoiced project price to the unaffiliated U.S. customer as submitted

by SGRE/Windar provided the most accurate price and cost information for the total turbine project, and thus the most accurate U.S. price for margin calculation purposes.

The Coalition agrees generally with the ratio methodology but contends that Commerce incorrectly used the invoiced project price to the unaffiliated U.S. customer, which included revenue attributable to non-subject merchandise, as its basis. Coalition Cmts. at 19-20, ECF No. 81. The Coalition contends that, Commerce unlawfully assigned a portion of this revenue associated with non-subject merchandise to wind tower sections. *Id.* at 19-22. The Coalition asserts that Commerce should have used a line item on project worksheets provided by SGRE to calculate cost ratios for the various components of the turbine project to ascertain the U.S. prices of the wind tower components. *Id.* at 22-24.

However, Commerce reasonably found that the most appropriate starting price from which to calculate the ratio is the verified, invoiced project price to the unaffiliated U.S. customer. In rejecting the Coalition's proposed alternative, Commerce found that the invoiced project price to the unaffiliated U.S. customer was the *most* appropriate starting price because: (1) it does not exclude components of the invoiced price and thus does not present the risk that profits may be shifted from one component to another, and (2) unlike the Coalition's proposed alternative, it is based on invoices issued to customers and payments received by SGRE Inc., rather than on an internal profit worksheet. *Second Remand Redetermination* at 47, n.147.

In particular, Commerce explained that the data source suggested by the Coalition is an internal profit worksheet that does not follow SGRE's standard business documentation practices, whereas the invoiced project price that Commerce used is a verifiable, reliable source. *Id.* at 47. Further, the figures identified by the Coalition are not tied to SGRE's books and records. In contrast, even assuming the internal profit worksheet were a possible alternative

source, the possibility of two inconsistent conclusions based on evidence on the record do not render Commerce's decision unsupported by substantial evidence. *Consolo*, 383 U.S. at 620. On the contrary, because Commerce determined that the invoiced turbine project price provides verified data in line with internal business practices, the decision to base cost ratios (and thus the U.S. price for wind tower components) on this data is supported by substantial evidence.

Substantial evidence further supports use of the total invoiced price because Commerce had an articulable concern regarding the possibility of shifting profits. *Second Remand Redetermination* at 47, n.147. In particular, Commerce explained that excluding components of the invoiced price, as proposed by the Coalition, created a possibility that a respondent "may shift profits from one component to another." *Id.* Commerce thus accounted for non-wind tower components by allocating a portion of the total invoiced price to each component based on a ratio of the costs to SGRE Inc. for that component to the total cost of each tower. *Id.* at 47-48. Accordingly, Commerce acted to ensure an accurate dumping margin because it did not exclude components of the invoiced price in calculating the U.S. price and based its calculation on a price supported by documentation.

Finally, contrary to the Coalition's assertion that Commerce's U.S. price calculation included "revenues associated with the project {that are} not related to the wind tower sections," Commerce's usage of the invoiced turbine project prices did not "arbitrarily deflate{}" the calculated dumping margin by allocating revenue not associated with subject merchandise. Coalition Cmts. at 20, 22, ECF No. 81; *see also* Final Analysis Memorandum at Attachment 3, C.2R.R. 255. To determine a cost of production-based ratio of the total turbine project price for each wind tower component, Commerce differentiated between costs for turbine components and services. *Second Remand Redetermination* at 48. In doing so, Commerce also differentiated

17

between project revenue associated with subject merchandise versus non-subject merchandise. *Id.* at 48.  By basing the revenue attributable to each component of the turbine project on the project cost allocated to each component, Commerce did not ascertain varying rates of profit among the different components; that is, the allocation assumed a consistent rate of profit across the turbine projects.  The Coalition is incorrect in asserting that Commerce's method resulted in a dumping margin "based, even in part, on non-subject merchandise."  Coalition Cmts. at 23-24, ECF No. 81.  Commerce's methodology did not account for the possibility of varying profit rates for different project components (which could attribute profit attributable to a different component to subject merchandise instead).  The record is devoid of information that could have been used to determine varying profit margins for different components in the turbine project prices.  Commerce thus used the best information available to allocate portions of the total project revenues to subject merchandise components.  *Second Remand Redetermination* at 47-48; Final Analysis Memorandum at Attachment 3, C.2R.R. 255.  Commerce's calculation of the gross unit price based on a CONNUM-specific, COP-based ratio, is thus supported by substantial evidence, in accordance with *SGRE II*, and should be sustained.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court sustain Commerce's *Second Remand Redetermination* and enter final judgement in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/  REGINALD T. BLADES, JR.
Assistant Director

18

OF COUNSEL:                                /s/  STEPHEN CARL TOSINI
FEE PAUWELS                                Senior Trial Counsel
Attorney                                   U.S. Department of Justice
Office of the Chief Counsel                Civil Division
   for Trade Enforcement & Compliance   Commercial Litigation Branch
U.S. Department of Commerce                P.O. Box 480, Ben Franklin Station
                                           Washington, D.C. 20044
                                           Telephone: (202) 616-5196
                                           E-mail: Stephen.tosini@usdoj.gov


August 21, 2024                            Attorneys for Defendant United States

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 5,203 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Stephen C. Tosini