Slip Op. 25-12

## UNITED STATES COURT OF INTERNATIONAL TRADE

SIEMENS GAMESA RENEWABLE ENERGY,

Plaintiff,

v.

UNITED STATES,

Defendant,

and

WIND TOWER TRADE COALITION,

Defendant-Intervenor.

Before: Timothy C. Stanceu, Judge

Court No. 21-00449

## OPINION

[Sustaining an agency decision submitted in response to court order in an action contesting a final determination concluding an antidumping duty investigation]

Dated: January 28, 2025

*Daniel J. Cannistra*, *Simeon Yerokun*, and *Pierce J. Lee*, Crowell & Moring LLP, of Washington, D.C., for plaintiff Siemens Gamesa Renewable Energy.

*Stephen Carl Tosini*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With him on the brief were *Brian M. Boynton*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Reginald T. Blades, Jr.*, Assistant Director. Of counsel on the brief was *Fee Pauwels*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

*Alan H. Price*, Wiley Rein LLP, of Washington, D.C., for defendant-intervenor Wind Tower Trade Coalition.  With him on the brief were *Robert E. DeFrancesco, III*, *Laura El-Sabaawi*, *Derick G. Holt*, and *John Allen Riggins*.

Stanceu, Judge: Plaintiff Siemens Gamesa Renewable Energy S.A. ("Siemens Gamesa") brought this action to contest a "less-than-fair-value" determination ("Final LTFV Determination") by the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") concluding an antidumping duty ("AD") investigation of certain wind towers from Spain (the "subject merchandise"). The court twice has ordered Commerce to reconsider its Final LTFV Determination. *Siemens Gamesa Renewable Energy v. United States*, 47 CIT __, 621 F. Supp. 3d 1337 (2023) ("*Siemens Gamesa I*"); *Siemens Gamesa Renewable Energy v. United States*, 47 CIT __, 659 F. Supp. 3d 1343 (2023) ("*Siemens Gamesa II*").

Before the court is the Department's "Second Remand Redetermination," issued under protest in response to the court's opinion and order in *Siemens Gamesa II*.  Final Results of Redetermination Pursuant to Second Court Remand (Int'l Trade Admin. June 21, 2024), ECF No. 77-1 ("*Second Remand Redetermination*").  The Second Remand Redetermination calculates an estimated dumping margin of 28.55% for an entity consisting of Siemens Gamesa and related companies.  *Id.* at 56.

Defendant-intervenor Wind Tower Trade Coalition (the "Coalition" or the "WTTC"), the petitioner in the antidumping duty investigation, opposes the Second Remand Redetermination on various grounds.  Defendant-Intervenor Wind Tower

Trade Coalition's Comments on Second Remand Redetermination (July 22, 2024), ECF Nos. 81 (conf.), 82 (public) ("Def.-Int.'s Comments").  Defendant asks the court to sustain the Second Remand Redetermination.  Defendant's Comments in Support of Remand Redetermination (Aug. 21, 2024), ECF No. 85 ("Def.'s Resp.").  Plaintiff did not submit comments.

The court sustains the Second Remand Redetermination.

## I. BACKGROUND

Background for this case is presented in the court's prior opinions and is supplemented herein.  *Siemens Gamesa I*, 47 CIT at __, 621 F. Supp. 3d at 1339–40; *Siemens Gamesa II*, 47 CIT at __, 659 F. Supp. 3d at 1345–48.

### A. The Contested Decision

The Final LTFV Determination was published as *Utility Scale Wind Towers From Spain: Final Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 33,656 (Int'l Trade Admin. June 25, 2021), P.R. 152, ECF No. 41 ("*Final LTFV Determination*").[1]  Commerce incorporated by reference an accompanying "Issues and Decision Memorandum." *Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-*

---

[1] Documents in the Joint Appendix (May 26, 2022), ECF Nos. 41 (public), 42 (conf.), are cited as "P.R. __" (for public documents).  Documents from the first remand proceeding, Remand Joint Appendix (Sept. 8, 2023), ECF Nos. 65 (public), 66 (conf.), are cited as "P.R.R. __" (for public documents).  Documents from the second remand proceeding, Remand Joint Appendix (Sept. 6, 2024), ECF Nos. 88 (public), 87 (conf.), are cited as "2P.R.R. __" (for public documents).

*Fair-Value Investigation of Utility Scale Wind Towers from Spain* (Int'l Trade Admin.

June 14, 2021), P.R. 149, ECF No. 41 ("*Final I&D Mem.*").

The Final LTFV Determination concluded an antidumping duty investigation of

utility scale wind towers from Spain covering a period of investigation ("POI") of

July 1, 2019, through June 30, 2020.  *Final LTFV Determination*, 88 Fed. Reg. at 33,656.

## 1.  Respondent Selection in the Investigation

During the investigation, Commerce issued "Quantity and Value" ("Q&V")

questionnaires to nineteen known exporters and producers of the subject merchandise

and received thirteen responses, including a response from Siemens Gamesa.  *Siemens*

*Gamesa II*, 47 CIT at __, 659 F. Supp. 3d at 1346; *Less-Than-Fair-Value Investigation of*

*Utility Scale Wind Towers from Spain: Response to Quantity and Value Questionnaire* 1 &

Attachment 1 (Dec. 7, 2020), P.R. 84, ECF No. 41.  Commerce selected Vestas Eolica

S.A.U. ("Vestas Eolica") as the sole "mandatory" respondent, i.e., a respondent

Commerce would investigate individually, but Vestas Eolica declined to participate in

the investigation.  *Siemens Gamesa II*, 47 CIT at __, 659 F. Supp. 3d at 1347.  Siemens

Gamesa requested, on behalf of itself and its affiliate Windar Renovables S.A.

("Windar"), to be investigated individually as a mandatory respondent, but Commerce

rejected its request.  *Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from*

*Spain: Request for Mandatory Respondent Selection* 1 (Feb. 17, 2021), P.R. 128, ECF No. 41;

*Utility Scale Wind Towers from Spain: Request to Select Replacement Mandatory Respondent* 1
(Int'l Trade Admin. Mar. 5, 2021), P.R. 132, ECF No. 41.

### 2. Assignment of a 73.00% Rate to All Respondents

In the Final LTFV Determination, Commerce reached a decision based entirely
on "facts otherwise available" under Section 776(a) of the Tariff Act of 1930, *as amended*
("Tariff Act"), 19 U.S.C. § 1677e(a), and an "adverse inference" under Section 776(b) of
the Tariff Act, 19 U.S.C. § 1677e(b), provisions to which Commerce often refers in the
aggregate as "adverse facts available" or "AFA."[2]  *Final LTFV Determination*, 86 Fed.
Reg. at 33,656–57.  Under these provisions, Commerce assigned Vestas Eolica, along
with six other companies, including Windar, a 73.00% dumping margin, "the sole
dumping margin alleged in the [p]etition," for failing to cooperate in the investigation
by not responding to the Q&V questionnaire.  *Id.*  Commerce adopted the 73.00% rate as
the "all others" rate, i.e., the rate to be applied to all other exporters and producers of
the subject merchandise that it did not individually examine, including Siemens
Gamesa.  *Id.* at 33,657.

### B.  *Siemens Gamesa I*

Siemens Gamesa contested the Final LTFV Determination, claiming that the
Department's assignment of the 73.00% rate to it was unlawful on two grounds.

---

[2] Citations to the U.S. Code herein are to the 2018 edition.  Citations to the Code
of Federal Regulations herein are to the 2021 edition.

*Siemens Gamesa I*, 47 CIT at __, 621 F. Supp. 3d at 1344.  It argued, first, that Commerce

unlawfully refused to examine it individually and, second, that Commerce unlawfully

adopted the 73.00% rate as the "all others" rate, which was not based on the actual data

of any exporter.  *Id.* (citations omitted).

In *Siemens Gamesa I*, the court granted plaintiff's motion for judgment on the

agency record under USCIT Rule 56.2 and remanded the Final LTFV Determination to

Commerce.  *Id.*, 47 CIT at __, 621 F. Supp. 3d at 1349.  The court held that the

Department's individual examination of a single respondent, Vestas Eolica, was

unlawful under the binding decision in *YC Rubber Co. (N. Am.) LLC v. United States*,

No. 21-1489, 2022 WL 3711377 (Fed. Cir. Aug. 29, 2022), and that the assignment of the

73.00% "all others" rate to Siemens Gamesa did not satisfy the "reasonable method"

required by Section 735(c)(5)(B) of the Tariff Act, 19 U.S.C. § 1673d(c)(5)(B).  *Siemens

Gamesa I*, 47 CIT at __, 621 F. Supp. 3d at 1344–47.  The court directed Commerce to

conduct an individual investigation of Siemens Gamesa, the sole respondent in the

investigation that is a party in this litigation.  *Id.*, 47 CIT at __, 621 F. Supp. 3d at

1348–49.

## C.  The First Remand Redetermination

In the remand redetermination Commerce issued in response to *Siemens Gamesa I*

(the "First Remand Redetermination"), Commerce reopened the record and

"individually investigated SGRE [referring to plaintiff Siemens Gamesa]."  Final Results

of Redetermination Pursuant to Court Remand 1, 4 (Int'l Trade Admin. June 16, 2023),

ECF No. 53-1 ("*First Remand Redetermination*").  During the first remand proceeding,

Commerce issued a "Collapsing Memorandum" in which it explained its preliminary

determination to treat Siemens Gamesa, Windar, and five wholly owned Windar

subsidiaries (the "Windar Manufacturing Subsidiaries") as a single "collapsed" entity

("SGRE/Windar") pursuant to 19 C.F.R. § 351.401(f).[3]  *Id.* at 1–2, 1 n.3, 2 n.4, 6; *Remand*

*for the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers: Preliminary*

*Affiliation and Collapsing Memorandum for Siemens Gamesa Renewable Energy S.A. and*

*Windar Renovables S.A.* 1, 8–9 (Int'l Trade Admin. Apr. 25, 2023), P.R.R. 69, ECF No. 65-9

("*Collapsing Memorandum*").  Commerce collapsed Siemens Gamesa with Windar and

the Windar Manufacturing Subsidiaries "because their operations with respect to the

sale and production of subject merchandise are intertwined."  *First Remand*

*Redetermination* 2.  Commerce maintained its preliminary collapsing decision in the First

Remand Redetermination and assigned the collapsed entity, based on the total

application of facts otherwise available and an adverse inference, an estimated

weighted average dumping margin of 73.00%, a rate Windar did not challenge in the

---

[3] The five wholly-owned Windar subsidiaries in the collapsed entity are Tadarsa
Eolica S.L., Windar Offshore S.L., Windar Wind Services S.L., Aemsa Santana S.A., and
Apoyos Metalicos S.A.  Final Results of Redetermination Pursuant to Court Remand 2
n.4 (Int'l Trade Admin. June 16, 2023), ECF No. 53-1 ("*First Remand Redetermination*").

underlying investigation and which Commerce deemed final.[4]  *Id.* at 2, 6, 8, 22, 26.

Commerce assigned a 73.00% rate as the all-others rate, again based on the rate alleged

in the petition.  *Id.* at 9, 36–38.

### D.  *Siemens Gamesa II*

In *Siemens Gamesa II*, the court concluded that "the First Remand

Redetermination was contrary to law in three major respects."  47 CIT at __, 659

F. Supp. 3d at 1350.

First, the court held that the Department's conclusion that the unchallenged

73.00% adverse inference rate assigned to Windar in the underlying investigation was

final and controlling was incorrect, because if the court were to sustain a rate for the

collapsed entity, that collapsed entity rate "necessarily would render null and void"

and "would supplant" the original 73.00% rate when it went into effect.  *Id.*

Second, the court held that Commerce was not permitted to resort to "facts

otherwise available" under 19 U.S.C. § 1677e(a) and an adverse inference under

---

[4] Commerce applied facts otherwise available and an adverse inference according to the following findings: (1) Windar failed to respond to the Department's "Quantity and Value" questionnaire in the underlying investigation, permitting an adverse inference; (2) Windar did not challenge the 73.00% rate in the Final LTFV Determination, such that the rate was final and Commerce could apply it to Siemens Gamesa as part of the collapsed entity; (3) Commerce could not "revisit" its "final/unchallenged decision" applying the 73.00% AFA rate to Windar on remand because the court "did not require (or even permit)" it in its prior opinion, *Siemens Gamesa Renewable Energy v. United States*, 47 CIT __, 621 F. Supp. 3d 1337 (2023); and (4) the assignment of the 73.00% rate to the collapsed entity was consistent with "long-standing" agency practice.  *First Remand Redetermination* 8, 22, 26–27.

19 U.S.C. § 1677e(b) in assigning a 73.00% rate to Siemens Gamesa. *Id.*, 47 CIT at __, 659 F. Supp. 3d at 1350, 1352–54. Substantial record evidence did not "support the Department's finding that the absence of a response by Windar to the Q&V questionnaire in the underlying investigation impaired the Department's ability to investigate Siemens Gamesa individually and assign it an estimated dumping margin in the remand proceeding." *Id.*, 47 CIT at __, 659 F. Supp. 3d at 1350.

The court concluded, third, that Commerce unlawfully selected a 73.00% "all-others rate" because it again did not satisfy the "reasonable method" requirement of the Tariff Act, 19 U.S.C. § 1673d(c)(5)(B). *Siemens Gamesa II*, 47 CIT at __, 659 F. Supp. 3d at 1350, 1359. The court recognized, nevertheless, that plaintiff, having been investigated individually for the First Remand Redetermination, lacked standing to contest the all-others rate assigned in that determination. *Id.*, 47 CIT at __, 659 F. Supp. 3d at 1359.

In ordering a second remand proceeding, the court presented Commerce with "a choice between two options": Commerce could either (i) "submit a new determination that would apply to Siemens Gamesa alone and allow to stand as 'final' the uncontested, 73.00 percent rate it assigned to Windar in the Final LTFV Determination," which "would foreclose any collapsing of Siemens Gamesa with Windar," or (ii) "substitute for Windar's existing rate a new rate that it would apply to a collapsed entity." *Id.*, 47 CIT at __, 659 F. Supp. 3d at 1351.

### E. Submission of the Second Remand Redetermination and Comments

In response to the court's opinion and order in *Siemens Gamesa II*, Commerce submitted the Second Remand Redetermination on June 21, 2024. Defendant-intervenor filed comments on July 22, 2024, and the government responded on August 21, 2024.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced under section 516A of the Tariff Act, 19 U.S.C. § 1516a, including an action contesting a final determination that Commerce issues to conclude an antidumping duty investigation.

In reviewing an agency determination, including one made upon remand to the agency, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence refers to "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. Nat'l Lab. Rels. Bd.*, 305 U.S. 197, 229 (1938)).

### B. The Second Remand Redetermination

In the Second Remand Redetermination, Commerce reached its determination of a 28.55% estimated weighted-average dumping margin by again collapsing Siemens Gamesa, Windar, and the five Windar Manufacturing Subsidiaries into a single entity (the "SGRE/Windar" entity), conducting an individual examination of that entity, and performing a verification. *Second Remand Redetermination* 1–2, 5, 56.  Commerce decided, "given the degree of affiliation among the parties and the intertwined nature of their operations," that collapsing was "the only viable option." *Id.* at 5.

In calculating normal value for its determination of an estimated weighted-average dumping margin, Commerce applied "partial" facts otherwise available with an adverse inference for certain information it considered to have been misreported. *Id.* at 10.  Specifically, Commerce used facts otherwise available with an adverse inference for what it considered to be a failure to report, according to "theoretical weights" as instructed by Commerce, certain weight information for wind towers sold in the comparison market of Sweden. *Id.* at 7–13.  Commerce also used facts otherwise available with an adverse inference for what it found to be a failure "to accurately describe its payment process for sales to its customers in both Sweden and the United States." *Id.* at 7, 9–11, 13–14.

To calculate U.S. price, Commerce resorted to constructed export price because the foreign seller and U.S. importer were related parties. *Id.* at 21–22.  Further, because

individual wind towers were sold in the United States only as components of wind

turbine projects, Commerce calculated constructed export prices for the subject

merchandise by allocating, according to relative cost, the total revenue realized from

those projects between the subject merchandise and the other elements (components

and services) of the wind turbine projects. *Id.* at 21, 44, 46–48.

Commerce assigned the 28.55% estimated dumping margin to all other

producers and exporters pursuant to section 735(c)(5)(A) of the Tariff Act, 19 U.S.C.

§ 1673d(c)(5)(A). *Id.* at 2, 15.

## C.  Defendant-Intervenor's Objections to the Second Remand Redetermination

In opposing the Second Remand Redetermination, the Wind Tower Trade

Coalition takes the position that Commerce, instead of assigning the 28.55% rate to the

collapsed entity, should have "reinstated Windar's original 73.00 percent margin."

Def.-Int.'s Comments 19.  The Coalition maintains that "Commerce's decision to

investigate SGRE S.A., a non-producing holding company, as a 'producer' of subject

merchandise is inconsistent with 19 U.S.C. § 1677f-1(c)(1) and not supported by

substantial evidence." *Id.* at 5.

The Coalition argues, further, that "because SGRE S.A. is not a producer or

exporter of subject merchandise, Commerce's decision to continue collapsing SGRE S.A.

and Windar is inconsistent with Commerce's regulations." *Id*.  Asserting that Windar,

as a producer and exporter of the subject merchandise, should be the respondent in the

investigation, the Coalition submits that Windar's failure to respond to the Q&V

questionnaire in the original investigation requires Commerce to reinstate the 73.00%

margin it originally assigned to Windar, on the basis of facts otherwise available and an

adverse inference.  *Id.* at 19 ("In light of the fully developed record in the second

remand, it became apparent that SGRE S.A. cannot be considered a producer for the

purposes of respondent selection or collapsing.  At that point, Commerce should have

reversed its decision to collapse SGRE S.A. and Windar, reinstated Windar's original

73.00 percent margin, and found that it cannot investigate SGRE S.A.").

        In the alternative, the Coalition contests the 28.55% margin by opposing the

Department's constructed export price for individual wind towers, arguing that "[t]o

the extent that the Court finds Commerce's decision to calculate a margin for the SGRE

S.A./Windar collapsed entity is appropriate, Commerce's selection of the revenue figure

used to allocate the gross unit prices of the subject merchandise is not supported by

substantial evidence."  *Id.* at 5.

        Rejecting each of defendant-intervenor's arguments, defendant advocates that

the court sustain the Second Remand Redetermination.  Def.'s Resp. 1, 6–18.

### D.  Refusal to Rescind the Investigation of Siemens Gamesa

        Defendant-intervenor argues that Siemens Gamesa Renewable Energy S.A. (to

which it has referred as "SGRE S.A" and Commerce has referred as "SGRE"), which is

"the sole plaintiff in this investigation" and "the entity that Commerce was instructed to

investigate in the second remand," was not lawfully investigated.  Def.-Int.'s

Comments 6 ("Commerce's decision to select this company as a respondent is based on

the agency's misreading of the record and incorrect interpretation of the statute's

requirement to investigate producers of subject merchandise.").  The Coalition

maintains that this company "is a holding company, supervising the equity of other

entities," and that it "has no production facilities and does not participate in the day-to-

day operations or sales decisions of the entities for which it supervises."  *Id.* at 11.

According to defendant-intervenor, Siemens Gamesa "cannot reasonably be considered

a producer or exporter, and therefore, is not qualified to be a respondent under

19 U.S.C. § 1677f-1(c)(1)."  *Id.* at 10 (footnote omitted).

In support of its argument, defendant-intervenor states that "[p]laintiff's extreme

lack of precision when referring to the individual Siemens Gamesa entities muddles

which entity is subject to this investigation."  *Id.* at 6.  It adds that "[t]hroughout the

various remands, plaintiff has used the 'SGRE' initialism to refer to various entities and

groups of entities relevant to this proceeding," including in its questionnaire responses.

*Id.* at 6–7.  According to the Coalition, "SGRE S.A.'s lack of specificity has made it

difficult to understand which entities were performing each function—a key fact in

determining whether the plaintiff is a 'producer'" and, in turn, a viable mandatory

respondent.  *Id.* at 6–9.  Defendant-intervenor submits that this "extreme lack of

precision" has "caused Commerce to fall into the same trap" of conflating multiple

Siemens Gamesa affiliates in its investigation, contrary to the court's instructions in

*Siemens Gamesa II* to investigate Siemens Gamesa individually. *Id.* at 8–9.

In the Second Remand Redetermination, Commerce rejected the Coalition's

argument that it must rescind the investigation of Siemens Gamesa. *Second Remand*

*Redetermination* 32 ("Because we continue to examine the single entity of SGRE/Windar

which, collectively, produces and exports wind towers from Spain, there is no basis to

rescind the investigation with respect to SGRE."). In support of its decision not to

rescind the investigation and also to collapse Siemens Gamesa with Windar and its five

wholly-owned manufacturing subsidiaries, Commerce cited, *inter alia*, record evidence

of "SGRE's ownership of 32 percent of Windar and indirect ownership of Windar's

manufacturing subsidiaries, as well as the companies' overlapping boards of directors

and managers and their intertwined operations." *Id.* Referring to its earlier "decision to

consider SGRE, Windar, and Windar's manufacturing subsidiaries as a single entity"

based on the record as it existed at that time, Commerce concluded that "none of the

information submitted since that decision undermines that finding." *Id.* at 33.

Defendant-intervenor does not dispute the Department's findings, *id.* at 32, that

Siemens Gamesa owned 32% of Windar and, indirectly, Windar's wholly-owned

manufacturing subsidiaries and that there were overlapping boards of directors. While

no party disputes that Siemens Gamesa is a holding company, defendant-intervenor

makes the blanket assertion that "SGRE S.A. is a holding company *that is not involved in*

*the production, sales, or export of subject merchandise*."  Def.-Int.'s Comments 10 (emphasis

added).

       In support of its argument that Siemens Gamesa was improperly investigated,

the Coalition directs the court's attention to a common definition of the term "holding

company."  *Id*. at 11 (quoting *Black's Law Dictionary* (12th ed. 2024) ("A company formed

to control other companies, usu. confining its role to owning stock and supervising

management.  It does not participate in making day-to-day business decisions in those

companies.")).  This argument is not persuasive.  Even were it assumed, *arguendo*, that

Siemens Gamesa did not participate in the "day-to-day" production, sales, or export

decisions of Windar and the Windar Manufacturing Subsidiaries, it would not

necessarily follow that Siemens Gamesa had no involvement in the production, sales, or

export of the subject merchandise such that Commerce was required to rescind the

investigation of Siemens Gamesa.  By broadly defining the term "exporter or producer"

as "the exporter of the subject merchandise, the producer of the subject merchandise, or

both," 19 U.S.C. § 1677(28), the Tariff Act largely left it up to Commerce to decide

whether a foreign entity's activities are sufficient to qualify it as an exporter, producer,

or both for the purpose of conducting an antidumping duty investigation.  Commerce

reasonably looked at Siemens Gamesa's relationships with the Windar companies and

the record evidence as a whole in rejecting the Coalition's position that it must rescind

the investigation of Siemens Gamesa.  Defendant-intervenor points to nothing in the

statute or the Department's regulations that would have compelled Commerce to accede to the Coalition's position in the Second Remand Redetermination.

Defendant-intervenor cites a decision of this Court, *Hyundai Steel Co. v. United States*, 45 CIT __, __, 518 F. Supp. 3d 1309, 1332 (2021), Def.-Int.'s Comments 16, but that case lends no support to its position. The issue in the case was whether Commerce erred in denying an untimely request of the petitioner to rescind the review of a freight company that was affiliated with a mandatory respondent and that Commerce itself found, on record evidence, not to have been a producer or exporter but instead to have transported raw materials to the mandatory respondent's production facility and finished product to customers. *Hyundai Steel Co.*, 45 CIT at __, 518 F. Supp. 3d at 1312, 1329. Commerce also concluded that collapsing the affiliate with the mandatory respondent was inappropriate. *Id.*, 45 CIT at __, 518 F. Supp. 3d at 1329–30. Reasoning that the untimeliness of the petitioner's request was not a sufficient justification for the refusal to rescind the review, this Court held that Commerce, upon determining that the freight company was neither an exporter nor a producer, should have rescinded the review of the freight company "on its own initiative." *Id.*, 45 CIT at __, 518 F. Supp. 3d at 1332.

The court agrees with the Coalition that questionnaire responses by plaintiff in the first remand proceeding present inconsistencies as to the intended meaning of various references therein to "SGRE." Commerce sent Siemens Gamesa its "Section A

Questionnaire," dated February 17, 2023, following the February 16, 2023 issuance of

the court's decision in *Siemens Gamesa I*. *Request for Information, Antidumping Duty*

*Investigation, Siemens Gamesa Renewable Energy* (Int'l Trade Admin. Feb. 17, 2023),

P.R.R. 1, ECF No. 65-3. Plaintiff's response, dated March 10, 2023, states as follows:

> Contractually, SGRE is responsible for manufacturing the tower sections
> and delivering the tower sections to the site. The customers are
> responsible for installation, while SGRE provides on-site technical
> assistance. SGRE negotiates directly with raw material suppliers in Spain,
> and sub-contracts its affiliate tower producer Windar Renovables
> ("Windar") to manufacture the tower sections, with coordination,
> consultation, and supervision by SGRE.

*Antidumping Duty Investigation of Utility Scale Wind Towers from Spain: Siemens Gamesa*

*Renewable Energy Section A Questionnaire Response* 2 (Mar. 10, 2023), P.R.R. 8–40, ECF

No. 65-4 ("*Section A Questionnaire Response*"). The "Certification in Accordance with

19 C.F.R. § 351.303(g)(l)," included at the beginning of that questionnaire response,

states as follows:

> I, Domenico Barger, currently employed by Siemens Gamesa Renewable
> Energy, Inc. (SGRE), certify that I prepared or otherwise supervised, on
> behalf of SGRE and its affiliates (collectively, "SGRE"), the preparation of
> the attached submission of SGRE's Section A response concerning Utility
> Wind Towers from Spain, dated March 10, 2023, pursuant to the
> Antidumping Orders on Utility Wind Towers from Spain (A-469-823).

*Id.* at Certification. As shown in this excerpt, the certification uses the abbreviation

"SGRE" to refer not only to the U.S. affiliate, Siemens Gamesa Renewable Energy, Inc.,

but also to "SGRE and its affiliates (collectively, 'SGRE')," which would include

Siemens Gamesa Renewable Energy S.A.

The questionnaire response also uses the abbreviation "SGRE" to refer solely to

Siemens Gamesa Renewable Energy S.A., *see*, *e.g.*, *id.* at 9 (describing "SGRE" as "a

publicly traded company" with shares listed on Spanish stock exchanges), but it uses

the same abbreviation to refer more broadly to a group of companies that includes the

producer "Windar/SGRE" as well as the U.S. importer, Siemens Gamesa Renewable

Energy, Inc.: "During the period of investigation, SGRE imported Windar/SGRE

produced wind tower sections into the United States, then incorporated those wind

towers into sales of wind turbines." *Id.* at 4.  The questionnaire response states: "SGRE

is part of the Siemens Gamesa group of companies owned by Siemens Gamesa

Renewable Energy, SA." *Id.* at 6.  On the same page, it states that:

> In a few regions, SGRE is also engaged in project development.  SGRE is
> present in more than 90 countries around the world, and its turbines are
> installed in more than 70 countries.  It operates more than 15
> manufacturing plants in over 10 countries and has approximately 40 sales
> offices (as of June 30, 2020).

*Id.*[5]

The questionnaire response also uses the abbreviation "SGRE" to refer solely to

Despite the confusing references in the questionnaire response, the court does

not view the record evidence, considered on the whole, as sufficient to have compelled

---

[5] There are similarly confusing references in Siemens Gamesa's questionnaire
responses from the second remand proceeding, following the court's decision in *Siemens
Gamesa Renewable Energy v. United States*, 47 CIT __, 659 F. Supp. 3d 1343 (2023).  *See*, *e.g.*,
*Antidumping Duty Investigation of Utility Scale Wind Towers from Spain: Siemens Gamesa
Renewable Energy Sections B–E Questionnaire Response* C-17 (Oct. 16, 2023), 2P.R.R. 5–6,
ECF No. 88-3 (referring to "wind tower sections exported and imported by SGRE"
without defining "SGRE").

Commerce to reach a finding, as the Coalition advocates, Def.-Int.'s Comments 10, that

Siemens Gamesa had no role whatsoever in the production, sale, or export of the subject

merchandise.  In addition to the evidence of Siemens Gamesa's ownership interests in

the Windar companies and the overlapping boards of directors, Commerce noted

evidence of intertwined operations.  *Second Remand Redetermination* 32 & n.91 (citing

*Collapsing Memorandum* 7); *Section A Questionnaire Response* 13, 15, 16 & Exhibit A-4S.

Commerce found also that "SGRE performs an essential role in the production of the

wind towers" in that "it designs the towers and provides the technical drawings and

specifications to Windar and its manufacturing subsidiaries to fabricate them."  *Second

Remand Redetermination* 34 (citing *Section A Questionnaire Response* 28 ("Windar generally

fabricates towers in accordance with the designs provided by the customer (OEMs).

Specifically, Windar receives a complete documentation package which includes the

detail drawings and specifications and the fabrication.")).[6]  Defendant-intervenor

contests this finding, arguing that the record reveals that "SGRE S.A. is not involved in

the relevant sales or production decisions," and that these functions instead were

performed by affiliates of Siemens Gamesa that are not companies in Spain.  Def.-Int.'s

Comments 12–13.  Commerce permissibly found to the contrary.  *See, e.g., Second*

---

[6] Siemens Gamesa is a customer of Windar because it makes "purchases from Windar Renovables."  *See Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from Spain: Response to Quantity and Value Questionnaire* Attachment 1 (Dec. 7, 2020), P.R. 84, ECF No. 41.

*Remand Redetermination* 37 n.117 ("Insofar as the petitioner's arguments are that

agreements between parties involve SGRE affiliates not located in Spain, the

agreements cover SGRE and are applicable to it.").  The possibility that two opposite

findings could be drawn from the same record evidence does not compel the conclusion

that the agency's decision was unsupported by substantial evidence.  *Consolo v. Fed.*

*Mar. Comm'n,* 383 U.S. 607, 620 (1966).

 In summary, Commerce acted on the uncontested findings that Siemens Gamesa

owned 32% of Windar and, indirectly, the Windar Manufacturing Subsidiaries and that

there were overlapping boards of directors.  While defendant-intervenor contests the

Department's findings that Siemens Gamesa had a role in the production of wind

towers, Commerce reasonably considered the evidence on the whole in rejecting the

Coalition's position that Commerce had no alternative to rescinding the investigation as

to Siemens Gamesa.[7]

---

[7] Defendant argues that the Coalition has waived its objection to the
Department's investigating Siemens Gamesa and its related objection to the
Department's including Siemens Gamesa in the collapsed entity.  Defendant's
Comments in Support of Remand Redetermination 6–7 (Aug. 21, 2024), ECF No. 85
(citing Def.-Int.'s Wind Tower Trade Coalition's Comments on Remand
Redetermination (July 17, 2023), ECF No. 59, in which defendant-intervenor commented
in support of the investigation of Siemens Gamesa and the collapsing determination).
Because Commerce addressed both issues on the merits in the Second Remand
Redetermination, the court does not decide either issue on the ground of waiver.

### E.  The Decision to Collapse Siemens Gamesa with Windar and the Windar Manufacturing Subsidiaries

The Coalition argues that collapsing Siemens Gamesa with Windar and the

Windar Manufacturing Subsidiaries was impermissible because Siemens Gamesa, in its

view, does not qualify as a "producer."  Def.-Int.'s Comments 16–19.  The court rejects

this argument for the reasons discussed previously.  It now considers the Coalition's

separate argument that, the investigation issue aside, collapsing was improper under

the Department's regulation, 19 C.F.R. § 351.401(f), because Siemens Gamesa does not

exercise "significant leverage over Windar's operations," because it "has no facilities

that could be retooled for production," and because it "does not set the prices or

oversee day-to-day operations of the companies in which it holds equity as a minority

shareholder."  *Id.* at 17–18.

In paragraph (1) of section 351.401(f), the Department's regulation contains a

"general" provision as follows:

> *In general*.  In an antidumping proceeding under this part, the Secretary [of
> Commerce] will treat two or more affiliated producers as a single entity
> where those producers have production facilities for similar or identical
> products that would not require substantial retooling of either facility in
> order to restructure manufacturing priorities and the Secretary concludes
> that there is a significant potential for the manipulation of price or
> production.

19 C.F.R. § 351.401(f)(1).  This "general" provision is notable for what it does *not* say: it

does not provide that the situation described in paragraph (1) is the *only* situation in

which the Secretary will collapse two or more affiliated producers.  Commerce

permissibly has interpreted § 351.401(f) to allow for collapsing even when an entity

lacks production facilities, stating in the Second Remand Redetermination that

"Commerce can, and frequently does, collapse resellers and other non-producing

entities (*i.e.*, those without production facilities) into single entities that are subject to

individual examination."  *Second Remand Redetermination* 35 (footnote omitted).

> Paragraph (2) of section 351.401(f) provides as follows:

> *Significant potential for manipulation*.  In identifying a significant potential
> for the manipulation of price or production, the factors the Secretary may
> consider include: (i) The level of common ownership; (ii) The extent to
> which managerial employees or board members of one firm sit on the
> board of directors of an affiliated firm; and (iii) Whether operations are
> intertwined, such as through the sharing of sales information,
> involvement in production and pricing decisions, the sharing of facilities
> or employees, or significant transactions between the affiliated producers.

19 C.F.R. § 351.401(f)(2).

> The Coalition acknowledges that Commerce has a practice of collapsing

producers with "non-producers," but it does not challenge this practice *per se*.  *See*

Def.-Int.'s Comments 16–17.  Instead, it argues that the practice, as the Coalition

interprets it, should not have been applied in the situation presented.  *Id.* at 17.

According to its interpretation of the Department's practice, "[t]he circumstances in

which Commerce will collapse producers with non-producers is limited to instances

where the companies unquestionably have sufficiently intertwined operations

presenting a concern that there may be a 'significant potential for the manipulation of

price or production' and in situations where 'the non-producer could nonetheless

behave like a producer.'" *Id.* at 17 n.4 (citing *Rebar Trade Action Coal. v. United States*,

43 CIT __, __, 398 F. Supp. 3d. 1359, 1369 (2019) (in turn citing 19 C.F.R.

§ 351.401(f)(2)(i)–(ii))). In the Coalition's view, "[s]uch concerns are not apparent in the

instant case as SGRE S.A. is demonstrably uninvolved in the production and sale of the

wind towers at issue, and no record evidence demonstrates a desire on the behalf of

SGRE S.A. for future involvement in such endeavors." *Id.*

The court rejects defendant-intervenor's argument that Commerce exceeded the

bounds of its own practice. As the court explained previously, the record evidence did

not compel Commerce to find, as the Coalition advocates, Def.-Int.'s Comments 10, that

Siemens Gamesa had no role whatsoever in the production, sale or export of the subject

merchandise. Commerce disagreed with the Coalition's position that Siemens Gamesa

was "demonstrably uninvolved in the production and sale of the wind towers at issue,"

*id*. at 17 n.4, and the record evidence supports Commerce in that regard. Commerce

found a "significant potential for the manipulation of price or production," 19 C.F.R.

§ 351.401(f), based in part on the uncontested findings that Siemens Gamesa owned 32%

of Windar during the POI, that "the companies had overlapping managers and boards

of directors," that there was "significant representation of SGRE on Windar's board,"

and that the Windar Manufacturing Subsidiaries are "governed by top management

within the Windar group." *Collapsing Memorandum* 7–8, 7 n.37. Commerce reached a

general conclusion that "the operations of SGRE and Windar were intertwined." *Id.* at

7, 8.  While defendant-intervenor maintains that Siemens Gamesa "would have to

overcome significant barriers (*i.e.*, set up production facilities, hire a work force, retain a

customer base, and procure machinery, raw materials, and other supplies) to establish

itself as a producer," Def.-Int.'s Comments 17 n.4, the Department's criteria are

addressed to the "significant potential for the manipulation of *price* or production,"

19 C.F.R. § 351.401(f) (emphasis added).  Based on the record evidence considered on

the whole, Commerce concluded that Siemens Gamesa, Windar, and the Windar

Manufacturing Subsidiaries should be treated "as a single entity for purposes of [its]

analysis in this proceeding."  *Collapsing Memorandum* 9.

### F.  Determination of Constructed Export Price

Under section 731 of the Tariff Act, 19 U.S.C. § 1673, an antidumping duty is

imposed "in an amount equal to the amount by which the normal value exceeds the

export price (or the constructed export price) for the merchandise."  19 U.S.C. § 1673.

Section 773(a) requires that Commerce make a "fair comparison" between the U.S.

price, i.e., the export price or constructed export price, and the normal value of the

subject merchandise.  *Id.* § 1677b(a).

The Tariff Act defines "export price" as "the price at which the subject

merchandise is first sold (or agreed to be sold) before the date of importation by the

producer or exporter of the subject merchandise outside of the United States to an

unaffiliated purchaser in the United States or to an unaffiliated purchaser for

exportation to the United States, as adjusted under subsection (c)." *Id.* § 1677a(a).

Constructed export price is "the price at which the subject merchandise is first sold (or

agreed to be sold) in the United States before or after the date of importation by or for

the account of the producer or exporter of such merchandise or by a seller affiliated

with the producer or exporter, to a purchaser not affiliated with the producer or

exporter, as adjusted under subsections (c) and (d)." *Id.* § 1677a(b). Stated generally,

subsections (c) and (d), read together, require the deduction from the starting price of,

*inter alia*, freight, selling expenses, cost of further manufacture or assembly, and profit.

*Id.* § 1677a(c)–(d).

      The decision whether to use an export price or constructed export price as the

U.S. price depends on whether the sale in the United States, by or for the account of the

foreign exporter or producer, was a sale to an unaffiliated purchaser. If it was not, then

Commerce must determine U.S. price by the constructed export price method. Because

the U.S. sales of the subject merchandise to unaffiliated parties were made by a U.S.

affiliate of the combined SGRE/Windar entity (Siemens Gamesa Renewable Energy,

Inc.), Commerce used constructed export price in the Second Remand Redetermination.

*Second Remand Redetermination* 21–22, 35.

      There is no dispute that Commerce was required to use constructed export price

in the investigation. The dispute pertains instead to the Department's method of

determining the constructed export price of the subject wind towers. This dispute arose

because of the absence of individual prices for the resale of subject wind towers to

unaffiliated U.S. purchasers, the wind towers having been supplied only as components

in complete wind turbine projects.  *Id.* at 22.  To address this problem, Commerce

performed a complex set of calculations, which the court describes below.

During the remand proceeding, Commerce directed plaintiff, using what

Commerce termed "granular project worksheets" (the "Worksheets") to allocate the

total revenue received by the U.S. affiliate for the wind turbine projects "to the

individual components of the wind turbines" on the basis of cost.  *Id.* at 47–48.  As

Commerce described its questionnaire: "Because SGRE/Windar sells complete projects

(*i.e.*, multiple assembled wind turbines) to unaffiliated U.S. customers, . . . [w]e

instructed SGRE/Windar to use the granular project worksheets, which contain project

costs by component (some of which are based on transfer price) and project revenue" to

perform the allocation.  *Id.* at 48.  Commerce instructed that the total "project cost" for

each wind turbine project should be allocated "to both 'the relevant components (*e.g.*,

tower, blades, nacelle) and services (*e.g.*, delivery, commissioning)'" and "did not

instruct SGRE/Windar to specifically exclude any items from the allocation."  *Id.*

(quoting *Second Sections ABC Supplemental Questionnaire* 5 (Int'l Trade Admin. Dec. 29,

2023)).[8]

---

[8] The questionnaire is missing from the record the parties submitted to the court.

Commerce explained that to avoid the use of transfer prices for wind towers that were supplied by the SGRE/Windar entity, i.e., subject merchandise, it did not use the costs associated with the subject wind towers as reported on the Worksheets. *Id.* at 46–47. Instead, Commerce used cost of production ("COP") data for the individual wind tower "sections" identified by control number ("CONNUM"), each of which had its own individual cost of production, stating that it "revised the gross unit price used in our margin calculations to be based on a CONNUM-specific, COP-based ratio." *Id.* at 47. It did so in response to the Coalition's comments on a draft version of the results of the second remand. *Id.* Commerce explained, further, that it used transfer prices for "wind towers and wind tower accessories" that the U.S. affiliate, Siemens Gamesa Renewable Energy, Inc. ("SGRE Inc."), purchased from "unaffiliated suppliers," which it "combined . . . with its purchases of SGRE/Windar's wind towers/accessories for some of the cost elements in its project sheets." *Id.* at 48 n.150. Commerce added that "[i]n such cases, we accepted SGRE Inc.'s data, as reported." *Id.* For the subject wind tower components supplied by the SGRE/Windar entity, Commerce indicated that it used a "revised COP calculated in the comparison market program." *Id.* at 47 n.147. Commerce stated that its "revised methodology allows Commerce to differentiate the prices for each wind tower section type, by assigning a higher percentage of the price to those products for which SGRE/Windar incurs greater costs." *Id.* at 47. Commerce described its calculation method as follows:

> To do this, we summed the reported total COP for each of the section types for each U.S. project to obtain a total COP for the entire wind tower (*i.e.*, the complete multi-section wind tower as sold to the unaffiliated U.S. customer). We then determined the ratio that each section type was of the total wind tower COP. Using the total revenue attributable to the wind towers for each U.S. project . . . , we applied the individual CONNUM cost ratios for the section type categories to the total tower revenue. We then divided the resulting value by the number of sections of that CONNUM sold in each U.S. project to arrive at a price per section.

*Id.* at 47–48. Commerce explained, further, that it made pre-allocation deductions from the gross revenue shown on the wind turbine invoices only for freight and "logistics." *Id.* at 49.

Defendant-intervenor claims that the Department's constructed value determination is unsupported by substantial evidence, Def.-Int.'s Comments 20–28, but clarifies that it is not objecting to the general calculation method described above, *id.* at 20 ("As an initial matter, WTTC supports the general calculation methodology of the gross unit price of the subject merchandise.").

The Coalition objects, instead, to the use of the invoice prices for the wind turbine projects to calculate the constructed export price of the subject wind towers, arguing that "[d]ue to [the] use of the total revenue received by SGRE Inc. for the wind turbine projects, the dumping margin calculated for SGRE S.A./Windar for the Second Final Remand Results was arbitrarily deflated." *Id.* at 20. Maintaining that "Commerce's current calculation contains revenue not attributable to the subject merchandise," *id.* at 23, the Coalition argues that "Commerce's use of the total invoice

price (which includes services and components that do not relate to wind tower sections) as the figure used to allocate the CONNUM-specific gross unit prices of the subject merchandise" should be held "to be unsupported by substantial evidence," *id.* at 27–28.

The Coalition advocates that Commerce should have used an alternative method to determine constructed export price, arguing that Commerce was required "to consider relevant evidence which demonstrated that the appropriate revenue figures could be ascertained from specific line items to the wind turbines on the granular project worksheets." *Id.* at 21. According to the Coalition's view of the record evidence, the Worksheets identified revenue attributed to subject wind towers and thereby provided "a more appropriate revenue line item for calculating gross unit prices," *id.* at 22, that is "the only appropriate revenue figure on the record to establish the gross unit prices of the subject merchandise," *id.* at 23.

The Coalition does not make out a *prima facie* claim that the Department's method of determining constructed export prices for subject wind towers was impermissible. The Coalition is correct that the total revenue shown on the invoices for the wind turbine projects included some revenue realized from the inclusion in the projects of various components and services that were unrelated to the subject wind towers. Nevertheless, the wind turbine invoices were only the starting point for the Department's analysis. Described in general terms, the second step in the analysis was

the allocation, based on relative cost, of revenue between subject merchandise (on a

"section-type" basis) and the other individual elements on the wind turbine invoices.

The Coalition does not back up its claim with a demonstration from record evidence

that this second step was a misallocation.  Absent such a demonstration, the court

cannot conclude that the Department's method resulted in a constructed export price

calculation that, as the Coalition argues, *id.* at 23, was unlawful due to "revenue not

attributable to the subject merchandise" or that the Department's method "presents a

significant problem because of the diminished accuracy of the calculation," *id.* at 23–24.

Instead of making pre-allocation deductions for components and services

unrelated to the wind tower sections, Commerce relied upon the Worksheets to allocate

revenue to the non-subject components, and to the services, on the basis of relative cost.

In doing so, Commerce made no pre-allocation deductions from the revenue shown on

the wind turbine invoices other than those for freight and other logistics related to the

wind turbines as a whole (which deductions it made to derive "the equivalent of an ex-

works price").  *Second Remand Redetermination* 49 ("Given that the freight expenses

differ, sometimes markedly, between the wind towers and the other components, we

find that it is more accurate to remove the freight expenses from the project price before

performing the allocation.").  Rather than show that this method necessarily

misallocated the revenue realized from the wind tower projects, defendant-intervenor

argues that its alternative method not only would have been superior to the method

Commerce employed but also was the only permissible method available.  The reasons

it offers are not persuasive.

The Coalition identifies various items as unrelated to the subject wind towers,

Def.-Int.'s Comments 21–22, giving as examples "elevators" and characterizing another

item (the "SCADA Power Manager") as "not related to the *sale* of the wind towers to the

unaffiliated customer," *id.* at 22 (emphasis added).  This objection is unconvincing not

only in failing to place the unrelated items in the context of the second step in the

Department's analysis but also in overlooking that there *was* no individual sale of the

wind towers to the unaffiliated customer.  Had there been such a sale, Commerce

would not have had occasion to resort to an allocation method.  Lacking actual resale

prices to unrelated purchasers for the subject wind towers or the individual wind tower

sections, Commerce reasonably began its calculation using revenue shown on the wind

turbine project invoices.  Unlike the line items on the Worksheets listing revenue

associated with subject wind towers, which the Coalition argues Commerce should

have used, the revenue shown on the wind turbine project invoices was found by

Commerce to be revenue that actually was realized in sales to unrelated purchasers.  *See*

*Second Remand Redetermination* 47 n.147 (rejecting the Coalition's alternative method

because it "uses a price that is not the verified, invoiced project price to the unaffiliated

U.S. customer"); *see also* Def.'s Resp. 16 (contrasting actual revenue from payments to

SGRE Inc. with "an internal profit worksheet").

Defendant-intervenor's method and the one used by Commerce differ in the treatment of profit. Defendant-intervenor's alternative method would use the revenue allocations to subject merchandise as shown on the Worksheets while the Department's method would use a uniform profit rate. The Coalition does not demonstrate that its method is superior in that respect. By beginning with the total project revenue and making allocations of that revenue based on relative cost, Commerce made a methodological choice to assume a uniform profit. *See Second Remand Redetermination* 48 (stating that Commerce "did not instruct SGRE/Windar to specifically exclude any items from the allocation"). As defendant describes this method, "Commerce did not ascertain varying rates of profit among the different components; that is, the allocation assumed a consistent rate of profit across the turbine projects." Def.'s Resp. 18. Commerce stated that use of the total invoice price as the starting price for the constructed export price calculation foreclosed a possibility that profits could be shifted from some items in the wind turbine projects to others. *Second Remand Redetermination* 47 n.147.

The Coalition argues that "[i]n the instant situation there is no evidence that profits were shifted to attribute additional profit to the wind towers," Def.-Int.'s Comments 27, but this objection misses the point. In the situation presented, in which the wind towers were not sold individually to an unrelated purchaser in the United States, Commerce made a reasonable methodological choice to use a uniform profit rate

that was grounded in record evidence of actual revenue, i.e., the wind turbine invoices.

That choice made it unnecessary for Commerce to consider whether the revenue line

items on the Worksheets, which the Coalition argues Commerce should have used,

were distorted by misallocated profit.  On a record that did not include resales of

subject merchandise to unrelated purchasers in the United States, it was reasonable for

Commerce to obtain and apply a uniform profit rate.

    In summary, the Coalition presents an alternative method of determining

constructed export price without demonstrating that the method Commerce chose

instead was unreasonable on the record before it.  Courts afford Commerce

considerable deference in determinations "involv[ing] complex economic and

accounting decisions of a technical nature," *Fujitsu Gen. Ltd. v. United States*, 88 F.3d

1034, 1039 (Fed. Cir. 1996), although to be afforded judicial deference Commerce still

must provide an adequate explanation and its ultimate determination must be lawful

and supported by substantial evidence, *see Vicentin S.A.I.C. v. United States*, 44 CIT __,

__, 466 F. Supp. 3d 1227, 1235 (2020).  The court concludes that Commerce provided a

reasoned explanation for its method of determining constructed export price for the

subject wind towers.  In contesting this method, defendant-intervenor does not show

that the Department's determination of constructed export price was unsupported by

substantial record evidence or otherwise contrary to law.

### III. Conclusion

The court sustains the Department's decision in the Second Remand Redetermination assigning a dumping margin of 28.55% to the entity comprised of Siemens Gamesa, Windar, and the Windar Manufacturing Subsidiaries.

The Second Remand Redetermination remedied the deficiencies the court identified in *Siemens Gamesa I* and *Siemens Gamesa II*.  For the reasons discussed above, the court rejects defendant-intervenor's claims that Siemens Gamesa should not have been investigated, that it unlawfully was collapsed with Windar and the Windar Manufacturing Subsidiaries, and that Commerce unlawfully determined the constructed export price of the subject merchandise.

The court will enter judgment sustaining the Second Remand Redetermination.

<u>/s/ Timothy C. Stanceu</u>
Timothy C. Stanceu
Judge

Dated: January 28, 2025
        New York, New York